IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 26 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOHN REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL NO.    B-02-104 |
| | § | |
| BANK OF AMERICA, N.A., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT BANK OF AMERICA, N.A.'S
MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF CITATIONS ........................................................................................ ii

SUMMARY OF THE ARGUMENT ........................................................................1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ............2

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT .......................2

SUMMARY JUDGMENT STANDARD ..................................................................3

FACTUAL BACKGROUND ...................................................................................4

    I.     The Parties. ...............................................................................................4

    II.    During Reed's conversations with Raul Anaya about a Bank of America
         Client Manager position, Anaya never intended to deceive Reed. ......................5

    III.   Before he resigned from Chase Bank, Reed signed written statements
         acknowledging that he was an at-will employee and that oral statements
         were not binding on the Bank. ....................................................................6

    IV.   Bank of America wanted Reed to succeed. .........................................................8

    V.    Despite Bank of America's efforts, Reed did not meet his goals. ......................9

ARGUMENT ........................................................................................................9

    I.     Anaya's alleged statement is not a material misrepresentation. ........................10

    II.    Anaya's statement was not false. ..................................................................13

    III.   There is no evidence that Anaya knew his statement was false. ......................14

    IV.   Reed admits that Anaya did not intend to deceive him. ...................................15

    V.    Reed cannot show justifiable reliance because he knew that he was
         an at-will employee and that no oral promises were binding on the Bank. ........16

         A.    Reed agreed that he was an at-will employee
             and that he would not rely on any oral promises. ......................................16

         B.    As an educated and experienced banker, Reed was not justified
             in relying on Anaya's vague statement. ...................................................20

    VI.   Reed's claim is preempted by the National Bank Act. .....................................21

    VII.  Reed's claim is barred by the Statute of Frauds. .............................................22

CONCLUSION .....................................................................................................23

# TABLE OF CITATIONS

## *Cases*

*Airborne Freight Corp., Inc. v. C.R. Lee Enterprises, Inc.,*
  847 S.W.2d 289 (Tex. App.—El Paso 1992, writ denied). ..........................15, 19, 20

*Alfano v. First National Bank,*
  490 N.Y.S.2d 56 (N.Y. App. Div. 1985). ..................................................................22

*Ambro v. American National Bank & Trust Co.,*
  394 N.W.2d 46 (Mich. Ct. App. 1986)......................................................................22

*American Medical International, Inc. v. Giurintano,*
  821 S.W.2d 331 (Tex. App.—Houston [14th Dist.] 1991, no writ). .............10, 12, 13

*Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.,*
  836 S.W.2d 726 (Tex. App.—Dallas 1992, writ denied). ..........................................11

*Becker v. National Education Training Group, Inc.,*
  No. 3:01-CV-1187-M, 2002 U.S. Dist. LEXIS 19063 (N.D. Tex. Oct. 7, 2002).....14

*Beijing Metals & Minerals Import/Export Corp. v. American Business Center, Inc.,*
  993 F.2d 1178 (5th Cir. 1993). ............................................................................16, 20

*Boggan v. Data Systems Network Corp.,*
  969 F.2d 149 (5th Cir. 1992). ..........................................................................10, 13, 19

*Bryant v. Transcontinental Gas Pipe Line Corp.,*
  821 S.W.2d 187 (Tex. App.—Houston [14th Dist.] 1991, writ denied)....................11

*C&A Investments, Inc. v. Bonnet Resources Corp.,*
  959 S.W.2d 258 (Tex App.—Dallas 1991, writ denied). ...........................................19

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)......................................................................................................3

*City National Bank v. Brown,*
  599 So. 2d 787 (La. Ct. App.), *writ denied,* 604 So. 2d 999 (1992)........................22

*Clardy Manufacturing Co. v. Marine Midland Business Loans, Inc.,*
  88 F.3d 347 (5th Cir. 1996), *cert. denied,* 519 U.S. 1078 (1997)..............3, 10, 15, 20

*Conkling v. Turner,*
  18 F.3d 1285 (5th Cir. 1994). .......................................................................................4

*Ehrhardt v. Electrical & Instrumentation Unlimited,*
  220 F. Supp. 2d 649 (E.D. Tex. 2002)........................................................................16

*Fowler v. SmithKline Beecham Clinical Laboratories, Inc.,*
  225 F.3d 1013 (8th Cir. 2000). ...................................................................................17

*Haase v. Glazner,*
  62 S.W.2d 795 (Tex. 2001)..............................................................................3, 23

*Hamilton v. Segue Software Inc.,*
  232 F.3d 473 (5th Cir. 2000). ................................................................3, 4, 13, 14

*Kansa Reinsurance Co. v. Congressional Mortgage Corp.,*
  20 F.3d 1362 (5th Cir. 1994). ...........................................................3, 14, 15, 16

*Kemper v. First National Bank,*
  418 N.E.2d 819 (Ill. App. Ct. 1981). ..............................................................3, 21

*Mackey v. Pioneer National Bank,*
  867 F.2d 520 (9th Cir. 1989). ................................................................3, 21, 22

*McCreery v. Seacor,*
  921 F. Supp. 489 (W.D. Mich. 1996). ...................................................................17

*Paul v. Farmland Industries, Inc.,*
  37 F.3d 1274 (8th Cir. 1994), *cert. denied,* 514 U.S. 1017 (1995)............................16

*Pruitt v. Levi Strauss & Co.,*
  932 F.2d 458 (5th Cir. 1991). ...........................................................................15

*S.W.S. Erectors, Inc. v. Infax, Inc.,*
  72 F.3d 489 (5th Cir. 1996). ..............................................................................4

*Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc.,*
  861 F. Supp. 1351 (S.D. Tex. 1994). ...........................................................11, 19

*Shaboon v. Duncan,*
  252 F.3d 722 (5th Cir. 2001). ....................................................................13, 14

### Rules and Statutes

FED. R. CIV. P. 56(c)..........................................................................................3

TEX. BUS. & COMM. CODE ANN. § 26.01(b)(6) (West 2002)...................................22, 23

12 U.S.C. § 24(Fifth). ....................................................................................21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 6 2003

Michael N. Milby
Clerk of Court

JOHN REED, §
§
    Plaintiff, §
§
vs. §          CIVIL NO.   B-02-104
§
BANK OF AMERICA, N.A., §
§
Defendant. §

**DEFENDANT BANK OF AMERICA, N.A.'S
MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

Defendant Bank of America, N.A. ("Bank of America" or "Bank") provides this

Motion for Summary Judgment and Supporting Brief on Plaintiff John Reed's ("Reed")

sole claim in this lawsuit, fraudulent inducement.

**SUMMARY OF THE ARGUMENT**

By bringing this lawsuit, John Reed asks the Court to render the at-will doctrine

meaningless, ignore two written agreements and turn a vague, pre-employment statement

into a contractual obligation. Reed bases his fraudulent inducement claim on a general

comment, made 30 to 45 days before he joined Bank of America, regarding the role that

unidentified third parties would play in helping him meet unidentified goals. Although

he signed agreements disavowing reliance on such a statement and does not believe the

comment was intended to deceive him, Reed asks the Court to find that the statement

fraudulently induced him to leave a position at Chase Bank and join Bank of America.

Reed's request contradicts both established law and reason and should, therefore, be

dismissed on summary judgment.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

John Reed filed his lawsuit on April 17, 2002, in the 197th Judicial District Court of Cameron County, Texas, alleging fraudulent inducement. Bank of America filed its Original Answer on May 8, 2002, and removed the case to this Court on May 17, 2002. Based on the evidence and the law, Bank of America now moves for summary judgment and respectfully asks the Court to dismiss this case with prejudice.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT[1]

Reed alleges that, 30 to 45 days before the Bank offered him a commercial lending position, Raul Anaya, his future Bank of America manager, told him:

> the ability to meet the goals that would be given to me would be by people coming into the market, what they call partners or product partners, coming into the market and actively soliciting business, prospecting for business, in the Rio Grande Valley with me and independently of me. And that we'd be working as a team to meet my goals and meet the region's goals.

(Dep. 12:16-14:19.) Reed claims that this statement fraudulently induced him into resigning from Chase Bank to join Bank of America. Bank of America respectfully submits that summary judgment is appropriate on Plaintiff's lawsuit based on determination of the following issues:

1.    Reed cannot establish the elements of his prima facie case:

    a.    Because the alleged statement at issue in this case is vague and relates to future events, it does not qualify as a "material representation."

    b.    Viewed objectively, the alleged statement was not false.

    c.    Anaya had no basis to know that the alleged statement was false.

---

[1] The facts and law in support of the issues to be ruled upon by the Court are contained in the "Argument" section of this Motion.

    d.    Reed admits, and the evidence demonstrates, that Raul Anaya, who made the alleged statement, did not intend to deceive Reed.

    e.    A reasonable person in Reed's position would not have relied on Anaya's alleged statement to leave a position with Chase and join Bank of America, particularly in light of two signed agreements disavowing any such reliance and confirming that Reed was an at-will employee.

*Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 359 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078 (1997); *Kansa Reins. Co. v. Congressional Mtg. Corp.*, 20 F.3d 1362, 1375 (5th Cir. 1994).

2.    Bank of America has also established the following affirmative defenses that defeat Reed's claim:

    a.    As a Bank officer, Reed's claim is preempted by the National Bank Act.

    b.    Because Reed claims that Anaya's statement promised work conditions that would exist for several years, the claim is barred by the Statute of Frauds.

*Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989)(National Bank Act defense); *Kemper v. First Nat'l Bank*, 418 N.E.2d 819, 821 (Ill. App. Ct. 1981)(same); *Haase v. Glazner*, 62 S.W.2d 795, 798 (Tex. 2001)(Statute of Frauds).

## SUMMARY JUDGMENT STANDARD

This Court should grant summary judgment if the pleadings and evidence demonstrate "that there is no genuine issue as to any material fact" with respect to either the elements of Reed's prima facie claim of fraudulent inducement or the Bank's National Bank Act and Statute of Frauds affirmative defenses. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). A fraud claim in no way alters this standard. To the contrary, "an allegation of fraud does not create an impenetrable shield through which the sword of summary judgment cannot pierce. A fraud case can be wounded and killed like

any other case; it receives no special privileges or protections in the battle for summary dismissal." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). Thus, to avoid summary judgment, Reed has the burden of showing "significant probative evidence" that a genuine material fact exists. *Hamilton*, 232 F.3d at 477 (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). Because Reed cannot carry this burden, Bank of America is entitled to summary judgment.

## FACTUAL BACKGROUND

In support of its Motion for Summary Judgment, Bank of America submits the following list of material, uncontested facts:

### I.     The Parties.

1.     John Reed, a self-described intelligent person, received his BBA in management from Southwest Texas State University in 1983. (Dep. 100:17-22; 110:5-7.)[2]

2.     In approximately 1985, Reed joined Commerce Bank, which subsequently became Chase Bank ("Chase"), as a Loan Officer Trainee. (Dep. 105:4-9; 15-17.) Within six months, Reed was promoted to Assistant Vice President. (Dep. 105:18-22.) In 1987 or 1988, Reed received another promotion to Vice President. (Dep. 106:4-9.) Three to four years later, Reed was promoted to Senior Vice President and remained in that position until he resigned from Chase. (Dep. 106:21-107:3.) During his 15-year tenure with Chase, Reed worked in commercial lending, obtaining more authority and

---

[2] The following evidence is attached to and incorporated in this Motion for Summary Judgment: John Reed's deposition is Exhibit A and referenced herein as "(Dep. page:lines-page:lines)." Cynthia Steven's Affidavit is Exhibit B. Exhibits 1 and 2 are attached to and authenticated by Ms. Steven's Affidavit. These exhibits are referenced herein by the exhibit number (i.e. "(Ex. 1.)"). Raul Anaya's Affidavit is Exhibit C and referenced herein as "(Anaya Aff. ¶ __.)." Exhibit 3 is attached to and authenticated by Mr. Anaya's Affidavit, and is referenced as "(Ex. 3.)." Finally, Allison Gilliam's Affidavit is Exhibit D and is referenced herein as "(Gilliam Aff. ¶ __.)." Exhibits 4 through 6 are attached to and authenticated by Ms. Gilliam's Affidavit, and referenced by the exhibit number. (i.e. "(Ex. 4.)").

responsibility with each promotion. (Dep. 105:8-107:8.) He attended numerous courses and several banking schools. (Dep. 101:1-7.) Throughout his employment with Chase, Reed was an at-will employee. (Dep. 95:15-19.) Reed's final annual salary at Chase was $80,000. (95:22-23.)

3.　　Bank of America is a national bank, chartered to do business as a national banking association under the National Bank Act. (Gilliam Aff. ¶ 3.)

**II.　During Reed's conversations with Raul Anaya about a Bank of America Client Manager position, Anaya never intended to deceive Reed.**

4.　　Bank of America employs Client Managers in different locations throughout the country. (Anaya Aff. ¶ 3.) These Client Managers are primarily responsible for identifying and acquiring high-dollar commercial lending relationships for the Bank. (Anaya Aff. ¶ 3.) At the beginning of 2000, Larry Zamponi and Alicia Garcia worked as Client Managers for Bank of America in the Rio Grande Valley. (Anaya Aff. ¶ 4.) During their respective tenures as Client Managers, both Larry Zamponi and Alicia Garcia had satisfactory performance as measured against their assigned goals. (Anaya Aff. ¶ 4.)

5.　　In March 2000, Alicia Garcia voluntarily transferred to another Bank of America position in San Antonio. (Anaya Aff. ¶ 5.) Consequently, one of the Rio Grande Valley Client Manager positions became vacant and Bank of America began searching for someone to fill this position. (Anaya Aff. ¶ 5.)

6.　　Bank of America searched for a new Client Manager by identifying and contacting individuals who worked for competitors in the Rio Grande Valley. (Anaya Aff. ¶ 6.) John Reed was one of the potential candidates identified. (Anaya Aff. ¶ 6.)

7.    Commercial Banking Market Executive Raul Anaya first spoke to John Reed about the Client Manager position in March 2000. (Anaya Aff. ¶¶ 2 & 7.) Anaya and Reed then met at Antonio's Restaurant in Brownsville, Texas, to further discuss the position. (Dep. 38:9-13; Anaya Aff. ¶ 7.) After this initial meeting, Reed and Anaya had additional telephone conversations about the position. (Reed Dep. 42:22-43:4; Anaya Aff. ¶ 7.)

8.    Prior to joining Bank of America, Reed also met with Rio Grande Valley Client Manager Larry Zamponi. (Dep. 29:22-24; Anaya Aff. ¶ 8.) Reed did not ask Zamponi about support from product partners. (Dep. 29:25-30:11.)

9.    During his pre-employment conversations with Reed, Anaya never lied to Reed or intended to deceive him. (Dep. 21:17-22:1; Anaya Aff. ¶ 12.)

**III.    Before he resigned from Chase Bank, Reed signed written statements acknowledging that he was an at-will employee and that oral statements were not binding on the Bank.**

10.    In April 2000, the Bank offered Reed the Client Manager position, with the title of Senior Vice President and a $100,000 annual salary. (Dep. 19:20-25; 42:22-44:2.) Reed understood that he would join Bank of America as an at-will employee. (Dep. 11:18-20; 54:17-19.)

11.    The Bank gave Reed a letter confirming the terms of his employment offer. (Dep. 44:15-18; Ex. 1.) This offer letter states:

> This letter does not constitute an employment contract, and nothing contained in this letter or in any other communications you have had with Bank of America representatives should be construed in any way as a guarantee of continued employment for any period of time, but rather your employment is on an at-will basis. That is, you or Bank of America may end the employment relationship with or without notice or cause. No officer or representative of Bank of America has any authority to make any agreement, express or implied, which is contrary to the foregoing.

(Ex. 1.)  Reed signed the offer letter on April 19, 2000, and understood from the letter that he was an at-will employee. (Ex. 1, Dep. 11:3-12:7.)

12.    On April 19, 2000, Reed also signed an Applicant Acknowledgment Form. (Dep. 53:19-54:7.)  That agreement states:

> I understand that if I am offered a position with Bank of America, the offer will be for employment on an at-will basis.  That is, the employment relationship is not guaranteed for any specific period of time and may be ended by Bank of America or me at any time, with or without notice or cause.

(Ex. 2.)  In a section entitled "Terms and Conditions of Employment," that "defines the conditions, nature, tenure and duration of [the] employment relationship," Reed acknowledged further that his job duties are subject to change and that:

### SCOPE OF AGREEMENT

> In the event I am employed by [Bank of America], I understand that this document is the complete agreement between the Bank and me, and takes the place of all prior oral and/or written agreements concerning the conditions, nature, tenure and/or duration of my employment relationship with the Bank.  Any and all such prior oral and/or written agreements, expressed or implied, are invalid, except any specific provisions set forth in prior written agreements stating my compensation and/or benefits.

> Any future changes to the terms and conditions of employment as described in this document must be in writing, signed by a senior officer of the Bank authorized to do so.

> There are no implied promises, obligations, covenants or guarantees in connection with this document or in connection with my employment by the Bank.

(Ex. 2.)  Reed signed that he understood this document and that his employment relationship would "be governed by these terms, conditions and provisions." (Ex. 2; Dep. 53:19-54:7.)  Reed understood this agreement took the place of any prior agreement. (Dep. 54:11-55:11.)

13.    Bank of America officially hired Reed on approximately April 26, 2000. (Ex. 1, pg. 1.)  The Bank's Board of Directors appointed Reed to serve as a Senior Vice President, an officer position.  (Gilliam Aff. ¶¶ 4-5; Exs. 4-5.)

14.    Reed resigned his employment with Chase, after he signed the agreements with Bank of America.  (Dep. 10:24–11:2.)  Although Reed gave two weeks notice, Chase told him to leave right away.  (Dep. 128:21-25.)

**IV.    Bank of America wanted Reed to succeed.**

15.    When Reed joined Bank of America, Anaya scheduled meetings for him with each of the product partners. (Dep. 56:19-22; Anaya Aff. ¶ 13.)  Product partners are Bank of America employees who have expertise in various areas, and to whom Reed could refer transactions in these areas.  (Anaya Aff. ¶ 13.)  Anaya set up these meetings to assist Reed.  (Dep. 57:1-4.)

16.    In June 2000, after he joined Bank of America, the Bank also held a reception in Brownsville in Reed's honor.  (Dep. 57:5-7; Anaya Aff. ¶ 14.)  Anaya attended this reception. (Dep. 57:14-18; Anaya Aff. ¶ 14.)

17.    During the course of Reed's employment, almost all of Reed's product partners traveled to the Valley to meet with Reed and, when applicable, clients.  For example, Martha Agarwal and Roger Akeman traveled to South Padre Island to discuss debt consolidation and moving into a second market with the partners of the NAFTA Industrial Park in Brownsville. (Dep. 24:16-25:25.)  Lisa Hill and Reed met with several entities in the Valley, including the Public Utilities Board and the City of Brownsville. (Dep. 35:18-36:2; 62:25-63:8.)  Andrew Tokar traveled from Los Angeles to the Valley and called on several plants.  (Dep. 67:25-68:7; Anaya Aff. ¶ 13.)  Reed and Jesse

Riveron talked to several potential clients together. (Dep. 36:8-18; 66:11-19.) Peter Hanson visited the Valley a couple of times. (Dep. 31:2-6.) Peggy Walker met Reed for lunch in Harlingen, Texas. (Dep. 27:18-28:12.) Gregg Muenster met with several professionals in the Valley. (Dep. 33:19-34:17.) Kevin Kleinsteuber traveled to the Valley whenever he knew there was a deal that would work. (Dep. 31:23-32:7; 35:4-11; Anaya Aff. ¶ 13.) Jerry Robinson handled calls in the Valley related to the Bank's tax exempt campaign. (Dep. 84:1-16.)

**V.     Despite Bank of America's efforts, Reed did not meet his goals.**

18.     Reed did not meet his goals at Bank of America. (Ex. 3.) For example, Reed's goal for new loans in 2000 was $21,300,000, but he only booked $1,675,000, less than eight percent (8%) of expectations. (Dep. 60:23-61:4; Ex. 3.) Reed also fell far short in every other category in which he had annual expectations. (Dep. 62:1-12; 62:25-63:18; 67:1-8; 69:7-22; 70:1-8; 70:21-71:2; 73:4-18; 74:18-24; Anaya Aff. ¶15; Ex. 3.)

19.     Consequently, Bank of America terminated Reed's employment. (Anaya Aff. ¶ 16.) Bank of America's Board of Directors ratified Reed's termination. (Gilliam Aff. ¶ 6; Ex. 6.)

## ARGUMENT

John Reed alleges that Bank of America fraudulently induced him into leaving a commercial lending position with Chase Bank and accepting a similar position with Bank of America. Reed's legal claim is based on a remark that his Bank of America manager, Raul Anaya, allegedly made 30 to 45 days before Reed joined the Bank:

> the ability to meet the goals that would be given to me would be by people coming into the market, what they call partners or product partners, coming into the market and actively soliciting business, prospecting for business, in the Rio Grande Valley with me and independently of me.

And that we'd be working as a team to meet my goals and meet the region's goals.[3]

(Dep. 12:16-14:9.)[4]  As a Bank of America employee, Reed fell far short of meeting his goals and, consequently, the Bank terminated him. (Anaya Aff. ¶¶ 15-16; Ex. 3.)  In this lawsuit, he blames his performance deficiencies on a lack of support from his product partners and irrationally claims that Anaya's statement regarding product partner support was therefore fraudulent.  Bank of America is entitled to summary judgment because Reed cannot establish the elements of his claim and because the claim is pre-empted by the National Bank Act and barred by the Statute of Frauds.

## I.    Anaya's alleged statement is not a material misrepresentation.

To prevail, Reed must initially point to a material misrepresentation.  To qualify as a fraudulent misrepresentation, a statement must assert material facts.  *Clardy Mfg. Co.,* 88 F.3d at 359; *American Med. Int'l, Inc. v. Giurintano,* 821 S.W.2d 331, 339 (Tex. App.—Houston [14th Dist.] 1991, no writ).[5]  In contrast, statements that merely describe the speaker's opinions or intent will generally not support a fraud claim.  *Clardy Mfg. Co.,* 88 F.3d at 359; *Boggan v. Data Sys. Network Corp,* 969 F.2d 149, 154 (5th Cir.

---

[3] Bank of America denies that Anaya made this statement.  Anaya did tell Reed that he would have product partners to whom he should refer deals in their areas of expertise and that part of his expectations would be based on these referrals.  (Anaya Aff. ¶ 11.)  He never, however, stated or implied that these product partners had any responsibility for ensuring that Reed met his goals.  (Anaya Aff. ¶ 11.)  In fact, although Reed claims that Anaya made this statement when they met 30-45 days before he joined the Bank, when he described his full conversation with Anaya, Reed said only that Anaya talked generally about working with the product partners to meet goals.  (Dep. 12:16-14:19; 39:21-40:6.)  Nonetheless, for purposes of summary judgment only, Bank of America discusses the alleged statement as if it were true.

[4] In his deposition, Reed also mentioned comments that Anaya made about his $100,000 salary and receiving the title of Rio Grande President after Larry Zamponi, who currently holds that title, resigned.  These comments are not at issue in this case because Reed received the $100,000 salary and Larry Zamponi has not retired.  (Dep. 19: 13-15; 141:11-23.)

[5] The statement must also be "material" from both a subjective and objective perspective.  *See Giurintano,* 821 S.W.2d at 338 ("Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions on the transaction in question.")  Such a vague statement would not induce a reasonable person to leave one job and join another.  Therefore, the statement is not "material."

1992); *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1358

(S.D. Tex. 1994); *Bryant v. Transcon. Gas Pipe Line Corp.*, 821 S.W.2d 187, 190 (Tex.

App.—Houston [14[th] Dist.] 1991, writ denied).  To ascertain whether Anaya's statement

falls in the category of a harmless opinion, often termed puffery, as opposed to meeting

the criteria of a concrete representation, the Court should consider factors like the

statement's specificity, the speaker's knowledge, the comparative levels of knowledge of

the speaker and listener, and whether the statement relates to the present or the future.

*Angelo Broad., Inc. v. Satellite Music Network, Inc.*, 836 S.W.2d 726, 733 (Tex. App.—

Dallas 1992, writ denied).

Applying these standards to Anaya's statement, it is quite clearly not a

representation on which a fraud claim can rest.  Most significantly, the statement lacks

the requisite specificity.  For example, although Reed claims that Anaya said generally

that Reed's "ability to meet goals . . . would be by people coming into the market," Reed

claims that Anaya did not tell him what his goals were, to what extent other people would

help him meet his goals, or which goals they would help him meet.  (Dep. 12:18-13:6;

39:7-40:6.)  In fact, Reed claims that he was not given and never even asked for his goals

prior to joining the Bank.  (Dep. 52:10-16.)  Anaya's alleged statement further lacks

specificity because it does not quantify how often these "people" would come into the

market or even identify these "people" by name.  (Dep. 12:18-25.)  Similarly, Anaya's

general reference to working as a "team" to meet individual and regional goals, a

common corporate concept, lacks any definition as to how the team would work and is

subject to various interpretations.  (Dep. 39:21-40:9.)  If this type of unspecific

description could support a fraud claim, all pre-employment discussions would become

the subject of litigation. The law protects against this influx of lawsuits by requiring measurable factual representations. Anaya's vague and indefinite statement about Reed's future relationship with other employees quite clearly does not meet this test.

In addition to the statement's complete lack of specificity, Anaya had no special knowledge of how Reed's working relationship with the product partners, whom Anaya did not supervise, would evolve.[6] (Anaya Aff. ¶ 13.) Further, Reed had worked in a commercial banking position for fifteen (15) years before joining Bank of America. (Dep. 105:15-107:3.) Thus, Reed had the background to understand how a national bank worked, to know that he would have personal responsibility for meeting goals, and to obtain information to clarify Anaya's vague statement if he desired such clarification.

Finally, Anaya's alleged statement describes Reed's future working relationship with third parties. It is not a statement of present intent. *Giurintano*, 821 S.W.2d at 339. *American Med. Int'l, Inc. v. Giurintano* provides a good analysis of why this type of statement regarding a future working relationship does not qualify as a material representation. *Id.* at 339. As part of its efforts to recruit an administrator for one of its hospitals, AMI told Giurintano that, if he accepted the position, "he would have the complete backing of the two and a half billion dollar corporation" and repeatedly assured him that he should not worry about employee unrest. 821 S.W.2d at 334. After Giurintano accepted the administrator position and resigned his previous job, however, AMI told him not to report because of the opposition to him. *Id.* The Texas Court of Appeals reversed a verdict for Giurintano on his fraud claim because AMI's pre-employment remarks were not statements of fact but, rather, were only future promises

---

[6] There is no special or fiduciary relationship between an employer and prospective employee. *Giurintano*, 821 S.W.2d at 340. Rather, negotiations and discussions regarding future employment are arms-length deals. *Id.*

that it intended to keep. *Id.* at 339. Similarly, Anaya's statement described Reed's future relationship with product partners, and the only evidence demonstrates that when he allegedly made this statement, Anaya intended that Reed would succeed. (Anaya Aff. ¶ 9.) Based on the applicable law, it is quite clear that Anaya's vague, future-focused statement cannot not support a fraud claim.[7]

## II.   Anaya's statement was not false.

It is axiomatic that to prove fraud, Reed must show that Anaya's statement was false; that it was a misrepresentation. *Shaboon v. Duncan*, 252 F.3d 722, 735 (5th Cir. 2001) *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 480-81 (5th Cir. 2000). Reed's testimony, however, establishes the accuracy of Anaya's alleged statement.

Consistent with Reed's claim that Anaya represented that people would come to the market to work with Reed, Reed's product partners traveled to the Valley to meet with him, customers and potential customers. (Dep. 24-25, 27-28, 31-34, 36, 63, 68, 72; Anaya Aff. ¶ 13.)[8] In fact, Reed's criticism of the product partners' efforts did not extend to all of them. In line with Anaya's remark about team work, Reed felt that he worked well with several product partners, including Kevin Kleinsteuber, Lisa Hill and Jesse Riveron. (Dep. 31:23-32:3; 35:18-36:18.)

