*19*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 2 8 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOHN REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL NO.   B-02-104 |
| | § | |
| BANK OF AMERICA, N.A., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT BANK OF AMERICA, N.A.'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Defendant Bank of America, N.A. ("Bank of America" or "Bank") provides this Reply to Plaintiff's Response to Motion for Summary Judgment ("Response"). Because the Response does not point to evidence creating a fact issue on the elements of Plaintiff John Reed's ("Reed") fraudulent inducement claim, summary judgment is appropriate.

## SUMMARY

John Reed's Response attempts to confuse the issues before this Court by pointing to irrelevant facts, misstating the Bank's position and ignoring Reed's own key admissions. The Response does not address the elements of Reed's claim and, for most of the argument, does not even cite the law. Rather, the Response disjointedly asks the Court to disregard well established law, ignore Reed's written acknowledgment that he would not rely on the oral statements at issue in this case, and find evidence of fraud based on general comments that Reed subjectively interpreted as inaccurate. Such a finding would devastate the at-will doctrine in Texas and is not merited based on the facts of this case.

S-127187_2.DOC

1

Ignoring the applicable reliance issue and controlling law, the Response only mentions the agreements signed by Reed in an attempt to twist their significance. Reed argues that, if these agreements preclude his justifiable reliance, then they should also preclude the Bank from setting performance goals and terminating him for not meeting these goals. (Resp. ¶ 3.) Not only is this argument inaccurate,[2] it is, more importantly, irrelevant. Reed has not alleged that the Bank breached the agreements with him by setting goals that were not outlined in these agreements. If he did, this would be a breach of contract case. Instead, Reed alleges that he was fraudulently induced to accept a position with Bank of America based on oral statements made before he joined the Bank. To prove that legal claim, he *must* show justifiable reliance. *Haralson v. E.F. Hutton Group*, 919 F.2d 1014, 1025 (5th Cir. 1990). The reason for his termination is irrelevant. His red herring arguments do not alter the conclusion that, because he cannot show justifiable reliance, the Bank is entitled to summary judgment.[3]

## II.    The Response does not point to any material misrepresentation.

Reed's Response does not dispute that, based on his deposition testimony, the pre-employment statements Reed attributes to Anaya cannot serve as the requisite "material

---

[2] The agreements that Reed signed make clear that Reed was required to follow the guidelines and rules set by the Bank and that the Bank had the right to set conditions of employment for Reed and to terminate him for any reason, including his failure to meet expectations. In a section entitled "HOURS, SCHEDULE AND JOB ASSIGNMENT," the Acknowledgment Form specifically says: "I understand that my hours, schedule, shift, location and/or job duties are subject to change, and I authorize the Bank to do so." (MSJ Ex. 2.) In a section entitled "BANK RULES," the Form further states: "I agree that . . . I must follow and obey the rules, procedures, guidelines and/or policies of the Bank . . . which are now in effect and/or which become in effect during the course of my employment." (MSJ Ex. 2.) That agreement also explains that the Bank has the right to "terminate or otherwise change my employment status at any time, with or without cause or notice." (MSJ Ex. 2.) Therefore, the express terms of the Acknowledgment form establish that Bank of America had the right to set Reed's job duties and to terminate Reed for any reason, including his failure to perform these duties. This right to terminate Reed is not dependent on any oral statement, or lack thereof, regarding performance goals; it is preserved in the written agreement.

[3] The Response also fails to explain how Reed, an experienced banker and self-described intelligent person, could have justifiably relied on vague statements regarding support in the admitted absence of any inquiry into their meaning. (MSJ at 20-21.) For this additional reason, Reed cannot establish justifiable reliance.

representations" to support his claim.  (MSJ at 10-13.)  Instead, Reed points to different

alleged statements, asks the Court to excuse him from his burden of identifying a material

representation, and attempts to introduce an entirely new claim.  Reed's arguments are

not supported by any law and do not defeat summary judgment.

> **A.    Reed's Affidavit and Interrogatory answers do not point to a material misrepresentation.**

The Response attempts to expand Reed's sworn testimony through an Affidavit

and his Interrogatory responses. (Resp. ¶ 4.)  Reed's Affidavit claims that Anaya said:

> that Bank of America had a system of marketing that involved Client Managers from various branches and services cooperating together to identify, target and market the bank's services to potential bank customers.

(Resp. Ex. B.)  Reed's Interrogatory responses assert that Anaya told Reed:

> I would receive all of the support from Bank of America personnel that I needed to do my job and reach my goals . . . that I would be assisted in my calling efforts by various product specialists who would prospect in the Rio Grande Valley and based on their calling efforts and my calling efforts, we would send referrals to each other.

(Resp. ¶ 4, Ex. A.)  To the extent that these new statements contradict Reed's deposition

testimony, they may not be considered as summary judgment evidence.[4]  *Copeland v.*

*Wasserstein, Perella & Co.*, 278 F.3d 472, 482 (5th Cir. 2002)(citing *S.W.S. Erectors, Inc.*

*v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)).

---

[4] As discussed in the Bank's Motion, after being asked "what statements were made by someone at Bank of America that you contend you relied on and that you contend Bank of America did not, in fact, do?," Reed testified that Anaya told him: "[T]he ability to meet the goals that would be given to me would be by people coming into the market, what they call partners or product partners, coming into the market and actively soliciting business, prospecting for business, in the Rio Grande Valley with me and independently of me.  And that we'd be working as a team to meet my goals and meet the region's goals. "(Dep. 12:13-25.)  Reed was asked, "Are there any other statements other than this one statement that is the subject of this lawsuit?," to which he responded that the previous statement was reiterated on a phone call, in which he was told he would have the support needed to make his goals. (Dep. 13:15-20.)  He later clarified that, before his employment began, this statement was made once in person and one time on the telephone. (Dep. 14:2-19.)

Irrespective of any change in content, however, these statements suffer from the same legal deficiencies as Reed's deposition testimony: they are general comments, incapable of measurement, that merely express Anaya's opinions regarding the future working relationship among third parties.[5] *Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 154 (5th Cir. 1992).  For example, they do not identify the referenced Bank of America personnel, or to what degree these unidentified individuals were to "cooperate" with or give "support" to Reed.  Most significantly, the statements cannot sustain Reed's claim that the lack of support of third parties led to his inability to meet his goals because they in no way suggest that John Reed did not have the ultimate responsibility for meeting his goals.[6]  To interpret these general statements as fraudulent depends entirely on Reed's subjective interpretation of their meaning.  As such, they cannot support a fraud claim.  *See, e.g., Becker v. Nat'l Educ. Training Group, Inc.*, No. 3:01-CV-1187-M, 2002 U.S. Dist. LEXIS 19063, at **21-22 (N.D. Tex. Oct. 7, 2002) (finding no misrepresentation where supervisor provided prospective employee with a general overview of commission structure but did not explain that commissions were not paid if the employee was terminated before the commissions became payable).

---

[5] Reed admits these statements describe future performance.  (*See* Resp. ¶ 6 referring to "false promises of *future performance*.")