Despite acknowledging that the product partners traveled to the Valley, Reed argues that their support was insufficient because not all of the deals were booked and he did not meet his goals. Reed appears to interpret Anaya's general statement to mean that

---

[7] In addition, the Fifth Circuit has held that if an oral statement is followed by a contradictory written agreement, the prior statement cannot serve as a protected "representation" in a fraud case. *Boggan*, 969 F.2d at 153. Anaya's statement was followed by two written agreements that unequivocally state that Reed was an at-will employee and that any oral promises were not binding on the Bank. (Exs. 1 & 2.) For this additional reason, Anaya's statement cannot stand as the "material representation" to support Reed's claim.

[8] In his deposition, Reed did not state whether Jim Class in leasing traveled to the Valley, but confirmed that each of the other product partners visited the Valley.

third parties bore the full responsibility for ensuring that Reed met his goals. This interpretation is not credible. Bank of America would not have hired Reed, made him a Senior Vice President and paid him $100,000 per year if he had no personal responsibility or expectations. (Ex. 1.) Reed's unreasonable, subjective expectations do not make Anaya's statement false. Rather, the Court should evaluate what the statement, on its face, promises. Considered objectively, the statement represents only that an unidentified number of product partners would travel to the Valley and work with Reed an unidentified number of times. *See, e.g., Becker v. Nat'l Educ. Training Group, Inc.,* No. 3:01-CV-1187-M, 2002 U.S. Dist. LEXIS 19063, at **21-22 (N.D. Tex. Oct. 7, 2002)(finding no misrepresentation where supervisor provided prospective employee with a general overview of commission structure but did not explain all details). According to Reed's own testimony, product partners traveled to the Valley and met with Reed and customers. Therefore, Reed can not establish falsity, and summary judgment is appropriate. *Id.; see also Shaboon,* 252 F.3d at 735 (rejecting fraudulent inducement claim in the absence of evidence of falsity); *Hamilton,* 232 F.3d at 480-81 (because company initially gave employee a promised title, there was no misrepresentation).

## III.    There is no evidence that Anaya knew his statement was false.

Even if Reed could show that Anaya's statement was false, his claim would fail because he also has the burden of establishing that Anaya knew that his statement was false when he made it. *Kansa Reins. Co. v. Congressional Mtg. Corp.,* 20 F.3d 1362, 1375 (5th Cir. 1994). Anaya, however, had no reason to believe that Reed would not receive the support that he needed from product partners. Before hiring Reed, Anaya's only experience with Client Managers in the Valley demonstrated success. The two other

Rio Grande Client Managers whom Anaya has supervised, Larry Zamponi and Alicia Garcia, had satisfactory performance as compared to their goals. (Dep. 30:22-24; Anaya Aff. ¶ 4.) Based on Anaya's past experience and Reed's background, Anaya believed that Reed would be successful. (Anaya Aff. ¶ 9.) In the absence of evidence that Anaya knew his statement was false, the Bank is entitled to summary judgment. *Kansa Reins. Co.*, 20 F.3d at 1375.

## IV. Reed admits that Anaya did not intend to deceive him.

Reed's claim is further derailed on the intent element. Because Reed contends that Anaya misrepresented the future conditions of his employment and the future acts of third parties, Reed must establish that Anaya made his statement "with the intention, design and purpose of deceiving, and with no intention of performing the act." *Clardy Mfg. Co.*, 88 F.3d at 360 (quoting *Airborne Freight Corp. v. C. R. Lee Enter., Inc.*, 847 S.W.2d 289, 294 (Tex. App.—El Paso 1992, writ denied)). Reed testified, however, that he *does not believe* that Anaya intentionally lied to him before he joined the Bank. (Dep. 21:16-22:1.) Reed's admission precludes him from establishing intent. *See Pruitt v. Levi Strauss & Co.*, 932 F.2d 458, 462 (5th Cir. 1991)(summary judgment granted where former employee admitted that he did not believe his employer deliberately misled him).[9]

In addition to Reed's admission, the objective evidence demonstrates that, far from trying to deceive Reed, Anaya wanted Reed to succeed and took numerous steps to assist Reed's performance and his relationship with the product partners. (Dep. 21:10-16; Anaya Aff. ¶¶ 7, 8, 13, 14.) When Reed joined the Bank, Anaya set up meetings between Reed and all of his product partners. (Dep. 56:19-22; Anaya Aff. ¶ 13.) Reed

---

[9] Consistent with Reed's testimony, Anaya affirms that he never lied to Reed or intended to deceive him. (Anaya Aff. ¶ 12.)

acknowledges that Anaya set up these meetings to assist Reed. (Dep. 57:1-4.) At Reed's suggestion, Bank of America also held a reception for Reed after he started working. (Dep. 57:5-20; Anaya Aff. ¶ 14.) Anaya told Reed that he thought the idea was great and he personally attended the reception. (Dep. 57:14-18; Anaya Aff. ¶ 14.) Because there is no evidence that Anaya in any manner intended to deceive Reed, this Court should grant summary judgment. *Kansa Reins. Co*, 20 F.3d at 1375-76; *Ehrhardt v. Elect. & Instrumentation Unltd.*, 220 F. Supp. 2d 649, 660 (E.D. Tex. 2002); *see also Paul v. Farmland Indus., Inc.*, 37 F.3d 1274, 1277 (8th Cir. 1994), *cert. denied*, 514 U.S. 1017 (1995)(summary judgment granted on claim that employer fraudulently represented the length of plaintiff's employment in the absence of evidence that the Company's president did not intend to perform consistently with his words).

**V.    Reed cannot show justifiable reliance because he knew that he was an at-will employee and that no oral promises were binding on the Bank.**

The element on which Reed's case most noticeably falls short is justifiable reliance. *Beijing Metals & Minerals Import/Export Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1186 (5th Cir. 1993).

**A.    Reed agreed that he was an at-will employee and that he would not rely on any oral promises.**

Reed claims that Anaya made the statement upon which his fraud claim rests a full 30 to 45 days before he joined Bank of America and repeated the statement in a phone call a few days later. (Dep. 14:2-13.)[10] Yet, on April 19, 2000, Reed signed: (1) an

---

[10] According to Reed, the next time that Anaya made a similar statement was after Reed had already joined the Bank. (Dep. 14:14-19.) Because Reed's lawsuit is based on an allegation that he was fraudulently induced to leave Chase Bank and join Bank of America, the only statements that could possibly support his claim are the two that happened 30 to 45 days before he actually joined Bank of America.

employment letter and (2) an Applicant Acknowledgment Form. (Exs. 1 & 2.) He *then* resigned his employment with Chase. (Dep. 10:24-11:2.) The offer letter clearly states:

> This letter does not constitute an employment contract, and nothing contained in this letter **or in any other communications you have had with Bank of America representatives should be construed in any way as a guarantee of continued employment** for any period of time, but rather your employment is on an at-will basis. That is, you or Bank of America may end the employment relationship with or without notice or cause. **No officer or representative of Bank of America has any authority to make any agreement, express or implied, which is contrary to the foregoing**.

(Ex. 1, emphasis added.)   Reed does not contend that this language was in any way misleading or that he was manipulated into signing the offer letter. To the contrary, Reed completely understood that he was an at-will employee and that the Bank could terminate him for any lawful reason. (Dep. 8:22-9:13; 11:3-12:7.)   Nonetheless, Reed irrationally believed that Anaya described a system that would remain in place for "at least" several years. (Dep. 20:17-24.)   Because Reed knew that he could be terminated at any time, he was not justified in relying on a statement about his future employment conditions. *See Fowler v. SmithKline Beecham Clinical Lab., Inc.*, 225 F.3d 1013, 1016 (8th Cir. 2000)(at will employee was not justified in relying on promise of car allowance for duration of her employment); *McCreery v. Seacor*, 921 F. Supp. 489, 493 (W.D. Mich. 1996)(plaintiffs could not reasonably rely on promises regarding the conditions of their employment because their offer letters contained clear at-will language).   Thus, Reed's agreement acknowledging that he was an at-will employee, signed before he resigned from Chase, precludes him from establishing any justifiable reliance.

Reed, however, agreed to more than just his at-will status.  On April 19, 2000,

Reed also signed an Employee Acknowledgment Form that, on the first page,

reconfirmed Reed's at-will status.  Specifically, the agreement states:

> I understand that if I am offered a position with Bank of America, the
> offer will be for employment on an at-will basis.  That is, the employment
> relationship is not guaranteed for any specific period of time and may be
> ended by Bank of America or me at any time, with or without notice or
> cause.

(Ex. 2.)  By signing the form, Reed also acknowledged that it "defines the conditions,

nature, tenure and duration of [the] employment relationship," that his job duties were

subject to change and that:

> In the event I am employed by [Bank of America], **I understand that this
> document is the complete agreement between the Bank and me, and
> takes the place of all prior oral and/or written agreements concerning
> the conditions, nature, tenure and/or duration of my employment**
> relationship with the Bank.  **Any and all such prior oral and/or written
> agreements, expressed or implied, are invalid**, except any specific
> provisions set forth in prior written agreements stating my compensation
> and/or benefits.
>
> Any future changes to the terms and conditions of employment as
> described in this document must be in writing, signed by a senior officer
> of the Bank authorized to do so.
>
> There are **no implied promises, obligations, covenants or guarantees** in
> connection with this document or **in connection with my employment by
> the Bank.**

(Ex. 2, emphasis added.)  Reed signed and understood that this document and that his

employment relationship would "be governed by these terms, conditions and provisions."

(Ex. 2; Dep. 53:19-55:11.)  Reed concedes that Anaya's prior statement described the

conditions of his employment.  (Dep. 13:7-10.)  Yet, Reed did not request that the

agreement include Anaya's prior oral statement.  (Dep. 54:23-55:11.)  Instead, he

voluntarily signed that he understood the agreement as it had been presented to him and

that his employment relationship would "be governed by these terms, conditions and provisions." (Ex. 2; Dep. 53:19-55:11.)

After signing these agreements, Reed's continued reliance on any prior oral description of the conditions of his employment was unreasonable and unjustified. *See Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 154 (5th Cir. 1992)(reliance on oral statement made prior to written agreement is misplaced); *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1357-58 (S.D. Tex. 1994)(where contract is silent as to subject of oral representation, merger clause bars prior or contemporaneous oral statements regarding the issue); *C&A Inv., Inc. v. Bonnet Res. Corp.*, 959 S.W.2d 258, 263-64 (Tex. App.—Dallas 1997, writ denied)(contractual agreement not to rely on oral and written statements vitiated any reliance on such statements).

In *Airborne Freight Corp. v. C. R. Lee Enterprises, Inc.*, for example, Airborne Express and an independent contractor entered into a written contract for delivery services. 847 S.W.2d 289, 297 (Tex. App.—El Paso 1992, writ denied). Their agreement disclaimed any understanding regarding the length of the independent contractor's service. *Id.* Despite this contract clause, Airborne's Regional Manager told the independent contractor that "as long as you do your job, you'll have a job." *Id.* at 292. In response to the independent contractor's fraud claim based on the termination of his contract, the Court observed that the contract language gave clear notice that any oral promise would not control. *Id.* at 297. Thus, the Court held: "The written contract contained ample cautionary language which would preclude exclusive reliance by a reasonable businessperson on verbal statements contradicting the written agreement," and the Regional Manager's broad oral assertion did nothing to alter the contract terms. *Id.*

Similarly, Reed, an experienced and educated banker, signed a written agreement that clearly explained that Anaya's statement was not binding on the Bank. (Ex. 2.) In fact, Reed's notice was more pronounced than in *Airborne Freight* because Reed signed the Acknowledgment Form *after* the alleged oral statement and *before* he resigned from his previous position. (Dep. 10:24-11:2; 12:16-14:19.) Thus, at the time he resigned his employment, Reed knew that Anaya's oral statement was not binding, and could not, as a matter of law, justifiably have relied on it.

### B. As an educated and experienced banker, Reed was not justified in relying on Anaya's vague statement.

In addition to agreeing that he was an at-will employee and would not rely on oral statements, Reed's banking experience renders any reliance on Anaya's general statement unreasonable. In evaluating whether reliance is justified, courts consider an individual's experience, intelligence and ability to determine whether the representation was true or false. *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 369 (5th Cir. 1996), *cert. denied* 519 U.S. 1078 (1997); *Beijing Metals*, 993 F.2d at 1186.

Reed is an educated and intelligent man. (Dep. 100:16-101:5; 110:5-7.) As an officer of Chase, Reed knew that it could be hard to get things done at a national bank. (Dep. 45:2-15; 46:19-47:1.) He experienced that changes occur at national banks, including changes to initiatives, procedure, structure and employees supporting the Valley. (Dep. 45:2-11; 96:24-97:5.) In fact, Reed assumed that Bank of America would work the same way as Chase. (Dep. 96:20-23.) He also understood the Bank had the right to change the way it did things. (Dep. 20:25-21:3.) Despite knowing that structures and people could change and that the Bank has a right to make these changes, Reed assumed that Anaya represented conditions of employment that would remain unaltered

for several years. (Dep. 20:17-24.) Based on Reed's experience, such reliance was unjustified.

Moreover, Reed made absolutely no inquiry into what Anaya's vague statement entailed. Although the statement mentions goals, and Reed's fraud claim follows his termination for failure to meet his goals, Reed never asked Anaya what his goals would be. (Dep. 52:11-16.) Similarly, before he accepted an employment offer, Reed met with Larry Zamponi, the other Rio Grande Valley Client Manager, but did not ask Zamponi how the product partner relationship actually worked. (Reed Dep. 29:22-30:11.) If Reed had deemed the product partners' role in helping him meet his personal goals a critical reason to join the Bank, this intelligent man who had relevant experience with a national bank should have obtained more information. Based on his failure to do so, any reliance was not justified.

## VI.    Reed's claim is preempted by the National Bank Act.

In addition to the unavoidable holes in Reed's prima facie case, Reed's lawsuit fails for defensive reasons. First, Reed's fraudulent inducement claim is preempted by the National Bank Act. The National Bank Act provides that a national banking association has the power to elect or appoint officers and to "dismiss such officers . . . at pleasure . . . ." 12 U.S.C. § 24(Fifth). Based on this provision, the Board of Directors may dismiss an officer without liability for breach of an agreement. *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989); *Kemper v. First Nat'l Bank*, 418 N.E.2d 819, 821 (Ill. App. Ct. 1981). The National Bank Act is intended to give national banks "the greatest latitude possible to hire and fire their chief operating officers . . . ." *Mackey*, 867 F.2d at 526. Consequently, "[a]n agreement which attempts to circumvent the

complete discretion of a national bank's board of directors to terminate an employee at will is void as against public policy." *Mackey*, 867 F.2d at 524; *see also Alfano v. First Nat'l Bank*, 490 N.Y.S.2d 56, 58 (N.Y. App. Div. 1985)(Act preempts all state law and alone governs instances in which bank officers are dismissed). Tort actions are similarly preempted by the National Bank Act. *Mackey*, 867 F.2d at 526 (noting that the effect of allowing tort claims "would be to substitute tort for contract claims, thus subjecting the national bank to all the dangers attendant with dismissing an officer"); *City Nat'l Bank v. Brown*, 599 So. 2d 787, 790 (La. Ct. App.), *writ denied*, 604 So. 2d 999 (1992)(holding that a claim for detrimental reliance was preempted by the National Bank Act); *Ambro v. American Nat'l Bank & Trust Co.*, 394 N.W.2d 46, 49 (Mich. Ct. App. 1986)(holding that contract and tort claims are preempted by National Bank Act).

Bank of America is a national banking association chartered to do business under The National Bank Act. (Gilliam Aff. ¶ 3.) When Reed joined the Bank, Bank of America's Board of Directors appointed him to the "Senior Vice President" officer position with Bank of America. (Gilliam Aff. ¶¶ 4-5; Exs. 4 & 5.) The Bank's Board of Directors also ratified Reed's termination. (Gilliam Aff. ¶ 6; Ex. 6.) Because Reed was a Bank officer, the National Bank Act preempts his claim that he was fraudulently induced into an employment contract, and his lawsuit should be dismissed. *Mackey*, 867 F.2d at 526; *Brown*, 599 So. 2d at 790; *Ambro*, 394 N.W.2d at 49.

## VII.    Reed's claim is barred by the Statute of Frauds.

Reed's claim is also barred by the Statute of Frauds. The Statute of Frauds provides that an agreement which is not to be performed within one year from the date of making the agreement is unenforceable unless in writing. TEX. BUS. & COMM. CODE

ANN. § 26.01(b)(6) (West 2002). To establish fraudulent inducement, a claimant must show that he was induced into reaching an agreement. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). The Statute of Frauds will bar the fraud claim if the claimant seeks to recover the benefit of an agreement that is barred by the Statute. *Id.* at 799.

In this case, Reed contends that Anaya's representation assured him of an employment condition that would last for at least several years. (Dep. 20:17-24.) In other words, he claims that he had a long-term agreement with Bank of America about the conditions of his employment. (Dep. 13:7-10; 20:17-14.) He seeks damages based on the alleged breach of this agreement – the difference between what he was earning at Bank of America and what he made after his employment was terminated – rather than damages as a result of leaving Chase. (Dep. 115:10-116:3.) His alleged agreement regarding his employment conditions, however, is not in writing. (Dep. 15:5-16; 51:8-12.) Therefore, his claim falls squarely within the Statute of Frauds' prohibition and is barred. TEX. BUS. & COMM. CODE ANN. § 26.01(b)(6) (West 2002).

## CONCLUSION

Because John Reed's fraudulent inducement claim fails as a matter of law, Bank of America, N.A. respectfully requests that the Court dismiss this lawsuit with prejudice and for all other and further relief to which it may be entitled.

S-125607_3.DOC

Respectfully submitted,

_Laura O'Donnell_

Michael W. Fox
State Bar No. 07335500
Laura E. O'Donnell
State Bar No. 00797477
Federal Id. No. 21720
HAYNES AND BOONE, L.L.P.
112 East Pecan Street, Suite 1600
San Antonio, Texas 78205-1540
Telephone:     (210) 978-7000
Telecopier:     (210) 978-7450

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been sent to all counsel of record on this 25th day of February, 2003.

_Laura O'Donnell_

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   JOHN REED,                )(
                               )(
 4          Plaintiff,         )(
                               )(
 5   VS.                       )(    CIVIL NO. B-02-104
                               )(
 6   BANK OF AMERICA, N.A.,    )(
                               )(
 7          Defendant          )(

 8

 9   ************************************************************

10                    ORAL DEPOSITION OF

11                         JOHN REED

12                     AUGUST 28, 2002

13   ************************************************************

14

15

16        ORAL DEPOSITION OF JOHN REED, produced as a witness

17   at the instance of the DEFENDANT, and duly sworn, was

18   taken in the above-styled and numbered cause on the 28TH

19   of AUGUST, 2002, from 11:21 A.M. to 2:32 P.M., before

20   JOHN W. FELLOWS, CSR in and for the State of Texas,

21   reported by machine shorthand, at the offices of PEREZ &

22   ASSOCIATES, 436 Paredes Line Road, Brownsville, Cameron

23   County, Texas, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached therein.
```

COPY

1                           A P P E A R A N C E S

2

3     APPEARING FOR THE PLAINTIFF:

4     MR. FRANK E. PEREZ
      Perez & Associates
5     436 Paredes Line Road
      Brownsville, Texas  78521
6
      APPEARING FOR THE DEFENDANT:
7
      MS. LAURA E. O'DONNELL
8     Haynes and Boone, L.L.P.
      112 East Pecan Street
9     Suite 1600
      San Antonio, Texas  78520
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                        INDEX

 2                                          PAGE

 3   Appearances  . . . . . . . . . . . . . . . .    2

 4   JOHN REED

 5        Examination by Ms. O'Donnell. . . . . . .    4

 6   Signature and Changes  . . . . . . . . . . .  145

 7   Reporter's Certification . . . . . . . . . .  146

 8                      EXHIBITS

 9   NO.        DESCRIPTION                      PAGE

10   1          Letter dated April 12, 2000         8

11   2          Letter dated April 17, 2000         8

12   3          Business cards                     24

13   4          2000 Goals                         51

14   5          Applicant Acknowledgment Form      53

15   6          Performance Planning and Coaching  57

16   7          Performance Planning and Coaching  60

17   8          Notes                              88

18   9          Business card                     125

19   10         Public Finance                    127

20

21

22

23

24

25
```

1                      JOHN REED,

2  having been first duly sworn, testified as follows:

3                      EXAMINATION

4  BY MS. O'DONNELL:

5      Q.    Would you please state your name.

6      A.    Sure.  John Reed.

7      Q.    Where do you currently live?

8      A.    Brownsville, Texas.

9      Q.    What is your home address?

10     A.    5186 Kensington Lane.

11     Q.    How long have you lived there?

12     A.    About eight years.

13     Q.    About eight years?

14     A.    Yes.

15     Q.    Okay.  Have you ever given a deposition before?

16     A.    Yes, I have.

17     Q.    In what type of case?

18     A.    In -- when I worked for Chase Bank, they were

19  being sued.

20     Q.    Was it employment dispute?

21     A.    No.

22     Q.    What were they being sued for?

23     A.    There was -- the client I handled, the partners

24  were disputing or having a fight among themselves, and

25  the bank got dragged into it.

1    Q.    Was the bank a party to the lawsuit?

2    A.    You mean they were being sued?

3    Q.    Yes.

4    A.    Yes, they were.

5    Q.    Okay.  What was the substance of your

6    deposition?

7    A.    Oh, primarily what the loan was about, my

8    involvement with the loan, how it was approved, who made

9    the decisions, how committee worked, basic functions of

10    the bank.

11    Q.    When was this?

12    A.    Oh, I was deposed three times on it.  I think

13    the last time was like four years ago, three years ago,

14    something like that.

15    Q.    What was the resolution of that case?

16    A.    I don't know.  It may still be going on.  I

17    don't have any idea.

18    Q.    You said you were deposed three times as part

19    of that?

20    A.    Yes, ma'am.

21    Q.    Were you the key witness with respect to Chase

22    Bank?

23    A.    Yes.

24    Q.    Why is that?

25    A.    Because I was the loan officer on the account.

1      Q.    Okay.  Were you disciplined at all for -- in
2  relationship to that case?

3      A.    No, not at all.

4      Q.    Did that lawsuit have anything to do with your
5  decision to leave Chase Bank?

6      A.    No, ma'am, not at all.

7      Q.    Do you know what the factual allegations were
8  in that case?

9      A.    They claimed that -- or one of the parties
10  claimed that the bank colluded with the former director
11  to the detriment of -- of the person who was suing.

12      Q.    Have you given your deposition in any other
13  time other than those three times for Chase Bank?

14      A.    No, ma'am.

15      Q.    Have you ever been a party to any other
16  lawsuit?

17      A.    No, ma'am.

18      Q.    Have you ever been divorced?

19      A.    No, ma'am.

20      Q.    Since you've given your deposition three times
21  for Chase, I'm sure that their attorney prepared you
22  very well, and I'm sure Mr. Perez prepared you very well
23  today, so you probably know the basic rules.  But I'll
24  give you a little --

25      A.    Sure.

1    Q.    -- quick refresher course.

2    A.    Sure.

3    Q.    One thing that's important is that when I ask a

4    question, you wait until I'm finished with the question

5    before you answer.  And vice versa, I need to wait till

6    you're done with your answer before --

7    A.    Sure.

8    Q.    -- I speak.  And that just makes it easier for

9    our court reporter.  And if at some point I remind you

10    of that, I'm not trying to be rude.  I'm just trying --

11    A.    That's fine.

12    Q.    Great.  It's important that you answer

13    questions with a yes or no as opposed to uh-huh or

14    huh-uh so that we can get a good record.

15    A.    Uh-huh.  And sometimes I will do that, and I

16    apologize up front.

17    Q.    Okay.

18    A.    Just tell me.

19    Q.    Absolutely.  I will remind you.  If I say, Is

20    that a yes --

21    A.    Yeah, uh-huh.

22    Q.    If you do not understand a question, will you

23    agree with me that -- that you'll ask me to clarify the

24    question?

25    A.    Sure.  Sure.

1      Q.   And at any time if you need a break, just let

2  me know?

3      A.   Okay.

4           (Exhibit No. 1 was marked.)

5      Q.   (By Ms. O'Donnell)  Let me show you what's been

6  marked as Deposition Exhibit No. 1.  Do you recognize

7  this document?

8      A.   Yes, ma'am.

9      Q.   Is this a letter that Bank of America gave to

10  you before you had accepted employment?

11      A.   Yes, ma'am.

12      Q.   On the bottom it says, This offer is intended

13  for informational purposes only and is valid until April

14  22nd.  Is that how you understood this letter to be,

15  informational only?

16      A.   I relied on it to make my decision, yes, I did.

17      Q.   Okay.  Which portion of this letter did you

18  rely on to make your decision in?

19      A.   Everything that's stated in here.

20      Q.   Okay.

21           (Exhibit No. 2 was marked.)

22      Q.   (By Ms. O'Donnell)  I'm going to show you now

23  what I've marked as Deposition Exhibit No. 2.  Do you

24  recognize this document?

25      A.   Yes, ma'am.

1    Q.    If you flip to the third page of this document,

2    is that your signature?

3    A.    Yes, it is.

4    Q.    And where it says, I, John Reed, concur with

5    all conditions outlined in the above confirmation

6    letter, did you personally write in, John Reed?

7    A.    Yes, I did.

8    Q.    Is that your Social Security number?

9    A.    Yes, ma'am.

10    Q.    Did you write that in?

11    A.    Yes.

12    Q.    And did you write in the date?

13    A.    Yes, ma'am.

14    Q.    When you signed this letter, were you denoting

15    your acceptance for employment with Bank of America at

16    that time?

17    A.    I believe so.  I believe I was, yes, ma'am.

18    Q.    On the front page of this letter, it looks like

19    someone changed the start date.  Do you know whose

20    handwriting that is?

21    A.    No, I do not.

22    Q.    When you received the letter, was it changed or

23    was it not changed?

24    A.    I don't -- I don't recall if it was changed or

25    not.

1    Q.    Could it have been that it was changed in a

2    conversation with Raul Anaya?

3    A.    It's possible, sure.

4    Q.    Do you recall when you actually started working

5    at Bank of America?

6    A.    It was the end of April, first of May,

7    somewhere around there.

8    Q.    The letter says in the -- well, actually,

9    strike that.

10          Did you rely on this letter in making your

11   decision to accept employment with Bank of America?

12   A.    Yes, ma'am.

13   Q.    This letter says in the first paragraph, last

14   sentence, The details of our offer outlined below; is

15   that correct?

16   A.    What paragraph?  I'm --

17   Q.    At the first paragraph on the first page, last

18   sentence.

19   A.    Okay.  I see it.  Yes, ma'am.

20   Q.    Is there anything in this letter that you

21   contend Bank of America said they would do and did not,

22   in fact, do?

23   A.    No, not there.

24   Q.    Did you resign your previous employment

25   position after you had signed this letter accepting

1 employment with Bank of America?

2     A.    Yes, I did.

3     Q.    If you turn to the second page of this letter,

4 right under the box paragraph, it says, This letter does

5 not constitute an employment contract, and nothing

6 contained in this letter or in any other communications

7 you've had with Bank of America representatives should

8 be construed in any way as guarantee of continued

9 employment for any period of time, but rather your

10 employment is on an at-will basis.

11         That is, you or Bank of America may end the

12 employment relationship with or without notice or cause.

13 No officer or representative of Bank of America has any

14 authority to make any agreement, express or implied,

15 which is contrary to the foregoing.  Do you understand

16 that paragraph?

17     A.    Yes, ma'am.  Yes, I do.

18     Q.    And you knew you were an at-will employee with

19 Bank of America?

20     A.    Yes, ma'am.

21     Q.    And that meant that Bank of America could

22 terminate you for any lawful reason, correct?