[6] Reed's Response focuses heavily on Anaya's statement that he gave Reed his goals before he started.  (Resp. ¶¶ 1-3.)  Anaya's statement, which is not mentioned in the Bank's Motion, is irrelevant to the issues before the Court and is another red herring to divert the Court from the true issues.  In fact, accepting Reed's claim that he was not given goals before joining the Bank only makes reliance more unreasonable and the alleged statements more ambiguous.  Why would an educated, experienced business person blindly rely on a statement that third parties would help him meet his goals if he did not know or even ask what those goals were?  Rather than supporting his claim, Reed's testimony that he neither knew *nor asked* what his goals were before joining the Bank makes his legal claim even more unreasonable.  (Dep. 52:10-16.)

5

**B.    Reed cannot shift his burden of pointing to a material representation to the Bank.**

Reed further attempts to circumvent the absence of any material representation by arguing that, although he can not point to any specific statement, there must have been one because Anaya admits that he talked to Reed on several occasions. (Resp. ¶ 5.)  The question for this Court, however, is not whether Anaya made any specific representation to Reed but, whether the statements *on which Reed claims he relied* are material representations.  There must not only be a representation; the representation must be "material" to the deal.  *American Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App.—Houston [14th Dist.] 1991, no writ).  Reed has been deposed, given Interrogatory responses and now provided the Court with an Affidavit.  Reed has had ample opportunity to carry *his burden* of pointing the Court to all material representations that induced him to join the Bank.  Because he has not done so, summary judgment is proper.

**C.    Any fraud by omission claim is not supported by the pleadings and is without merit.**

Reed's third attempt to escape the absence of any representation seeks to alter his alleged misrepresentation claim to one of fraud by omission based on his contention that, prior to joining the Bank, he was not given sales goals. (Resp. ¶¶ 1, 2 & 6.)  Reed, however, has not pled this theory. (Pl.'s Orig. Pet. ¶ II.)  In a fraud case, the plaintiff is required to describe the fraud with particularity.  FED. R. CIV. P. 9(b); *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 564-65 (5th Cir. 2002)(quoting *Williams v. WMX Tech, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).  Reed is "bound to his pleadings and cannot assert an unpleaded nondisclosure theory at this late stage in the

litigation." *Becker v. Nat'l Educ. Training Group, Inc.*, No. 3:01-CV-1187-M, 2002 U.S. Dist. LEXIS 19063, at **23 (N.D. Tex. Oct. 7, 2002).

Even if his omission argument were considered, however, it would fail. First, although this experienced, educated business man knew that he would have goals, he admits that he *never asked* anyone what the goals would be. (Dep. 52:10-16.) The Bank should not be held liable because Reed chose not to inquire into areas of the employment relationship that he now claims were important to his decision. More significantly, the Fifth Circuit has made clear that a party's silence will only support a fraud claim if there is a fiduciary or confidential relationship between the parties. *Jackson v. West Telemarketing Corp. Outbound*, 245 F.3d 518, 525 (5th Cir. 2001); *Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998, 1004 (5th Cir. 1997); *Mitchell Energy Corp. v. Samson Resources Co.*, 80 F.3d 976, 985 (5th Cir. 1996). There is no special or fiduciary relationship between an employer and prospective employee. *Giurintano*, 821 S.W.2d at 340. Rather, negotiations and discussions regarding future employment are arms-length deals. *Id.* (Anaya Aff. ¶ 13.) Therefore, Reed's last-ditch attempt will not save his claim.

## III.    The Response offers no evidence of falsity.

In trying to establish that Anaya's alleged statements were false, the Response appears to rely solely on assertions in Reed's Affidavit and Interrogatory Responses that he believed Anaya's "promises" were not fulfilled. (Resp. Exs. A & B.) Reed's testimony regarding falsity, however, depends entirely on his subjective interpretation of the purported comments. In asserting that he does not believe a statement regarding marketing is true. for example, Reed avers that the Bank did not have an "aggressive marketing strategy or system in place." (Resp. Ex. B.) The statement that he attributes to

7

Anaya, however, never uses the word "aggressive." Rather, it merely states that there is a "system of marketing that involved Client Managers . . . cooperating." (Resp. Ex. B.) Reed may have subjectively understood the strategy would be "aggressive," but such an interpretation is not clear from the statement itself.

As described in the Bank's Motion for Summary Judgment, Reed testified that he received some support, cooperation and assistance from the product partners, all of whom traveled to the Valley to meet with Reed, customers and potential customers. (MSJ at 13.) Stripping away the subjective spin that Reed tries to put on Anaya's comments, Reed's admission that he received support, cooperation and assistance from other Bank employees prevents him from proving that Anaya's alleged statements about third-party support were false. For this additional reason, summary judgment is appropriate.[7]

## IV.    Reed's argument asks the Court to change the law in a manner that would give would-be litigants an end-run around the at-will doctrine.

It is also important to consider the impact that a liability finding, based on the facts of this case, would have on recruiting and the employment relationship in Texas. Without citing any law, the Response argues that the Court should impose liability on Bank of America based on general, subjective pre-employment statements regarding cooperation, teamwork and support among peers. It further argues that the fact of meeting with a prospective employee, in and of itself, should create an inference of fraud. If Reed is successful, it would open the door for all dissatisfied employees or all

---

[7] The Response also offers no evidence that Anaya knew any statements were false or intended to deceive Reed. Reed claims that he must depose Anaya to respond to these arguments. Because Reed is unable to establish the other elements of his case, determination of these issues is not necessary to award summary judgment. Further, contrary to Reed's assumption, Anaya's deposition testimony will only further highlight the absence of evidence that Anaya knowingly made a false statement or intended to deceive Reed. To that end, the Bank repeats the argument in its response to Plaintiff's Motion to Supplement and asks the Court to grant summary judgment without any supplementation. In the alternative, if Reed is permitted to supplement his response with Anaya's testimony, Bank of America respectfully requests that it also be afforded the opportunity to supplement this reply with any such testimony.

employees who have performance deficiencies to pick through the normal pre-employment conversations for general subjective comments like the ones at issue in this case (i.e. "you will have support," "we work as a team," "we cooperate") and claim that the employer did not live up to these statements. It would require employers to qualify every statement made to a prospective employee, irrespective of how general, with a "this is not a promise" caveat. It would make employers who pride themselves on a corporate culture of "cooperation" "teamwork" and "support among peers" liable if any employee did not fit within this general description. Finally, it would establish fraud as an end-run around the at-will doctrine. Such an unprecedented departure from established jurisprudence is clearly not warranted in this case.

**V.    The Response points to no evidence or authority that would allow Reed to escape application of the National Bank Act.**

Reed's Response does not dispute that he is a Bank of America officer or that the National Bank Act affords the Bank the right to terminate an employee at will. His only response to the National Bank Act defense is one paragraph that, without citing any legal authority, asserts that the National Bank Act does not apply to fraud in the inducement claims. (Resp. ¶ 9.) Contrary to Reed's legally unsupported argument, courts have consistently held that this statutory provision preempts state law claims relating to a termination, irrespective of the nature of the claim. *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 526 (9th Cir. 1989); *City Nat'l Bank v. Brown*, 599 So. 2d 787, 790 (La. Ct. App.), *writ denied*, 604 So. 2d 999 (1992); *Ambro v. American Nat'l Bank & Trust Co.*, 394 N.W.2d 46, 48-49 (Mich. Ct. App. 1986).