23     A.    That's correct.

24     Q.    So you could've worked there six months and

25 Bank of America could've terminated you?

1      A.    According to the letter, yes.

2      Q.    You could've worked there two weeks and Bank of

3  America could've terminated you?

4      A.    According to the letter, yeah.

5      Q.    And you could've quit at any time; is that

6  correct?

7      A.    That's correct.

8      Q.    Now, my understanding is, that in this lawsuit

9  you contend that there were certain oral representations

10  that were made to you before you signed this letter; is

11  that correct?

12      A.    That's correct.

13      Q.    Tell me what statements were made by someone at

14  Bank of America that you contend you relied on and that

15  you contend Bank of America didn't live up to.

16      A.    Well, my conversations with Raul Anaya prior to

17  signing these letters and coming on board with Bank of

18  America, he stated on numerous occasions that the

19  ability to meet the goals that would be given to me

20  would be by people coming into the market, what they

21  call partners or product partners, coming into the

22  market and actively soliciting business, prospecting for

23  business, in the Rio Grande Valley with me and

24  independently of me.  And that we'd be working as a team

25  to meet my goals and meet the region's goals.

1   Q.   Is that exactly what Raul Anaya said?

2   A.   Pretty much, yes.

3   Q.   Okay.  So I can say that's a quote what you

4   just told me?

5   A.   Verbatim quote, every exact word, I don't know.

6   But yeah, that's pretty much it.

7   Q.   Did you consider these to be representations

8   about the conditions of your employment of Bank of

9   America?

10   A.   Yes, I did.

11   Q.   When is the first time that Mr. Anaya made that

12   statement to you?

13   A.   When he first approached me to come to work for

14   Bank of America.

15   Q.   Are there any other statements other than this

16   one statement that is the subject of this lawsuit?

17   A.   That, and subsequent statements I had with

18   them on the phone to reiterate that prior to me

19   signing.  But, yeah, that I'd have all the support I

20   needed to -- to make my goals.

21   Q.   Okay.  So he said to you, You'll have all the

22   support you need to make your goals, and your ability to

23   meet your goals will be assisted by product partners who

24   will come into the market to assist you with

25   prospecting; is that correct?

1      A.    Right.

2      Q.    You said the first time he made this

3   representation was when he first approached you?

4      A.    Uh-huh.

5      Q.    Was that in person or on the telephone?

6      A.    In person.

7      Q.    Can you remember the date?

8      A.    No.  But it probably 30, 45 days before I

9   actually went -- went to work for Bank of America.

10      Q.    When is the next time he made that statement to

11   you?

12      A.    When I talked to him again on the phone a few

13   days later.

14      Q.    When is the next time he made that statement?

15      A.    After that -- after the -- the phone

16   conversation?

17      Q.    Right.

18      A.    When I first got hired.  My first day I

19   reported to work.

20      Q.    So three times?

21      A.    At least three times, yeah.

22      Q.    When else may he have made that statement?

23      A.    Oh, I'm sure during the course of the

24   employment that I was employed there.  Product partners

25   are supposed to be working the market -- coming into the

1  market.

2      Q.   Now, when you refer to product partners, are

3  these individual people?

4      A.   Yes, ma'am.

5      Q.   And was it your understanding that they were

6  supposed to come to the Valley to assist you in your

7  sales efforts?

8      A.   Yes, ma'am.

9      Q.   And so your contention is, that these

10 individuals didn't live up to their end of the bargain?

11     A.   That's correct.

12     Q.   Is this statement documented anywhere?

13     A.   No.  Not that I have anyway, no, ma'am.

14     Q.   Did you ever ask Mr. Anaya prior to joining

15 Bank of America to put that in writing?

16     A.   No, I did not.

17     Q.   So you are not contending that Bank of America

18 fraudulently induced you into signing any kind of

19 agreement; is that correct?

20     A.   The only agreement I signed with Bank of

21 America was this -- this document here.

22     Q.   Deposition Exhibit 2?

23     A.   Yes, ma'am.

24     Q.   Okay.  But the question is, you're not

25 contending that Bank of America fraudulently induced you

1    into signing any agreements?

2                MR. PEREZ:  We'd object to the -- to the

3    question, ask that you define for the witness what you

4    mean by "fraudulently induced."

5        Q.    (By Ms. O'Donnell)  In this lawsuit are you

6    alleging that you were fraudulently induced into coming

7    to work for Bank of America?

8        A.    Yes, I am.

9        Q.    And do you understand what fraudulently induced

10   means?

11               MR. PEREZ:  Well, why don't -- so we'll all

12   be on the same page, why don't you explain what you mean

13   by it so that the question will be clear to him.

14       Q.    (By Ms. O'Donnell)  Well, let me ask you this.

15       A.    Okay.

16       Q.    That's your claim in this lawsuit.  What does

17   fraudulent induced mean to you?

18       A.    Any --

19               MR. PEREZ:  Whatever.

20       A.    What it means to me?

21       Q.    (By Ms. O'Donnell)  Right.  What does it mean

22   to you?

23       A.    Someone telling me something that's a lie,

24   that's not the whole truth, and caused me to -- to leave

25   a job that I didn't need to leave with promises of -- of

1    additional enrichment, more money, more titles, more

2    prestige, and saying that all these things are going to

3    happen and never intended to -- to have them happen.

4        Q.   Did -- were you promised any additional titles

5    that you didn't get?

6        A.   Yes, ma'am.

7           MR. PEREZ:  I'm going to object, because you

8    still haven't told him what you mean by fraudulently

9    induced, and I don't know if you still intend to use

10   that particular question.

11          MS. O'DONNELL:  Well, I think we'll go with

12   the fraudulent inducement definition that he's given,

13   but this is a new question that doesn't use that term.

14       Q.   (By Ms. O'Donnell)  Were there any titles that

15   were given -- promised to you that you didn't get?

16       A.   Yes.

17       Q.   What -- what is that?

18       A.   He told me -- Mr. Anaya, Raul Anaya, told me

19   that within two to three years Mr. Zamponi would be

20   retiring.  He's the current president of the bank.  And

21   that I would assume that title.  I would be president of

22   the Rio Grande Valley when Mr. Zamponi retired.

23       Q.   Did he tell you that in order to become

24   president, you would have to meet your goals?

25       A.   No, ma'am.

1    Q.   He told you that irrespective of your

2  performance at Bank of America, in two to three years

3  you would get the title of president in this area?

4    A.   He said that -- because I specifically asked,

5  What -- where could I advance in the organization?  And

6  he said, You can become president when Mr. Zamponi

7  retires in two or three years.

8    Q.   So he was stating that was a possibility?

9    A.   No.  He was saying that was a fact.

10    Q.   Okay.  Mr. Reed, do you really think if you

11  went to work for a company and your performance -- not

12  saying anything about your performance in this case.

13  But somebody goes to work for a company, their

14  performance is awful, that they have a guarantee to

15  become president of -- or get the president title

16  irrespective of what happened?

17    A.   Not if their performance is awful, no.

18    Q.   Okay.  Is that one of the claims you're relying

19  on in this lawsuit?

20    A.   I'm not sure what's all in the lawsuit on that.

21  What -- I mean, I've read it, but I'm not quite sure all

22  the different --

23    Q.   I asked you initially what statements were made

24  by Bank of America that you felt the bank didn't live up

25  to, and you gave me one statement?

```
 1        A.    Uh-huh.

 2        Q.    Is this other statement also something that

 3   your --

 4        A.    That I relied on to go to work for them?

 5        Q.    Uh-huh.

 6        A.    Yes.

 7        Q.    What about money?

 8        A.    In what way?  What do you mean by --

 9        Q.    You had said that one way that you might have

10   been induced to go somewhere was through a promise of

11   money.  Were you promised additional money?

12        A.    Yes.  My salary of 100,000 dollars.

13        Q.    Did the bank give you a 100,000 dollars?

14        A.    They -- they -- the monthly -- the monthly

15   payments to me would've equaled to 100,000 dollars.

16        Q.    Okay.  Your salary was --

17        A.    Yes, ma'am.

18        Q.    Okay.  Let me finish before you start.

19        A.    Oh, I'm sorry.

20        Q.    That's okay.  That 100,000 dollars was

21   important to you in joining Bank of America, wasn't it?

22        A.    Yes, ma'am.

23        Q.    That was a 20-percent increase over what you

24   were making at Chase?

25        A.    Yes, ma'am.
```

1      Q.    What about prestige?  Were there any promises

2   of prestige to you?

3      A.    Well, the title of president.

4      Q.    Okay.  So the two things that -- that you

5   contend were false representations were the fact that

6   you would have product partners who would come into the

7   Valley and assist you, and that you would become

8   president or get the president title in two to three

9   years?

10     A.    Yes.

11     Q.    Now, when we talk about the president title,

12  that's not President of Bank of America?

13     A.    That'd be the Rio Grande Valley, the region.

14     Q.    When you worked at Chase, did the way things

15  worked at Chase sometimes change?

16     A.    Sure.  Every day.

17     Q.    How long did you expect the system that

18  Mr. Anaya represented to you to last with respect to the

19  product partners?

20     A.    For longer than the seven or eight months I

21  worked there.

22     Q.    You expected that that would be something that

23  would last for several years?

24     A.    At least.

25     Q.    You didn't think that Bank of America had the

1  right to change the way it did things?

2      A.    They have the right to change things.  They're

3  a corporation.  Sure they do.

4      Q.    But you felt that you had been promised that

5  this would stay the same for at least several years?

6      A.    I believe so, yes.

7      Q.    Now, the two comments that you're relying on in

8  this case were both made by Mr. Anaya?

9      A.    Yes, ma'am.

10     Q.    When Mr. Anaya came to you to join Bank of

11  America, do you think Mr. Anaya wanted you to succeed at

12  Bank of America?

13     A.    If I succeeded, I would assume he would've

14  succeeded, yes, uh-huh.

15     Q.    So you would assume he wanted you to succeed?

16     A.    I would assume.

17     Q.    Now, you're not contending that Mr. Anaya

18  purposely lied to you; is that correct?

19     A.    At the initial stages?

20     Q.    Yes.

21     A.    I'd say no.

22     Q.    At any stage, do you think Mr. Anaya

23  intentionally lied to you?

24     A.    I think towards the end of my employment, yes.

25     Q.    But not prior to your employment?

```
 1       A.    No, ma'am.

 2       Q.    Tell me all of the things that you relied on in

 3  making the decision to join Bank of America.

 4       A.    Primarily it -- well, really it was the money

 5  and the title of being president.  Those were the two

 6  main factors.

 7       Q.    And you think at the time that Mr. Anaya made

 8  the statement to you about the title, that he intended

 9  that in two to three years when Mr. Zamponi retired you

10  would be made the president?

11       A.    Yes, ma'am.

12       Q.    Why did you rely on the representation about

13  the title in making your decision?

14       A.    Because I was looking to move ahead in my

15  career, and that's where I wanted to go with a company.

16  With my experience in banking, I felt like now was the

17  time or shortly thereafter would be the time to move

18  into that role.  And so that appealed to me greatly.

19       Q.    Did you not think you had that opportunity at

20  Chase?

21       A.    No, ma'am.

22       Q.    Why not?

23       A.    Because my boss was a few years older than I

24  was, and he wasn't -- I mean, he wasn't going to go

25  anywhere any time soon, so...
```

1      Q.   Who was your boss at Chase?

2      A.   Irv Downey.

3      Q.   So the two things that you relied on were the

4  money, the 100,000 dollars, and this statement about

5  becoming president when Mr. Zamponi retired?

6      A.   Yes, ma'am.

7      Q.   And that's it?

8      A.   Yes, ma'am.

9      Q.   If Bank of America had provided you with the

10  title of president, how would your performance have

11  improved?

12      A.   How'd my performance improved?  I don't know if

13  it could've without the product partners coming into the

14  market.

15      Q.   If the product partners -- let's talk about

16  this product partners.  Explain to me what your

17  understanding was of what was supposed to happen.

18      A.   The way it was supposed to happen is, I would

19  prospect in the Rio Grande Valley for potential clients

20  for Bank of America.  And then -- for various services

21  the bank offered.  And then I was supposed to call this

22  product partners, and they were supposed to come into

23  the market and help solidify whatever transaction that

24  was.

25           In addition, they were supposed to work the

1  market to coming in from their various cities to

2  prospect the market.  And what they would dig up if it

3  was -- whatever they were selling -- in the process of

4  selling, they found loan business, they were supposed to

5  let the commercial lenders know.  And that just never

6  materialized.

7      Q.   Who were the product partners?

8      A.   Oh, I have a list of business cards.

9           (Exhibit No. 3 was marked.)

10     Q.   (By Ms. O'Donnell)  Let me show you what I've

11 marked as Deposition Exhibit No. 3.  This is a document

12 that you produced to Bank of America in discovery.  Is

13 this the list of business cards that you were

14 referencing?

15     A.   Yes, ma'am.

16     Q.   The first business card on Deposition Exhibit 3

17 is Martha Agarwal, A-G-A-R-W-A-L?

18     A.   Uh-huh.

19     Q.   Was she one of your product partners?

20     A.   Yes, ma'am.

21     Q.   What was she supposed to do with relationship

22 to you?

23     A.   She -- when I referred business to her, she was

24 supposed to come down and visit with clients.

25     Q.   What type of business were you supposed to

1  refer to her?

2      A.    To her, was -- was commercial mortgage lending,

3  which is large commercial real estate transactions.

4      Q.    Did you ever refer any business to her?

5      A.    Yes, I did.

6      Q.    Tell me what specific deals you referred to

7  her.

8      A.    I referred the NAFTA Industrial Park to her.

9      Q.    Where was the NAFTA Industrial Park?

10     A.    In Brownsville, Texas.

11     Q.    How did that come about that you talked to the

12  NAFTA Industrial --

13     A.    I know the partners involved.

14     Q.    Who are they?

15     A.    Frank Parker, Jr.; Bobby Ostos; Randy Davis;

16  Dewayne Tyner and Mark Johnson.

17     Q.    And what were they in need of?

18     A.    They were looking to consolidate their existing

19  debt and package it up in a secondary market.

20     Q.    And you referred this to Martha?

21     A.    Martha came down and there was another

22  gentleman, Roger Akeman who's on here.  We had dinner

23  with the group on South Padre Island.

24     Q.    How did the dinner go?

25     A.    Went great.

1    Q.    What happened next on the deal?

2    A.    I don't think they ever followed up on it.

3    Q.    Do you know that or are you just assuming that?

4    A.    I know for a fact that they never followed up

5  on it.

6    Q.    How do you know for a fact?

7    A.    Talking with the partners.

8    Q.    Tell me what the partners told --

9    A.    Nobody ever called them from the real estate

10 group.

11    Q.    Who, specifically, told you that?

12    A.    Mark Johnson.  And also I referred the Mesquite

13 Plaza, which is here in Brownsville, Texas, to the real

14 estate group as well.

15    Q.    Would that be Ms. Agarwal?

16    A.    I can't remember if it's Agarwal or Akeman, be

17 quite honestly.

18    Q.    What happened with that?

19    A.    They never got back with Mark Johnson on it.

20    Q.    Mark Johnson was also a principle in that?

21    A.    Yes.

22    Q.    Mr. Johnson told you that?

23    A.    Yes.

24    Q.    What was the Mesquite Plaza deal?

25    A.    It's a shopping center.

1    Q.    Where -- sorry.  Go ahead.

2    A.    They had -- I believe what it was they had a

3    seller for it, and they were trying to arrange financing

4    for the seller -- or for the buyer, I'm sorry.  They had

5    a buyer for the product, for the property, and they were

6    trying to arrange financing for the buyer.

7    Q.    So the financing wouldn't actually be for

8    Mesquite Plaza.  It would be for someone else?

9    A.    It would be for the sale of Mesquite Plaza to a

10   third party.

11   Q.    Okay.  What other deals did you refer to

12   Ms. Agarwal?

13   A.    I think that was -- those are the only two that

14   I recall.

15   Q.    Are those also the only two that you referred

16   to Mr. Akeman?

17   A.    Yes, ma'am.

18   Q.    Peggy Walker, was she one of your product

19   partners?

20   A.    Yes.

21   Q.    What was your relationship with her supposed to

22   be?

23   A.    She was supposed to come down -- same -- same

24   type situation.  You refer business to her, she's

25   supposed to come down and try to solidify that business.

1    Or vice versa, she comes down prospecting and then she

2    turns around and refers loan business to me.

3        Q.    And did you ever refer any business to

4    Ms. Walker?

5        A.    No, because I had lunch with her, and she said

6    there's absolutely no business down here for us.

7        Q.    What was her department?

8        A.    Private banking.

9        Q.    Where did you have lunch with her at?

10       A.    In Harlingen at the -- oh, gosh, I think it's

11   called the Coral Reef.  It's right there across from the

12   hospital.  I think that's the name of it.

13       Q.    How long had you been working for Bank of

14   America when you had that lunch with Ms. Walker?

15       A.    Probably 30, 60 days.

16       Q.    When she said that she didn't feel there was

17   anything for private banking in this area, what did you

18   say?

19       A.    I totally disagreed with her.  I told her you

20   can't expect business to fall into your lap.  You have

21   to prospect for it, and I do not know your product in

22   and out.  You're the expert at it.  And you have to come

23   down -- I could get the doors open, but you have to come

24   down and work it.  No interest.

25       Q.    And do you believe that, that you can't expect

1  business to fall in your lap, that you have to prospect

2  for it?

3      A.   You have to work for it.  It's way too much

4  competition.  You have to work for it.

5      Q.   So consequently, you didn't refer any business

6  to Ms. Walker?

7      A.   No.

8      Q.   Larry Zamponi, he was actually in the Valley

9  with you, correct?

10     A.   Right.

11     Q.   And so you wouldn't refer business back and

12  forth, would you?

13     A.   No.  Larry and I worked together.  We'd go on

14  joint calls, and we talked about potential prospects or

15  clients.  And -- and Larry and I great relationship.

16  Good guy.  I like Larry a lot.

17     Q.   Did Mr. Zamponi express to you any of the same

18  concerns with respect to the product --

19     A.   Every -- every day.  We even kept a calendar, a

20  poster board, of how often they came in the Valley.  And

21  it was mainly blank.

22     Q.   Okay.  You met with Mr. Zamponi prior to

23  joining Bank of America, did you not?

24     A.   Yes, ma'am.

25     Q.   During that interview, did you ask him any

 1  questions about how this worked with the product

 2  partners?

 3      A.   I don't recall.  We just talked general -- we

 4  mainly talked generalities.  I met the two -- other two

 5  ladies that worked there.  And, basically, talked

 6  how -- who are you calling on type -- type things.  But

 7  I don't recall ever talking about partners not coming in

 8  or coming in or anything, no.

 9      Q.   It's probably something you did not ask

10  Mr. Zamponi?

11      A.   I -- I doubt I asked him.

12      Q.   You don't think Mr. Zamponi lied to you?

13      A.   No, not at all.  No, not Larry.  Good guy.

14      Q.   How do you think it was that Mr. Zamponi was

15  able to be successful despite having product partner

16  support?

17      A.   Larry had a book of business he was working off

18  of.  That was -- that was a good book of business.

19      Q.   That he had worked over the years to establish?

20      A.   However long he had been with the Bank of

21  America and its predecessors, yes.

22      Q.   And to the best of your knowledge, Mr. Zamponi

23  was successful?

24      A.   Yes, as far as I know he was.

25      Q.   Fran Herndon.  Do you remember who that is?

1     A.    No, I don't remember who Fran is.

2     Q.    Peter Hanson?

3     A.    Peter -- Peter came down a couple times, if I

4 remember correctly.  I don't think there was ever any

5 business for him, but I think I may have talked to him a

6 couple times on the phone.

7     Q.    What did he do for Bank of America?

8     A.    He sold derivatives for Bank of America out of

9 Chicago.

10    Q.    Explain to me what a derivative is.

11    A.    That's a good question.  I'd have to get my

12 banking book out to take you -- give you the exact

13 definition of a derivative.

14    Q.    Is there any kind of layman's definition you

15 can give me or general explanation?  Like what kind of

16 deal would give rise to a derivative?

17    A.    Oh, gosh, I -- I wasn't real well versed on

18 derivative products, to be honest with you.  No training

19 on it.  So I'd butcher whatever -- I'd screw it up so

20 bad I couldn't even tell you.

21    Q.    Did you not work with derivatives at Chase?

22    A.    No, I did not.

23    Q.    The next person at the top of the page is Kevin

24 Kleinsteuber?

25    A.    Uh-huh.

1  Q. Did -- was he one of your product partners?

2  A. Yes.  I did refer business to Kevin.  Kevin and

3 I worked well together.

4  Q. Did he come to the Valley some?

5  A. Kevin pretty much spent his time in Corpus.  He

6 came to the Valley when there was a deal that he knew

7 would work.  There -- there wasn't any prospecting done

8 on Kevin's part down here or very little.  He had -- he

9 had so much business in Corpus.

10  Q. What type of deals were you supposed to refer

11 to Mr. Kleinsteuber?

12  A. Companies that had sales under ten million

13 dollars, and deal size of a million or less.  And

14 companies, if they were under ten million dollars and

15 didn't think we were going to get them over the

16 ten-million-dollar threshold, then -- in the short-term

17 future, then we were supposed to refer them to

18 Mr. Kleinsteuber.

19  Q. You understood that those smaller deals were

20 not deals that you were supposed to work on?

21  A. We were supposed to work on them with Kevin in

22 the referral process and to help him in the hope that

23 those companies would eventually grow and to become

24 commercial customer.  But I didn't work on them

25 day-to-day with him other than take him out to meet

1  them, opened the door for him, get him some information

2  if he needed help with the information.  Yeah, I'd do

3  things like that for him.

4      Q.    But if a deal were -- if the company had more

5  than ten million dollars in assets, it was a bigger than

6  a one-million-dollar deal, that would be a commercial

7  deal?

8      A.    Yes, ma'am.

9      Q.    And you would be the primary person working?

10      A.    Larry or I, yes.

11      Q.    The next card is Terri Edlund.  Do you remember

12  who she was?

13      A.    I -- I don't recall, huh-uh.  I may have met

14  her when I went to San Antonio one time.  She was in

15  recruiting, I think, by looking at this.  Yeah.  But no.

16      Q.    Roger Akeman.  We've already talked about him,

17  correct?

18      A.    Yes, ma'am.

19      Q.    Gregg Muenster.  What did he do for Bank of

20  America?

21      A.    Gregg was also in private bank with Peggy --

22      Q.    Okay.

23      A.    -- Walker, and they work in the same

24  department.  And Roger came down here -- I'm sorry.

25  We're talking about Gregg.  I'm sorry.  Gregg.  I -- I

1    brought him down here and I had him meet with -- with

2    several attorneys, CPA's, in the hopes that he would

3    develop contacts with them, develop referral business

4    from them, and there was no follow-through on his part

5    either with those individuals.

6        Q.    How do you know that?

7        A.    Because I've talked to all the individuals

8    after the fact and he never talked on the phone.

9        Q.    Who, specifically, did you introduce

10   Mr. Muenster to?

11       A.    Oh, to the Law Firm of Rentfro, Faulk and

12   Blakemore:  Daniel Rentfro, Jr., Rusty Faulk, and

13   William Rentfro.  We had lunch with the Law Firm of

14   Ransome and Ray; Marshall and Mary Lou Ray.  He met with

15   Carlos Barrera with -- a partner with Long and Chilton.

16   And I think he also met with Hales, Bradford and Allen,

17   CPA firm.

18       Q.    Did you talk to each of those people?

19       A.    Yes.

20       Q.    And all of them said that he did not follow-up

21   with them?

22       A.    That's correct.

23       Q.    On his card I noticed you have his cell phone

24   number handwritten in?

25       A.    Right.

1     Q.    Did he give you his cell phone number?

2     A.    I don't know if that's my handwriting or his,

3  but he -- you could contact him by his cell, sure.

4     Q.    Going back to Kevin Kleinsteuber?

5     A.    Uh-huh.

6     Q.    What deals did you refer to Mr. Kleinsteuber?

7     A.    Oh, he talked to World Clothing Corporation.

8  He talked to Hearne Industrial Metals.  I think it was

9  Hearne Industrial Metals.  He talked to Rio Grande Tool

10  Company.  There may have been a few others.  Off the top

11  of my head, I can't remember.

12     Q.    Did he refer any business to you?

13     A.    No, ma'am.

14     Q.    Did you feel like he wasn't living up to his

15  job expectations because he didn't refer business to

16  you?

17     A.    That's correct.

18     Q.    The person in the bottom right-hand corner of

19  this exhibit is Lisa Hill.  What were her

20  responsibilities in Bank of America?

21     A.    To come in and work treasury management.  Sell

22  treasury management products.

23     Q.    Did you refer any business to Ms. Hill?

24     A.    Yes.  Lisa was good.

25     Q.    What business did you refer to Ms. Hill?

1      A.    We went and talked to The Public Utilities

2    Board.  I think the City of Brownsville.  I can't

3    remember.  But Lisa was the type of partner that if the

4    others had been, the -- the Valley would've been

5    successful or I'd been successful.

6      Q.    On the second page?

7      A.    Uh-huh.  Uh-huh.

8      Q.    The first card, Jesse Riveron.

9      A.    Jesse worked out of the Houston office.  He did

10   XM Bank, letters of credit.

11     Q.    Did you refer deals to him?

12     A.    Yes.  We went and talked to various people.

13     Q.    Do you remember who?

14     A.    We talked to Stone Art.  We talked to World

15   Clothing.  Who else we talked to?  I don't know.  There

16   were several others.  I can't remember.

17     Q.    Was he a good product partner?

18     A.    Jesse, yes.  Jesse was.

19     Q.    Was he also one of the ones that was supposed

20   to refer things to you?

21     A.    Yes.

22     Q.    Did he refer things to you?

23     A.    Not that I recall, no.

24     Q.    He may have, but you don't recall?

25     A.    I don't think Jesse did, no.  I can almost

1  state that as a fact, he did not.

2      Q.    So you don't feel like he was living up to his

3  job expectations?

4      A.    Not on the back side.  I mean, he did his part

5  of coming down prospecting, and calling and saying, Hey,

6  what can we do?  You know, who should we call on,

7  blah-blah-blah.  He was proactive.  Jesse was proactive.

8      Q.    Alma Ybarra.

9      A.    She was my secretary.

10     Q.    Did she ever go on calls with you?

11     A.    No.

12     Q.    Let's kind of back up and go through the

13  process of you joining Bank of America.  When is the

14  first time that you learned that there was a position

15  open?

16     A.    I received a phone call from a corporate

17  recruiter from Bank of America, and I -- I don't

18  remember who that was, asking me if I'd be interested in

19  talking to them.  I said sure.

20     Q.    What did she tell you about the position, if

21  anything?

22     A.    She just said it was a senior commercial

23  in -- position.

24     Q.    Why were you interested in talking to someone

25  else about a position?

1    A.    Because I felt it was time to -- to start

2  looking to see if I could move ahead in my career.

3    Q.    Had you talked to anyone else while you worked

4  at Chase about a possible employment position?

5    A.    No, ma'am.

6    Q.    Is that all you can remember about that first

7  conversation?

8    A.    Yes.

9    Q.    What's the next thing that happened?

10    A.    Oh, either she called or -- or Raul called to

11  set up a meeting at Antonio's Mexican Restaurant.

12    Q.    Then you met with Mr. Anaya at Antonio's?

13    A.    Yes, ma'am.

14    Q.    Tell me about that meeting.

15    A.    It was generalities in the sense of what do you

16  do at Chase, how long you been with Chase, you know,

17  family, you know, little background information on me,

18  what I did in the community, et cetera.

19    Q.    When he asked you what do you do at Chase, what

20  did you tell him?

21    A.    That I was a -- my title was senior vice

22  president commercial lending.  I did sales calls and

23  for -- on both clients and prospects.

24    Q.    Did you tell him the dollar value of the deals

25  you were working on?