In *City National Bank v. Brown*, the plaintiff alleged that he was induced by a Bank to develop a new lending program and that the Bank promised to provide him a

sufficient staff to develop the program. 599 So. 2d at 788. Similar to Reed's claim in this case, that plaintiff argued that because he was not given the promised support, he was not successful in developing a lending program and he was terminated. *Id.* (Compare Pl.'s Orig. Pet. ¶ III: "Plaintiff's employment was terminated under the pretense that he was not achieving his stated goals, when . . . Plaintiff . . . did not meet his stated goals solely due to the failure of Defendant to provide the promised support, cooperation, and assistance.") The plaintiff claimed, as Reed does in his Response, that the National Bank Act did not preclude a claim for detrimental reliance. *Id.* at 790. The court decisively noted that this argument "has no merit," explaining that the National Bank Act "preempts *all* state law and it alone governs in those instances in which officers of national banks are dismissed." *Id.* (emphasis added); *Alfano v. First Nat'l Bank*, 490 N.Y.S.2d 56, 58 (N.Y. App. Div. 1985) (citation omitted). Similarly, Reed cannot escape the National Bank Act, which requires dismissal of his claim.

**VI.**   **Reed's fraud claim is barred by the Statue of Frauds because he contends it represented conditions that would remain the same for several years.**

Reed's argument in response to the Bank's Statute of Frauds defense asserts that the alleged promise by Anaya could be completed within one year and that, therefore, the Statute of Frauds is not applicable. (Resp. ¶ 8.) This assertion, however, completely ignores Reed's testimony that he understood that Anaya's representation assured him of an employment condition that would last for at least several years. (Dep. 20:17-24.) To keep this promise, it could not possibly be completed within one year and, consequently, Reed's fraud claim is barred by the Statue of Frauds. TEX. BUS. & COMM. CODE ANN. § 26.01(b)(6) (West 2002).

## CONCLUSION

Because John Reed's fraudulent inducement claim fails as a matter of law, Bank of America, N.A. respectfully requests that the Court dismiss this lawsuit with prejudice and for all other and further relief to which it may be entitled.

Respectfully submitted,

Michael W. Fox
State Bar No. 07335500
Laura E. O'Donnell
State Bar No. 00797477
Federal Id. No. 21720
HAYNES AND BOONE, L.L.P.
112 East Pecan Street, Suite 1600
San Antonio, Texas  78205-1540
Telephone:    (210) 978-7000
Telecopier:    (210) 978-7450

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been sent to all counsel of record on this 25ᵗʰ day of April, 2003.

11

LEXSEE 2003 US app lexis 6299

C. Allen Villines; Robert Donnelly, Appellants, v. General Motors Corporation, a
Delaware Corporation, Appellee.

No. 02-2112

UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

*2003 U.S. App. LEXIS 6299*

January 13, 2003, Submitted

April 2, 2003, Filed

PRIOR HISTORY:
[*1] Appeal from the United States District Court for the Western District of Missouri.

DISPOSITION:
Affirmed.

COUNSEL:
For C. Allen Villines, Robert Donnelly, Plaintiffs - Appellants: James Tracy Madison, MADISON & FRANKLIN, Kansas City, MO. Doc Netterville, IV, NETTERVILLE & ASSOCIATES, Kansas City, MO.

For GENERAL MOTORS CORPORATION, Defendant - Appellee: Rosalee M. McNamara, Alok Ahuja, David C. Vogel, LATHROP & GAGE, Kansas City, MO.

JUDGES:
Before WOLLMAN and MURPHY, Circuit Judges, and GRITZNER, n1 District Judge.

> n1 The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

OPINIONBY:
WOLLMAN

OPINION:

WOLLMAN, Circuit Judge.

In this diversity action, C. Allen Villines and Robert Donnelly (collectively, Employees) allege contract and tort claims against their employer, General Motors

Corporation (GM), based on alleged verbal representations regarding their right to return to hourly employment after accepting salaried positions. Employees appeal the district court's n2 adverse grant of summary judgment. We affirm.

> n2 The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

[*2]

I. Background

Employees began working for GM as hourly employees at GM's former assembly plant in the Fairfax District of Kansas City, Kansas. In the 1980s, GM constructed a new assembly plant in the Fairfax District and needed additional supervisors to staff both plants. Around 1986, Employees became "per diem" supervisors. As such, Employees were no longer part of the collective bargaining unit, but were still compensated on an hourly basis.

Around February 1987, Villines attended a meeting to discuss an opportunity for per diem supervisors to accept regular salaried positions. Jim Schmer, the plant's salaried personnel administrator, and Tim Danahy, the plant's personnel director, conducted the meeting. During this meeting, one of Villines' co-workers inquired as to what would happen if, after he accepted a salaried position, he found that he did not like the job. Schmer allegedly responded, "We understand that this job is not for everyone and if at any time you feel it's not for you and you need to go back, well, thank you for your time

and your trouble and your effort." Villines and his co-workers were also advised that they would "retain all of [their] hourly rights [*3] as far as seniority."

In 1987, Donnelly was also offered a regular salaried position. Donnelly recalled that three members of GM management, including Schmer, advised him that those who accepted salaried positions would retain their seniority and would also have the right to return to hourly employment.

Both Villines and Donnelly accepted GM's offer of regular salaried positions and executed employment agreements. In doing so, each "agreed to devote his time and service in the employ of the Employer in such capacity as the Employer may direct." The agreements also included the following clause:

The Employer and the Employee acknowledge that there are no other arrangements, agreements, or understandings, verbal or in writing, regarding same and that any modification or amendment hereof, other than a cancellation and replacement hereof by another written form of agreement, must be endorsed hereon in writing and initialed by both the Employee and the Employer.

At various times, GM increased Employees' pay and had them sign compensation statements. These statements, "when signed and accepted," became a part of Employees' "basic 'Employment Agreement.'" The statements [*4] also included the following language: "There are no other arrangements, agreements, understandings or statements[,] verbal or in writing, except as stated above."

On December 3, 1990, Danahy sent a letter to employees who had transferred from hourly to salaried employment prior to December 1, 1990. The letter offered these employees the option "to elect to have all future treatment as a salaried employee-in other words, eliminate the possibility of being returned to the hourly work force." Attached to the letter was an Agreement to Retain or Relinquish Hourly Recall Right on which employees could check one of two boxes. In April 1991, Donnelly executed the agreement and checked the box indicating that he elected "to relinquish [his] eligibility to return to the hourly work force and thereby have all future employment considerations based on policies, procedures and practices that pertain to salaried employees." Villines did not execute the agreement.

On December 14, 1995, a GM vice president issued a memorandum regarding "employee transfer activity from the salaried work force to the hourly workforce." The memorandum stated that employees who had transferred to salaried from [*5] hourly employment prior to December 1, 1990, and had elected to retain their

eligibility to return to the hourly workforce "would remain salaried employees as before and retain eligibility to return to the hourly work force in the event they were facing unemployment due to a salaried reduction in force and had sufficient seniority to hold a position in the bargaining unit." The memorandum also provided that "in circumstances not involving a reduction in the salaried work force, salaried employees may request return to the hourly work force," and that "approval of such request would be solely at management's discretion and in the best interest of the Corporation."