1    A.   Oh, I'm sure we discussed dollar -- in fact, I
2    know we discussed various dollar deals, sure.
3    Q.   What were the dollar deals you were doing at
4    Chase?
5    A.   There were anything from 50,000 up to 30
6    million dollars.
7    Q.   Did Mr. Anaya explain to you that the deals you
8    would be responsible for at Bank of America were
9    million-dollar plus deals?
10   A.   No, not at that time.
11   Q.   Did he explain that to you later?
12   A.   When I was hired, yeah.
13   Q.   Before you were hired or after you were hired?
14   A.   After I was hired.
15   Q.   Did he not tell you before you were hired that
16   you would have to refer smaller deals to the private
17   banking?
18   A.   No, not at that time.  Not private banking.
19   Small business banking.
20   Q.   Oh, I'm sorry.
21   A.   No.  No.  He said we all -- we worked hand in
22   hand, and everything was related to partners.  Even the
23   partners worked together.  The partners work with you.
24   That was all.  I mean, it was always partners this and
25   partners that and you and the partners.

1    Q.    So he didn't give you specifics about the

2 partners and how it worked with individual partners or

3 groups, just that you worked with the partners?

4    A.    Everybody worked together to meet their goals

5 and the region's goals and corporate goals.  It was all

6 a nice neat package.

7    Q.    Did he tell you that this was a relatively new

8 system at Bank of America?

9    A.    No, ma'am.

10    Q.    So at Tony -- at Antonio's, rather, when he

11 asked you what your community involvement was, what did

12 you tell him?

13    A.    That I'd been President of the Chamber of

14 Commerce, that I've been President of the Boys and Girls

15 Club, president of various civic organizations, and sat

16 on boards of various civic organizations, been very

17 involved in the community.

18    Q.    Did he tell you that community ties was

19 important?

20    A.    Yes, he did.

21    Q.    Did he tell you that he expected you to use

22 your community ties to generate business?

23    A.    Not, he didn't specifically say use your

24 community ties.

25    Q.    Did he say something like that?

1    A.    I don't recall him saying.  He just -- it's

2  important to be involved in the community.  And the bank

3  that -- I did ask him at Bank of America, how did -- how

4  did they look at being involved with the community.  He

5  goes, That's important to -- to be involved in the

6  community.

7    Q.    You said that you did talk to him about some

8  deals that you had done at Chase.  Can you remember any

9  of the deals you talked to him about?

10   A.    Specifically, no, ma'am.

11   Q.    What else do you remember about that

12  conversation at Antonio's?

13   A.    It was just -- like I said, he was trying to

14  get to know me.  I was trying to get to know him a

15  little bit.  And -- and it centered on, you know,

16  call -- how do you like to call, you know, how are you

17  at calling, and then it -- I told him what I'd like to

18  see if I ever went with -- to another bank, because I'd

19  like to have career opportunities to move to advance.

20   Q.    Excuse me one second.  My pen just went out.

21        MS. O'DONNELL:  Let's go off the record for

22  one second.

23        (Recess, 12:07 - 12:07.)

24   Q.    (By Ms. O'Donnell)  When he -- when you told

25  him about what you were looking for, what did you tell

1  him?

2      A.    That I would like to have a position of

3  management, and where I -- place where I could

4  eventually have a group of people to work with or work

5  under -- I mean, that I'd have some authority beyond

6  just making loans.  And that's when he said, Well, you

7  know, you can be president in two or three years when

8  Mr. Zamponi retires.

9      Q.    When he asked you how you were at calling on

10  people, what did you tell him?

11      A.    Very good at it.

12      Q.    What else can you remember about that

13  conversation?

14      A.    I can't remember anything else.

15      Q.    What's the next step in this process?

16      A.    I don't understand the question.

17      Q.    Oh, I'm sorry.  It was a bad question.  You

18  said that, initially, you got called by a recruiter?

19      A.    Uh-huh.

20      Q.    And you met with Mr. Anaya --

21      A.    Right.

22      Q.    -- at Antonio's Restaurant.  What's the next

23  thing that happened in the process leading you to join

24  Bank of America?

25      A.    He was calling me or one of the -- one of the

1  recruiters was calling me, and -- and we started talking

2  salaries and benefits and, you know, vacation, you know,

3  how soon if -- were -- if a job offer is extended, how

4  soon could you start, those type of questions.

5      Q.   Had you previously told Mr. Anaya or told the

6  recruiter that you needed to have a 100,000 dollars?

7      A.   Yes.

8      Q.   Do you recall the first time that you mentioned

9  this salary?

10     A.   No, I don't.

11     Q.   Okay.  So we had the first call from the

12  recruiter, then the meeting at Antonio's, then some

13  phone calls about the salary and benefits and vacation,

14  what's the next thing that happened?

15     A.   Oh, I think they said that they were

16  going -- they were going to extend me an offer.

17     Q.   Who is "they"?

18     A.   Bank of America.

19     Q.   Who specifically; do you remember?

20     A.   Again, I don't know if it's Raul or the

21  recruiter, because there were various conversations

22  with -- between the two of them.

23     Q.   What did they tell you about the offer they

24  were going to extend to you?

25     A.   That it was going to be a 100,000 dollars, and

1   I'd be -- what was stated in these letters.  I was going

2   to be senior vice president, et cetera.

3       Q.    Then is the next thing that happened that you

4   got Deposition Exhibit 2 and signed it and returned it?

5       A.    I think I signed this at Chili's Restaurant

6   with Mr. Anaya.  I think I verbally committed to them,

7   and I actually signed this at -- when he came down.

8       Q.    So who did you verbally commit to; do you

9   recall?

10      A.    I think it was Raul.  And I think I committed

11  to both, Raul and the other person.

12      Q.    Do you recall when that was?

13      A.    It was probably a few days before I actually

14  signed this -- this letter.

15      Q.    Would you have already received this letter,

16  Deposition Exhibit 2?

17      A.    I believe they sent it to me in the mail to my

18  home.

19      Q.    So you had the letter, and then you verbally

20  committed, and then you met with Mr. Anaya at Chili's

21  and signed the letter?

22      A.    Right.  I believe that's how the sequence of

23  events was, yes.

24      Q.    Do you know anyone else who was considered for

25  this position at Bank of America?

1      A.    No, ma'am.

2      Q.    Did you ever tell Mr. Anaya that you felt that

3   Chase was changing, and that there were a lot of

4   initiatives that were coming from outside of the Valley

5   as a reason why you wanted to leave?

6      A.    That was one -- I'm sure I did.  That was one

7   of the reasons that was always happening.

8      Q.    Did those changes occur as a result of Chase

9   taking over the bank, or were they just changes that

10   were gradually happening?

11      A.    They were constant, gradually happening.

12      Q.    What type of changes?

13      A.    Golly, less people, more going to New York,

14   less reaction time, harder to get deals done.  I mean,

15   just whole bunch of things.

16      Q.    What was it before Chase took it over?

17      A.    Texas Commerce Bank.

18      Q.    Texas Commerce Bank is a more local bank,

19   correct?

20      A.    It was -- it was a company based in Texas.

21      Q.    Where was it based?

22      A.    Houston.

23      Q.    And it had a pretty good presence in the

24   Valley; is that correct?

25      A.    Had a very good presence in the Valley.

1      Q.    When did Chase take it over?

2      A.    First, it was taken over by Chemical Bank.  And

3    then it was taken over by Chase Bank.  I -- I really

4    don't know the dates.  I mean, it had to be in the early

5    '90's.  I'm guessing.  Late '80's, early '90's.

6      Q.    That Chase took it over?

7      A.    No.  The various mergers happened.

8      Q.    So in the early -- early '90's or late '80's,

9    Chemical Bank took it over?

10     A.    I believe so, yes.

11     Q.    Where was Chemical Bank based?

12     A.    New York.

13     Q.    Then how much later did Chase take it over?

14     A.    I don't know how many years, what the time span

15   was.  Probably four, five years.

16     Q.    Would've been the late 1990's, approximately?

17     A.    Probably mid '90's.  Mid to early '90's.

18   I -- mid to late '90's, yeah.

19     Q.    Did you find that working for a big national

20   bank was different than working for Texas Commerce Bank?

21     A.    Oh, sure.  Oh, yes, ma'am.

22     Q.    How was it different?

23     A.    Oh, you were having to be handled out of New

24   York.  It just different ideas, different philosophies,

25   different attitudes, longer to make decisions.  It's

1   various -- various things like that.

2     Q. Did Mr. Anaya tell you that he would give you a

3   small base of two to three clients to start off with

4   when you joined Bank of America?

5     A. He -- he told me he'd give me a base of

6   clients.  I don't recall how many he said.

7     Q. He didn't specify or you don't recall?

8     A. I don't think he specified.

9     Q. Mr. Anaya made clear to you that you were

10  expected to bring in new clients, correct?

11    A. Oh, yes.

12    Q. Did you ever ask Mr. Anaya how you were

13  supposed to go about bringing in new clients?

14    A. He said make phone calls, go knock on doors,

15  use your contacts.  It's a standard way of developing

16  business.

17    Q. So you did ask him that question and that was

18  his answer?

19    A. I don't know if I asked that question.  I know

20  he stated it many times in meetings and in conference

21  calls, to -- to groups.

22    Q. Did Mr. Anaya explain to you that the -- the

23  Bank of America had a prospect -- prospect list that

24  would be split between you and Mr. Zamponi?

25    A. Yes.

1    Q.    And you, in fact, got that prospect list,

2  correct?

3    A.    After I joined the bank, yes.

4    Q.    You were expected to call on those prospects,

5  correct?

6    A.    Those that we could clarify as being quality

7  prospects.

8    Q.    So did you have some responsibility to

9  investigate companies and initially qualify them?

10    A.    Sure.

11    Q.    Tell me the process that you would use to do

12  that.

13    A.    Well, some of the companies, obviously, I knew

14  about from my prior banking experience.  So that was one

15  way.  Other ways, sit down with Larry.  We'd go over,

16  figure out what we knew about the companies.  Some were

17  bankrupt.  Some we knew were in financial trouble.  Some

18  did meet the -- whatever criteria we're looking for.

19  You pull the D&B's, Dunn and Bradstreets; call around to

20  referral sources, Hey, do you know these people?  How do

21  I get -- help me get in, you know, that -- that's how

22  you would do it.

23    Q.    Now, understand that you had a credit products

24  officer; is that correct?

25    A.    Yes.

1    Q.    And that was Scott Griffith?

2    A.    Right.

3    Q.    Do you have any concern about how Scott

4    Griffith did his job?

5    A.    He was horrible.

6    Q.    Okay.  Tell me why you think he was horrible.

7    A.    He -- he would never return phone calls.  He

8    would never respond to E-mails in timely fashion.  I

9    mean, it may take him days to get back to you.  You send

10    him something and it would be weeks before he'd get

11    around to doing it.  And he was also supposed to come

12    into the market and meet the clients so he would

13    understand them and their business.  He hardly ever

14    came.

15    Q.    Did you know that the CPO's system was a pretty

16    new system at Bank of America?

17    A.    Not till after I got there.

18    Q.    Okay.  Did -- what did you know about it before

19    you got there?

20    A.    Nothing.

21    Q.    You didn't have that kind of system at Chase?

22    A.    We had a credit executive system where the guy

23    was right in your office or in the facility.

24    Q.    What would the credit executive officer do at

25    Chase?

1    A.    He'd approve or deny the loans.  He'd help you

2  write it up to some degree if you needed assistance with

3  it.

4    Q.    Is that the same or different from what Scott

5  did?

6    A.    Different.  Well, wait a minute.  Let me think

7  about that.  I do not -- I cannot remember Scott

8  actually approved the loan or declined the loan or if it

9  went to somebody else to actually approve or decline.

10  That -- that part I don't know.  And he did -- Scott did

11  lots of analytical work and credit executive did

12  analytical work, but also had the authority to -- to

13  approve or decline.

14    Q.    At some point, did Mr. Anaya sit down with you

15  and Mr. Griffith to talk about communication?

16    A.    I think -- I think there was conversation to

17  that extent, yeah.

18    Q.    What do you remember about that?

19    A.    Oh, I think he knew I was very frustrated and

20  Larry was very frustrated with the lack of response from

21  Scott.  And I think he talked to Scott on several

22  occasions to better communicate with us as to what was

23  going on with our -- with our particular deals.

24    Q.    You knew before you joined Bank of America that

25  you would not have a credit product officer physically

1  bottom, yes.

2      Q.    But did the numbers reflect your understanding

3  of what the expectations were?

4      A.    Yes.

5          MR. PEREZ:  At what point in time?

6      Q.    (By Ms. O'Donnell)  Before you started at Bank

7  of America?

8      A.    Oh, before I started?  No.

9      Q.    Did you -- I'm sorry.  Go ahead.

10     A.    There were no goals given to me before I start.

11     Q.    Did you ask what are the expectations?

12     A.    I didn't ask them what my goals would be, no.

13  He said they would be given to me when I would be

14  accepted.

15     Q.    And you did not ask him what they would be?

16     A.    No.

17     Q.    On Deposition Exhibit No. 4, if this document

18  pertained to you, you would be in the level of tier one;

19  is that correct?

20     A.    Yes, ma'am.

21     Q.    Do these goals look like the goals that were

22  required of client managers that you learned after you

23  started at Bank of America?

24     A.    Oh, I don't recall.  I mean, they -- possibly,

25  yeah.

1      Q.   Do you recall Mr. Anaya, at any time prior to

2  joining Bank of America -- prior to you joining Bank of

3  America, explaining to you that your goals would be

4  prorated based on your starting into the year?

5      A.   After I got there he told me they'd be

6  prorated.

7      Q.   So he didn't tell you anything about your goals

8  prior to joining bank of America?

9      A.   No, ma'am.

10          MR. PEREZ:  Can we take a break?  Let me go

11 get some water.

12          MS. O'DONNELL:  Absolutely.

13          (Recess, 12:24 - 12:27.)

14     Q.   (By Ms. O'Donnell)  So there are no specific

15 documents you can remember receiving prior to joining

16 Bank of America?

17     A.   No, ma'am.

18          (Exhibit No. 5 was marked.)

19     Q.   (By Ms. O'Donnell)  Let me show you what's been

20 marked as Deposition Exhibit 5.  If you flip to the

21 third page of this document, can you tell me if that's

22 your signature?

23     A.   Yes, ma'am, it is.

24     Q.   And is that your handwriting on the date?

25     A.   Yes, ma'am.

1    Q.    Do you recall signing this document?

2    A.    Yes, ma'am.

3    Q.    You voluntarily signed this document, correct?

4    A.    Yes, ma'am.

5    Q.    No one could coerced or induced you into

6    signing it?

7    A.    No, ma'am.  No, ma'am.

8    Q.    If you look at the first page of this document,

9    letter "G," do you see that?

10    A.    Yes, ma'am.

11    Q.    It says, I understand that if I'm offered a

12    position with Bank of America, the offer will be for

13    employment on an at-will basis.  That is, the employment

14    relationship is not guaranteed for any specific period

15    of time and may be ended by Bank of America or me at any

16    time with or without notice or cause.  We've already

17    talked about that.  You knew you were an at-will

18    employee?

19    A.    Yes, ma'am.

20    Q.    If you flip to the third page of this exhibit,

21    do you see the paragraph entitled, Scope of Agreement?

22    A.    Yes.

23    Q.    And it says, In the event I'm employed by the

24    Bank, I understand that this document is the complete

25    agreement between the Bank and me, and takes place of

1  all prior and/or written agreement concerning the

2  conditions, nature, tenure and/or duration of my

3  employment relationship with the Bank.  And all such

4  prior oral and/or written agreements, expressed or

5  implied, are invalid except any specific provisions set

6  forth in prior written agreements stating my

7  compensation and/or benefit.  Did you make any changes

8  to that portion of this agreement?

9        A.    Did I?  No.

10        Q.    Do you understand what that means?

11        A.    Yes, I do.

12        Q.    Before you were hired at -- or strike that.

13              Before you decided to join Bank of America,

14  did Mr. Anaya explain to you that you were being hired

15  based on your experience and connections in the Valley?

16        A.    I don't recall if he said that or not.

17        Q.    You knew that Bank of America only had three

18  branches in the Valley?

19        A.    That's correct.

20        Q.    How many branches did Chase have?

21        A.    Five or six.  Five.  I think five.

22        Q.    Does Chase have a bigger presence in the Valley

23  than Bank of America?

24        A.    In what way?

25        Q.    Does it have more name recognition in the

1    Valley?

2        A.    Yes, it does.

3        Q.    Does it have a bigger percentage of the

4    commercial deals?

5        A.    I don't know the answer to that question.

6        Q.    Before you joined Bank of America, you knew

7    that the product partners that Mr. Anaya had referenced

8    were not physically located in the Valley?

9        A.    That's correct.

10        Q.    Did you take a fishing trip immediately after

11    starting with Bank of America?

12        A.    Did I take a fishing trip?  I go fishing all

13    the time.  I don't recall when -- if I took it right

14    afterwards or not.

15        Q.    You don't recall telling Mr. Anaya that you had

16    a pre-planned fishing trip, and that you were going to

17    take that after you started?

18        A.    I -- I don't recall.  I really don't.

19        Q.    After you started at Bank of America, Mr. Anaya

20    had you meet either in person or on the telephone with

21    all of these product partners, correct?

22        A.    Yes, ma'am.

23        Q.    Did he give you product capability information

24    prior to those meetings to assist you with them?

25        A.    I don't recall.  I'm sure he did, yeah.

1      Q.    Was it your impression or your opinion that he

2    set up these meetings and gave you that information

3    because he was trying to assist you?

4      A.    Yes.

5      Q.    Did Bank of America have a reception in your

6    honor on June 6th after you had started?

7      A.    Yes, ma'am.

8      Q.    In your opinion, was that done to help you

9    succeed?

10     A.    I think I was the one that requested that be

11   done and told Mr. Anaya, Raul, that it would be a very

12   good way to get Bank of America's name out in the

13   Brownsville community.

14     Q.    What did Mr. Anaya say when you told him that

15   you thought that would be a good idea?

16     A.    That was great.

17     Q.    Did he personally come to this reception?

18     A.    Yes, he did.

19     Q.    Was the reception a success?

20     A.    I believe it was.

21           (Exhibit No. 6 was marked.)

22     Q.    (By Ms. O'Donnell)  Let me show you what we've

23   marked as Deposition Exhibit No. 6, which is a

24   Performance Planning and Coaching document.  Does this

25   look familiar to you?

1        A.    Yes, ma'am.

2        Q.    Will you turn to page six of this document,

3    please.   Does page six reflect your goals while you were

4    at Bank of America and your success at meeting those

5    goals?

6        A.    Yeah.   I'm sure it does.

7        Q.    In the -- each of the goal columns there are

8    numbers.   Are those numbers in the thousands?   In other

9    words, under New Loans for June year to date, the goal

10   would be 5,325,000?

11       A.    Yes.

12       Q.    Okay.

13       A.    That's correct.

14       Q.    I want to talk to you about each of these

15   particular goals.   And we'll start with New Loans --

16       A.    Okay.

17       Q.    -- including leasing.   What did that encompass?

18       A.    As far as the actual loans?

19       Q.    Yes.   What kind of deals would go into this?

20       A.    Loans that you -- that you had booked, that

21   formally booked on the system.

22       Q.    Were they supposed to be loans in excess of a

23   million dollars?

24       A.    At this particular time, I don't -- I think

25   they probably were, yeah.

1    Q.   It says in June that your actual -- on New

2  Loans, was zero; is that correct?

3    A.   In June, that's what it says, yes.

4    Q.   Is that correct?

5    A.   I assume so.

6    Q.   Do you remember having any loans booked as

7  early as June?

8    A.   No, I do not.

9    Q.   When we move over to September, it looks like

10  your goal for New Loans was 13,315,000?

11    A.   Uh-huh.

12    Q.   Does that sound accurate?

13    A.   I'm assuming -- I'm assuming it is.

14    Q.   And actual was zero; does that sound accurate?

15    A.   That's what's there, yes.

16    Q.   Okay.  You don't disagree with this document?

17    A.   I just don't -- I -- I don't know enough about

18  the document since -- if the figures are correct or not

19  correct in the sense it's so long ago.  But I -- you

20  know, it's there.  That's what it's stating.

21    Q.   Do you recall seeing this document during your

22  employment with Bank of America?

23    A.   This particular document?  I don't recall

24  seeing this, no.

25    Q.   Do you recall seeing a similar document?

1    A.    I recall talking about it and there were

2  different documents that I looked at, yes.

3          (Exhibit No. 7 was marked.)

4    Q.    (By Ms. O'Donnell)  I've marked Deposition

5  Exhibit No. 7, which is a document that you've produced

6  to us in discovery in this case.  If you flip to page

7  six of that document.  If you compare it to Deposition

8  Exhibit No. 6, I think that the only difference is, and

9  tell me if you agree, that on the one you produced the

10  Year-end column, Actual, is not filled out; is that

11  correct?

12    A.    Yes, ma'am.

13    Q.    Do you recall receiving Deposition Exhibit

14  No. 7?

15    A.    I'm sure I did, yeah.

16    Q.    Okay.  Looking at Deposition Exhibit No. 7,

17  which is the one I just gave you, again, if we go to

18  that New Loans column -- or row, rather.

19    A.    Uh-huh.

20    Q.    We talked about June.  We talked about

21  September.

22    A.    Uh-huh.

23    Q.    Then your goal for year end was 21,300,000 in

24  new loans; does that sound accurate?

25    A.    Yes, ma'am, it does.

1     Q.   Okay.  If you look back at Deposition Exhibit

2  6, it reflects that your actual for the year was

3  1,675,000; does that sound accurate to you?

4     A.   It sounds like it's in the ballpark.

5     Q.   The next line -- and let's just stick with

6  Deposition Exhibit No. 6, but if you feel that anything

7  is inaccurate, we can --

8     A.   Okay.

9     Q.   -- look at the other document.  New

10  Non-interest DDAs, what type of deal is that referring

11  to?

12     A.   Just check -- commercial checking accounts.

13     Q.   Okay.  Let me just back up for one second.  On

14  the New Loans, were the product partners in any way

15  supposed to help you bring in new loans?

16     A.   Commercial loans?

17     Q.   Yes.

18     A.   They were supposed to refer business

19  when -- while they were prospecting in -- in the

20  marketplace.

21     Q.   Did anyone refer a commercial loan to you?

22     A.   No, ma'am.

23     Q.   Do you know if anyone referred a commercial

24  loan to Larry?

25     A.   I don't -- I don't recall.

1  evaluates the finances of a particular entity either

2  for a long-term deal or for a one-time deal.  And then

3  if -- if it looks okay, they give them a letter of

4  credit; is that how it works?

5       A.   Well, it depends on how they're secured.  I

6  mean, I don't know exactly what Bank of America's

7  policies were on that, because Jesse handled that.  But

8  that's one of the steps.  The other is give me a CD,

9  I'll issue you a letter of credit.  That's how they're

10  usually handled is, is by backing them up with cash.

11       Q.   You said you did do a letter of credit for

12  Stone Art.  Do you recall the dollar value of that

13  letter?

14       A.   I don't -- I don't recall.

15       Q.   Was it just one letter of credit for them, or

16  was it more than one?

17       A.   I think Jesse was working on them with several

18  letters of credit.  And that was a result of that call

19  we had made -- or several calls we had made on them.

20       Q.   Did you bring that to Mr. Anaya's attention,

21  that you felt there were letters of credit that you

22  weren't getting credit for?

23       A.   I don't recall if I said anything or not.  I'm

24  sure I would've if I -- you know, you want as much

25  credit as you can.  No pun intended on letter of credit.

1    Q.    Okay.  Fees F/X.  What does that refer to?

2    A.    That's foreign exchange.

3    Q.    Okay.

4    A.    Selling like pesos or yen or whatever, and

5    making the money on the trading of the product.

6    Q.    This reflects that you did not get any fees

7    from foreign exchange; is that accurate?

8    A.    That's accurate.

9    Q.    Is there anything the product partners could've

10   done to help you succeed at that?

11   A.    Yes, a lot.

12   Q.    Okay.  What could they have done?

13   A.    Well, the product partner for foreign exchange

14   was out of Los Angeles and -- well, the way foreign

15   exchange works, you have to really work the -- at least

16   in this region, the Mexican side of the border.  I mean,

17   you have to be -- you have to have a lot of contacts.

18   You have to have done it for a long time.

19         The primary players in this market are

20   International Bank of Commerce, Chase, and First

21   National Bank of Edinburg.  They have people dedicated

22   to that.  That's all they do all day long is foreign

23   exchange.  They're not going -- they're in Mexico.

24   That's all they do.

25         And when Raul said, Hey, y'all need to start

1  doing foreign exchange, we don't have a presence in

2  Mexico.  At least not along the border here that -- in

3  the Valley region.  And your product partner is going to

4  be out of Los Angeles.  This guy's never been to Mexico

5  in his life.  So he came down.  I mean, we set up

6  meetings for him.  He came down.  And went and called on

7  plants.

8           But it's like any other business.  If you

9  don't keep calling and knocking on doors and letting

10  them know you're there and that you have product to

11  offer, they're not going to -- why they going to do

12  business with you?  They got IBC, they got Chase, First

13  National Bank, people they've been doing business for

14  years.  He headed back to Los Angeles, never to be seen

15  or heard from again.

16     Q.    Okay.  So he actually tried, but just didn't

17  have the experience or the connections?

18     A.    He came down because we forced him -- or

19  somebody forced him to come down one time.

20     Q.    Do you know who forced him to come down?

21     A.    Don't know if it's Raul or somebody else says,

22  Hey, you're serving South Texas region, get down there

23  and meet your quota of calls.  I mean, I don't know how

24  it all played out.  But he came down, we took him

25  around, met with all -- whole bunch of different

1  companies.

2      Q.    Who was the foreign exchange product partner?

3      A.    Goodness.  I hope I have his card.  I don't

4  recall his name.  I don't know.  I don't recall his

5  name, but he was out of Los Angeles.  He'd come from

6  Chicago or L.A.  I remember that.

7      Q.    Okay.  The next line, Fees Derivatives.

8      A.    Uh-huh.

9      Q.    Tell me what that means.  Is that what we

10 already talked about?

11     A.    Yeah.  I can't explain derivatives.  I'm sorry.

12     Q.    Okay.  Is there anything that product partners

13 could've done to help you met the derivatives goal?

14     A.    Only they were based out of Chicago.  It

15 would've been that expert coming in and -- and being

16 able to be down here on a more frequent basis.

17     Q.    You did have, according to this, 33,000 in

18 derivatives; does that sound accurate?

19     A.    I know there were derivative fees.  And it was

20 on -- from Burger King, the Wright Brothers.  But I

21 don't know if those dollar amounts are correct or not,

22 but...

23     Q.    Would that be something you'd refer to this

24 person in Chicago?

25     A.    Right.

1      Q.    The next line is, Fees Investment Services,
2  what is that?
3      A.    I think those are related to private bank and
4  trust.
5      Q.    And it looks like you didn't have any fees from
6  that source; does that sound accurate?
7      A.    That's right.  They never would come into the
8  market.
9      Q.    Is that the concern you had with Ms. Walker?
10     A.    Yes.  Uh-huh.  And with the other gentleman who
11 never followed up on any of those calls.  I set him
12 up --
13     Q.    Okay.  He actually came down?
14     A.    He came down, met with them one time.
15     Q.    The next line says, Fees Loaned and Other.  Do
16 you know what that references?
17     A.    No, ma'am.
18     Q.    Actually, looks like you did not have a goal in
19 this area, correct?
20     A.    That's correct.
21     Q.    The next line, Calls Business Development, what
22 is that referencing?
23     A.    How many calls you made in the year.
24     Q.    And it looks like you were required for the
25 year to have made 200 calls.  You made a 176; does that

1  sound accurate?

2      A.    That's -- if that's what is down there, yeah.

3      Q.    How would you record a call in order to get

4  credit for it?

5      A.    You gave them to your secretary, and they input

6  them into -- into a software system they had to -- to

7  record them.