In 1999, Employees learned that, pursuant to a change in the collective bargaining agreement between GM and the union representing hourly employees, salaried employees who had transferred from hourly employment would no longer accrue hourly seniority, effective January 1, 2000. In October 1999, both Villines and Donnelly requested that they be returned to hourly employment. GM denied both requests.

Employees sued GM in the United States District Court for the Western District of Missouri, alleging six causes of action: breach [*6] of contract, promissory estoppel, fraud, fraud through silence, fraudulent promise of future events, and negligent misrepresentation. In count seven, Employees requested punitive damages. GM moved for summary judgment on all six substantive claims. Applying Kansas law, the district court granted GM's motion, and judgment was entered dismissing Employees' complaint.

## II. Standard of Review

"We review de novo a grant of summary judgment, applying the same standard as the district court." *Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002)* (citation omitted). "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Thomas v. Union Pacific R.R. Co., 308 F.3d 891, 893 (8th Cir. 2002)* (citation omitted). In this diversity case, we also review the district court's interpretation of state law de novo. *Walk v. Starkey Mach., Inc., 180 F.3d 937, 939 (8th Cir. 1999)* (citing *Salve Regina Coll. v. Russell, 499 U.S. 225, 231, 113 L. Ed. 2d 190, 111 S. Ct. 1217(1991)*; [*7] *Kaplon v. Howmedica, Inc., 83 F.3d 263, 266 (8th Cir.1996)).* "We may affirm the district court on any basis supported by the record." *Thomas, 308 F.3d at 893* (citation omitted).

## III. Analysis

Employees' claims are based on the alleged verbal assurances by GM management regarding Employees' right to return to hourly employment after accepting

supervisory positions. GM contends that its policies have never granted former hourly workers the unilateral right to transfer back to hourly positions. Instead, GM argues, transfer requests have always been subject to management approval, except in limited circumstances not found in this case. We agree with the parties that Kansas law governs Employees' claims, and we discuss each of these claims below.

## A. Breach of Contract

Employees contend that the alleged verbal assurances made by GM management were "essential provisions of their employment contracts" with GM, and that GM breached these provisions when it refused to allow them to return to hourly employment. "Under Kansas law, parties to a contract may define the terms of their agreement and, absent fraud, mistake or duress, the contract is [*8] enforceable." *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994) (citing *Augusta Med. Complex, Inc. v. Blue Cross of Kansas, Inc.*, 227 Kan. 469, 608 P.2d 890, 895 (Kan. 1980)). "Where the parties have negotiated and entered into a written contract which addresses the issues negotiated between them, the written contract determines their rights." *Id.* (citing *Albers v. Nelson*, 248 Kan. 575, 809 P.2d 1194, 1197 (Kan. 1991); *Edwards v. Phillips Petroleum Co.*, 187 Kan. 656, 360 P.2d 23, 26 (Kan. 1961)). Thus, "when a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible." *Simon v. Nat'l Farmers Org., Inc.*, 250 Kan. 676, 829 P.2d 884, 887-88 (Kan. 1992) (citing *First Nat'l Bank of Hutchinson v. Kaiser*, 222 Kan. 274, 564 P.2d 493 (Kan. 1977)); see also *Jack Richards Aircraft Sales, Inc. v. Vaughn*, 203 Kan. 967, 457 P.2d 691, 696 (Kan. 1969) ("Broadly stated, the parol evidence rule [*9] excludes evidence of prior or contemporaneous oral agreements to contradict or to modify a written contract.").

We see no ambiguity in the employment agreements. As discussed above, these agreements included a clause reserving GM's right to direct the "capacity" in which Employees would work. The alleged verbal representations contradict this clause and thereby "vary the terms" of the parties' agreements. *Simon*, 829 P.2d at 888. We are also satisfied that the agreements are "complete on [their] face." *Robertson v. McCune*, 205 Kan. 696, 472 P.2d 215, 218 (Kan. 1970); see *Prophet v. Builders, Inc.*, 204 Kan. 268, 462 P.2d 122, 126 (Kan. 1969). The agreements included integration clauses disclaiming the existence of "[any] other arrangements, agreements, or understandings, verbal or in writing." Although Employees contend that they did not read these agreements, Kansas law provides that "a party who signs

a written contract is bound by its provisions regardless of the failure to read or understand the terms, unless the contract was entered into through fraud, undue influence, or mutual mistake." *Albers*, 809 P.2d at 1197 [*10] (citations omitted); see also *Flight Concepts*, 38 F.3d at 1157 ("A party cannot void a contract by claiming to be ignorant of its contents." (citing *Albers*, 809 P.2d at 1197)). Employees do allege fraud in their complaint. For the reasons discussed below, however, we are satisfied that Employees' fraud claims were properly dismissed. See infra Part III.B. Thus, because Employees have failed to demonstrate that GM breached a contractual term by refusing to permit them to return to hourly employment, summary judgment was properly granted with respect to their breach of contract claim.

## B. Fraud

Employees allege claims of fraud, fraudulent promise of future events, and fraud through silence. "Actionable fraud includes an untrue statement of material fact, known to be untrue by the person making it, made with the intent to deceive or recklessly made with disregard for its truthfulness, where another party justifiably relies upon the statement and acts to his injury." *Slaymaker v. Westbank State Bank*, 241 Kan. 525, 739 P.2d 444, 450 (Kan. 1987) (citations omitted). The misrepresentation "must relate to some material present or pre-existing [*11] fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Edwards*, 360 P.2d at 26 (citations omitted). An exception exists where "there are circumstances tending to show an actual fraudulent intent at the time the promise or representation regarding a future event is made." *Id.*

As discussed above, the alleged verbal assurances regarding Employees' unilateral right to transfer to hourly status conflict directly with the clause in their employment agreements reserving GM's right to direct the "capacity" in which they would work. Under such circumstances, we fail to see how Employees' reliance on the assurances could be deemed justified. See *Flight Concepts*, 38 F.3d at 1157 ("Where the written contract directly contradicts the oral promises made during contract negotiations, the oral promise cannot be construed as fraudulent." (citing *Edwards*, 360 P.2d at 27; *Jack Richards Aircraft Sales, Inc.*, 457 P.2d at 696)); see also *Metal Trading Servs. of Colo., Inc. v. Trans-World Servs., Inc.*, 781 F. Supp. 1539, 1545 (D. Kan 1991) (stating that the test for analyzing [*12] the reasonableness of a party's reliance on certain information is whether that party "has knowledge that would alert a reasonable person to the potential falsity of the information" (citing *Goff v. Am. Sav. Ass'n of Kansas*, 1 Kan. App. 2d 75, 561 P.2d 897, 903 (Kan. Ct. App. 1977))). Although Employees contend that they did not

read these agreements, this allegation does not save their claims of fraud. Under Kansas law, "the fact that a party signs a contract and does not know its contents is not alone sufficient to permit that party to void it." *Albers, 809 P.2d at 1198* (citation omitted). The Kansas Supreme Court has recognized that:

Fraudulent representations as to the legal effect of an instrument will avoid it, even if made to one who has actually read it, if unable to judge of its true construction. But the fraud must be contemporaneous with the execution of the instrument and must consist in obtaining the assent of the party defrauded, by inducing a false impression as to its legal or literal nature and operation.