8      Q.    And you gave all your calls to your secretary?

9      A.    Yeah.  There was a sheet of paper or -- I can't

10 remember if there was an actual form or we hand wrote

11 them, gave it to them, but that's how it was done.  Then

12 she'd type them into the computer.

13     Q.    Did you think Ms. Ybarra was competent at that

14 task?

15     A.    She -- she had some -- some skills that were

16 lacking?

17     Q.    Do you -- did you ever feel like she didn't put

18 people in that -- whom you had made calls on?  In other

19 words, didn't properly --

20     A.    There were times -- there were times that she

21 didn't accurately input things.

22     Q.    When she didn't accurately input things, did

23 you correct it with her?

24     A.    I would tell her she needed to go back and

25 input them.

1    Q.   Would she then go back and input them?

2    A.   She was supposed to.

3    Q.   Do you know if she did?

4    A.   I would hope she did.

5    Q.   Okay.  You --

6    A.   I mean, I didn't follow up on every single

7 time.  But yes, the -- I told her the things that were

8 missing, to please go back and input them correctly.

9    Q.   The call business development, that was

10 something you were supposed to do all on your own

11 without any product partner help, correct?

12    A.   Well, it was joint.  You were supposed to do

13 your own.

14    Q.   Uh-huh.

15    A.   Then product partners were supposed to get

16 referrals, too, to help you in that effort.

17    Q.   The 200 goal were ones you were supposed to do

18 on your own, correct?

19    A.   Yes, I was supposed to go knock on the doors,

20 right.  Well, I was supposed to -- sometime these

21 partners came with me, and that was considered a joint

22 call.

23    Q.   You would both get credit for the call?

24    A.   Right.

25    Q.   And when you would input the information on the

1  call, you would list all the people that were there?

2      A.    There was supposed to be in the call, yes,

3  ma'am.

4      Q.    Calls Derivatives, the next line, it says that

5  you had one.  Do you recall making call about

6  derivatives?

7      A.    Well, that was with -- oh, the Burger King

8  people.

9      Q.    Does that sound accurate, that there was one?

10     A.    Yes.  And then it was handed over to this

11 gentleman who does the derivatives.

12     Q.    That five calls that you are supposed to make,

13 was that, again, something that you were to do by

14 yourself or you had responsibility for?

15     A.    It was joint responsibility.

16     Q.    Could it be a call you went on by yourself or a

17 call you went on with product partners?

18     A.    Right.  Exactly.

19     Q.    Or with anyone else, right?

20     A.    With anybody else, yes.

21     Q.    Referrals private, what is that refer to?

22     A.    Referrals to the private bank people.

23     Q.    It says that you did not have any; is that

24 accurate?

25     A.    That's wrong.

1    Q.    Okay.  Tell me how many referrals to the
2    private bank you had.

3    A.    Those were -- the referrals were the people
4    that I told you about, Rentfro, Faulk and Blakemore;
5    Long and Chilton; who else could I say in there?  I
6    think there were four that I mentioned earlier.  I think
7    I said Hales, Bradford and Allen.  I -- I can't remember
8    all of them.

9    Q.    Do you know whether they had to actually be
10   booked as clients in order to get credit for it?

11   A.    For a call?

12   Q.    For the referral private.

13   A.    That's a good question.  I -- I don't know.  I
14   don't know.  My understanding of a referral is that you
15   just made the referral, and then they were supposed to
16   follow up with talking to them, trying to get business
17   out of them.  That's my understanding.

18   Q.    Okay.  Referral Premier, what is that
19   reference?

20   A.    I don't remember what premier banking was.  I
21   don't remember what the definition is.

22   Q.    Okay.  So you certainly don't remember having
23   any?

24   A.    No.

25   Q.    Let's look at page nine of this document.

1    A.    Okay.

2    Q.    Page nine has comments on a quarterly basis --

3    A.    Uh-huh.

4    Q.    -- with respect to your performance?

5    A.    Uh-huh.

6    Q.    Do you recall Mr. Anaya going over this with

7  you on a quarterly basis?

8    A.    Yes.

9    Q.    Let's talk about after the second quarter.

10    A.    Uh-huh.

11    Q.    Tell me what you remember about your meeting

12  with Mr. Anaya after the second quarter.

13    A.    In what way?

14    Q.    Just -- before we actually look at what's

15  written, just tell me generally what do you remember

16  about your meeting with Mr. Anaya after this -- the

17  second quarter.

18    A.    I don't -- I don't remember anything.  I really

19  don't.

20    Q.    Let's look at what's written then.

21    A.    Okay.

22    Q.    The second bullet point:  John has done a good

23  job involving his product partners, trade banking,

24  private banking, treasury management, leasing, foreign

25  exchange in his calling efforts.  So it was clear to you

1   at that point that you were required to involve your

2   product partners?

3        A.   Uh-huh.

4        Q.   Is that a yes?

5        A.   Yes.   That was a yes.

6        Q.   That was your first time.   That's pretty good.

7        A.   Getting tired.

8        Q.   The third bullet point:   In order to reach his

9   goals, John will need to prioritize the market

10  opportunities and dedicate his efforts on those

11  opportunities with the greatest potential.   Do you

12  remember talking about the need for you to prioritize

13  opportunities better?

14       A.   No, I don't recall that.

15       Q.   He could've told you that, you just don't

16  remember?

17       A.   Right.   Uh-huh.

18       Q.   It continues:   A plan should be developed on

19  how each of the various goal segment will be reached by

20  identifying those prospects that can help him reach his

21  goals.   When it says "goal segment," do you understand

22  that to be referencing the different requirements on

23  page six?

24       A.   Yes, I do.

25       Q.   Do you recall discussing coming up with a plan

1    to target each of those areas?

2        A.    I don't recall coming up with a plan, no.

3        Q.    Do you recall Mr. Anaya suggesting to you that

4    you come up with a plan?

5        A.    I don't recall him saying that, no.

6        Q.    He could've, but you don't remember?

7        A.    Right.

8        Q.    But you never did develop some kind of a plan

9    for how you would target each of these individual areas?

10       A.    A formal plan, no.

11       Q.    Did you ever?

12       A.    One that I had came up with, sure.

13       Q.    Okay.  Well, what was your plan?

14       A.    To try to get the product partners more

15   involved, come down; use D&B list more; try to target

16   other customers of other banks that I knew would fit our

17   criteria; and -- but the main thing was trying to get

18   people down here to help prospect.

19       Q.    What about how you targeted individual

20   companies?  Did you think about which companies maybe

21   had needs that went into each of these categories?

22       A.    You know, the way I normally would do it, look

23   at the D&B, did they fit the sales criteria, which was

24   ten million or more.  And if they did, try to figure out

25   what type of company was it, a trucking company, a

1   trading company, a retail company, what it was.  And

2   then look at that and say, Okay.  What -- what do we

3   have to offer them?  And then -- then you try to -- to

4   get in the door to see them.  A lot of it's cold

5   calling.  You just got to keep -- try to get in to see

6   somebody.  That's -- cold calling is the most difficult

7   form of any sort of selling, is cold call.

8        Q.    I would believe that.

9        A.    So you always try to use a connection,

10  whether it be an attorney, be CPA, or a friend, and say,

11  Hey, I know this guy down at Bank of America.  He's a

12  good guy.  Give him five minutes of your time.  And

13  that's how you -- I mean, that's a heck of a lot easier

14  getting in that way than just, Hey, I'm John Reed.  I'm

15  a good guy.  Can you see me?

16       Q.    The last bullet point on second quarter says,

17  Regular, several times weekly, conversations with his

18  CPO, who's Scott Griffith, right?

19       A.    Uh-huh.

20       Q.    And market executive is Mr. Anaya, right?

21       A.    Yes, ma'am.

22       Q.    Are recommended such that John can continue to

23  become better acquainted with Bank of America's credit

24  culture and credit process.  Do you recall Mr. Anaya

25  suggesting to you that you have more communication with

1  Mr. Griffith?

2      A.    Yeah.    We were trying to increase communication

3  both ways.

4      Q.    When you say "we," you're referring to you and

5  Mr. Griffith?

6      A.    Right.

7      Q.    That was something that Mr. Anaya was

8  requesting of both of you?

9      A.    Yes.    After much frustration on my part, yes.

10     Q.    And Mr. Anaya was trying to make that a better

11 relationship, correct?

12     A.    I think -- well, I think he was trying to do

13 anything possible to keep from getting rid of

14 Mr. Griffith.    It's this person.

15     Q.    Why do you think that?

16     A.    Because everybody was having the same problem

17 with Mr. Griffith.

18     Q.    When you say "everybody" --

19     A.    Mr. Zamponi, I'm sorry.    Mr. Zamponi.    I don't

20 know about the people in San Antonio or Corpus, but...

21     Q.    Now, do you know Mr. Griffith supported three

22 people?

23     A.    What do you mean by "supported"?

24     Q.    Three client managers?

25     A.    No.    I -- well, I probably knew at the time.    I

1    don't recall how many he supported.

2        Q.    Why do you think Mr. Anaya would not want to

3    get rid of Mr. Griffith?

4        A.    Because he needed help.

5        Q.    Who's "he"?

6        A.    Mr. Anaya needed people in San Antonio to help

7    get loans moving, under written.

8        Q.    Was Mr. Anaya trying to improve Mr. Griffith's

9    performance?

10        A.    I don't know.

11        Q.    The next sentence says, Because the Valley CPO,

12    referring to Mr. Griffith, is not physically located in

13    the Valley, it is very important that John continue to

14    stay involved to some degree in the credit process in

15    order to facilitate information from the client/prospect

16    and therefore, ensure an efficient credit process.  Do

17    you remember him talking to you about that, that you

18    needed to stay involved in the process?

19        A.    Yes, I do.

20        Q.    Okay.  Third quarter -- before we actually look

21    at this document, do you remember anything about the

22    meeting you had with Mr. Anaya to discuss your third

23    quarter performance?

24        A.    No, ma'am.

25        Q.    If we look at this document under, Third

1   quarter --

2       A.    Uh-huh.

3       Q.    -- the first bullet point says that, At

4   September 30th your production reflected 200,000 in new

5   DDA's.  What's a DDA?

6       A.    Demand deposit account.

7       Q.    What --

8       A.    That's a checking account.

9       Q.    From one existing relationship, Wright III

10  Foods, does that sound like an accurate number at that

11  time?

12      A.    Probably, yeah.

13      Q.    Wright III Foods was a Bank of America client

14  who was given to you; is that correct?

15      A.    That's correct.

16      Q.    The next line, His active pipeline totalled 1.8

17  million reflecting two deals, Wright III Foods and

18  Texgulmarco, that will close in October/November.  Does

19  that sound like what your pipeline was as of September?

20      A.    Yes.

21      Q.    Was Texgulmarco a company that you had worked

22  with previously?

23      A.    That's correct.  At Chase Bank.

24      Q.    Additionally, opportunities with WenCar, Inc.,

25  exist for Treasury Management and, I guess, that's

1  Securities Debt?

2      A.    Senior Debt, which is -- I'm sure -- I think

3  he's referring to commercial debt.

4      Q.    Does that sound right?

5      A.    That's correct.

6      Q.    If you go to the third bullet point,

7  Improvement is needed in calling on priority prospects

8  that provide good revenue potential.  Calls on companies

9  with more limited opportunities should result from

10  John's efforts in qualifying prospects for the

11  commercial bank.  Do you remember Mr. Anaya talking to

12  you about the need to be focusing on companies with

13  higher revenue?

14      A.    Yes.  Uh-huh.

15      Q.    Did you try to do that after you talked to

16  Mr. Anaya?

17      A.    Yes, I did.

18      Q.    Did you think you were successful?

19      A.    I think I was working towards that effort; very

20  diligent.

21      Q.    The last bullet point is related:  John has not

22  been diligent in calling on several names that are

23  considered priority prospects, and then he names

24  several.  Do you recall him talking to you about that?

25      A.    Yes.  And I remember my conversation, Diocese

1   of Brownsville, they had a lot of turmoil.  They were

2   changing accounts.  They weren't interested in talking

3   to us.

4       Q.    Had you tried to talk to them?

5       A.    Many times.  Finally got in, like I said, in

6   September.  And this was a -- a -- the Diocese, I don't

7   know if you could call them a company, but it was a

8   potential client that Bank of America lost a deal to.

9   And I don't recall if it was to Chase or some other

10  bank, a couple years prior to that.  And it was just

11  very hard to get in to see them.  But I was very

12  diligent, and finally got in to see them.

13          Edelsteins, that was Mr. Ruben Edelstein.

14  He was a director -- then it was Mercantile Bank.  Now,

15  it's Wells Fargo.  No interest in talking to us.  I told

16  that to Mr. Anaya.  I -- I know Mr. Edelstein.  I've

17  talked to him.  Tex-Mex Cold Storage, didn't meet our

18  criteria of ten million or more in sales.  He's a client

19  of mine now.  Pizza Hut of South Texas, couldn't get in

20  to see them; made several phone calls.

21      Q.    Did you explain that to Mr. Anaya at the time

22  of this review?

23      A.    Uh-huh.

24      Q.    Is that a yes?

25      A.    Yes, ma'am.  I'm sorry.

1    Q.    The next sentence says, Additionally, John

2    did not fully participate in the Tax-Exempt Brochure

3    Mailing Campaign with follow-up telephone calls as

4    instructed -- instructed.  Do you remember the

5    Tax-Exempt Brochure --

6    A.    Yes, I do.

7    Q.    And then these mailings went out, and you and

8    all of the client managers were required to make phone

9    calls to follow-up?

10    A.    Right.

11    Q.    And you did not make your number of phone

12    calls; is that correct?

13    A.    I made, I would say, about half of them.  And

14    then after talking to John Robertson who is the -- oh,

15    the man that -- the specialist that would come down and

16    handle these calls if there would be an interest.  He

17    said, specifically, We don't have any business down

18    there, that that business is controlled by Estrada

19    Hinojosa.  Y'all are wasting your time.  And we don't

20    have a chance in hell, because we are not Mexicans.

21    Q.    Did you tell Mr. Anaya about the conversation

22    with Mr. Robertson?

23    A.    I'm sure Larry did.

24    Q.    Do you know if Mr. Zamponi made all of his

25    calls?

1     A.    I do not know if he made them all or not.

2     Q.    So based on what Mr. Robertson told you, you

3   decided not to make all those calls?

4     A.    I felt my efforts would be better utilized for

5   my goals and for the company if I concentrated on other

6   products.  I had my secretary make the phone calls on

7   the rest of them to make sure that they had received the

8   package.  And if there was any interest at all in it,

9   then I would call them.

10    Q.    Do you remember Mr. Anaya being upset with you

11  about --

12    A.    Oh, he was furious.

13    Q.    He was furious?

14    A.    Yeah.  But he never said that to me.  He said

15  it to Larry and he said it to Alma.  But he never said,

16  I'm furious with you.  All he said is, I expect you to

17  do your calls.

18    Q.    Okay.  Improvement in calling and new business

19  generation is needed so John can meet his goals.  Do you

20  remember talking about the need for you to improve in

21  calling and generating new business at the end of the

22  third quarter?

23    A.    I don't recall that, no.  No.  I was doing

24  everything possible to make it work.

25    Q.    Is it true that during the fourth quarter of

1  2000, you did not add any new deals to your pipeline?

2      A.    I don't recall if I did or didn't.

3      Q.    Now, did you ever tell Mr. Anaya that you

4  thought your performance would improve if you -- if Bank

5  of America had done the things that they told you they

6  would do?

7      A.    I told him that we had better participation in

8  the product partners, that things could get better.  But

9  we'd have a better presence down here, the things would

10  work better.

11      Q.    When you started at Bank of America -- or

12  actually, strike that.

13          Before you joined Bank of America, you knew

14  that all of the different aspects of the bank were not

15  going to be physically located in the Valley, correct?

16      A.    You talking about where the product partners

17  were located?

18      Q.    Exactly.

19      A.    Yeah.  I knew the product partners were

20  scattered across the state and across the country.

21      Q.    Tell me about your termination meeting.

22      A.    Boy, I'm going to hash up a bad memory here.  I

23  had gone out on a call, very good call.

24      Q.    With whom?

25      A.    Company out of McAllen.  Right off the top of

1  my head, I don't recall the name of it.  But I remember

2  I was very excited when I got back to the office.

3  Because it fit all the criteria and buzz words and the

4  company was interested in talking.

5          Came in and Raul called me into the

6  conference room, and -- and said, You're not meeting

7  your goals -- or I forget how -- exact words that were

8  used.  But -- but said, I'm going to have to let you go.

9  And I was just shocked.  Completely shocked.  And he

10  just -- he asked me if I had any comments.  I just,

11  basically, said, Well, no.  I think I'm going to cry.  I

12  was just so taken aback.

13          And -- and I can't even -- I think

14  conversation was, like, ten minutes, fifteen minutes.

15  It wasn't a very long conversation.  And he said, Well,

16  you can go ahead and leave and come back tomorrow, get

17  your -- clean out your stuff and all that, so -- and

18  that was -- that was pretty much the extent of the

19  conversation.  I mean, it wasn't a lengthy one.  It

20  wasn't -- you know, that was pretty much it.

21      Q.    Did he tell you that the bank was going to give

22  you more severance than you'd otherwise be entitled to?

23      A.    Oh, I think he told me he was going to give me

24  30 days.

25      Q.    Did he tell --

1    A.    He gave -- it was 30 days, but I don't

2    remember -- I don't recall.  Anything beyond that, I

3    mean --

4    Q.    You dont' recall him saying that, generally,

5    you'd only be entitled to two weeks?

6    A.    Yeah, he did say that.  He did say that.

7          (Exhibit No. 8 was marked.)

8    Q.    (By Ms. O'Donnell)  Show you what's been marked

9    as Deposition Exhibit No. 8.

10    A.    Uh-huh.

11    Q.    Is this a document that you prepared?

12    A.    Yes, ma'am.

13    Q.    Is this a document that you brought with you to

14    the termination meeting?

15    A.    No.  Because I -- like -- the termination

16    meeting, I just walked in the door and he said come on

17    into the conference room.  I need to talk to you about

18    something.

19    Q.    Do you recall when you showed -- well, strike

20    that.

21          Did you ever give this document or show it

22    to Mr. Anaya?

23    A.    I don't -- I don't recall if it got sent up

24    during the seven or eight months I worked there, however

25    long I worked there.

1    Q.    Why did you prepare this document?

2    A.    Because I wanted to show Frank what I had done

3   at the -- at the bank.  The bank was alleging I wasn't

4   doing anything.  I wanted to show him that I really did

5   go out there and hustle it and work it.  You add these

6   up, I did meet my 21 million dollars; obviously, not

7   everything got approved, but I did go out there and work

8   it, tried like heck to -- to make the deal work.

9    Q.    I don't want to know anything that you have

10  discussed with your attorney.

11   A.    Uh-huh.

12   Q.    But I do want to know had you hired an attorney

13  prior to being terminated from Bank of America?

14   A.    Had I hired one?

15   Q.    Yes.

16   A.    No, ma'am.

17   Q.    Had you consulted with an attorney prior to

18  being terminated from Bank of America?

19   A.    No, ma'am.

20   Q.    Do you think that you prepared this document,

21  Exhibit No. 8, after you left Bank of America?

22   A.    Yes.

23   Q.    Now, you understood in order to meet your

24  goals, that deals had to be booked, correct?

25   A.    That's correct.

1    Q.    The list, the first part of this on the first

2  page, declined?

3    A.    Uh-huh.

4    Q.    These six deals are deals that were never

5  booked, correct?

6    A.    Yes, ma'am.

7    Q.    So they wouldn't count towards your goals?

8    A.    No, ma'am.

9    Q.    And that's fair, correct?

10    A.    That's fair.

11    Q.    On the approved list, the WenCar deal 168,000,

12  that's well blow the million you were supposed to go

13  after, correct?

14    A.    Yes.  But I'm not quite sure when they

15  came through with the million dollars and when this

16  was -- was being booked or during the process of being

17  solicited.  Because they came in with a million dollar

18  cap.  I don't -- "X" number of months after I'd been

19  there.  I'm not quite sure what that time frame was.

20    Q.    Oh, okay.  Your recollections is, that that

21  million dollars was put in some time during your

22  employment?

23    A.    Yes, it was.  Definitely put in some time.

24    Q.    Do you know whether that deal had been booked

25  at the time that you left?

1    A.    Yes, that had been booked.

2    Q.    Prior to you leaving?

3    A.    Prior to me leaving.

4    Q.    You're sure?

5    A.    Well, I hate to say sure, because the system

6 sometimes weren't as full -- or as fast, as accurate as

7 I sometimes believed them to be.  But I know it got

8 booked, but I think it was booked before I got -- I

9 mean, not before, but before I left.

10    Q.    The second one, Texgulmarco, do you know if

11 that was ever booked?

12    A.    No, it was not booked.

13    Q.    And is that because you left the bank?

14    A.    That's correct.

15    Q.    The next one, Rio Grande Tool, was that a

16 commercial deal?

17    A.    That was one that was -- it was referred to

18 Kevin Kleinsteuber.  He booked that one.

19    Q.    Dr. Kiesel, was that a commercial one?

20    A.    You know, I don't recall that one.  I -- I

21 really don't recall what that one was.  I don't know if

22 that was -- I think that was in private bank.  I think I

23 referred that one to -- oh, shoot.  I keep forgetting,

24 but the gentleman in private bank.

25    Q.    Okay.  Not Kevin Kleinsteuber?

1    A.    No.   I should keep this list out.   Gregg.   I

2  think I referred that one to Gregg Muenster.

3    Q.    Okay.   El Pollo Loco, is that part of Wright

4  III Foods?

5    A.    Yes, it is.

6          MR. PEREZ:   Pollo.

7          MS. O'DONNELL:   I apologize.

8    A.    Just giving you -- I was going to say

9  something, but I thought it wasn't my place.

10          MR. PEREZ:   I'm just kidding.

11    Q.    (By Ms. O'Donnell)   El Pollo Loco.

12          MR. PEREZ:   There you go.   There you go.

13    Q.    (By Ms. O'Donnell)   Okay.   On the Pending --

14    A.    Uh-huh.

15    Q.    -- Mesquite Plaza, that was a real estate deal,

16  correct?

17    A.    Right.

18    Q.    WenCat?

19    A.    WenCar.

20    Q.    WenCar?

21    A.    Right.

22    Q.    Tell me about that.

23    A.    That was a company out of Corpus Christi.   It

24  distributed -- oh, supplies to -- to fast food.   I say

25  fast food, to "C" stores, to convenience stores.   And

1  Gary Meske (phonics) who owns that.  And we were -- I

2  can't remember exactly what we were looking at, but I

3  think we were looking at refinancing a shopping center

4  and refinancing the debt they had at WenCar as well.

5      Q.   Do you know whether that was ever booked?

6      A.   I do not know.

7      Q.   Do you know whether Mesquite Plaza was ever

8  booked?

9      A.   I do not know.

10     Q.   The Bowling Alley, was that a start-up?

11     A.   That was a start-up, right.

12     Q.   Do you know that that was declined?

13     A.   That was declined.

14     Q.   MRI Clinic, was that something that was

15 referred to private banking?

16     A.   That was -- I can't remember who it was

17 referred to.  It was a doctor, Dr. Fremaux.  I don't

18 know if that was private banking or Kevin.

19     Q.   It was not a commercial deal?

20     A.   No.  Because of the -- it didn't -- it didn't

21 meet the sales criteria.  It met the dollar amount to

22 the loan, but didn't meet the sales.  I can't -- I can't

23 remember if it went to private banking or not.

24     Q.   Kerr Industrial, that was declined, right?

25     A.   I believe so.  That -- that went to Kevin.  It

1  was either Kevin or Jesse who was trying to work it.  I

2  think it was Jesse; was working with Kevin on this one.

3       Q.    On the second page, Derivative Fee?

4       A.    Uh-huh.

5       Q.    And Tejon Property, tell me about that.

6       A.    I think Tejon, I believe, was also the Wright

7  Brothers, the Burger King people.

8       Q.    Do you remember that deal?

9       A.    Oh, I remember we were working on it.  I don't

10  remember all the details, no.

11       Q.    That's the one that I think you had told me

12  when we talked about Deposition Exhibit No. 6, and the

13  chart of your performance reflected that you had one

14  derivative call, and I think you said you thought it was

15  that deal; is that correct?

16       A.    Right.  I think it was related to the Wright

17  Brothers.

18       Q.    Okay.  Which is also Burger King

19       A.    Right.

20       Q.    The Wright Brothers just own a lot of things?

21       A.    Yeah.  They own lots of things.

22       Q.    Okay.  The next line, Approved, it looks like

23  2,928,000 or 26 percent of those -- what -- is that your

24  handwriting?

25       A.    That's my handwriting.

1    Q.    Okay.  Why don't you read it to me.

2    A.    Approved two million nine twenty-eight or 26

3 percent of those actually decisioned.

4    Q.    What does that mean?

5    A.    I don't recall what that means.  I'm trying

6 to -- sit here trying to figure that out.

7    Q.    Okay.  And then the final is just the total

8 value of the deals that you looked at?

9    A.    Right.

10    Q.    Now, my understanding is, that immediately

11 before Bank of America, you worked for Chase, correct?

12    A.    Yes, ma'am.

13    Q.    Let me finish my question first.

14    A.    Oh.

15    Q.    You did not have an employment contract with

16 Chase, correct?

17    A.    That's correct.

18    Q.    You were an at-will employee at Chase?

19    A.    As far as I know I was, yes.

20    Q.    What was your title at Chase?

21    A.    Senior Vice President.

22    Q.    Did you tell me that you made 80,000?

23    A.    I made, approximately, 80,000 dollars, yes.

24    Q.    Did you have a commission structure?

25    A.    It was a bonus plan in place, but it was never

1   a very defined bonus plan.  I always likened it to, You

2   do good a job, you get -- here's a check.  I mean, it

3   was never -- when I was there, it was never specifically

4   spelled out to us.

5       Q.   Did you have an understanding of the bonus plan

6   at Bank of America?

7       A.   I don't recall talking about the bonus plan.

8       Q.   How much support did you have at Chase?

9       A.   Lots of support.

10      Q.   Where did that support come from?

11      A.   Came from Houston -- primarily Houston.  And

12  whatever was in the Valley as well.

13      Q.   And when you say "support," are you talking

14  about people that would support you?

15      A.   Yes, ma'am.

16      Q.   And would those people refer business to you?

17      A.   Yes, ma'am.

18      Q.   And you would refer business to them?

19      A.   Yes, ma'am.

20      Q.   Based on the way that it worked at Chase, did

21  you assume it would work the same way at Bank of

22  America?

23      A.   Very much so.

24      Q.   And I think you said earlier that sometimes the

25  way procedures worked and the way the structure worked

1    at Chase, would change; is that correct?

2         A.    It would.

3         Q.    Would the individual people who supported you

4    sometimes change?

5         A.    Yes, they would.

6         Q.    Where were you born?

7         A.    Brownsville.

8         Q.    What's your birth day?

9         A.    4 -- April the 6th, 1961.

10        Q.    What's your Social Security number?

11        A.    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.

12             MR. PEREZ:  Could we just have an agreement

13    that -- I'm seeing more and more -- that if you're going

14    to file anything with the Social Security number on it,

15    that you let us know?  Because, you know, Social

16    Security numbers getting out is a real problem.  So, I

17    mean, you're entitled to it, it's information, but if we

18    could kind of keep it confidential in your file.  If you

19    need to file it for some reason, or divulge it to

20    someone, if you'll, you know, let us know so we can know

21    his Social Security is out on something other than

22    employment applications or something like that.

23             MS. O'DONNELL:  The only thing I can think

24    of that we would do would be subpoenas, and I believe

25    you get copies of those.  And I'm not certain whether

1  they put the Social Security numbers on --

2        MR. PEREZ:  Yes.  I don't think there's

3  going to be any subpoenas for medical -- there's no

4  medical records.  But there would be -- if you want to

5  get employment records from Chase and stuff, they have

6  his Social Security number, I'm sure, on his

7  application.  I just want to be careful.  We're seeing

8  that more and more, that -- at least down here.  I don't

9  know what y'all are doing up there.  But I would

10 appreciate it if you would let us know before you do so

11 we can -- if it's no problem, we'll let you know.  If

12 it's an issue -- I mean, you're going to get what you

13 need to get.