*Stegman v. Prof'l Bus. Men's Life Ins. Co., 173 Kan. 744, 252 P.2d 1074, 1080-81 (Kan. 1953)* (quotation marks [*13] and citations omitted); see *Stapleton v. Mendoza, 257 P.2d 113,116 (Kan. 1953)* ("If a person is ignorant of the contents of a written instrument and signs it under a mistaken belief, induced by misrepresentation, that it is an instrument of a different character, without negligence on his part, the agreement is void." (quotation marks and citations omitted)); *McKay v. Clark, 162 Kan. 653, 178 P.2d 679, 684 (Kan. 1947)* (noting that "in this case ... the appellant does not plead that the written instruments should be set aside on the ground that he was induced to sign them by fraudulent representations as to their content"). Employees' claims, however, simply do not fall within this rule, as they have failed to direct us to any evidence indicating that the verbal assurances were "representations as to the legal effect of [the employment agreements]." *Stegman, 252 P.2d at 1081*. We are therefore satisfied that, as a matter of law, Employees' reliance on the alleged verbal assurances was not justified. n3

> n3 As discussed above, in 1991 Donnelly elected "to relinquish [his] eligibility to return to the hourly work force and thereby have all future employment considerations based on policies, procedures and practices that pertain to salaried employees" when he executed the Agreement to Retain or Relinquish Hourly Recall Right. This document further undermines Donnelly's assertion that his reliance on the alleged verbal representations was justified.

[*14]

Employees' fraud through silence claim fails for a similar reason. This claim is based on GM's alleged failure to advise Employees "that its promise to allow [their] unconditional return to the Bargaining Unit [i.e.,

hourly employment] in the event they accepted supervisory positions could be unilaterally revoked." To establish fraud through silence under Kansas law, a plaintiff must show, inter alia, "that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence." *OMI Holdings, Inc. v. Howell, 260 Kan. 305, 918 P.2d 1274, 1299 (Kan. 1996)* (quotation marks and citations omitted). We need not look beyond this first element, as the evidence demonstrates that Employees were provided written notice, via the employment agreements, that GM retained the right to direct the "capacity" in which they would work. We are therefore satisfied that Employees had knowledge of the facts underlying their fraud through silence claim. Accordingly, summary judgment was properly granted with respect to all three of Employees' fraud claims.

## C. Promissory Estoppel

Employees [*15] also seek to recover under a theory of promissory estoppel. The Kansas Supreme Court has explained that:

In order for the doctrine of promissory estoppel to be invoked the evidence must show that the promise was made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise.

*Kirkpatrick v. Seneca Nat'l Bank, 213 Kan. 61, 515 P.2d 781, 787 (Kan. 1973)* (quotation marks and citation omitted). We question whether the doctrine applies in the circumstances of this case. See, e.g., *Decatur County Feed Yard, Inc. v. Fahey, 266 Kan. 999, 974 P.2d 569, 577-78 (Kan. 1999)*. Assuming that it does, we again conclude that, as a matter of law, Employees' reliance on the alleged assurances was not justified. See supra Part III.B. Thus, summary judgment was properly granted with respect to Employees' promissory estoppel claim.

## D. Negligent Misrepresentation

Under Kansas law, "the elements of negligent misrepresentation differ from those of fraudulent misrepresentation in one major respect: while the [*16] latter requires proof that the defendant knew the statement was untrue or was reckless as to whether the statement was true or false, the former merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information." *Mahler v. Keenan Real Estate, Inc., 255 Kan. 593, 876 P.2d 609, 616 (Kan. 1994)* (quoting *Huttegger v. Davis, 599 S.W.2d 506, 514 (Mo. 1980)* (Welliver, J., dissenting)). Thus, negligent

2003 U.S. App. LEXIS 6299, *

misrepresentation, like fraud, includes an element of justifiable reliance. *See id.*; *Slaymaker, 739 P.2d at 450.* Because Employees failed to demonstrate a genuine factual issue as to this element, see supra Part III.B, their

negligent misrepresentation claim was also properly dismissed.

The judgment is affirmed.

LEXSEE 2002 us dist lexis 19063

**NORMAN BECKER, Plaintiff, v. NATIONAL EDUCATION TRAINING GROUP, INC., Defendant.**

**3:01-CV-1187-M**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

*2002 U.S. Dist. LEXIS 19063*

**October 7, 2002, Decided**

**October 7, 2002, Filed**

**DISPOSITION:**
[*1]    Defendant's Motion for Summary Judgment GRANTED.

**COUNSEL:**
For NORMAN BECKER, plaintiff: Thomas C Barron, Attorney at Law, Law Office of Thomas C Barron, Dallas, TX USA.

For NATIONAL EDUCATION TRAINING GROUP, INC., defendant: Bryan Patrick Neal, Attorney at Law, Carolyn Ritchie, Attorney at Law, Thompson & Knight, Dallas, TX USA.

**JUDGES:**
BARBARA M. G. LYNN, UNITED STATES DISTRICT JUDGE, NORTHERN DISTRICT OF TEXAS.

**OPINIONBY:**
BARBARA M. . LYNN

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Norman Becker ("Becker") brought suit against National Educational Training Group ("NETg"), asserting several claims arising out of his termination as one of NETg's employees. Before the Court is the Defendant's Motion for Summary Judgment filed on April 5, 2002, in which it seeks dismissal of Becker's claims for breach of contract, unjust enrichment, breach

of the duty of good faith and fair dealing, reformation, and fraud and misrepresentation.

**I. Background**

NETg sells educational software. NETg offered Becker employment in a letter dated June 6, 2000 ("Offer Letter"). Becker worked for NETg as an Account Manager from June 15, 2000 until January 26, 2001. Becker's responsibilities included selling [*2] NETg products to prospective clients and servicing the needs of NETg's existing clients. The Offer Letter states that an Employee Guide ("Employee Guide") would govern the terms of his employment and that a yearly compensation plan provided by a NETg manager ("Compensation Plan") would govern his receipt of incentive compensation. Becker signed the Employee Guide on June 16, 2000. The Employee Guide states in part:

Employment by the Company is "at-will," meaning that it is not for a specified period of time and that either the Company or I may terminate the employment relationship for any or no reason at any time with or without cause or notice. l acknowledge that a violation of the Company's rules, policies, and standards will result in corrective action up to and including the immediate termination of my employment. I understand that the foregoing agreement concerning my employment-at-will status and the Company's right to determine and modify the other conditions of my employment is the sole and entire agreement between me and [my employer] concerning the duration of my employment, the circumstances under which my employment may be terminated, and the circumstances under [*3] which the

terms and conditions of my employment may change. The Company disclaims any implied contractual obligation of continuing employment. n1

n1 Def.'s App. at 78.

Becker received the Compensation Plan for NETg's 2000 fiscal year sometime after he began working in June of 2000. On November 6, 2000, Gary Osborn ("Osborn"), District Manager for NETg, sent Becker a memorandum discussing compensation issues and the Compensation Plan for NETg's 2001 fiscal year. Becker signed the memorandum, acknowledging "that there [were] no other compensation commitments" n2 made to him other than the 2001 Compensation Plan. The 2001 Compensation Plan provides in part:

Revenue commissions will only be payable on contracts or orders signed by Client, accepted by NETg, and signed by an officer of NETg. No commissions will be paid on contracts or revenue recognized [sic] signed by a Client subsequent to the termination date of the employee, regardless of the reasons for such termination. n3

n2 Id. at 153. [*4]

n3 Id. at 151.