14        MS. O'DONNELL:  Sure.

15        MR. PEREZ:  But I think John would like to

16 know if there's a Social Security number going out to

17 someone that may not otherwise get it, maybe we can find

18 an alternative way or maybe he can get the records for

19 you, give them a release or something like that.

20        MS. O'DONNELL:  Let me -- I will check and

21 see if we put it on our subpoenas.

22        MR. PEREZ:  Okay.

23        MS. O'DONNELL:  And we do, I'll let you

24 know.  And I'll agree if we are going to put it on any

25 other documents that's disclosed to a third party, that

1    I'll let you know in advance.  We can talk about it.

2              MR. PEREZ:  Okay.  Thank you.

3              MS. O'DONNELL:  Sure.

4        Q.   (By Ms. O'Donnell)  Okay.  I think at the

5    beginning of the deposition you told me that you've

6    lived in your current house for eight years?

7        A.   Yes, ma'am.

8        Q.   Do you own that house?

9        A.   I own it, yes, ma'am.

10       Q.   Do you have a mortgage?

11       A.   Yes, ma'am.

12       Q.   What kind of car do you drive?

13       A.   I drive a 1997 Ford Expedition, green one,

14   parked right in front.

15       Q.   Did you buy that new or used?

16       A.   Used.

17       Q.   What does your wife drive?

18       A.   She drives a Ford Aerostar Van.  It's what?

19   2000, I think.  Yeah.

20       Q.   Did you buy that new or used?

21       A.   We lease it.  It's a new -- new vehicle.

22       Q.   Do you own any other cars?

23       A.   My daughter has a car that was -- she's not 16

24   yet, so she can't drive.  Or well I -- she just turned

25   16.  She can't drive till November, but --

1    Q.    What kind of car --

2    A.    It's a Honda Accord, 1992, her brother -- her

3  uncle gave her.

4    Q.    And any other cars?

5    A.    No, ma'am.

6    Q.    Where did you go to primary school?  Did you go

7  in Brownsville?

8    A.    I went to James Pace High School.  That what

9  you mean by primary school?

10    Q.    Well, did you -- let me ask you this:  From

11  kindergarten through twelfth grade, were you in

12  Brownsville?

13    A.    In Brownsville, yes, I was.

14    Q.    You graduated from high school?

15    A.    Yes, ma'am.

16    Q.    What education have you had since high school?

17    A.    I graduated from Southwest Texas State

18  University.

19    Q.    What year did you graduate?

20    A.    1983.

21    Q.    What was your degree?

22    A.    BBA in management.

23    Q.    Do you have any other higher education?

24    A.    Degreed, no.

25    Q.    How about not degreed?

1     A.    I've got lots of courses and banking schools

2  and things like that.  But certificates, I guess I've

3  gotten various certificates.

4     Q.    So you've gone to various banking schools?

5     A.    Right.

6     Q.    Primarily through Chase?

7     A.    They were all internal through Chase.

8     Q.    Were any of them affiliated with a college or

9  university?

10     A.    No.  They were all in-house.

11     Q.    Have you ever been arrested?

12     A.    No, ma'am.

13     Q.    You said you were married, correct?

14     A.    Right.

15     Q.    What's your wife's name?

16     A.    Christine Reed.

17     Q.    What does she do?

18     A.    She's a special education teacher.

19     Q.    Where does she work?

20     A.    Brownsville Independent School District,

21  Russell Elementary.

22     Q.    How long has she worked there?

23     A.    For the school district, I think seven -- seven

24  years.

25     Q.    Does she still work?

```
 1      A.   Yes.

 2      Q.   How long have you been married?

 3      A.   Check my ring.  I think it's 18 years.

 4      Q.   What's your anniversary?

 5      A.   Oh --

 6      Q.   Really testing you.

 7      A.   June the 2nd, 198- -- I'm horrible.  My wife

 8 would kill me.  1984.

 9      Q.   Well, you remember the date.  The year I think

10 is hard.  Give you some leeway.

11      A.   That's why she put it in the ring.

12      Q.   It's in my ring, too.  I understand.  How many

13 children do you have?

14      A.   Two children.

15      Q.   What are their names?

16      A.   Helen Reed and Olivia Reed.

17      Q.   How old are they?

18      A.   Sixteen and 12.

19      Q.   Helen is 16?

20      A.   Yes, ma'am.

21      Q.   Where does Helen go to school?

22      A.   St. Joseph Academy.

23      Q.   Is that a Catholic school?

24      A.   Catholic private school, yes.

25      Q.   How long has she gone there?
```

1      A.    Oh, she's a junior.  This will be her fifth

2  year there.  Seventh, eighth, ninth, yeah.

3      Q.    Where does Olivia go to school?

4      A.    St. Joseph Academy.

5      Q.    How long has she gone there?

6      A.    This is her first year as a seventh grader.

7      Q.    Where did she go before St. Joseph Academy?

8      A.    The Episcopal Day School in Brownsville.

9      Q.    Is that where she had gone from kindergarten?

10     A.    Kindergarten on, yes, ma'am.

11     Q.    What is the first job you ever had?

12     A.    Very first one was my dad at Western Auto.

13     Q.    What did you do?

14     A.    Clean floors, windows.

15     Q.    Does your dad own Western Auto?

16     A.    No.  He's been -- he sold them and been retired

17 for probably five or six years.  Maybe longer.

18     Q.    At the time you worked for him, did he own

19 Western Auto?

20     A.    Yes, he did.

21     Q.    What's the next job?

22     A.    Oh, Wal-Mart.  When I got out of college I

23 worked for them for almost two years.

24     Q.    What did you do for Wal-Mart?

25     A.    Assistant manager.

1      Q.    Where were you located?

2      A.    Brownsville and Port Isabel.

3      Q.    Did you get -- ever have any disciplinary

4  action taken against you at Wal-Mart?

5      A.    No, ma'am.

6      Q.    Why did you leave?

7      A.    I left because I was working 80-hour weeks, and

8  just realized that was not going to be what I wanted to

9  do the rest of my life.

10     Q.    So you resigned?

11     A.    Yes, ma'am.

12     Q.    I assume when you worked for your dad you

13  weren't disciplined?

14     A.    Oh, at home all the time.

15     Q.    Not related to employment?

16     A.    No.

17     Q.    And I assume you weren't terminated from that

18  position?

19     A.    No.  I'm sure he wanted to.

20     Q.    Before you joined Wal-Mart, what are the things

21  that Wal-Mart told you about the job that made you

22  decide to take that job?

23     A.    I loved retail.  Retail's in my blood.  Grew up

24  in it.  Working for my dad all those years.  Primarily

25  just salary.  You had to work these hours, and we train

1    you to be a store manager.

2        Q.    You were an at-will employee with Wal-Mart?

3        A.    Yes, ma'am.

4        Q.    Where did you go to work after Wal-Mart?

5        A.    Went to work for Texas Commerce Bank.

6        Q.    Which subsequently became Chase?

7        A.    Yes, ma'am.

8        Q.    What was your first position at Texas Commerce?

9        A.    Loan officer trainee.

10       Q.    What did a loan officer trainee do?

11       A.    Just learned what a bank -- basically, what the

12   bank was about, learn how to do financial stuff.  They

13   sent me to Houston for four or five months to train in

14   their credit area.

15       Q.    Do you remember what year you started working

16   for Texas Commerce Bank?

17       A.    I think it was '85.  1985.

18       Q.    How long were you a loan officer trainee?

19       A.    Maybe six months, eight months, something like

20   that.

21       Q.    What is the next position you held?

22       A.    Assistant vice president.

23       Q.    What were your responsibilities?

24       A.    Oh, they got -- they gave me a portfolio,

25   primarily all the horrible accounts.  And then I

1   assisted the -- the senior more experienced lenders in

2   their -- helping them with their portfolio, learning how

3   to call on customers, things like that.

4        Q.   How long were you in that position?

5        A.   Probably couple of years.

6        Q.   So till like '87 or '88?

7        A.   Yeah.

8        Q.   What's the next position you had?

9        A.   Vice president.

10       Q.   What did you do as a vice president?

11       A.   You just had more lending responsibilities,

12  more seasoned loans, more complex loans, that type.

13            MR. PEREZ:  Can we take another break?  I

14  need to sign a letter and go to the boy's room?

15            MS. O'DONNELL:  That's fine.

16            (Recess, 1:32 - 1:37.)

17       Q.   (By Ms. O'Donnell)  I think we were at you

18  being a vice president, and you said that that really

19  involved more lending experience at Texas Commerce Bank?

20       A.   Yes, ma'am.

21       Q.   How long were you a vice president?

22       A.   Probably three or four years.

23       Q.   What's the next position that you held with

24  Texas Commerce Bank?

25       A.   Senior vice president.

1       Q.    Did you hold that position until the time that

2    you resigned?

3       A.    Yes, ma'am.

4       Q.    And how was that different than vice president?

5       A.    Again, just more responsibility, more

6    authority.

7       Q.    Still dealing with lending?

8       A.    Yes, ma'am.

9       Q.    Did you go directly from Wal-Mart to Texas

10   Commerce Bank?

11      A.    Yes.  I didn't work in between probably 30 days

12   something -- 30, 60 days.

13      Q.    You didn't have a job with Texas Commerce Bank

14   before you left Wal-Mart?

15      A.    No, ma'am.

16      Q.    What are the things that Texas Commerce Bank

17   told you that made you decide to go to work there?

18      A.    Well, I was interviewing both between Texas

19   Commerce Bank and -- I don't know if it was Bank of

20   Southwest at that time.  May have been.  It's

21   currently Wells Fargo, but I think it was Bank of

22   Southwest back then.  And, literally, I was walking

23   back and forth across the street talking to the

24   president, chairman of the bank.

25             Texas Commerce, to me, was just a

1  much classier operation, and they were willing

2  to -- to -- they emphasized the training aspect of

3  it in sending me to Houston to do the training.  At

4  that time I knew nothing about banking other than the

5  checkbook.  That was it.  So that's what appealed to me.

6      Q.   At the end of your employment with Chase, what

7  kinds of deals were you working on?  Give me some

8  examples.

9      A.   Oh, just the normal lines of credit with

10  the shrimp brokers and the boat loans with the

11  shrimpers, and the warehouse loans with the custom

12  brokers.  And -- and just -- I mean, nothing out of the

13  ordinary.  It's all normal stuff.

14      Q.   Were you doing any treasury management deals at

15  Chase?

16      A.   We were referring our treasury management

17  people to -- to people -- yes, we were.

18      Q.   Where were the people located?  You were --

19      A.   In -- in Brownsville.

20      Q.   Did those people ever refer commercial deals to

21  you?

22      A.   I don't recall.

23      Q.   What -- were you doing any commercial checking

24  account?

25      A.   Yes, we were.  Constantly opening checking

1   accounts.

2       Q.    How about trade finance?

3       A.    Yes.   Letters of credit.   We were always doing

4   letters of credit.

5       Q.    Was that something you did individually or that

6   you referred --

7       A.    No.   They were the -- we had a person in the

8   bank that handled that.

9       Q.    Did that person ever refer any commercial deals

10  to you?

11      A.    No.   That wasn't her -- her job was a clerical

12  job.

13      Q.    Did you have someone who did foreign exchange?

14      A.    Yes.   My boss.   Primarily he did foreign

15  exchange.

16      Q.    Were you responsible at all for foreign

17  exchange?

18      A.    I brought in foreign exchange where

19  appropriate, but I didn't call in Mexico.

20      Q.    Derivatives, were you involved at all --

21      A.    Not at all.

22      Q.    Investment services?

23      A.    That would be trust and private bank.   Yeah, we

24  referred customers to trust.   I just don't -- we had a

25  private bank, but it was just getting going about the

1    time I left.

2        Q.    Do you remember if anyone from the private bank

3    ever referred customers to you?

4        A.    Oh, no.  It was just pretty new.

5        Q.    Do you consider yourself to be an intelligent

6    person?

7        A.    Yes, ma'am.

8        Q.    After you left Bank of America, where is the

9    next place that you worked?

10        A.    I worked for a friend of mine, I.V. Arroyo, who

11    was just starting out in an imaging company called

12    Quality Data Imaging.  And I was helping him get that

13    company up and going.

14        Q.    What were you doing, like, operational things?

15        A.    Sales for him.

16        Q.    When you left Bank of America, why did you not

17    go back to Chase?

18        A.    I -- I had such a bad taste in my mouth for

19    banking after what happened to me at Bank of America.

20    I had no desire to get back into banking during

21    that -- right after that.

22        Q.    So you didn't talk to anyone at Chase?

23        A.    No, ma'am.

24        Q.    Do you know if you're eligible for rehire at

25    Chase?

```
 1      A.    If they're hiring, I'm sure I could apply.

 2      Q.    Okay.  You don't think there's anything that

 3  would bar them --

 4      A.    No.  No.  From hiring me, no.

 5      Q.    Where did you go after -- well, let me ask you

 6  this:  When did you get the job with the imaging

 7  company?

 8      A.    Probably within 30 days.

 9      Q.    What were you making there?

10      A.    I was just making a commission on whatever I

11  sold.

12      Q.    Were you successful at selling?

13      A.    Yes, I was.  I thought I was.

14      Q.    Do you remember, approximately, how much money

15  you were making per week?

16      A.    No, I don't.  It wasn't a whole lot what I made

17  during -- during that course of working for him.

18      Q.    How long did you work for them?

19      A.    I worked until I got the job with Coastal Banc.

20      Q.    When did you get the job with Coastal Banc?

21      A.    September 10th.

22      Q.    Of this year?

23      A.    No, of --

24      Q.    2001?

25      A.    2001, yes.  2001.
```

1      Q.    Did you resign from the imaging company?

2      A.    It wasn't even that type of -- he was working

3   out of his house.  And I helped him grow it to where

4   now he has 40 employees, and he's working out -- I got

5   him -- not that I got him.  But we secured an office

6   building at that airport, Brownsville Airport.  And he's

7   doing work all over the state now.  But he could never

8   pay me a salary.

9      Q.    But you left voluntarily?

10      A.    Oh, yeah.  We're very good friends.

11      Q.    When you started at Coastal Banc, what did they

12   tell you about the job there that led you to make the

13   decision to join Coastal Banc?

14      A.    They were going to pay me 78,000 dollars.  I

15   was going to eat.  That I could lend till almost

16   anything -- you know, there was no criteria like at Bank

17   of America, had to be ten million or more in sales, that

18   there was million dollars -- you know, minimum deal

19   size.  Their deal was, If it's a business, it's credit

20   worthy, we have all the technology products, we have the

21   treasurer management products, we have a lot of the same

22   products big banks have, but you can deal with them on a

23   local level.

24      Q.    How did it come about that you joined Coastal

25   Banc?  Did you go to them or did they come to you?

     1      A.    Walter Pocket, who's my boss, he and I go to

     2   church together, and he said that they were hiring and

     3   would I be interested, and to come by, fill out an

     4   application, and he would forward it to human resources

     5   with his recommendation to hire me.  That's kind of how

     6   it all came about.

     7      Q.    Then someone called you from human resources?

     8      A.    Yes.  And they interviewed me on the phone.

     9   That's pretty much a formality as to how they had to do

    10   it.  And then they got back to me a few days later, just

    11   said, Basically, extend you the offer, this is it:

    12   78,000 a year and go to work.  When do you want to

    13   start?  I said, Tomorrow.

    14      Q.    Did Mr. Pocket or anyone at Coastal Banc tell

    15   you that you would have support at Coastal Banc in all

    16   these different areas?

    17      A.    No, not at all.  I mean, there was

    18   nothing -- all he said that -- was, These are people,

    19   call them if you need them.

    20      Q.    When you say "these are the people" --

    21      A.    Like treasury management, there's a guy

    22   named -- oh, gosh.  I'm getting the names confused here.

    23   Anyway, he's in Houston.  If you need anything, he comes

    24   down and makes the call.  You set up the appointment, he

    25   comes down.  He's really the only person.  Everything

1  else is here.

2         We're not a real sophisticated bank like a

3  Chase or Bank of America.  We don't have all the

4  investment groups, and we don't have trust departments,

5  and we don't have private banking.  You know, we're

6  retail commercial lenders, and we have the treasury

7  management products and we can do letters of credit.  We

8  don't have derivatives and all this other stuff.

9     Q.   Did you -- did you know before you joined

10  Coastal Banc what types of areas it had?

11     A.   Walter told me, yeah.

12     Q.   So he talked to you, generally, about what

13  areas the bank was in and what it was looking for?

14     A.   Right.  He -- he had -- you know, I asked him,

15  Well, where is it headquartered?  Who owns it?  Is it

16  public traded, and who runs the Valley, you know, who do

17  I report to, and located in Houston, trades on the

18  NAZDAQ, Walter runs the Valley, they're 14 branches in

19  the Valley.  It was that kind of discussion.

20     Q.   What is your position with Coastal Banc?

21     A.   Senior Vice President.

22     Q.   Is that the same position you've had the whole

23  time?

24     A.   Yes, ma'am.

25     Q.   And are you, again, responsible for commercial

1   deals?

2       A.    Yes, ma'am.

3       Q.    Is there anything that Coastal promised you

4   that they haven't given you?

5       A.    No.

6       Q.    You're an at-will employee?

7       A.    Yes, ma'am.

8       Q.    Where is Coastal Banc headquartered?

9       A.    In Houston.

10      Q.    What are you seeking in damages in this

11  lawsuit?

12            THE WITNESS:  Do I answer that or do you

13  want me --

14            MR. PEREZ:  No, no.  You answer the

15  question.  You got -- the questions are for you.

16            THE WITNESS:  Oh, okay.

17      A.    It's the differential between the 100,000 and

18  78,000, which is 22,000.  And there is -- that's six

19  months of, basically, where I didn't have employment,

20  what I call substantial employment.  So there's about

21  50,000 dollars there.  And then the savings I had to

22  cash in to make up for that.

23      Q.    (By Ms. O'Donnell)  Okay.  When you say a

24  100,000 dollars to 70,000 (sic), you're talking about

25  the difference between what you made at Bank of America

1   and --

2       A.   -- what I'm currently making, yes, ma'am, at

3   Coastal Banc.

4       Q.   Do you have any commissions at Coastal Banc?

5       A.   No.

6       Q.   Do you have any bonus opportunities?

7       A.   Yeah, I do have bonus opportunity.

8       Q.   How much is your bonus opportunity?

9       A.   The way I understand it is, they have to fund

10  the pool.  And if you make a 100 percent of your goal,

11  you can make up to 50 percent of your salary in bonus.

12  And then it's a tier-down effect, accordingly.  But this

13  is something that they just implemented a few months

14  ago.

15      Q.   So you could make up to an additional 39,000 in

16  bonus if you made your goal?

17      A.   If I understand the program right, yes, ma'am.

18      Q.   What about benefits at Coastal Banc?  What

19  benefits do you have?

20      A.   The dental, the 401K, medical, vacation.

21      Q.   Is -- are your children insured through your

22  work or your wife's work?

23      A.   I have them separately insured through my

24  brother, because it's cheaper than going on Coastal's

25  plan or through BISD's plan.

1    Q.    Have you had them insured separately for --

2    A.    No.

3    Q.    When did you do that?

4    A.    When -- when I lost my job with Bank of

5    America, I insured -- made sure that they were insured

6    and I was insured through my brother.  And when I got

7    the job with Coastal, it was still cheaper to keep them

8    on a separate policy than to move them onto Coastal or

9    to move them into BISD.

10    Q.    Were they covered when you were with Bank of

11    America through Bank of America?

12    A.    Yes.

13    Q.    Was your wife covered through Bank of America?

14    A.    No.  BISD.

15    Q.    Is the amount that it's costing you now through

16    your brother's company less than what it was costing you

17    with Bank of America?

18    A.    I don't -- I don't know.

19    Q.    Okay.  So as far as damages, basically you're

20    seeking what you lost as a result of losing your job at

21    Bank of America?

22    A.    Yes, ma'am.

23    Q.    How were your benefits at Bank of America as

24    compared to your benefits at Chase Bank?

25    A.    They were almost identical.

1    Q.    Now, I think in your discovery responses you

2    said that the only person with whom you discussed your

3    decision to leave Chase was your wife; is that correct?

4    A.    That is correct.

5    Q.    What did you tell your wife was the reason that

6    you left?

7    A.    Better -- better opportunity, more money.

8    Q.    Anything else you can remember telling her?

9    A.    I just told her it was going to be a great move

10    to us.

11    Q.    Did she concur with the decision?

12    A.    Yes.  She's pretty much, you know, if that's

13    the way you feel, you know, you think that's best for us

14    in the family.

15    Q.    Did she raise any concern?

16    A.    Not at all.  She thought it would be a great

17    move for me.

18    Q.    When you went back to -- or rather, when you

19    joined Coastal Banc, did you consider at that point

20    going back to Chase?

21    A.    No.

22    Q.    Why not?

23    A.    I was so, you know, upset with the way big

24    banks worked and how I was treated via B of A, that I

25    felt I need to get in a small bank as possible where I

1  knew exactly what the deal was, and had someone in there

2  that I could trust.  I trust Walter very, very much.

3      Q.   Did you feel frustrated at Chase Bank as well

4  because it was a big bank?

5      A.   Not near as much as I did at Bank of America.

6      Q.   But you did some?

7      A.   Oh, sure.

8      Q.   Now, I think you had said to me earlier that

9  you didn't think that Mr. Anaya had lied to you at all

10  before you started at Bank of America, but you implied

11  that maybe he had later.  Is there any period of time

12  when you felt Mr. Anaya was not truthful with you?

13      A.   Well, I just think he was such a corporate man,

14  that no matter what, the corporation could do no wrong.

15  And that's what I -- what I mean by that.

16      Q.   At what point did that become apparent to you?

17      A.   Oh, I think about five, six months into the

18  process that I was there.

19      Q.   But nothing specifically that he said to you

20  that you considered a lie?

21      A.   No, huh-uh.  Just corporate man.  Corporation

22  did no wrong.  You know, work at high part, work it

23  hard, force partners in, you know, that type, you know.

24      Q.   Are you claiming mental anguish damages,

25  emotional distress, mental suffering?

1    A.    I think I am.

2    Q.    Okay.  Tell me what type of mental anguish

3  you've had as a result of this situation at Bank of

4  America.

5    A.    Just lots of sleepless nights, lots of worries

6  about having to pull my children out of private school,

7  about having to sell my wife's dream house, do I take

8  bankruptcy or not take bankruptcy, am I ever going to

9  get a job again paying that kind of money, that -- that

10 type of thing.

11   Q.    So they were mostly concerned about your

12 finances?

13   A.    Primarily.

14   Q.    What else?

15   A.    And what really upset me is having to tell my

16 children that I lost my job, and that we were going to

17 have to sell my house.  And to watch my -- my old -- I

18 told my oldest daughter while we were through the drive

19 in at Whataburger, and her response was, Daddy, that's

20 okay, as long as we're together.  That tore me up.  Then

21 my -- my 12 year old, who is now 12, just started

22 crying.  That hurt.

23   Q.    Did you have to sell your house?

24   A.    It's supposed to sell on the 16th of this

25 month.  16th of September.

1       Q.    And that -- when did you put your house on the
2   market?
3       A.    Probably 30 or 60 days after I lost my job at
4   Bank of America.
5       Q.    How much is your mortgage payment -- or was
6   your mortgage payment?
7       A.    It's 1562 a month.
8       Q.    How many years was your mortgage?
9       A.    It was a 30 year -- I think it was 30-year
10  mortgage, yeah.
11      Q.    You had said you had it for eight years?
12      A.    Yeah.  I think its -- must be more like
13  seven-and-a-half years.  Eight years, I think, in
14  January.
15      Q.    Have you bought a new house?
16      A.    No, ma'am.
17      Q.    Where are you going to live after --
18      A.    We're leasing the house back from the -- from
19  the people buying it.
20      Q.    Now, that you have a job, do you intend to buy
21  it back?
22      A.    No.
23      Q.    Why not?
24      A.    Because I learned a valuable lesson, that
25  corporations in -- individuals in corporations can treat

1  you like dirt.  And I don't want to ever be in that

2  position again.

3      Q.    Okay.

4      A.    Meaning I don't want a big house.  I want to

5  sell this house, and move into a much smaller house and

6  never have to have that worry again if I were to ever

7  lose my job.

8      Q.    So is your -- is it your intent to buy another

9  house?

10     A.    Yes, it is.

11     Q.    How many square feet is your current house?

12     A.    About 3700 square feet.

13     Q.    Do you have any houses that you currently are

14  thinking are good prospect?

15     A.    No.  Because the way this sell work -- is going

16  to work if it comes through on the 16th is, people

17  buying the house live in -- I'm sorry.  Live in El

18  Salvador.  They sold their property in Maryland, and

19  that's a rental property, so they have to buy rental

20  property to avoid taxes.

21           They're retiring in two or three years from

22  whatever company this man works for, and they asked us

23  to -- if we would be willing to stay in it.  And we said

24  sure.  It's gets my daughter out of school -- out of

25  high school, into college.  And my wife's working on her

1  master's, so she won't have to pick up and look for a

2  new house.  It -- so it worked out perfect.

3      Q.    Where is your wife going to school?

4      A.    She is doing it through North Texas State

5  University on the internet.

6      Q.    On the internet?

7      A.    Right.  It's a degree in library science.

8      Q.    When did she start that?

9      A.    Started -- she's taking nine hours,

10  September/October of 2001.

11      Q.    How much are you paying to lease your house?

12      A.    Fifteen hundred dollars a month.

13      Q.    So just 62 dollars less a month on your

14  mortgage?

15      A.    Yeah.  But I don't have taxes.  I don't have

16  insurance.  I don't have the home equity loan that's on

17  it, 562 dollars or something like that.

18      Q.    When you got the job at Coastal Banc, did you

19  consider at all taking your house off the market?

20      A.    I took it off the market for two weeks, and

21  these people approached my realtor and just had to have

22  it.

23      Q.    So you could have sustained your mortgage and

24  the insurance and all the other things with your

25  position at Coastal Banc?

1    A.    Yes.  But I wouldn't have had a pretty -- a

2    dime to do much anything else.

3    Q.    Has your wife's salary decreased at all?

4    A.    No.  But her incremental, two percent, however

5    the school district does her incremental salaries.

6    Q.    Hadn't gone up much?

7    A.    Hadn't gone up much.

8    Q.    Did you pull either of your daughters out of

9    private school?

10   A.    No.  That was the last thing I wanted to do.

11   Q.    You did not file for bankruptcy, correct?

12   A.    No, I did not.

13   Q.    Have you seen any doctors for mental anguish?

14   A.    No, ma'am.

15   Q.    Have you seen any kind of counselor?

16   A.    My clergy.  Besides that, no.

17   Q.    Where do you go to church?

18   A.    Episcopal church.  Church of the Advent

19   Episcopal.

20   Q.    What's it called, Church what?

21   A.    Church of the Advent, Episcopal.

22   Q.    Have you counseled with the pastor or priest

23   there?

24   A.    Yes.

25   Q.    Who's that?

1      A.    Chuck Shairo (phonics).  The Reverend Chuck

2   Shairo, the Reverend -- oh, goodness gracious.  I'm

3   sorry.  Reagan Cock.

4      Q.    Were those formal counseling sessions that

5   scheduled --

6      A.    They were mainly prayer sessions.

7      Q.    Do you know if they took notes during those?

8      A.    No, they didn't.

9      Q.    Any other mental anguish that you've suffered

10  as a result of this situation?

11     A.    Not that I know of, no.

12           (Exhibit No. 9 was marked.)

13     Q.    (By Ms. O'Donnell)  Let me show you what I've

14  marked as Deposition Exhibit 9.  This is a three-page

15  document.  It was produced by you to Bank of America.