During the term of his employment, Becker received several evaluations of his performance. Osborn gave Becker his third evaluation on December 20, 2000, and placed him on a Performance Improvement Plan ("PIP"). The PIP provided that Osborn would monitor Becker's performance for thirty days. On January 26, 2001, Osborn advised Becker that his employment with NETg was terminated. At the time of Becker's termination, a contract was pending between CompuCom and NETg under which NETg would become CompuCom's educational software provider. During Becker's termination meeting, he expressed concern about whether or not he would receive a commission on the CompuCom account. However, Becker was told that he would not receive a commission on the CompuCom account according to the terms of his Compensation Plan. Becker claims that NETg excluded him from working on the CompuCom deal in its final stages and terminated his employment in order to avoid paying him the commission.

Becker filed this lawsuit in state court on April 24, 2001, asserting claims for breach of contract, unjust enrichment, [*5] breach of the duty of good faith and

fair dealing, reformation, and misrepresentation. NETg timely removed the case to this Court. Becker seeks recovery for damages, including the unpaid commissions on four potential accounts--CompuCom, NCH, Haynes and Boone, and Inet. Following Becker's termination, three of the four potential clients signed a contract with NETg. CompuCom signed a contact with NETg on February 2, 2001; NCH signed a contract with NETg on March 20, 2001; Haynes and Boone signed a contract with NETg on March 30, 2001.

## II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. n4 "The substantive law will identify which facts are material." n5 Only disputes about those facts will preclude the granting of summary judgment. n6 In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. n7 If the moving party meets this initial burden, the burden then shifts to the nonmovant, who must produce [*6] evidence establishing a genuine issue of material fact for trial. n8 The record before the court must be considered in the light most favorable to the opposing party. n9 However, bare allegations in briefs and pleadings are insufficient to withstand summary judgment. n10

n4 Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

n5 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

n6 Id.

n7 Latimer v. Smithkline & French Lab., 919 F.2d 301, 303 (5th Cir. 1990).

n8 Celotex Corp. v. Catrett, 477 U.S. 317, 321-22, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

n9 Anderson, 477 U.S. at 248; Harrison v. Byrd, 765 F 2d 501, 504 (5th Cir. 1985)

n10 Alizadeh v. Safety Stores. Inc., 802 F.2d 111, 113 (5th Cir. 1986).

## III. Decision

### A. Breach of Contract

Becker contends that NETg breached his employment contract [*7] by terminating him to avoid paying the commissions. NETg seeks summary judgment on grounds that the terms of the contract preclude Becker's recovery. The compensation agreement in effect at the time Becker left NETg explicitly states he would not receive a commission on an account if the client signed a contract with NETg after the date of his termination. Whether an employee's commission is payable is determined according to a reasonable interpretation of the employee's contract with the employer. n11

> n11 *See Sun Medical v. Overton, 864 S.W.2d 558, 562 (Tex. App.-- Fort Worth 1993, writ denied); Stinger v. Stewart & Stevenson Ser.'s Inc., 830 S.W.2d 715, 719 (Tex. App.-- Houston 1992, writ denied)* (both giving effect to the reasonable interpretation of the terms of the contract between employer and employee regarding commissions). *See also,* 33 TEX. JUR. 3D *Employer and Employee* §   31 (1997) ("Commissions on sales are payable according to the reasonable interpretation of the terms of agreement between the employer and employee.").

[*8]

NETg terminated Becker on January 26, 2001. Becker seeks payment of commissions on three accounts involving clients who did not sign a contract with NETg until after the date of his termination and on one account involving a potential client who never signed a contract with NETg. Express terms of the Compensation Plan state that NETg had no duty to pay Becker a commission on these accounts. The Court is bound by these terms unless there is a reason the Court should disregard the specific terms of Becker's contract.

Becker argues that NETg owes Becker a commission, despite the terms of the Compensation Plan, because NETg wrongfully prevented Becker from being employed on the dates Becker's commissions would have been realized. In support of his claim, Becker cites *S.K.Y. Investment Corporation v. H.E. Butt Grocery Company*: n12

When one party to a contract, by wrongful means, prevents the other party from performing, as by making it impossible for him to perform, such an action by the party at fault constitutes a breach of contract. The effect of such a breach is not only to excuse performance by the injured party, but also to entitle him to recover for any

damage he may [*9] sustain by reason of the breach. n13

In *S.K.Y. Investment Corporation,* the parties executed a written lease agreement containing the following provision: "if prior to September 1, 1967, construction work has not commenced upon the building containing the demised premises, Tenant may thereafter at its option cancel this lease ...." n14 On September 1, 1967, the lessee exercised its election to terminate the lease. n15 The lessor brought suit, contending that the lessee had canceled the contract in bad faith. The trial court granted summary judgment for the lessee. n16 On appeal, the lessor argued that the lessee prevented it from commencing construction by failing to provide it with certain design and financial information. n17

> n12 *440 S.W.2d 885* (Tex. Civ. App.- Corpus Christi 1969, no writ).
>
> n13 *440 S.W.2d at 889-890.*
>
> n14 *440 S.W.2d at 888.*
>
> n15 *Id.*
>
> n16 *440 S.W.2d at 887.*
>
> n17 *440 S.W.2d at 888.*

The court affirmed [*10] the decision below, finding that under the contract the lessee was not obligated to provide design or financial information to the lessor. n18 Thus, the court held that the lessor failed to show that the lessee "breached any of its contractual obligations." n19 The prevention of performance doctrine did not apply, since the action not not undertaken by the lessee was not required under the contract. n20 Here, Becker in effect argues that NETg prevented his performance of the employment contract by terminating his employment. It is undisputed that Becker was an at-will employee. Therefore, under the analysis of *S.K.Y. Investment Corporation,* Becker cannot base his prevention of performance argument on NETg's failure to maintain Becker's status as an employee, since that action was not required under the contract.

> n18 *440 S.W.2d at 891.*
>
> n19 *440 S.W.2d at 892.*
>
> n20 *Id. See also,* RESTATEMENT (SECOND) OF CONTRACTS § 245 ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of

one of his duties, the non-occurrence is excused."); *id.* cmt. a ("The rule stated in this Section only applies, however, where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court. There is no breach if the risk of such a lack of cooperation was assumed by the other party or if the lack of cooperation is justifiable.).")"