16  It was not stapled as produced.  I stapled it, because

17  it looked like it went together.

18     A.    Uh-huh.

19     Q.    Can you tell me what this group of documents

20  shows?

21     A.    It's a referral I made to Kevin Kleinsteuber on

22  Rio Grande Tool.

23     Q.    That is one of the referrals we discussed

24  previously, correct?

25     A.    Yes, ma'am.

1    Q.    Anything significant about Deposition Exhibit 9

2 with respect to this lawsuit?

3    A.    I'm not sure what you mean.

4    Q.    It doesn't show any kind of misrepresentation,

5 does it?

6    A.    No.  No.  Just says I did a good job and Kevin

7 did a good job.

8         MR. PEREZ:  Just to -- as a side for your

9 information, it was a document I think I produced it,

10 because you asked for all documents that he had that

11 came from the bank or something, so that's -- that was

12 in the stack.

13        MS. O'DONNELL:  Okay.  That's fine.  I just

14 wanted to make sure there wasn't more to it.

15        MR. PEREZ:  It was difficult to put the

16 documents into the categories that you asked.  So I put

17 them into the five or six categories that made sense to

18 me and produced them in that way.

19        MS. O'DONNELL:  That was fine.

20        MS. PEREZ:  Okay.

21        MS. O'DONNELL:  It was well organized.  I

22 appreciate that.

23        MR. PEREZ:  Well, I don't know if it was

24 well organized, but it was the only way that made sense

25 to me where I could give them to you.

1          MS. O'DONNELL:  Thanks.

2          (Exhibit No. 10 was marked.)

3      Q.   (By Ms. O'Donnell)  Show you what's been marked

4   as Deposition Exhibit No. 10.  This is also a document

5   that was produced to me.  Can you tell me when you

6   received this document, if you remember?

7      A.   It was -- I don't really -- I mean, this looks

8   like literature that we probably received from the

9   public finance people describing what they did.

10     Q.   Some time after you started with the bank?

11     A.   Right.

12     Q.   Okay.  Before you accepted the offer to work

13  for Bank of America, did you make any notes about your

14  decision-making process?

15     A.   No, not that I recall.

16     Q.   Do you keep any kind of journal or diary or

17  calendar?

18     A.   No, ma'am.  I mean, appointments, but I would

19  throw those away every year.

20     Q.   Did you keep a paper calendar with

21  appointments?

22     A.   No, ma'am.

23     Q.   You kept it on a computer?

24     A.   No.  I kept it on -- yeah, I had a paper

25  calendar that was in my -- it is a calendar book.

1    Q.   You discarded that?

2    A.   I discarded, right, at the end of the year.

3    Q.   You didn't record any thoughts in there?

4    A.   No.

5    Q.   Did you give Chase Bank a resignation letter?

6    A.   Yes, I did.

7    Q.   Do you not have a copy of that?

8    A.   I don't have a copy of it.

9    Q.   Do you recall what it said?

10    A.   No, I don't, other than, basically, I'm

11 resigning my position to go work for Bank of America or

12 to seek better opportunity.  Thank you for everything.

13 I mean, it was very -- two- or three-sentence letter.

14    Q.   Who's it addressed to?

15    A.   To Irv Downey, my boss.

16    Q.   Did you do it on your computer at home?

17    A.   I don't know if I did it on my computer or the

18 bank's computer, to be quite honest with you.  Human

19 resources one said I needed to -- to submit a letter to

20 them.

21    Q.   Did you give two-week notice or anything like

22 that?

23    A.   I did, but they -- they said, you know, which

24 is -- which is normal, is if you're going to work for a

25 competitor, to go ahead quit the bank that day.

1      Q.    Do you have a good relationship with

2   Mr. Downey?

3      A.    I -- I think I do, but I'm taking business away

4   from him, so I wonder at times.

5      Q.    Do you talk to him at all?

6      A.    I have run into Irv probably twice, maybe three

7   times in the last couple of years at social functions.

8      Q.    When you run into him, you just make small

9   talk?

10     A.    Yeah.  How you doing?  How's the family?  How

11  the kids?

12     Q.    Will you check for me on your home computer

13  just to make sure you don't have a copy of that letter?

14     A.    Sure.  I'll be glad to.

15     Q.    And you don't have any -- there's no other

16  written documents that you gave to Chase regarding your

17  decision to leave the bank?

18     A.    No, not at all.

19     Q.    Have you had any communication with any

20  employee or former employee of Bank of America regarding

21  your termination from Bank of America or this lawsuit?

22     A.    I went and told Larry.  Larry and I are

23  friends.  We've -- we've talked.  We've had lunch

24  together since my termination.  I just told Larry about

25  a month ago that I was suing the bank, that I didn't

1  want him to -- wasn't a reflection on him.  It had

2  nothing to do with him, and I didn't want him to catch

3  wind of it if he hadn't already.

4      Q.   Did he know about it?

5      A.   He said he didn't.  He hadn't heard about it.

6      Q.   Did you tell him what your allegations were?

7      A.   No, I didn't go into details at all.  I

8  didn't -- that wasn't fair to him, and I didn't want to

9  put him on the spot of any sort.

10     Q.   You didn't ask him to be a witness?

11     A.   No.  I just told him, Larry, I just wanted you

12 to know, I'm suing Bank of America.  That's not against

13 you.  And nothing was done here with you, just...

14     Q.   Anyone else, current or former employee, Bank

15 of America?

16     A.   That -- that I've talked to?

17     Q.   Right.  That you've talked to about your

18 termination or about this lawsuit?

19     A.   Eddie Gutierrez and --

20     Q.   What have you talked to Mr. Gutierrez about?

21     A.   I think he was going to be a witness here.

22     Q.   Have you asked him to be a witness?

23     A.   Yes.

24     Q.   And has he said yes?

25     A.   Yes.

1    Q.    What knowledge does he have?

2    A.    He has knowledge of Bank of America's practice.

3    Q.    How does he have that knowledge?

4    A.    Former employee.

5    Q.    What will he say about Bank of America

6    practice?

7              MR. PEREZ:  Well, I kind of think it depends

8    on what you ask him, but a little more specific.

9    Q.    (By Ms. O'Donnell)  What is the reason why you

10   want him to testify for you?  What has he told you that

11   you think is significant?

12   A.    He knows about the culture of having product

13   specialist come in.  He knows Raul Anaya.  He worked at

14   Bank of America.  I don't know how many years, but for

15   several years.

16   Q.    So he knows that -- of the culture of not

17   having product partners help?

18   A.    Right.

19   Q.    Do you know what his position was with Bank of

20   America?

21   A.    No, I don't -- I don't -- I do not know what

22   his position was, no.

23   Q.    Do you know that he was not a product client

24   manager?

25   A.    Was he client manager?

1      Q.    Right.

2      A.    I don't know if he was client manager.  I know

3  he was an analyst, but I don't know if he was actually a

4  client manager.  I can't remember.

5      Q.    What will he say about Raul Anaya related to

6  this lawsuit?

7      A.    That Raul offered him the presidency position,

8  too.

9      Q.    Did Mr. Anaya offer that to Mr. Gutierrez while

10  he was still an employee of Bank of America?

11      A.    Yes.

12      Q.    Did Mr. Gutierrez tell you why he left Bank of

13  America?

14      A.    Went to work at Texas State Bank, but I think

15  he had said it was better offer -- better job offer.

16      Q.    Did most of the people that work in the Valley

17  know that the product partners wouldn't come down here

18  and help out?

19      A.    That's correct.

20      Q.    Do you know whether Mr. Gutierrez applied or

21  was considered for the position that you ended up

22  getting with Bank of America?

23      A.    I do not know.

24      Q.    Any other current or former employees of Bank

25  of America with whom you've had contact?

1    A.    I had my former secretary, Alma Ybarra, how you

2  doing, small chitchat.

3    Q.    Have you told her that you're suing the bank?

4    A.    No.  No, huh-uh.

5    Q.    Anyone else?

6    A.    Margie Watson.

7    Q.    Who's that?

8    A.    Margie was Larry's secretary.  And when I got

9  fired, she got fired.

10   Q.    Why was she fired; do you know?

11   A.    Because they -- they didn't need two

12 secretaries.

13   Q.    Did Alma have more experience?

14   A.    I don't know how they made their decision.  All

15 I do know, it took them two or three days before they

16 got around to determining which one they got rid of.

17   Q.    Have you talked to Ms. Watson about being a

18 witness?

19   A.    Yes.

20   Q.    What did she say?

21   A.    Yes, she would.

22   Q.    What will she have to say that is relevant to

23 this lawsuit?

24   A.    She will tell you about how product partners

25 didn't -- weren't supportive, how difficult it was to

134

1   get things done.

2       Q.    Where does she work now?

3       A.    Lone Star National Bank.

4       Q.    Did you ask Ms. Ybarra to be a witness?

5       A.    No.

6       Q.    Anyone else that you've talked to current or

7   former Bank of America employee?

8       A.    No.  That's it.

9       Q.    How did you meet Mr. Gutierrez?

10      A.    He and I work together now.

11      Q.    You currently work together?

12      A.    Yes, uh-huh.  That's how I met him.

13      Q.    Did you know Mr. Gutierrez before you joined

14  Bank of America?

15      A.    No, ma'am.

16      Q.    Did you -- did you know him before you joined

17  Coastal?

18      A.    No, ma'am.

19      Q.    What is Mr. Gutierrez' position?

20      A.    He's commercial lender with Coastal Banc.

21      Q.    Is he your subordinate?

22      A.    We're equals.

23      Q.    Is he a senior vice president?

24      A.    I think he's vice president.  When I say

25  "equals," I mean we all report to Walter.  And I don't

1  tell him what to do.  He doesn't tell me what to do.

2      Q.  Did Mr. Gutierrez tell you that he does not

3  like Mr. Anaya?

4      A.  He's never said that.

5      Q.  Did you file for unemployment after you left

6  Bank of America?

7      A.  Yes, I did.

8      Q.  Did you get it?

9      A.  Yes, I did.

10      Q.  Bank of America didn't fight it, did they?

11      A.  No.  If they did, I wasn't aware of it.

12      Q.  Are you seeking attorney's fees in this

13  lawsuit?

14      A.  Yes.

15      MR. PEREZ:  Oh, yeah.  You'll -- you'll from

16  the -- well, as soon as the other attorney gets back

17  into town, I'll talk to him about the contract and his

18  agreement, everything else, because that's how, you

19  know, I'm dealing with the case.  So I need to get

20  everything straight with him.

21      MS. O'DONNELL:  Sounds good.  Thanks.

22      MR. PEREZ:  And I objected, but I think

23  you're going to be entitled to that, but I need to get

24  it from Trey.

25      MS. O'DONNELL:  Okay.  Thank you.

1      Q.    (By Ms. O'Donnell)  Have you taken any

2   prescription drugs in the last five years?

3      A.    Not that I'm aware of.  If I did, it was like

4   for cold or sore throat.

5      Q.    You haven't consistently been on any

6   medication?

7      A.    Oh, no, not at all.

8      Q.    You're not taking any medications for stress or

9   anxiety?

10      A.    No, ma'am.

11      Q.    Depression?

12      A.    No, ma'am.

13      Q.    Okay.  Have you ever seen a doctor for stress

14   or anxiety?

15      A.    No.

16      Q.    Have you ever gone to any kind of counseling?

17      A.    No.

18      Q.    I'd asked you for all documents referencing,

19   summarizing or relating to communications between you

20   and any present or former Chase Bank employee regarding

21   your resignation from Chase Bank or decision to accept

22   employment with defendant.  And you said, None in my

23   possession.  Is the only document responsive to that the

24   resignation letter?

25      A.    Yes, ma'am.

```
 1        Q.    The company that you worked for before Coastal,
 2   that was I.V. Arroyo?
 3        A.    Yes.   Quality Data Imaging.
 4              MR. PEREZ:   You can say Arroyo.
 5              MS. O'DONNELL:   I'm trying here.
 6              MR. PEREZ:   That's okay.
 7        Q.    (By Ms. O'Donnell)  Did you apply for a job
 8   with Irwin Herman?
 9        A.    Irwin Herman.
10        Q.    Irwin.
11        A.    I worked for him for a month in December.
12        Q.    December of 2000?
13        A.    2001.  Because I needed Christmas money.
14        Q.    What did you do for him?
15        A.    I was, basically, a waiter.  He has these eight
16   liner machines, and I'd go around making change for
17   people and giving them gift certificates if they won;
18   they needed a coke or chips or whatever, I'd give it to
19   them.
20        Q.    What's an eight liner machine?
21        A.    It's a -- it's a gambling device
22   where -- that's the best way I can describe it.  Where
23   they have to have so many ships or cars or whatever --
24        Q.    Like a slot machine?
25        A.    Slot machine.  There you go.  And they have to
```

1   line up.  And they win, they get tickets.  And so many

2   tickets equals so many coupons to, like, a restaurant or

3   to the mall or whatever.

4       Q.   Okay.  Thanks.  Did you work for Convergy's

5   Corporation?

6       A.   Yes, ma'am.

7       Q.   What did you do for them?

8       A.   I was training to be a telemarketer.  And I

9   think I was there ten days or two weeks.  Then I got the

10   job with Coastal.

11       Q.   Were you still working at Quality Data Imaging?

12       A.   At the same -- yes, ma'am.

13       Q.   Did you work at the Ronald McDonald House?

14       A.   I applied for -- for a job there.  They had an

15   ad for an executive director.  I applied.

16       Q.   You did not get that?

17       A.   I never heard from them, no.  I didn't get that

18   job, no.

19       Q.   Did you apply at Red River Service Corporation?

20       A.   Yes, ma'am.

21       Q.   What job did you apply for there?

22       A.   It was a new company that opened up in

23   Harlingen.  They had a whole list of people that were

24   trying to -- trying to hire.

25       Q.   What ended up happening with your application?

1    A.    I was over qualified.

2    Q.    What kind of company is that?

3    A.    They do a little bit of everything.  It's

4  telecommunication, and they came out of Oklahoma.  They

5  have got a web site.  I can't remember all the -- all

6  the details of it right now.

7    Q.    Did you apply at Brownsville Medical Center?

8    A.    I talked to the CEO.  It wasn't a formal

9  application, because I got the interview through my CPA,

10  and I went and talked to him and he said there weren't

11  any positions in marketing or insurance at the time.

12  But he would let me know if anything came up.

13    Q.    Who is the CEO?

14    A.    I don't remember.  I got his business card, I

15  think, at the office.  But I don't recall his name.

16    Q.    Did you apply at Valley Baptist Medical Center?

17    A.    Yes, I did.

18    Q.    What position did you apply for?

19    A.    They had -- I went through their personnel

20  department.  They had a whole bunch of positions.  I

21  think I applied for marketing position and insurance

22  position.

23    Q.    What happened?

24    A.    I never heard back from them.

25    Q.    Did you apply at Brownsville Independent School

1    District?

2        A.    Yes, I did.

3        Q.    What position did you apply for?

4        A.    I applied for two positions there:  Director of

5    Insurance and Assistant Director of Purchasing.

6        Q.    What happened with those applications?

7        A.    I didn't get the job.

8        Q.    As a witness to this case, you have listed your

9    wife.  Other than the conversation that you told me you

10   had with your wife, what does your wife know that's

11   relevant to this lawsuit?

12       A.    Pretty much everything I've told you here.

13       Q.    And is that based on conversations with you?

14       A.    Yes.

15       Q.    You've also said your brother Eric Reed?

16       A.    Uh-huh.

17       Q.    What does he know relevant to this lawsuit?

18       A.    He doesn't know as much detail, but he knows a

19   lot.

20       Q.    Based on what you've told him?

21       A.    What I've told him, yes.

22       Q.    Does he have any independent knowledge?

23       A.    No.  He's an attorney, so that's why I was

24   talking to him.

25       Q.    What kind of attorney is he?

1        A.    He's a U.S. Attorney.

2        Q.    I'm sorry, a what?

3        A.    A U.S. Attorney, federal prosecutor.

4        Q.    And your wife doesn't have any independent

5    knowledge other than what you've told her?

6        A.    No.  No.

7            MS. O'DONNELL:  Why don't we take a break,

8    and let me kind of look over things.

9            MR. PEREZ:  Sure.  Sure.

10            (Recess, 2:23 - 2:30.)

11        Q.    (By Ms. O'Donnell)  Okay.  I wanted to just ask

12    you a couple follow-up questions about the statement

13    that you contend Mr. Anaya made about becoming the

14    president in two or three years.

15        A.    Uh-huh.

16        Q.    There's nothing related to that statement that

17    would've improved your performance in 2000, correct?

18        A.    That's correct.

19        Q.    And that statement was completely contingent

20    upon Mr. Zamponi retiring?

21        A.    That's correct.

22        Q.    And he is not retired?

23        A.    No.

24        Q.    Do you think that when Mr. Anaya made that

25    statement, that he thought or hoped that some day you

1  would be the president when Mr. Zamponi retired?

2      A.    I don't have any idea.

3      Q.    You don't know what his intent was?

4      A.    No, huh-uh.

5      Q.    When you left Chase, did you get any retirement

6  benefit?

7      A.    I had my 401K, and I think I had a pension, but

8  I -- yeah, I think it was a pension in there.

9      Q.    You were vested?

10     A.    Yes.  I was vested in it.

11     Q.    Do you know how much a month you got from Chase

12  from your pension?

13     A.    I don't get anything.

14     Q.    Oh, okay.  It was just a flat --

15     A.    Yeah.  When I left, it all came to me.

16     Q.    Any kind of retirement continuing payments that

17  you get from Chase?

18     A.    No, ma'am.  I didn't -- I did not get anything

19  from Chase.

20     Q.    If you look back at Deposition Exhibit 6 --

21     A.    Okay.

22     Q.    -- on page 11, do you recall receiving this

23  document prior to starting at Bank of America?

24     A.    I don't -- I don't recall getting it.

25     Q.    You could have, but you don't remember?

1      A.   Yes, ma'am.

2            MS. O'DONNELL:  I'll pass the witness.

3            MR. PEREZ:  I don't have any questions,

4    John.  I'll get to talk to you in trial.

5            (The deposition concluded at 2:32 p.m.)

144

1                    CHANGES AND SIGNATURE

2  PAGE      LINE      CHANGE          REASON

3  ----------------------------------------------------

4  ----------------------------------------------------

5  ----------------------------------------------------

6  ----------------------------------------------------

7  ----------------------------------------------------

8  ----------------------------------------------------

9  ----------------------------------------------------

10 ----------------------------------------------------

11 ----------------------------------------------------

12 ----------------------------------------------------

13 ----------------------------------------------------

14 ----------------------------------------------------

15 ----------------------------------------------------

16 ----------------------------------------------------

17 ----------------------------------------------------

18 ----------------------------------------------------

19 ----------------------------------------------------

20 ----------------------------------------------------

21 ----------------------------------------------------

22 ----------------------------------------------------

23 ----------------------------------------------------

24 ----------------------------------------------------

25 ----------------------------------------------------

```
 1          I, JOHN REED, have read the foregoing deposition

 2   and hereby affix my signature that same is true and

 3   correct, except as noted above.

 4

 5

 6                    X _____

 7

 8   THE STATE OF TEXAS      *

 9   COUNTY OF CAMERON        *

10          Before me, _____, on this day

11   personally appeared JOHN REED, known to me (or proved to

12   me under oath or through _____) (description

13   of identity card of other document) to be the person

14   whose name is subscribed to the foregoing instrument and

15   acknowledged to me that they executed the same for the

16   purposes and consideration therein expressed.

17          Given under my hand and seal of office this

18   _____ day of _____, A.D., _____.

19

20

21            _____
                Notary public in and for the
22              State of Texas

23

24

25
```

```
 1  THE STATE OF TEXAS         *

 2        I, JOHN W. FELLOWS, Certified Shorthand Reporter

 3  in and for the State of Texas, do hereby certify that

 4  the above and foregoing contains a true and correct

 5  transcription of the oral deposition of JOHN REED.

 6        I further certify that I am neither attorney, or

 7  counsel for, nor related to, or employed by, any of the

 8  parties to the action in which this deposition is taken

 9  and, further, that I am not a relative or employee or

10  attorney or counsel employed by the parties hereto or

11  financially interested in the action.

12        WITNESS MY HAND, this the __9th__ day of

13  _____September_____, A.D., 2002.

14

15        _____
          JOHN W. FELLOWS, TEXAS CSR 3335
16        Expires 12/31/02
          Hill & Romero
17        5415 North McColl Road
          Suite 107
18        McAllen, Texas  78504
          (956) 994-8898
19

20

21

22

23

24

25
```

# STIPULATIONS

**HILL & ROMERO**
5415 North McColl, Suite 107
McAllen, Tx 78504
(956) 994-8898
(956) 994-9992 FAX

Deposition Date: _8-28-02_

Trial Date: _____

Cause No.: _B-02-104_

Style: _John Reel_

vs. _Bank of America, NA_

Deposition(s) of: _John Reel_

_____

_____

_____

_____

ATTORNEYS AGREE TO STIPULATIONS CHECKED:

PURSUANT TO:

_✓_ NOTICE___ AGREEMENT___ COURT ORDER

ALL OBJECTIONS IN ACCORDANCE WITH:

___TEXAS RULES
_✓_FEDERAL RULES

SIGNATURE:

_✓_ The original deposition will be submitted to
___the witness or the _✓_ witness' attorney,
who will return the signed transcript,
including any changes, to Hill & Romero
within _____ days.

___Signature is waived and the reporter will
deliver the original transcript and exhibits to
the Custodial Attorney,_____

---

I, the undersigned, do hereby agree to the stipulations
as indicated and request the following items:

___Original and Copy of Deposition
_✓_ASCII _✓_Exhibits ___ Rush___Pagesaver

Attorney for: _Defendant_

Signature: _Laura O'Donnell_

---

Copy of Deposition: _✓_Yes___No
_✓_ASCII ___Exhibits ___Rush ___Pagesaver

Attorney for: _PLAINTIFF_

Signature: _____

---

___Copy of Deposition: ___Yes___No
___ASCII ___Exhibits ___Rush ___Pagesaver

Attorney for:_____

Signature:_____

---

___Copy of Deposition: ___Yes___No
___ASCII ___Exhibits ___Rush ___Pagesaver

Attorney for:_____

Signature:_____

---

Special instructions:_____
_____
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL NO.    B-02-104 |
| | § | |
| BANK OF AMERICA, N.A., | § | |
| | § | |
| Defendant. | § | |

## CYNTHIA F. STEVEN AFFIDAVIT

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

On this day appeared before me Cynthia F. Steven, who is personally known to me and who, upon her oath, stated as follows:

1.      My name is Cynthia F. Steven.  I am over the age of twenty-one and am competent in all respects to make this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true.

2.      I am currently a Consultant for Exult Incorporated ("Exult"). Exult is responsible for maintaining the personnel records for Bank of America, N.A.

3.      In my position as a Consultant, I am a custodian of the personnel records for Bank of America, N.A. employees, including John Reed.  The records attached to this affidavit as Exhibits 1 and 2 are six (6) pages of records from Bank of America, N.A.  These said six (6) pages of records were made at or near the time of the occurrence of the matters set forth in them by, or from information transmitted by, a person with knowledge of those matters.  These records are kept in the course of Bank of America, N.A.'s regularly conducted business activity, and it

was the regular practice of Bank of America, N.A.'s business activity to make these records. The records attached hereto are exact duplicates of the originals.

FURTHER AFFIANT SAYS NAUGHT.

_Cynthia F. Steven_
Cynthia F. Steven

SUBSCRIBED AND SWORN TO BEFORE ME on _February 18_____, 2003.

_Nancy Jo Michaud_
Notary Public in and for the State of North Carolina

My Commission Expires February 28, 2005

(PERSONALIZED SEAL)

2

**Bank of America**

Commercial Banking Staffing
TX7-060-06-04
300 Convent, 6th Floor
San Antonio, TX 78205-3701

Tel  210.270.5588
Fax  210.270.5620

April 17, 2000

Mr. John Reed
5186 Kensington Lane
Brownsville, TX 78526

Dear John:

Welcome to Bank of America! We are looking forward to your joining our team. This letter will confirm our offer and your acceptance to join the Commercial Banking Department in Harlingen as a Growth Group Sr. Client Manager, reporting to Mr. Raul Anaya. The details of our offer are outlined below.

- You will receive a salary of $8,333.33 per Month.

- Your corporate title is Sr. Vice President.

- **We expect that all compensation matters will be kept confidential.**

- Your start date is on or before May 1, 2000. Please call me to confirm your actual start date. *April 26th.*

- You will be entitled to 20 days of vacation in the year 2000.

At Bank of America we believe strongly in making the associate experience a rewarding one. One of the first events we would like to invite you to attend is Welcome Day. Unfortunately, at this time the Welcome Day Program is not being conducted in Harlingen, TX. Therefore, I am forwarding the Welcome Day package that is distributed to all new associates along with your offer package.

We believe this is not only a great company to work for but that it is a company that works for you. You may be eligible for a variety of health and welfare plans: medical, dental, life and disability. You may also be eligible for retirement plans offered by Bank of America such as a 401(K) and a Cash Balance (pension) plan as well as a sick leave policy, paid vacation and special banking services. Health care coverage will become available the first day of the month following, not contiguous with, one full month of service (for example, an associate starting on 1/1/00 is benefits eligible 3/1/00). At a later date you will receive more information about these benefits along with instructions for enrollment. Should you have benefits-related questions in the interim, please call the Personnel Center at 1.800.556.6044.

This offer is contingent upon the following:
- A satisfactory background check
- Proof of right to work in accordance with (I-9) governmental requirements
- Verification of the information you have provided

There are several important activities for you to complete in order to set up your payroll records and ensure a smooth transition to Bank of America. We ask that you complete these upon receipt of this letter:

1. To remain in compliance with current immigration laws, the U.S. Government requires employers to verify eligibility for employment through the completion of the I-9 form. Attached you will find a list of acceptable forms of identification you must present in person. On your first day of employment please complete the form I-9 along with your manager or a designated associate and present your required identification.

2. Enclosed you will find a W-4 form. Please complete it in its entirety and return in the self addressed envelope provided. Until you return this form, your tax withholdings will be deducted using a status of Single with 0 exemptions.

3. Contact the Bank of America Personnel Center at 800.556.6044 to coordinate the completion of other new associate data. Please be prepared to provide your social security number and to answer questions regarding the following:
   - Emergency Contact
   - Preferred name
   - Payroll deductions (e.g., savings bonds)
   - Associate Banking (i.e., payroll direct deposit)

4. In addition, please be prepared to notify the Personnel Center if you would like to identify yourself as a person with a disability, a disabled veteran, or a veteran of the Vietnam era for purposes of the Bank of America affirmative action plan. You may inform us of your desire to benefit under the program at this time and/or at any time in the future. Submission of this information is voluntary and refusal to submit it will not subject you to any adverse treatment. Information about your disability or veteran status will be kept as confidential as possible and will not be used in a manner inconsistent with the law. The Personnel Center will not ask you for this information.

This letter does not constitute an employment contract, and nothing contained in this letter or in any other communications you have had with Bank of America representatives should be construed in any way as a guarantee of continued employment for any period of time, but rather your employment is on an at-will basis. That is, you or Bank of America may end the employment relationship with or without notice or cause. No officer or representative of Bank of America has any authority to make any agreement, express or implied, which is contrary to the foregoing.

We believe that you are capable of making an outstanding contribution to Bank of America and that we can offer you a challenging and rewarding career. Welcome aboard!

If you have any questions or if there is any way I can help you further, please do not hesitate to call me at 210.270.5588.

Sincerely,

*Jromyn Herndon*
*for Jerri Edlund*

Terri S. Edlund
Vice President
Commercial & Private Bank Staffing

Please sign the enclosed copy of the confirmation letter and return in the enclosed self addressed envelope.

I, _____, concur with all conditions outlined in the above confirmation letter.