[*11]

Another Texas court has applied a similar analysis in the employment context. In *Mitsubishi Aircraft International, Inc. v. Maurer*, n21 Mauer was an at-will employee who sought to recover commissions from his former employer after he was terminated. n22 At trial, Mauer recovered in quantum meruit against his employer. n23 On appeal, the court found that Mauer's ability to recover commissions was subject to an express contract, which stated "personnel may only receive [commissions] if they are in employment...at the applicable time." n24 Mauer did not receive commissions on certain accounts and argued on appeal that the prevention of performance doctrine should allow him to recover in quantum meruit. n25 The court held that the doctrine of prevention of performance did not apply because the plaintiff was an employee at-will, and the employer's act of termination could not be construed as a breach of the at-will employment contract. Thus, "there was no wrongful discharge and no breach of contract preventing [plaintiff's] completion of performance." n26

n21 *675 S.W.2d 286* (Tex. App.--Dallas 1984, no writ). [*12]

n22 *675 S.W.2d at 287.*

n23 *Id.*

n24 *Id.*

n25 *675 S.W.2d at 288.*

n26 *675 S.W.2d at 289.*

Becker's claim that NETg breached its contract by preventing Becker's performance fails. NETg's termination of Becker is not a breach of Becker's employment contract because that contract allowed NETg to discharge Becker "with or without cause and with or without notice." n27 Additionally, Becker's argument that NETg's discharge was wrongful is of no assistance to him. The Texas Supreme Court has held

that "absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at-will for good cause, bad cause, or no cause at all." n28 Becker has not presented any evidence of an agreement indicating that his employment status at NETg was anything other than that of an at-will employee. To the contrary, the only evidence before the Court is an express agreement between Becker and NETg stating that Becker was an employee at-will who could be terminated with or without cause. Thus, Texas law precludes recovery under his cause [*13] of action for breach of contract.

n27 Def's Brief at 77.

n28 *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502, 41 Tex. Sup. Ct. J. 537 (Tex. 1998).

**B. Unjust Enrichment**

Becker also claims that NETg was unjustly enriched by Becker's work on the accounts for which he did not receive a commission. NETg's Summary Judgment Motion on the unjust enrichment claim is based on two points. First, NETg asserts that the unjust enrichment claim is barred because an express contract governs the subject matter of the dispute. Second, NETg contends that it compensated Becker for his work. The Court agrees with the former ground for summary judgment on the unjust enrichment claim and thus does not reach the latter.

It is well settled Texas law that "when a valid express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." n29 In *Fortune Production Company v. Conoco*, the Texas Supreme Court ruled that natural gas producers could not recover against [*14] their purchaser under an unjust enrichment theory because a written contract governed the sale. n30 The Court held that "when a party claims that it is owed more than the payments called for under a contract, there can be no recovery for unjust enrichment if the same subject is covered by the express contract." n31 The narrow exceptions to this rule do not salvage Becker's claim for unjust enrichment. n32 Here, the relationship between the parties is governed by an express written contract. The Compensation Plan specified that if Becker was terminated before a final contract sale, NETg would not pay him commission "regardless of the reasons for such termination." n33 As a matter of law, Becker's unjust enrichment claim fails because an express contract governs his compensation.

n29 *Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 684, 44 Tex. Sup. Ct. J. 97 (Tex. 2000)* (quoting *TransAmerican Natural Gas Corp. v. Finkelstein, 933 S.W.2d 591, 600* (Tex. App.--San Antonio 1996, writ denied)). The Court explained that recovery under quasi-contract is appropriate if justice requires the law to impose an obligation where no promise between the parties existed. *Id.* [*15]

n30 *52 S.W.3d at 686.*

n31 *52 S.W.3d at 685.*

n32 Becker cites *Mitsubishi Aircraft Int'l, Inc. v. Maurer, 675 S.W.2d 286* (Tex. App.--Dallas 1984, no writ), for his assertion that, despite the express contract governing this dispute, he can recover in unjust enrichment because NETg discharged him without good cause and prevented his performance under the contract. However, the *Mauer* court held that the wrongful discharge and prevention of performance arguments do not provide exceptions to the rule that "if the work in question is covered by an express contract, there can be no recovery in quantum meruit." *675 S.W.2d at 288-89.* The Texas Supreme Court has noted the existence of limited exceptions to the general rule that an express contract governing the parties' obligations is fatal to an unjust enrichment claim. *See Fortune Prod. Co., 52 S.W.3d at 684; Southwestern Electric Power Co. v. Burlington Northern Railroad Co., 966 S.W.2d 467, 469-70, 41 Tex. Sup. Ct. J. 529 (Tex. 1998).* However, these exceptions are not applicable here because those exceptions involve *overpayments* under a contract. *See, e.g., Southwestern Electric Power Co. v. Burlington Northern Railroad Co., 966 S.W.2d 467, 469-70, 41 Tex. Sup. Ct. J. 529 (Tex. 1998)* (noting that a party may recover overpayments under a contract by asserting a claim for unjust enrichment or restitution). [*16]

n33 Def.'s App. at 151.

## C. Duty of Good Faith and Fair Dealing

Becker argues NETg terminated him after he performed all the necessary requirements to receive his commission, thereby creating a breach of the duty of good faith and fair dealing. NETg seeks summary judgment on this cause of action, arguing that NETg did not owe Becker a duty of good faith and fair dealing.

In the *City of Midland v. O'Bryant,* n34 the Texas Supreme Court held that no cause of action exists under Texas law for breach of the duty of good faith and fair dealing in the context of the employer-employee relationship. n35 In that case, five former police officers sued the city and city administrators, alleging employment discrimination and retaliation. The Court held that the defendants were entitled to summary judgment on the plaintiffs' bad faith claim, noting that a "court-created duty of good faith and fair dealing would completely alter the nature of the at-will employment relationship, which generally can be terminated by either party for any reason or no reason at all." n36 Additionally, the Court stated [*17] that it made no distinction in its holding "between government and private employers" n37 or "between employment at-will and employment governed by an express agreement." n38 Since Becker was an at-will employee, this Court holds that Becker's cause of action of breach of the duty of good faith and fair dealing is barred as a matter of law.

n34 *18 S.W.3d 209, 43 Tex. Sup. Ct. J. 884 (Tex. 2000).*

n35 *18 S.W.3d at 216.*

n36 *Id.*

n37 *Id.*

n38 *Id.*

## D. Reformation

Becker seeks reformation of his contract with NETg. He alleges that the contract he signed after becoming an employee is different from the contract NETg presented to him prior to his employment. NETg argues that Becker has failed to provide evidence to support a cause of action for reformation. Reformation of a contract is proper "when the parties have reached a definitive and explicit agreement, understood in the same sense by both, but, by their mutual or common mistake, the written contract fails to express the agreement. [*18] " n39

n39 *Huttleston v. Beacon Nat'l Ins. Co., 822 S.W.2d 741, 746* (Tex. App.-- Fort Worth 1992, writ denied) (citing *Champlin Oil & Refining Co. v. Chastain, 403 S.W.2d 376, 377, 9 Tex. Sup. Ct. J. 84 (Tex. 1965)*).

Becker has the burden of proving that Becker and NETg reached an agreement on a material term but that the written contract differs from the parties' agreement because of their mutual mistake. n40 Becker argues that, prior to his employment, he and NETg entered into an agreement under which NETg would pay commissions based on his performance, rather than his employment status. However, the 2001 Compensation Plan signed by Becker indicates that NETg would not pay commissions on an account if the client had not signed a contract with NETg prior to Becker's termination. Additionally, the 2001 Compensation Plan states that it "reflects the employee's entire understanding of his/her [fiscal year] 2001 Compensation" n41 and that it "supersedes any other agreement, whether written or verbal, [*19] regarding compensation." n42

> n40 *GeoSouthern Energy Corp. v. Chesapeake Operating, Inc., 274 F.3d 1017, 1021 (5th Cir. 2001)* (citing *Thalman v. Martin, 635 S.W.2d 411, 413, 25 Tex. Sup. Ct. J. 385 (Tex. 1982)); Estes v. Republic National Bank of Dallas, 462 S.W.2d 273, 275, 14 Tex. Sup. Ct. J. 70 (Tex. 1970).*

> n41 Def.'s App. at 153.