X _____
(Signature)

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
Social Security Number

4-19-00
Date

**Bank of America**

**Applicant Acknowledgment Form**

PLEASE PRINT

| Name (First, MI, Last) John C. Reed | Social Security Number 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 | Today's Date 4-19-00 |
|---|---|---|

| Current Address - Street 5186 Kensington Lane | City Brownsville | State TX | Zip Code 78526 | Telephone 956-831-6189 |
|---|---|---|---|---|

Welcome to Bank of America. We appreciate your interest in employment with our organization.

**Please read the following statements carefully before signing. If you have any questions regarding the content of this document, please ask them of the employment interviewer before signing.**

(A) I understand that Bank of America is an Equal Opportunity Employer. Bank of America Corporation and its affiliated companies [1] (hereinafter referred to as the "Bank" and/or "Bank of America") recruit and hire qualified candidates without regard to race, religion, color, sex, sexual orientation, age, national origin, citizenship and veteran or disability status, or any factors prohibited by law and as such affirms in policy and practice to support and promote the concept of equal employment opportunity and affirmative action, in accordance with all applicable federal, state and municipal laws. The Bank is governed equally by its firm belief that the success of Bank of America depends upon the full and effective use of the abilities of all employees, regardless of race, color, sex, sexual orientation, age, religion, national origin, veteran or disability status.

(B) I understand that Bank of America is committed to providing disabled candidates and employees with reasonable accommodations necessary for the completion of the application process and for performance of their essential job duties. I understand that if I need an accommodation in the completion of the application process, that I should request such accommodation from the employment interviewer.

(C) I understand that the Immigration Reform and Control Act of 1986 requires proof of authorization to be employed in the United States. Authorized documents must be presented within three days of the start of employment. Failure to present these documents will prohibit or discontinue employment.

(D) I understand that Bank of America does not typically hire individuals with F-1 student visas. Candidates must be presently authorized to work in the U.S. on a full-time basis, not including optional or curricular training authorizations. Under normal business practice, Bank of America does not provide sponsorship for visas. (This would include H1B visas.)

(E) I understand that federal law requires all Bank associates to be bonded and restricts employment of individuals who have been convicted of a crime involving dishonesty or breach of trust or who have avoided such a conviction by participating in a pre-trial diversion or similar program. I also understand that convictions of various other crimes may also restrict my eligibility for employment.

(F) I agree to be fingerprinted if requested by Bank of America or required by applicable law. Further, if I am employed by the Company, I agree as a condition of continued employment to otherwise fully cooperate with any internal investigation conducted by the Company.

(G) I understand that if I am offered a position with Bank of America, the offer will be for employment on an at-will basis. That is, the employment relationship is not guaranteed for any specific period of time and may be ended by Bank of America or me at any time, with or without notice or cause.

(H) I hereby give Bank of America permission to request the preparation of an investigative consumer report that may include information relating to my criminal record and my character in connection with my application for employment. Should I become employed by Bank of America, I hereby give Bank of America permission to request the preparation of such an investigative consumer report at any time during my employment. I understand that I have the right to request that the Bank completely and accurately disclose the nature, scope and results of the investigation requested. Such request must be made in writing to the Bank of America employment office in which I am a candidate. In addition, I also give Bank of America permission to investigate my employment history and police record.

(I) In accordance with applicable law, I agree to undergo a screening for illegal drugs prior to or during my employment with the Company if requested or as legally required. I understand that a positive test result for illegal drugs or controlled substances will render me ineligible for employment at Bank of America at the time of the positive test result.

(J) I authorize Bank of America to contact my current and former schools, references and previous employers to verify the information I have provided in the application and interview process as well as information as to my performance, attendance record and separation reason and I hereby release Bank of America, its officers, directors, employees or agents and any such individuals, corporations or organizations who provide such information from any liability for claims for damages in relation to such contacts.

---

[1] For convenience we refer to Bank of America Corporation ("Bank of America" or "Bank") although your potential employment may be with one of the many Bank of America companies. In the event you are hired, you will be an employee of the company that directly pays your salary.

95-13-1824B  11-1999

<u>PLEASE PRINT</u>
Name (First, MI, Last)

_____

(K) Maryland Candidates Only - If applying or being employed in Maryland, I understand that Maryland employers cannot require employees or applicants for employment to take a lie detector or similar test as a condition of employment or continued employment.

## Criminal Disposition

Answering "Yes" to the following question will not necessarily be a bar from employment.  However, failure to answer this question truthfully will result in your rejection as a candidate for employment or in the termination of your employment, if hired.

Have you ever been convicted of a criminal offense, pleaded no contest to charges or agreed to enter in a pre-trial diversion or similar program in lieu of criminal prosecution for any crime other than a minor traffic violation?

☐ Yes   ☒ No

If yes, explain in detail and include the offense, date, court, location, disposition of case.  Include any pending charges.

```



```

## Right to Work

Do you have the legal right to work in the United States?                                    ☒ Yes    ☐ No

Are you able to present the proper documentation of employment eligibility upon your date of hire?    ☒ Yes    ☐ No

## Nepotism

Answering "Yes" to the following question will not necessarily prevent you from consideration for employment with Bank of America, but will help to avoid possible conflicts of interest.  Do you have any relatives working for Bank of America or any of its affiliates?

☐ Yes   ☒ No

If yes, please give name(s) and relationship(s):

```



```

PLEASE PRINT

Name (First, MI, Last)

## Terms & Conditions of Employment

In the event you are offered and accept employment with Bank of America (as defined above), this document defines the conditions, nature, tenure and duration of your employment relationship with the Bank. Please read it carefully. After you have read it, acknowledge your acceptance of these terms and conditions of your potential employment by the Bank by signing your name in the space provided.

### CONFIDENTIALITY & RELATED PROVISIONS

Bank of America may reveal to me trade secrets and proprietary and confidential information, including, but not limited to, customer lists and data regarding customers. I will maintain this information in confidence, limiting distribution and access to the information and not release the information to anyone outside Bank of America without prior specific authorization of my manager or other authorized bank representative. If I am hired as an employee of Bank of America, the Bank owns any and all Intellectual Property created by me during my term of employment and relating in any way to my work or the business of the Bank. I agree to execute all documents necessary to assist Bank of America in securing rights to any and all Intellectual Property.

### NON-SOLICITATION

If I am hired as an employee of the Bank, I agree that for the period of my employment by the Bank and for six months after the date of the termination of my employment with the Bank, I will not (i) solicit or induce any associate of the Bank to leave the employ of the Bank or (ii) solicit the business of any customer of the Bank (other than on behalf of the Bank) of whom I became aware or was introduced in the course of my duties for the Bank.

### BANK RULES

I agree that during my employment with the Bank, and in performing my work, I must follow and obey the rules, procedures, guidelines and/or policies of the Bank and/or my department which are now in effect and/or which come into effect during the course of my employment.

### HOURS, SCHEDULE AND JOB ASSIGNMENT

If employed by the Bank, I understand that my hours, schedule, shift, location and/or job duties are subject to change, and I authorize the Bank to do so. I may request or apply for a change in position or transfer, but I understand that I am not entitled to have any such request granted. Should a transfer occur anywhere in the Bank, the terms and conditions of my employment as set forth in this document remain in full force and effect.

### RESIGNATION AND TERMINATION

I may resign at any time. I understand I should attempt to provide my manager with at least two weeks' notice prior to the effective date of my resignation to ensure a smooth transition. I understand that failure to do so may jeopardize my eligibility for reemployment with the Bank. If I am employed by the Bank, I understand my employment is at will and the Bank may terminate or otherwise change my employment status at any time, with or without cause or notice. If my employment is terminated, I will receive only the salary or wages I have already earned for the time I have worked as of the date of the termination of my employment, and nothing more.

### RETURN OF PROPERTY

If my employment is terminated, I will immediately return all property belonging to the Bank, its customers or suppliers, including such things as any keys, badges or passes issued to me, my employee credit and identification card(s), equipment and any other items given to me or in my possession as a result of my employment.

Upon my transfer or termination, I will give my manager a list of all computer systems or other access codes (such as passwords and log-on procedures) I have been assigned or used prior to my transfer or termination. I also agree that unless required in a new position with the Bank, I will discontinue using those codes when transferred or terminated.

### SCOPE OF AGREEMENT

In the event I am employed by the Bank, I understand that this document is the complete agreement between the Bank and me, and takes the place of all prior oral and/or written agreements concerning the conditions, nature, tenure and/or duration of my employment relationship with the Bank. Any and all such prior oral and/or written agreements, expressed or implied, are invalid, except any specific provisions set forth in prior written agreements stating my compensation and/or benefits.

Any future changes to the terms and conditions of employment as described in this document must be in writing, signed by a senior officer of the Bank authorized to do so.

There are no implied promises, obligations, covenants or guarantees in connection with this document or in connection with my employment by the Bank.

### CERTIFICATION AND AGREEMENT

I certify that all information I have provided as a part of this application process, including statements on this form are true and complete. I understand that providing any misinformation, making any omission or otherwise causing any inaccuracy to become a part of my application record will prohibit my employment or be grounds for dismissal at any time after it is discovered.

I understand the above stated terms, conditions and provisions included in this Applicant Acknowledgment Form and I agree that any employment relationship I may enter into with the Bank will be governed by these terms, conditions and provisions.

| Candidate's Signature | Today's Date |
|---|---|
| | 11-19-00 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL NO.    B-02-104 |
| | § | |
| BANK OF AMERICA, N.A., | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF RAUL ANAYA

| | |
|---|---|
| STATE OF ARIZONA | § |
| | § |
| COUNTY OF MARICOPA | § |

Before me, the undersigned authority, personally appeared Raul Anaya, who, being by me duly sworn, deposed as follows:

1.    My name is Raul Anaya.  I am over the age of twenty-one and am competent in all respects to make this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true.

2.    I am currently a Commercial Banking Market Executive and Senior Vice President for Bank of America, N.A. (hereinafter "Bank of America" or "Bank").  From January 1999 until January 2002, I served as a Bank of America Commercial Banking Market Executive based in San Antonio, Texas.  In this position, I supervised Bank of America's Client Managers, including John Reed, in the Rio Grande Valley.  I was also involved with hiring, evaluating and terminating the Client Managers who reported to me.  I have personal knowledge regarding the responsibilities and performance expectations of the Rio Grande Valley Client Managers, including John Reed, during the time that I supervised them.  I also have personal knowledge regarding the general expectations and responsibilities of Client Managers at Bank of America.

3.    Bank of America has several Client Managers who are located throughout the country.  These Client Managers are primarily responsible for identifying and acquiring high dollar commercial lending relationships for the Bank.

4.    At the beginning of 2000, Bank of America had two Client Managers located in and responsible for the Rio Grande Valley, Larry Zamponi and Alicia Garcia.  Bank of America assigned performance goals to both Alicia Garcia and Larry Zamponi.  During their respective tenures as Client Managers with the Bank, both Larry Zamponi and Alicia Garcia had satisfactory performance as measured against these goals.

5.    In March 2000, Alicia Garcia voluntarily transferred to another position with Bank of America in San Antonio.  Consequently, one of the Rio Grande Valley Client Manager positions became vacant and Bank of America began searching for someone to fill this position.

6.    Bank of America searched for a new Client Manager by identifying and contacting individuals who worked for competitors in the Rio Grande Valley.  John Reed was one of the potential candidates identified.

7.    I initially spoke to Reed about the Client Manager position in March 2000.  At that time, he expressed an interest in the position.  I subsequently met with Reed in person at Antonio's Restaurant in Brownsville, Texas and had several telephone conversations with him.  During these meetings and phone conversations, I explained the parameters of the Client Manager position to Reed, including his role, responsibilities and performance goals.

8.    To facilitate Reed's understanding of the Client Manager's expectations and responsibilities, I arranged a meeting between Reed and Larry Zamponi, the other Rio Grande Valley Client Manager.  I also sent John Reed a copy of the goals applicable to Client Managers.

9.    In April 2000, Bank of America decided to offer Reed a Rio Grande Client Manager position.  I met with Reed in April 2000 to discuss this employment relationship.  At that time, I gave Reed an offer letter and an Applicant Acknowledgment form.  Reed subsequently accepted the Client Manager position.  At the time that I hired Reed, I believed that he would be successful as a Client Manager.

2

10.     As a Client Manager in the Rio Grande Valley, Reed had the same goals as Larry Zamponi and as Alicia Garcia. Because Reed started working in the middle of 2000, I prorated these goals for the year. Reed's primary area of responsibility was commercial loans in excess of $1 million. Reed was expected to book $21,300,000 in commercial loans for 2000. Based on my experience managing Larry Zamponi and Alicia Garcia and based on Reed's representations regarding his commercial lending experience, I expected Reed to succeed at meeting these goals.

11.     I never told Reed that the ability to meet his goals would be based on product partners or any other person's solicitation of business for him. I told Reed that he would have Product Partners to whom he should refer deals that were in their areas of expertise and that his performance goals included referrals to these product partners.

12.     I never lied to Reed about the job expectations, responsibilities, work conditions or about any other matter. I never misrepresented any expectation or term of employment and I never intended to deceive Reed.

13.     Once Reed began working for Bank of America, I scheduled meetings for Reed with each of the product partners. Product partners are Bank of America employees who are responsible for sales and services in a specific area. These employees have goals that are separate and apart from the goals of the Client Managers. They report to different supervisors than the Client Managers. During the time that John Reed worked for Bank of America, none of the Product Partners reported to me. Client Managers, including Reed, were expected to refer transactions and clients that had banking needs in the areas of a Product Partner's expertise to that individual. I set up meetings between Reed and the Product Partners to assist Reed. During his tenure with Bank of America, Reed could refer appropriate transactions to the following product partners: Martha Agarwal and Roger Akeman in Commercial Mortgage Lending; Lisa Hill in Treasury Management; Jerry Robinson in Public Finance; Jesse Riveron in Trade Finance; Peter Hanson in Derivatives; Andrew Tokar in Foreign Exchange; Jim Class in

Leasing; Gregg Muenster and Peggy Walker in Private Banking; and Kevin Kleinsteuber in Premier Banking.

14.    After Reed joined the Bank, Bank of America also held a reception for Reed in Brownsville. I personally attended this reception and invited Bank contacts in the area to attend. The purpose of this reception was to assist Reed.

15.    Reed did not meet his goals at Bank of America. I met with Reed quarterly to formally discuss his performance and, at each meeting, explained to Reed that he needed to improve. I also spoke to Reed informally regarding his performance and his need to improve. At the end of 2000, Reed had failed to meet his goals in almost every category in which he had annual expectations. For example, Reed was required to obtain $21,300,000 in new loans in 2000 but he only obtained $1,675,000. I am a custodian of the performance records that Bank of America keeps for John Reed. The record attached to this affidavit as Exhibit 1 is a record from Bank of America, N.A. This record was made at or near the time of the occurrence of the matters set forth in it by, or from information transmitted by, a person with knowledge of those matters. The record is kept in the course of Bank of America, N.A.'s regularly conducted business activity, and it was the regular practice of Bank of America, N.A.'s business activity to make the record. The record attached hereto is an exact duplicate of the original.

16.    Because Reed's performance, as measured against his goals, was not acceptable, Bank of America terminated his employment on March 15, 2001.

4

FURTHER AFFIANT SAYS NAUGHT.

_____
Raul Anaya

SUBSCRIBED AND SWORN TO BEFORE ME on *February 12*, 2003.

"OFFICIAL SEAL"
Judith E. Covey
Notary Public-Arizona
Maricopa County
My Commission Expires 6/6/2005

5



**Bank of America.**

# Performance Planning and Coaching

| Name: | John Reed | Social Security Number: |
|---|---|---|
| Client Team Role: | Senior Client Manager | Performance Period: 5/1/00 to 12/31/00 |
| Manager's Name: | Raul Anaya | |

## 1. Performance Summary:  75% Overall Weight

| Key Measures | Weight % 75% | March YTD Goal | March YTD Actual | March YTD % of Goal YTD | June YTD Goal | June YTD Actual | June YTD % of Goal YTD | September YTD Goal | September YTD Actual | September YTD % of Goal YTD | Year-end Goal | Year-end Actual | Year-end % of Goal YTD | Year-end % of Goal YTD on a weighted basis | Significant Business Accomplishments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (e.g., key financial measures, activity measures, client sat. measures, associate sat. measures, etc.) | 75% | | | | | | | | | | | | | | |
| New Loans (incl Leasing) | | N/A | | | 5,325 | 0 | 0% | 13,315 | 0 | 0% | 21,300 | 1,675 | 7.9% | | |
| New Non-Interest DDAs | | N/A | | | 533 | 100 | 19% | 1,332 | 200 | 15% | 2,130 | 216 | 10.1% | | |
| Fees – Treasury Mgmt | | N/A | | | 13 | 0 | 0% | 57 | 0 | 0% | 100 | 0 | 0% | | |
| Fees – Trade Finance | | N/A | | | 4 | 0 | 0% | 17 | 0 | 0% | 30 | 0 | 0% | | |
| Fees – FX | | N/A | | | 4 | 0 | 0% | 17 | 0 | 0% | 30 | 0 | 0% | | |
| Fees – Derivatives | | N/A | | | 20 | 0 | 0% | 50 | 0 | 0% | 80 | 33 | 41.3% | = Weight % x % of goal YTD | |
| Fees – Investment Srvcs | | N/A | | | 12 | 0 | 0% | 31 | 0 | 0% | 50 | 0 | 0% | = Weight % x % of goal YTD | |
| Fees – Loan & Other | | N/A | | | ** | 0 | 0% | ** | 0 | 0% | ** | 0 | 0% | = Weight % x % of goal YTD | |
| Calls – Bus Development | | N/A | | | 50 | 36 | 72% | 125 | 115 | 92% | 200 | 176 | 88% | = Weight % x % of goal YTD | |
| Calls – Derivatives | | N/A | | | 1 | 0 | 0% | 3 | 1 | 33% | 5 | 1 | 20% | = Weight % x % of goal YTD | |
| Referrals – Private | | N/A | | | 0 | 0 | 0% | 1 | 0 | 0% | 2 | 0 | 0% | = Weight % x % of goal YTD | |
| Referrals – Premier | | N/A | | | 2 | 0 | 0% | 4 | 0 | 0% | 6 | 0 | 0% | | |
| Total | | | | | | | | | | | | | | = Sum of this column | |

** Loan Fees & Other:  Goal is part of combined total fee goal

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL NO.   B-02-104 |
| | § | |
| BANK OF AMERICA, N.A., | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF ALLISON L. GILLIAM

STATE OF NORTH CAROLINA   )
                          )
COUNTY OF MECKLENBURG   )

On this day appeared before me, Allison L. Gilliam, who is personally known to me and who, upon her oath, stated as follows:

1.      My name is Allison L. Gilliam.  I am over the age of twenty-one and am competent in all respects to make this Affidavit.  The facts stated in this Affidavit are within my personal knowledge and are true.

2.      I am an Assistant Corporate Secretary of Bank of America, National Association ("the Bank"), a national banking association existing under the laws of the United States of America.  In my position with the Bank, I have personal knowledge regarding the Bank's process for appointing officers and ratifying officer terminations.

3.      In my capacity as an Assistant Corporate Secretary for the Bank, I am familiar with the Bank's status under the National Bank Act, 12 U.S.C. § 24, Fifth.  The Bank is a national bank, chartered to do business as a national banking association under the National Bank Act.

4.      Attached hereto as Exhibit "4" are true and correct copies of excerpts of the official minutes, as redacted, (with attachment) of the regularly scheduled meeting of the

Bank's Board of Directors concerning officer appointments. Included in Exhibit 4 is a true and correct copy of the resolution of the Bank's Board of Directors, dated April 24, 2000, confirming the Bank officer title of "Senior Vice President."

5.    Attached hereto as Exhibit "5" are true and correct copies of excerpts of the official minutes, as redacted, (with attachment) of the regularly scheduled meeting of the Bank's Board of Directors concerning Officer Appointment and Terminations dated July 25, 2000. Included in Exhibit 5 is a true and correct copy of the list of officer appointments that lists John Reed as appointed to Senior Vice President.

6.    Attached as Exhibit "6" are true and correct copies of excerpts of the official minutes, as redacted, (with attachment) of the regularly scheduled meeting of the Bank's Board of Directors concerning Officer Appointment and Terminations dated April 24, 2001. Included in Exhibit 6 is a true and correct copy of the list of officer separations that lists John Reed's separation on March 15, 2001.

7.    In my position as Assistant Corporate Secretary, I am a custodian of the official minutes of the Board of Directors for Bank of America, N.A. The records attached to this affidavit as Exhibits 4 through 6 are ten (10) pages of records from Bank of America, N.A. These said ten (10) pages of records were made at or near the time of the occurrence of the matters set forth in them by, or from information transmitted by, a person with knowledge of those matters. These records are kept in the course of Bank of America, N.A.'s regularly conducted business activity, and it was the regular practice of Bank of America, N.A.'s business activity to make these records.   The records attached hereto are exact duplicates of the originals.

2

FURTHER AFFIANT SAYS NAUGHT.

*Allison L. Gilliam*

Allison L. Gilliam

SUBSCRIBED AND SWORN TO BEFORE ME on *February 12* , 2003.

*Clara S. Blanding*

Notary Public in and for the State of North Carolina

(PERSONALIZED SEAL)

3

## MINUTES OF MEETING OF BOARD OF DIRECTORS
### OF
## BANK OF AMERICA, NATIONAL ASSOCIATION

### April 24, 2000

The meeting of the Board of Directors of Bank of America, National Association was held in the Executive Conference Room on the 57th floor of the Bank of America Corporate Center in Charlotte, North Carolina, at 3:30 p.m. EDT on Monday, April 24, 2000.

The following members were present:

James H. Hance, Jr.                    Michael J. Murray
Kenneth D. Lewis                       F. William Vandiver, Jr.
Hugh L. McColl, Jr.

There being a quorum, the meeting was called to order by Mr. Murray, Chairman of the Board.

**Election of Officers**

Upon motion duly made, seconded and unanimously carried, the Board adopted a resolution electing officers of the bank. A copy of the resolution is attached hereto as Exhibit B.

Bank of America, National Association
Board of Directors Meeting
April 24, 2000 -- Page 6

There being no other business to come before the Board, the meeting was, upon motion duly made, seconded and unanimously carried, adjourned.

Michael J. Murray
Chairman

James W. Kiser
Secretary

Exhibit B

## BANK OF AMERICA, NATIONAL ASSOCIATION
## BOARD OF DIRECTORS

### RESOLUTIONS

### APRIL 24, 2000

RESOLVED, that the following persons are hereby appointed and elected to the offices set forth opposite their respective names, to serve at the pleasure of the Board of Directors until the next annual meeting or until their successors shall have been duly appointed and elected and qualified:

| NAME | TITLE |
|------|-------|
| Hugh L. McColl, Jr. | CEO |
| Michael J. Murray | Chairman of the Board |
| Kenneth D. Lewis | President |
| James H. Hance, Jr. | Vice Chairman |
| F. William Vandiver, Jr. | Vice Chairman |
| James W. Kiser | Secretary |

RESOLVED FURTHER, that all other officers currently serving in their respective positions at Bank of America, National Association, as reflected in the records of the Bank, are hereby appointed and elected to serve at the pleasure of the Board until resignation, retirement, or removal.

RESOLVED FURTHER, that the Board confirms that each of the corporate titles identified by name in paragraph (a) below and each of the position or functional titles identified by reference to the records of the Bank in paragraph (b) below was created as provided for in Article IV of the bylaws and each is confirmed as an officer title of the Bank. Other than as provided for in the Bank's bylaws, each officer shall have such authority and duties as usually are incident to the title and office held.

(a) <u>Corporate Titles</u>.

| | |
|---|---|
| Chairman of the Board | Treasurer |
| President | Assistant Treasurer |
| Chief Executive Officer | Secretary |
| President, Global Retail Bank | Assistant Secretary |
| President, Global Wholesale Bank | Senior Authorized Officer |
| Vice Chairman | Authorized Officer |
| Group Executive Vice President | Officer |
| Executive Vice President | General Auditor |
| Senior Vice President | Director of Credit Examination Services |
| Vice President | General Counsel |
| Assistant Vice President | Security Officer |
| Managing Director | Senior Trust Officer |
| Director | Trust Officer |

(b)  <u>Position or Functional Titles</u>.

All position or functional titles treated as officer titles as reflected in the records of the Bank.  This includes all positions or functional titles in grade 75 and above, band 6 and above, and in other bands or grades as reflected in the records of the Bank.

I:\wallace\resolut\BOAresolut400

-2-

## MINUTES OF MEETING OF BOARD OF DIRECTORS
## BANK OF AMERICA, NATIONAL ASSOCIATION

### JULY 25, 2000

The meeting of the Board of Directors of Bank of America, National Association was held in the Executive Conference Room on the 57th floor of the Bank of America Corporate Center in Charlotte, North Carolina, at 4:00 p.m. EDT on Tuesday, July 25, 2000.

The following members were present:

Kenneth D. Lewis                    F. William Vandiver, Jr.
Hugh L. McColl, Jr.

Noting the absence of Mr. Michael J. Murray, Chairman, who had announced earlier his retirement plans, Mr. Hugh L. McColl, assumed the Chair, declared a quorum and called the meeting to order.

Bank of America, National Association
Board of Directors Meeting
July 25, 2000 – Page 6

## <u>Officer Appointments and Terminations</u>

Mr. McColl then presented for Board approval the appointment of the individuals, shown on a list bearing a report date of July 25, 2000, as officers at the level of Managing Director, Senior Vice President and Vice President and the appointment of all other officers as recorded in the personnel records of Bank of America, N.A. He also presented for Board ratification the termination from employment as officers in Bank of America, N.A., of the individuals shown on the document entitled "Officer Separations November 16, 1999 – July 13, 2000". Upon motion duly made, seconded and unanimously carried, the Board approved the officer appointments and ratified the termination from employment of the listed officers. Copies of the lists are attached hereto as Exhibit M.

There being no other business to come before the Board, the meeting was, upon motion duly made, seconded and unanimously carried, adjourned.

Hugh L. McColl, Jr.
Chairman


James W. Kiser
Secretary

# CONFIDENTIAL
## Bank of America, National Association

### Officer Appointments
### April 14, 2000 - July 13, 2000

| Officer Name | Title |
| --- | --- |
| Reed, John | Senior Vice President |

# MINUTES OF MEETING OF BOARD OF DIRECTORS
## OF
## BANK OF AMERICA, NATIONAL ASSOCIATION

### April 24, 2001

The meeting of the Board of Directors of Bank of America, National Association was held in the Executive Conference Room on the 57th floor of the Bank of America Corporate Center in Charlotte, North Carolina, at 4:00 p.m. on Tuesday, April 24, 2001.

The following members were present:

| | |
|---|---|
| Amy Woods Brinkley | Kenneth D. Lewis |
| Edward J. Brown III | R. Eugene Taylor |
| James H. Hance, Jr. | F. William Vandiver, Jr. |

There being a quorum, the meeting was called to order by Mr. Lewis, Chairman of the Board.

Bank of America, National Association
Board of Directors Meeting
April 24, 2001 — Page 6

## Officer Appointments and Terminations

Mr. Lewis then presented for Board approval the appointment of officers to the levels of Managing Director, Senior Vice President and Vice President as set forth on the document dated April 24, 2001 and the appointment of all other officers as recorded in the personnel records of Bank of America, N.A. He also presented for Board ratification the termination from employment, as officers in Bank of America, N.A., of the individuals listed on the document entitled "Officer Separations October 15, 2000 – April 12, 2001". Upon motion duly made, seconded and unanimously carried, the Board approved the officer appointments and ratified the terminations from employment. Copies of the lists are attached hereto as Exhibits P and Q.

There being no other business to come before the Board, the meeting was, upon motion duly made, seconded and unanimously carried, adjourned.

Kenneth D. Lewis
Chairman

Rachel R. Cummings
Secretary

** TOTAL PAGE.03 **

# CONFIDENTIAL

**Bank of America, National Association**

**Officer Separations**
**October 15, 2000 - April 12, 2001**

| Officer Name | Separation Date |
| --- | --- |
| Reed, John | March 15, 2001 |