> n42 *Id.*

NETg's representative, Paula Leuske ("Leuske"), discussed the Compensation Plan with Becker during his employment interview and told him that his receipt of commissions would be subject to his performance as an employee. However, Becker has not presented evidence that he and NETg agreed that sales commissions would be paid even if NETg terminated his employment before the commissions were due under the Compensation Plan. Becker presents no evidence that a mutual mistake between the parties prevented them from entering into a contract reflecting a mutually held belief that Becker would be paid commissions regardless of his employment status. The operative document [*20] which he signed says the contrary. Thus, Becker's cause of action for reformation must be dismissed.

### E. Fraud / Negligent Misrepresentation

Becker's final cause of action is for fraud/misrepresentation. In his petition, Becker asserts that NETg made misrepresentations regarding compensation prior to his employment. In his response to NETg's Motion for Summary Judgment, Becker argues that NETg's misrepresentation was its failure to reveal certain compensation details to him before he became an employee. NETg seeks summary judgment on claims

Becker might have for fraud n43 and negligent misrepresentation. n44

> n43 To prevail at trial on a fraud claim, Becker must show that (1) NETg made a material representation that was false, (2) NETg either knew the representation to be false at the time or asserted it without knowledge of its truth, (3) NETg intended Becker to act on its representation, and (4) that his reliance on the representation caused him injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs., 960 S.W.2d 41, 47-48, 41 Tex. Sup. Ct. J. 289 (Tex. 1998); Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282, 37 Tex. Sup. Ct. J. 685 (Tex. 1994).* [*21]

> n44 Becker would have to prove the following elements to prevail on a negligent misrepresentation claim: (1) NETg owed Becker a duty of reasonable care, (2) NETg made a representation of an existing fact in the course of its business or in a transaction in which it had pecuniary interest, (3) NETg's representation supplied false information to guide Becker in his business affairs, (4) NETg did not exercise reasonable care or competence in obtaining or communicating the information, and (5) Becker suffered a pecuniary loss by justifiably relying on NETg's representation. *See Federal Land Bank Ass'n v. Sloane, 825 S.W.2d 439, 442, 35 Tex. Sup. Ct. J. 184 (Tex. 1991).*

Becker argues that during his employment interview, Leuske misrepresented facts about NETg's payment of commissions. Even construed most favorably to Becker, the evidence suggests that Leuske told Becker about the Compensation Plan and explained its structure, but failed to tell Becker that he would not receive commissions if he was terminated before the commissions became payable under the plan. The Offer Letter stated that Becker's incentive [*22] compensation would be governed by a Compensation Plan that he would receive from his manager. Additionally, by signing the Offer Letter, Becker acknowledged "that there have been no representations by the Company or its agents which are not reflected in this agreement." n45 Becker admits that no one at NETg told him he would receive commissions even if he was terminated before the commissions were payable, and there is no evidence that Leuske represented that her explanation of the Compensation Plan was as complete as the plan itself. Thus, Becker has failed to present evidence supporting his argument that NETg made a misrepresentation about

2002 U.S. Dist. LEXIS 19063, *

the terms of his compensation, and summary judgment is granted on this cause of action.

n45 Def.'s App. at 77.

Additionally, summary judgment is granted on Becker's claim that NETg made a misrepresentation by concealing information about his compensation. In his Response to NETg's Motion for Summary Judgment, Becker admits that that "no one told him he would not be compensated [*23] if he was not an employee," and that no one told him that NETg could terminate him in order to avoid paying his commissions. While nondisclosure gives rise to a claim for fraud in some limited circumstances, Becker's pleadings assert a cause of action only for an affirmative misrepresentation. He pleads only that agents of NETg made representations about his compensation to induce him to become an employee, and that he relied on these representations to his detriment, and the deadline for amending pleadings in this case has passed. Thus, Becker is bound to his pleadings and cannot assert an unpleaded nondisclosure theory at this late stage in the litigation.

However, even if the Court were to allow Becker to pursue a nondisclosure theory, such a claim would fail as a matter of law. The Texas Supreme Court has held that "a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." n46 Thus, a party's silence may constitute a false representation only if the party has a duty to speak and deliberately fails to do so. n47 Further, the Fifth Circuit has repeatedly held that under Texas law a failure to disclose is not actionable as fraud [*24] unless a fiduciary or confidential relationship exists between the parties. n48

n46 *Bradford v. Vento, 48 S.W.3d 749, 755, 44 Tex. Sup. Ct. J. 655 (Tex. 2001).*

n47 *Id.*

n48 See *Jackson v. West Telemarketing Corp. Outbound, 245 F.3d 518, 525 (5th Cir. 2001)* ("Absent a fiduciary or confidential relationship, the failure to disclose information is not actionable as fraud."); *Bay Colony, LTD v. Trendmaker, Inc., 121 F.3d 998, 1004 (5th Cir. 1997)* ("Texas law recognizes a duty to disclose only where a fiduciary or confidential relationship exists."); *Mitchell Energy Corp. v. Bliss, 80 F.3d 976, 985 (5th Cir. 1996)* ("Absent a fiduciary of confidential relationship, the failure

to disclose information is not actionable as fraud.").

Whether a duty to disclose exists is a question of law. n49 In *Bradford,* the Texas Supreme Court declined to recognize a general duty to disclose in a commercial setting. The Court noted that:

The Restatement (Second) of Torts section 551 [*25] also recognizes a general duty to disclose facts in a commercial setting. In such cases, a party does not make an affirmative misrepresentation, but what is said is misleading because other facts are not disclosed. We have never adopted section 551. n50

Before *Bradford,* the Fifth Circuit addressed a claim for fraud by nondisclosure in the employment context. In *Hamilton v. Software, Inc.,* n51 the Fifth Circuit held that an employer had no duty to disclose to a prospective employee allegations of accounting fraud against the employer. n52 Here, Becker argues that when no one at NETg explained that he would not receive compensation after his employment terminated, he was left with the impression that he would receive such compensation. Becker points to no evidence supporting such a belief other than the fact that Leuske did not explain every detail of the Compensation Plan during the employment interview. Even if Texas law recognized a duty to disclose in the employer-employee context, Becker has failed to produce any evidence that NETg's partial disclosure provided false information on which Becker justifiably relied.

n49 *Id.* [*26]

n50 *48 S.W.3d at 755-56* (internal citations omitted).

n51 *232 F.3d 473 (5th Cir. 2000).*

n52 *232 F.3d at 481.*

**IV. Conclusion**

Therefore, NETg's Motion for Summary Judgment is hereby **GRANTED.**

SO ORDERED.

October 7, 2002.

BARBARA M. G. LYNN

UNITED STATES DISTRICT JUDGE

2002 U.S. Dist. LEXIS 19063, *

NORTHERN DISTRICT OF TEXAS