2 4

United States District Court
Southern District of Texas
FILED

JUN 18 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN REED | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-02-104 |
| | § | |
| BANK OF AMERICA, N.A. | § | |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO
## BANK OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Raul Anaya's deposition was taken on May 6, 2003. A true and correct copy of Mr. Anaya's entire deposition is attached hereto for completeness (without exhibits). Bank of America's motion for summary judgment should be denied for each of the reasons stated in Plaintiff's original response to Bank of America's Motion for Summary Judgment, and because Raul Anaya absolutely negates Bank of America's grounds for  summary judgment as follows:

1.    The statements made by Raul Anaya to John Reed regarding conditions of employment were neither "vague" nor "general comments" as alleged in Bank of America's motion at page 1; to the contrary, Raul Anaya's statements concerning marketing strategy and support, product partners and interaction between them, were direct, clear and unambiguous. See Reed's affidavit, attached as Exhibit B. Raul Anya's deposition, pages 45 and 105.

Specifically, at page 45, beginning at line 13, Anaya testified as follows:

```
13      Q.   Okay.  And you spoke about Mr. Reed's 2000

14  goals -- In fact, you documented his 2000 goals during

15  the interview process, according to your testimony?
```

16    A.    Yes.

17    Q.    Okay.  And, in fact, you spoke about -- you

18 spoke about specific information regarding each goal

19 category?

20    A.    Yes.

21    Q.    Okay.  And you spoke -- And you gave a

22 detailed explanation of the target commercial market?

23    A.    What do you mean by "detailed"?

24    Q.    Okay.  More than just a vague statement.

25    A.    Yes.

## At page 105 Anaya states:

6    Q.    (BY MR. MARTINEZ)  Mr. Anaya, there's --

7 there's just one point that -- that I wanted to go

8 over with you, and I'm just going to introduce these

9 now, for any other reason, but these are, basically,

10 statements that were -- that were made either by you

11 or through Bank of America.

12            You and I have already talked about the

13 -- the specific things that you talked about with

14 Mr. Reed when you -- during the interview process?

15    A.    Okay.

16    Q.    Is that -- Is that right?

17    A.    Yes.

18    Q.    We talked about all that?  Okay.

19    A.    Yes.

20    Q.    There wasn't -- There wasn't just a -- a

21 general comment made to Mr. Reed about, "Come join

```
22    Bank of America," before he came over?

23    A.    That's correct.

24    Q.    Okay.  You and I can agree to that?

25    A.    Yes.
```

2.    Bank of America agues that John Reed is not entitled to rely on Raul Anaya's "alleged statement to leave a position with Chase and join Bank of America...." Motion for Summary Judgment, page 3. This evidence ignores the undisputed evidence that Mr. Reed did rely on Mr. Anaya's statements, and did quit his job at Chase to work for Bank of America, all based on Raul Anaya's and the bank's false promises of future performance. It also ignores Mr. Anaya's clear deposition testimony that he expected Mr. Reed to rely on his statements during the recruitment process. Specifically, beginning at page 47, Anaya testifies that,

```
 8    Q.    When you're recruiting somebody, you want to

 9    tell them all the good things about Bank of America?

10    A.    That's one of the -- That's many of the

11    things that we talk about.

12    Q.    Okay.  Including the different things that

13    you spoke about -- with Mr. Reed about, that we just

14    went over, that I won't rehash with you?

15    A.    Yes.

16    Q.    Okay.  And it's that information that

17    Mr. Reed is going to use in order to make a decision

18    as to whether or not to leave Chase Bank in order to

19    come to B of A?

20              MS. O'DONNELL:  Objection.  Calls for
```

21    speculation.

22             THE WITNESS:  I don't know.

23    Q.  (BY MR. MARTINEZ)  Okay.  Well, would you

24    expect that, based upon your experience of recruiting

25    people?

                                                    48

1     A.   What?

2     Q.   For people to use the information you give

3     them to make a decision.

4     A.   Yes.

Again at page 50 Anaya testifies,

1     THE WITNESS:  State the question again.

2     Q.  (BY MR. MARTINEZ)  When you're going out and

3     recruiting people for Bank of America, you would

4     expect them to rely on what you say?

5     A.   I would expect them.

6     Q.   To rely on --

7     A.   Yes.

Mr. Anaya made those statements for one reason and one reason only, to induce Mr. Reed to quit his job with Chase and come to work with Bank of America. The important question here is not whether Bank of America had the right to terminate Mr. Reed "at-will", but rather would John Reed have relied on Bank of America's promises and joined the bank had Bank of America told him the truth about his goals and the total lack of support absolutely necessary to attain

Reed's expected goals. The answer to that question is "no." See John Reed's affidavit.

Finally, Mr. Anaya's credibility is at issue in this matter, and is, indeed, a critical focus of the bank's defense. The entirety of Mr. Anaya's deposition reveals that Mr. Anaya presents as a very poor witness with no credibility. He does not know the meaning of specific words, he is evasive, non-responsive and most significantly, does not know the difference between a true and a false statement. A prime example of Mr. Anaya's lack of credibility is the following exchange, which begins at page 53 of Mr. Anaya's deposition,

```
 5      Q.   (BY MR. MARTINEZ)  Well, you would understand
 6   that if your word was different -- If you told
 7   somebody something, okay, and then Bank of America
 8   doesn't back up what you say, right, then somebody is
 9   making a representation that's not true?
10              MS. O'DONNELL:  Objection.  Calls for a
11   legal conclusion.  Calls for speculation.
12              MR. MARTINEZ:  What's the legal
13   conclusion?
14              MS. O'DONNELL:  You're trying to ask him
15   to make a legal statement about -- about the impact of
16   statements that he made before, and I don't think he
17   can do that.
18              MR. MARTINEZ:  I'm asking him, if he
19   makes a statement and if Bank of America doesn't back
20   up that statement, then somebody is making a false
```

21  representation -- somebody is making a

22  misrepresentation.  That sounds to me like it's a

23  pretty factual thing.

24          MS. O'DONNELL:  Objection.  Calls for

25  speculation.

                                                    54

1          MR. MARTINEZ:  Okay.

2          THE WITNESS:  I don't know.

3   Q.  (BY MR. MARTINEZ)  Let's see if we can put it

4   in clear terms -- clear English terms.  If you make a

5   statement -- Do you understand that part of it?  You

6   make -- You make --

7   A.   What type of statement?

8   Q.   You make a statement to me and you say,

9   "Look, I'm going to -- I'm going to pay you a million

10  dollars a year."  You make that statement to me, okay?

11  And then Bank of America comes back and says, "I'm not

12  going to pay him a million dollars a year."  Somebody

13  is making a misrepresentation or a false statement.

14          MS. O'DONNELL:  Objection.  Calls for a

15  legal conclusion.

16  Q.  (BY MR. MARTINEZ)  Would that be right?

17  A.   I don't know.

18  Q.   You're telling me that you don't know, if you

19  make a statement to me and then somebody doesn't --

20  who -- who -- your employer doesn't back up that

21  statement, you don't know if that would be false or

22    true?

23              MS. O'DONNELL:  Objection.  Calls for

24    speculation.

25              THE WITNESS:  If I'm -- I'm just making

                                                    55

1    the statement for a million dollars?

2        Q.    (BY MR. MARTINEZ)  You just -- You just say

3    -- You -- You tell me.  "Hey, guess what.  I want you

4    to come over.  We're going to pay you a million

5    dollars a year," okay?  And I say, "Okay."  And then

6    Bank of America says, "I'm not going to pay you a

7    million dollars a year.  I'll pay you $500,000 a

8    year."  Somebody made a false statement.

9        A.    I don't know.  I don't -- From a legal

10   perspective, I don't know.

11       Q.    It's -- No, I'm just talking from -- from a

12   regular perspective.

13       A.    State the question again then.

14       Q.    If you make a statement to me saying that

15   you're going to pay me a certain amount of money --

16       A.    Okay.

17       Q.    -- okay, and then your employer says, "I'm

18   not going to pay you that amount of money," then

19   somebody -- somebody made a false representation

20   somewhere.

21              MS. O'DONNELL:  Objection.  Calls for

22   speculation.

23              THE WITNESS:  If I made a -- If I made a

24    statement for a million dollars --

25        Q.    (BY MR. MARTINEZ)   Right.

56

1        A.    Okay.

2        Q.    And your boss says, "We're not going to pay a

3    million dollars."  Then somebody made a falsity.

4    Somebody --

5        A.    If who is paying the million dollars?

6        Q.    You said, "Bank of America is going to pay

7    you a million dollars."

8        A.    Okay.

9        Q.    And then Bank of America says, "I'm not going

10    to pay you a million dollars."

11        A.    Okay.

12        Q.    Some statement is false in there somewhere.

13        A.    I don't know.

14        Q.    Okay.  Is that the -- If you get in front of

15    a jury, you're going to say that you don't know if

16    that's true or false?  Is that -- Is that -- Is that

17    what I'm understanding right now?

18        A.    From a legal perspective, I don't know.

19        Q.    Not from a legal perspective.  From a factual

20    perspective.  If I get you in front of a jury and I

21    ask you:  If somebody says, "I'm going to pay you a

22    million dollars," and then the employer says, "I'm not

23    going to pay a million dollars," you're going to go in

24    front of the jury and say, "I don't know if that's

25    true or false"?

                                                        57

1       A.    If who says "I'm not going to pay you a

2    million dollars"?  Me or Bank of --

3       Q.    Your employer.

4       A.    -- America?  If I state what?

5       Q.    If you state, on behalf of Bank of America,

6    that you're going to pay a certain amount of money,

7    and then Bank of America says, "I'm not going to pay

8    that amount of money," you can't tell me that there's

9    a false statement in there somewhere?

10                MS. O'DONNELL:  Objection.  Asked and

11   answered.

12                THE WITNESS:  What is the question?

13      Q.    (BY MR. MARTINEZ)  You said that you don't

14   know if there's a false statement; is that correct?

15      A.    Correct.

16      Q.    Okay.  And so, what I'm saying is, if I get

17   you in front of a jury and I gave you the same fact

18   scenario, you're going to go up there and tell 14

19   people that you don't know if that's a false

20   statement?

21                MS. O'DONNELL:  Objection.  Asked and

22   answered.

23      Q.    (BY MR. MARTINEZ)  That's what you're --

24   That's what you're going to go up there and tell them?

25   Because I'm going to read this deposition back to

58

1   them.

2        A.   State the question again.

3        Q.   If you go up there and you offer me a million

4   dollars on behalf of Bank of America --

5        A.   Okay.

6        Q.   -- okay, and then Bank of America says, "I'm

7   not going to pay you a million dollars" --

8        A.   Okay.

9        Q.   -- there's a false statement in there

10  somewhere.

11       A.   False statement?

12       Q.   Right.  Something that's not true.

13       A.   What do you mean by "not true"?  Something

14  that didn't happen?

15       Q.   Not that it didn't happen.  It's not going to

16  happen.  It's not true.  There was a representation

17  that was not going to come true.  Is that right?

18            MS. O'DONNELL:  Objection.  Calls for

19  speculation.  Asked and answered.

20            THE WITNESS:  I'm sorry.  State the

21  question again.

22       Q.   (BY MR. MARTINEZ)  I'll do it one more time.

23  This is -- This is what I'm going to read back to the

24  jury, is your answer and this question, and what I

25  want to know is what you're going to tell the ladies

59

```
 1   and gentlemen of this jury with regards to this
 2   statement --
 3       A.   Okay.
 4       Q.   -- okay?  We're clear on that?
 5       A.   Uh-huh.
 6       Q.   Okay.  If you go up here and you tell me, on
 7   behalf of Bank of America, "I'm going to pay you a
 8   million dollars a year," and then Bank of America
 9   says, "I'm not going to pay you a million dollars a
10   year," then somebody made a representation that was
11   not true.
12       A.   That was not correct?
13       Q.   Not correct, not true, false, whatever
14   language you want to use.
15       A.   I don't know.
16       Q.   That's what you're going to tell this jury?
17       A.   Yes.
18       Q.   You're not going to change your testimony
19   when I read this statement back to them?
20               MS. O'DONNELL:  Objection.  Asked and
21   answered.
22               MR. MARTINEZ:  It's a different
23   question.
24               THE WITNESS:  What's the question?
25       Q.   (BY MR. MARTINEZ)  Same question that I've
```

60

1    asked before.  You're not going to change your --

2    You're not going to go up there and say, "By the way,

3    this is a false statement.  I just didn't know at the

4    time"?

5              MS. O'DONNELL:  Objection.  Calls for

6    speculation.

7    Q.    (BY MR. MARTINEZ)  That's what -- This is

8    what you're going to say?

9    A.    Say what?

10   Q.    You're going to say "I don't know"?

11   A.    Yes.

12   Q.    So you don't know the difference between

13   false and true?

14             MS. O'DONNELL:  Objection.  Misstates

15   prior testimony.

16             THE WITNESS:  State the question again.

17   Q.    (BY MR. MARTINEZ)  You don't know the

18   difference between false statements and true

19   statements?

20   A.    Sure.

21   Q.    But you don't know the difference with

22   regards to that scenario?

23   A.    Right.

    John Reed submits that significant fact issues exist surrounding the nature

and character of the statements made by Mr. Anaya and others with Bank of

America, Mr. Anaya's credibility, Mr. Reed's reliance on the bank's

representations, and the bank's intent and ability to perform the specific promises it made to Mr. Reed. For these reasons, John Reed asks that the Court deny Bank of America's Motion for Summary Judgment, and for such additional relief to which John Reed may show himself justly entitled.

Respectfully submitted,

PÉREZ & PIETTE

By: _____

Frank E. Pérez
State Bar No. 15776540
Federal Id No. 1930
436 Paredes Line Road
Brownsville, Texas 78521
Telephone:  (956) 504-5403
Facsimile:  (956) 504-5991
ATTORNEYS FOR PLAINTIFF
JOHN REED

## CERTIFICATE OF SERVICE

I hereby certify that on this the 18th day of June 2003, a true and correct copy of the foregoing instrument has been served upon counsel of record by the following method:

**VIA FAX: 210-978-7450**
Mr. Michael W. Fox
Haynes & Boone, L.L.P.
112 East Pecan St., Suite 1600
San Antonio, TX 78205-1540



Pérez & Piette

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF TEXAS

 3                 BROWNSVILLE DIVISION

 4
   JOHN REED,                  )
 5                             )
          Plaintiff,           )
 6                             )
   VS.                         ) CIVIL NO. B-02-104
 7                             )
   BANK OF AMERICA, N.A.,      )
 8                             )
          Defendant.           )
 9

10   ********************************************************

11            ORAL AND VIDEOTAPED DEPOSITION OF

12                      RAUL ANAYA

13                     MAY 6, 2003

14   ********************************************************

15

16

17

18

19

20

21

22

23

24

25
```

2

```
 1        ORAL AND VIDEOTAPED DEPOSITION of RAUL ANAYA,

 2   produced as a witness at the instance of the

 3   Plaintiff, and duly sworn, was taken in the

 4   above-styled and numbered cause on the 6th day of May,

 5   2003, from 9:10 a.m. to 12:01 p.m., before Naomi R.

 6   Peltier, Certified Shorthand Reporter and Notary

 7   Public in and for the State of Texas, reported by

 8   Computerized Stenotype Machine, at the offices of

 9   Haynes & Boone, L.L.P., Weston Centre, Suite 1600,

10   112 E. Pecan Street, San Antonio, Texas, pursuant to

11   the Federal Rules of Civil Procedure and the

12   provisions stated on the record or attached hereto.

13                    S T I P U L A T I O N S

14       It is stipulated and agreed by and between counsel

15   and the respective parties hereto that the Oral and

16   Videotaped Deposition of the witness named in the

17   caption hereto may be taken at this time and place,

18   and that the said deposition, or any part thereof,

19   when so taken may be used in the trial of this case

20   the same as if the witness were present in court and

21   testifying in person.

22       It is further stipulated and agreed by and between

23   counsel and the respective parties hereto that the

24   Witness may read, examine and sign the deposition

25   within thirty (30) days.
```

3

```
 1              A P P E A R A N C E S

 2
     FOR THE PLAINTIFF:  JOHN REED
 3       BY:  BENIGNO (TREY) MARTINEZ
         MARTINEZ, BARRERA Y MARTINEZ, L.L.P.
 4       1201 E. Van Buren Street
         Brownsville, TX  78520
 5       (956) 546-7159

 6   FOR THE DEFENDANT:  BANK OF AMERICA, N.A.
         BY:  LAURA O'DONNELL
 7       HAYNES & BOONE, L.L.P.
         Weston Centre, Suite 1600
 8       112 E. Pecan Street
         San Antonio, TX  78205-1540
 9

10   THE VIDEOGRAPHER:  Neal Castile

11                   * * * * * *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                           I N D E X

2
                                                        PAGE
3  Stipulations ...................................    2
   Appearances ....................................    3
4
                           EXAMINATIONS
5                                                       PAGE
   RAUL ANAYA
6      Examination by Mr. Martinez .................    6

7
                                                        PAGE
8  Changes and Signature ..........................  140
   Reporter's Certificate .........................  141
9

10                           EXHIBITS
                                               FIRST
11  NO.        DESCRIPTION                    REFERENCED

12  1      Notice ...................................    5

13  2      Defendant's Objection to First Amended Notice
              of Intention to Take Oral and Videotaped
14            Deposition and Subpoena Duces Tecum of
              Raul Anaya .............................   22
15
    3      Affidavit of Raul Anaya ..................  105
16
    4      5-4-01 letter to B. Martinez and M. Salinas
17            from K. Deibert ........................  105

18  5      Performance Planning and Coaching ........   74

19  6      2000 Goals ...............................   62

20  7      Handwritten calculations for entire time
              of employment ..........................  117
21
    8      Handwritten calculations for year 2000 ....  117
22

23                           -o-O-o-

24

25

5

```
 1                THE VIDEOGRAPHER:  Good morning.  My
 2    name is Neal Castile, legal videographer for Esquire
 3    Deposition Services, San Antonio, Texas.  We're here
 4    today, May 6, 2003, in the offices of Haynes & Boone,
 5    in San Antonio, Texas, to take the oral video
 6    deposition of Raul Anaya in Cause No. B-02-139, on
 7    file in the U.S. District Court for the Southern
 8    District of Texas, Brownsville Division, styled John
 9    Reed versus Bank of America, N.A.  If the attorneys
10    would introduce themselves, please.
11                MR. MARTINEZ:  Trey Martinez on behalf
12    of John Reed.
13                MS. O'DONNELL:  Laura O'Donnell with
14    Haynes & Boone, on behalf of Bank of America.
15                THE VIDEOGRAPHER:  The time is
16    approximately 9:10.  We're on the record.
17                    RAUL ANAYA,
18    having been first duly sworn, testified as follows:
19                (Exhibit No. 1 marked.)
20                MR. MARTINEZ:  And let me just clarify
21    something for the record.  I think, even though we
22    have his amended notice as the number being B-02-139,
23    I believe the number is actually B-02-104.  Is that
24    correct, Ms. O'Donnell?
25                MS. O'DONNELL:  You know, I'm not sure.
```

6

1              MR. MARTINEZ:  I'm just -- I'm going by

2    the Plaintiff's Response to Bank of America's Motion

3    for Summary Judgment.  Let me just double-check.  As

4    well as -- As well as your motion for summary

5    judgment, which is B-02-104.

6              MS. O'DONNELL:  Okay.

7              MR. MARTINEZ:  Okay.  Would it be okay

8    if we just interlineate that at the appropriate time?

9              MS. O'DONNELL:  Sure.

10                     EXAMINATION

11    Q.   Good morning, Mr. Anaya.

12    A.   Good morning.

13    Q.   Would you please state your full name for the

14    record?

15    A.   Raul Antonio Anaya.

16    Q.   Mr. Anaya, my name is Trey Martinez and I

17    represent John Reed in this case that he's filed

18    against Bank of America.  Do you understand that?

19    A.   Yes.

20    Q.   Okay.  And today we're here to take your

21    video deposition with regards to some of the different

22    things that occurred prior to Mr. Reed's employment

23    and during his employment with Bank of America.  Are

24    you aware of that?

25    A.   Yes.

7

1      Q.    Okay.   Have you ever given your deposition

2  before, sir?

3      A.    No.

4      Q.    Okay.   This is the first time?

5      A.    Yes.

6      Q.    Okay.   I'm sure you've been able to meet with

7  Ms. O'Donnell, and she's been able to go over the

8  basics of what a deposition is all about?

9      A.    Yes.

10      Q.    But let me go ahead and go over some of that

11  stuff with you, just so you and I are clear as to what

12  it is that we're going to do this morning.   And I

13  don't anticipate being longer than a couple of hours,

14  so we'll try and go through this pretty quickly.   I'm

15  generally not known for a long deposition.

16      A.    Okay.

17      Q.    You understand that today in your deposition

18  that the purpose of this deposition is to determine

19  the extent of your knowledge with regards to Mr. Reed

20  and his recruitment efforts -- or your recruitment

21  efforts of Mr. Reed for Bank of America?

22      A.    Yes.

23      Q.    As we go through this deposition, I'm going

24  to ask you certain questions, and I'll be marking

25  certain exhibits that you'll see right here, and we'll

8

1  be entering those through the deposition process.  Is

2  that all right?

3      A.   Yes.

4      Q.   You understand that today you're under oath?

5      A.   Yes.

6      Q.   And that everything that you say here today

7  is going to be recorded by the Court Reporter as well

8  as the video camera, so certain portions of this

9  deposition actually may be played during the trial of

10 John Reed versus Bank of America.  Do you understand

11 that?

12     A.   Yes.

13     Q.   Over the course of this deposition, your

14 attorney, Ms. O'Donnell here, she may make objections

15 to this deposition, and that's going to be part of

16 this deposition process.  However, unless she

17 instructs you not to answer the question, you have to

18 answer the question -- unless you don't understand

19 what I'm saying, and then you can ask for me to

20 clarify it or if you need for me to repeat it, okay?

21     A.   (Nods head up and down.)

22     Q.   Is there any reason why you cannot testify

23 here today -- any impairments for you testifying?

24     A.   No.

25     Q.   Any reason you cannot testify truthfully here

9

1  today as to the events that occurred prior to

2  Mr. Reed's employment with Bank of America and during

3  his employment with Bank of America?

4      A.   No.

5      Q.   Now, Mr. Anaya, where were you originally

6  born and raised?

7      A.   I was born in Detroit, Michigan, and raised

8  in Detroit, Michigan and Brownsville, Texas.

9      Q.   Okay.  And when was it that you moved from

10 Detroit to Brownsville?

11     A.   In 1978.

12     Q.   And so how long did you live in Brownsville

13 for?

14     A.   Until I graduated from college.

15     Q.   Okay.  So, in fact, where did you go to high

16 school?

17     A.   Homer Hanna High School.

18     Q.   Okay.  What year did you graduate, sir?

19     A.   1985.

20     Q.   Then you went to the University of Texas,

21 Brownsville, and TSC?

22     A.   Texas Southmost College and Pan American

23 University at Brownsville.

24     Q.   Okay.  When did you earn your degree?

25     A.   I'm sorry?

10

1    Q.    I'm sorry.  When did you earn your degree?

2    A.    I graduated in 1989.

3    Q.    And what was your degree in?

4    A.    Bachelor's of business administration.

5    Q.    Did you get any postgraduate degrees?

6    A.    No.

7    Q.    After that, sir, where did you go and work?

8    A.    NCNB Texas.  NCNB Texas.

9    Q.    Okay.

10           THE VIDEOGRAPHER:  Would you mind

11   speaking up?

12           THE WITNESS:  Okay.

13   Q.    (BY MR. MARTINEZ)  Yeah.  You and I probably

14   both have the same problem.  We're -- We're not as

15   strong spoken as we should be, so it's going to be

16   important for us to speak up.  And one of the things

17   that -- that I failed to go over with you is the fact

18   that, over the course of this deposition, I'm going to

19   be asking you a lot of "yes" and "no" questions.  And

20   as you sit here, right here, it's going to be very

21   important for you not to nod your head or give an --

22   A.    Right.

23   Q.    -- "uh-huh" -- it's important for -- for you

24   to give a "yes" or a "no" answer, okay?

25   A.    Yes.

11

1      Q.    Did you start with NCNB Texas back in 1989?

2      A.    Yes.

3      Q.    And what did you start out at?

4      A.    What do you mean?

5      Q.    What was your position there?

6      A.    Credit analyst.

7      Q.    How long were you with NCNB?

8      A.    I'm still with NCNB, which became

9   NationsBank, which is now Bank of America.

10     Q.    Okay.  So you've been with one company this

11  entire time?

12     A.    Yes.

13     Q.    Okay.  From credit analyst, where did you go

14  to?

15     A.    Banking associate.

16     Q.    What year was that?

17     A.    I don't remember.

18     Q.    And after banking associate?

19     A.    Banking officer.

20     Q.    Do you remember that year?

21     A.    No.

22     Q.    After banking officer?

23     A.    Assistant vice president.

24     Q.    That year?

25     A.    No.

1    Q.    And after --

2    A.    I don't remember.

3    Q.    I'm sorry.  And after assistant VP?

4    A.    Vice president.

5    Q.    You don't --

6    A.    I don't remember.

7    Q.    Don't remember that year either?

8    A.    No.

9    Q.    Okay.  And after VP?

10    A.    Senior vice president.

11    Q.    When did you become a senior vice president?

12    A.    I don't remember the specifics.

13    Q.    Do you have an approximate year?

14    A.    Approximately 2000 -- No, I'm sorry.

15 Approximately 1999, from what I remember.

16    Q.    1999?

17    A.    Yeah.

18    Q.    Okay.  And are you still currently senior VP?

19    A.    Yes.

20    Q.    Okay.  What are you senior VP of?

21    A.    Senior vice president in the commercial

22 banking group with Bank of America.

23    Q.    And what are your general duties or

24 responsibilities?

25    A.    What do you mean?

13

1     Q.   What do you do as a senior VP in the

2   commercial banking group?

3     A.   When?

4     Q.   Let's say, what did you start out with back

5   in 1999?

6     A.   I managed the commercial growth group for

7   San Antonio and the Rio Grande Valley.

8     Q.   Okay.  So you were the manager from

9   San Antonio down to the Rio Grande Valley; is that

10  correct?

11    A.   Just San Antonio and --

12    Q.   Just San Antonio and the Rio Grande Valley?

13    A.   -- the Rio Grande Valley.

14    Q.   Okay.  Those two different areas?

15    A.   At that time.

16    Q.   Okay.  And what is it that you specifically

17  did?

18    A.   I managed the -- a -- a group of client

19  managers.

20    Q.   Okay.  And how many client managers were

21  there?

22    A.   I don't remember the specific number.

23    Q.   Well, was it more than five?

24    A.   I don't remember.

25    Q.   Could it have been more than five?

14

1    A.    Could have been.

2    Q.    Okay.  Could it have been more than a

3  hundred?

4    A.    No.

5    Q.    Okay.  More than 10?

6    A.    No.

7    Q.    No?  Okay.  So less than 10?

8    A.    Less than 10.

9    Q.    Possibly more than five?

10    A.    Possibly more than five, correct.

11    Q.    And what were those client managers supposed

12  to do for you?

13    A.    They were supposed to do many things, but one

14  of the primary things was keep the clients happy and

15  also generate new business for the bank.

16    Q.    Okay.  And are you still in charge of these

17  client managers?

18    A.    Which client managers?

19    Q.    In between -- or in San Antonio and the Rio

20  Grande Valley.

21    A.    When?

22    Q.    Now.

23    A.    No.

24    Q.    Okay.  Are you in charge of client managers

25  up in Phoenix?

15

1    A.    Yes.

2    Q.    Okay.  How many are you in charge of over

3    there?

4    A.    In Phoenix, I'm in charge of five client

5    managers.

6    Q.    And do they have the same duties that these

7    managers had down here?

8    A.    What do you mean "same duties"?

9    Q.    As far as their objectives in keeping the

10   clients happy and generating new business for the

11   bank.

12   A.    Yes.

13   Q.    Okay.  Let me go back to 1999, before you

14   actually were moved to Phoenix.  Do you remember the

15   names of any of your client managers in San Antonio

16   and the Rio Grande Valley?

17   A.    When?

18   Q.    Let's start off with 1999.

19   A.    1999, yes.

20   Q.    Okay.  Could you go ahead and give me those

21   names?

22   A.    Alicia Garcia, Larry Zamponi.  And from what

23   I remember, here in San Antonio would be Rhonda Kolm,

24   Scott Griffith, Bob Chavarria.

25   Q.    Excuse me?

16

1     A.   Bob Chavarria.

2     Q.   Okay.  Anybody else?

3     A.   That's all that I remember right now.

4     Q.   And that's from 1999 on to the time that you

5   moved to Phoenix?

6     A.   Those were the client managers at the time in

7   1999.

8     Q.   Okay.  What other client managers have you

9   had since that time?

10     A.   Where?

11     Q.   In San Antonio and the Rio Grande Valley.

12     A.   We had Bill Baskerville in San Antonio.

13   Obviously, John Reed.  And that's all that I can

14   remember right now.

15     Q.   Okay.  Is Bill Baskerville still with B --

16   B of A?

17     A.   No, not at this time.

18     Q.   Do you know where he's working currently?

19     A.   No.

20     Q.   Everyone else that you mentioned before, the

21   five different names including Bob Chavarria, are all

22   those people still currently with B of A?

23     A.   Which ones?

24     Q.   Let's start off with Alicia Garcia.

25     A.   Is she still with Bank of America?  Yes.

17

```
 1     Q.   Okay.  Larry Zamponi?

 2     A.   Yes.  Yes.

 3     Q.   Rhonda Kolm?

 4     A.   Yes.

 5     Q.   Scott Griffith?

 6     A.   Yes.

 7     Q.   And Bob Chavarria?

 8     A.   Well, let me take that back.  Scott Griffith,

 9  I don't know.

10     Q.   Okay.  And Bob Chavarria?

11     A.   Bob Chavarria, no.

12     Q.   Do you know where he's at?

13     A.   No.

14     Q.   Okay.  As a senior VP in commercial banking,

15  and in charge of the client managers from 1999 --

16  Strike that.

17          Once you became senior VP back in 1999,

18  how long were you senior VP here in San Antonio and

19  for the Rio Grande Valley?

20     A.   Until I left to Phoenix.

21     Q.   Okay.  When did you leave to Phoenix?

22     A.   In January of 2002.

23     Q.   And was there an opening that you took up

24  there or were you transferred?

25     A.   It was a transfer.
```

18

1    Q.    By who?

2    A.    By Bank of America.

3    Q.    Okay.  Who was your specific boss at the

4 time?

5    A.    At the time of the move?

6    Q.    Right.

7    A.    It -- In January of 2002, the manager was

8 Bill Lorenz.

9    Q.    Which office is he out of?

10   A.    He offices in Dallas.

11   Q.    Okay.  And is he your current manager right

12 now?

13   A.    Yes.

14   Q.    Okay.  Who was managing you before January of

15 2002?

16   A.    Who did I report to?

17   Q.    Right.

18   A.    Guy Bodine.

19   Q.    Guy Bodine?

20   A.    Yeah.

21   Q.    Could you spell his last name for me?

22   A.    B, as in boy, O-D, as in David, I-N-E.

23   Q.    Okay.  And what office was he out of?

24   A.    He officed most recently in San Antonio.

25   Q.    Okay.  At the time that he was managing you,

19

1    was he still in San Antonio?

2        A.    Yes.

3        Q.    Do you know his position or his title?

4        A.    He's no longer with the bank -- with Bank of

5    America.

6        Q.    Do you know where he went to?

7        A.    He's retired.

8        Q.    Do you know if he's still here in San

9    Antonio?

10       A.    He's in the San Antonio area.

11       Q.    And was he the one that transferred you?

12       A.    I don't know.

13       Q.    Would he have been a part of the -- of the

14   people that made the decision to do the transfer?

15       A.    I don't know.

16       Q.    Did he give you a reason as for the transfer?

17       A.    Yes.

18       Q.    What was it?

19       A.    What was what?

20       Q.    What was the reason for the transfer?

21       A.    For me to manage the commercial growth group

22   for Arizona.

23       Q.    So what -- Are you in charge of the entire

24   state of Arizona?

25       A.    What do you mean?

20

1      Q.    What's your specific area in Arizona that

2  you're in charge of?

3      A.    Arizona.

4      Q.    The entire state?

5      A.    For commercial bank -- commercial growth

6  group, yes.

7      Q.    So would you consider that a promotion?

8      A.    No.

9      Q.    Why not?

10     A.    It's the same position.

11     Q.    Who was the manager for the commercial growth

12  group in Arizona before you?

13     A.    What do you mean?

14     Q.    Who had your position in Arizona before you

15  went there?

16     A.    You can't say somebody had my position in

17  Arizona --

18     Q.    Okay.

19     A.    -- because it's different roles.

20     Q.    Okay.  Did they create that position for you?

21     A.    They created a market executive position for

22  Arizona.

23     Q.    Okay.  And that's -- that was created for

24  you?

25     A.    That was created.

1      Q.    And you were the first person to fill it?

2      A.    Yes.

3      Q.    Did you get a raise when you got moved over

4   there?

5      A.    I don't remember.

6      Q.    Before we go any further, I just forgot to do

7   this in the beginning.  This was an amended notice of

8   an intention to take the oral and videotaped

9   deposition and subpoena duces tecum of you.  Have you

10  seen that -- Has your lawyer showed you this?

11     A.    I have not seen this before.

12     Q.    Okay.  Could you just take a moment to review

13  that subpoena, as well as the duces tecum in the back

14  there, with regards to the documents that we asked to

15  be produced today?

16     A.    I've seen these last two pages.

17     Q.    You have seen the last two pages?

18     A.    Yes.

19     Q.    Okay.  Are there any documents that are

20  responsive to those two pages?

21              MS. O'DONNELL:  We've --

22              MR. MARTINEZ:  And I -- And I realize --

23  We'll go over the objections.

24              MS. O'DONNELL:  Okay.  And -- And to the

25  extent we've objected to those, and also some of

1  those, I think, specifically request communications

2  with attorneys for Bank of America.  And I don't want

3  him to testify at all with respect to communications

4  with attorneys.

5            MR. MARTINEZ:  No problem with respect

6  to privileged communications.  I don't want to get

7  into that.  Any communications that were done prior to

8  anticipation of litigation is not going to be

9  privileged.

10            MS. O'DONNELL:  After anticipate of

11  litigation.

12            MR. MARTINEZ:  Prior to --

13            MS. O'DONNELL:  Oh, okay.

14            MR. MARTINEZ:  -- anticipation --

15            MS. O'DONNELL:  Okay.

16            MR. MARTINEZ:  -- of litigation is not

17  privileged.

18     Q.   (BY MR. MARTINEZ)  So you've had a chance to

19  review those?

20     A.   I've seen the last two -- two pages.

21     Q.   Okay.  Were there any documents that were

22  responsive to those that you brought with you here

23  today?

24     A.   No.

25            (Exhibit No. 2 marked.)

23

```
 1                    MR. MARTINEZ:  Okay.  And just for the

 2   record, and I'll just -- Deposition Exhibit Number 2

 3   is Defendant's Objection to First Amended Notice of

 4   Intention to Take the Oral and Videotaped Deposition

 5   and Subpoena Duces Tecum of Raul Anaya.  I'm just

 6   putting that on the record just so it could be in the

 7   record.

 8                    MS. O'DONNELL:  Sure.

 9                    MR. MARTINEZ:  Okay.

10        Q.   (BY MR. MARTINEZ)  Now, Mr. Anaya, let me go

11   back to 1999, when you were specifically made senior

12   vice president in the commercial banking group for

13   B of A.  Was Guy Bodine your superior at the time or

14   the person that you reported to at that time?

15        A.   He was in the management team.  I don't

16   remember if I reported directly to him.

17        Q.   Okay.  Who was it that you reported to back

18   in 1999?

19        A.   Reported to Deborah Cannon.

20        Q.   Do you know what her position was?

21        A.   From what I remember, she was the growth

22   group executive.

23        Q.   And, at that time, were you living in

24   San Antonio and working for B of A up here?

25        A.   When?
```

1     Q.   Back in 1999.

2     A.   When in 1999?

3     Q.   Well, were you -- were you not in San Antonio

4  the entire year of 1999?

5     A.   What do you mean "in San Antonio the entire

6  time of 1999"?

7     Q.   Were you -- Were you living in San Antonio in

8  1999?

9     A.   I lived -- I lived in San Antonio in 1999.

10     Q.   Okay.  Were you living here the entire year

11  of 1999?

12     A.   I was commuting back and forth for a period

13  of time.

14     Q.   Okay.  Between San Antonio and where?

15     A.   And Houston.

16     Q.   Okay.  Prior to 1999, were you living in

17  Houston?

18     A.   Yes.

19     Q.   Okay.  How long were you living in Houston

20  prior to 1999?

21     A.   Since 1989.

22     Q.   Okay.  So you started out from Brownsville,

23  going straight to Houston, from 1989 to 1999; is that

24  correct?

25     A.   Yes.

1     Q.   And then, in 1999, you started commuting back

2   and forth between Houston and San Antonio?

3     A.   Correct.

4     Q.   And, at that time, you were made senior VP of

5   the commercial banking group?

6     A.   At what time?

7     Q.   In 1999.

8     A.   Yes.

9     Q.   Okay.  And your manager who you were

10   reporting to -- name was Deborah Cannon?

11     A.   At what time?

12     Q.   When you were made senior VP back in 1999.

13     A.   Yes.

14     Q.   Okay.  When you were made senior VP, did

15   Deborah Cannon sit down and explain to you your

16   different goals and objectives with your new position?

17     A.   Yes.

18     Q.   Okay.  What did she tell you?

19     A.   What did she tell me?

20     Q.   Sure.

21     A.   I don't remember the -- the conversation.

22     Q.   Give me as much as you can remember.

23     A.   Well, from what I remember, she generally

24   told me that I was responsible for managing the client

25   managers in San Antonio and the Rio Grande Valley, and

26

1   that I had to increase the level of business in both

2   of those markets, from what I remember.

3        Q.    Did she tell you specifically how much money

4   you needed to book?

5        A.    When?

6        Q.    Back in 1999.

7        A.    Yes.

8        Q.    How much money did you need to book?

9        A.    I don't remember.

10       Q.    Was it over $20 million?

11       A.    Yes.

12       Q.    Was it over $30 million?

13       A.    I don't remember.

14       Q.    Could it have been over 30 million?

15       A.    It could have been over 30 million.

16       Q.    Could it have been over 50 million?

17       A.    It could have been over 50 million.

18       Q.    Could it have been over 100 million?

19       A.    I don't remember.

20       Q.    Do you have any documents that either you or

21  Bank of America would have reflecting how much money

22  you were supposed to book back in 1999 with your five

23  client managers?

24       A.    I don't know.

25       Q.    If anybody would have those documents, Bank

27

1   of America would?

2            MS. O'DONNELL:  Objection.  Calls for

3   speculation.

4            THE WITNESS:  I don't know.

5       Q.   (BY MR. MARTINEZ)  Okay.  So your basic goals

6   were explained to you by Deborah Cannon in: one, that

7   you needed to increase business down in San Antonio

8   and the Rio Grande Valley; is that correct?

9       A.   Yes.

10      Q.   Okay.  And did she tell you how to achieve

11   those goals?

12      A.   I don't remember.

13      Q.   Okay.  And she told you a certain specific

14   amount that you needed to book?

15      A.   What do you mean "a specific amount"?

16      Q.   A specific dollar amount that we just talked

17   about that you didn't remember if it was at 20

18   million, 30 million, 100 million.

19      A.   Yes.

20      Q.   She did tell you a specific amount, but you

21   don't remember that number?

22      A.   I don't remember.

23      Q.   Okay.  And it could have been over 20

24   million, right?

25      A.   It could have been over 20 million.

28

1    Q.    Could have been less than 20 million?

2    A.    No.  It could -- It was more than 20 million.

3    Q.    It was more than 20 million.  Could it --

4   That's what I'm trying to get.  I mean, give me a

5   range here.

6    A.    I -- I don't remember.

7    Q.    Okay.  Back in 1999, did you achieve those

8   goals?

9    A.    I don't remember.

10    Q.    Could you not have achieved those goals?

11    A.    Yes.

12    Q.    Possibly could not have?

13    A.    I possibly could not have.

14    Q.    Okay.  How about in 2000, did they set new

15   goals for you?

16    A.    Yes.

17    Q.    Okay.  Did you achieve those goals in 2000?

18    A.    What goals?

19    Q.    The goals that they set for you.

20    A.    I don't remember.

21    Q.    Could you possibly not have achieved those

22   goals?

23    A.    I possibly could not have achieved those

24   goals.

25    Q.    Okay.  You understand that you're here today

29

1   as a corporate representative of Bank of America?

2                MS. O'DONNELL:  Objection.  I don't

3   think he's here as a corporate representative.  I

4   think he's here in his individual capacity.  It was

5   not a corporate rep depo notice.  It was an individual

6   deposition notice.

7       Q.   (BY MR. MARTINEZ)  Okay.  You understand

8   you're here on behalf of Bank of Ameri- -- as an agent

9   or employee of Bank of America?

10               MS. O'DONNELL:  I'm going to object

11  again.  I mean, I think it's okay to ask him "Are you

12  an agent" or "Are you an employee of Bank of America,"

13  but he's not a corporate rep for purposes of this

14  deposition.

15               MR. MARTINEZ:  Ms. O'Donnell, I mean,

16  they're my questions.  It's all right for me to ask

17  him if he understands it.  He's here as an agent of

18  Bank of America.

19               MS. O'DONNELL:  Well, he's not here as

20  an agent of Bank of America, and I don't know that he

21  would know the answer to that question, because I

22  think it's a -- it's a legal question with respect to

23  the type of notice of deposition that you issued.

24      Q.   (BY MR. MARTINEZ)  Do you understand that you

25  are employed by Bank of America?

1    A.    Yes.

2    Q.    Okay.  You are currently employed by Bank of

3    America?

4    A.    Yes.

5    Q.    You're an agent of Bank of America?

6    A.    What do you mean by "agent"?

7    Q.    You're employed by them.

8    A.    I'm employed by Bank of America.

9    Q.    Okay.  You speak on behalf of Bank of

10   America?

11              MS. O'DONNELL:  I'm going to object to

12   that to the extent that you're asking him --

13              MR. MARTINEZ:  Okay.  Ms. --

14              MS. O'DONNELL:  -- whether he thinks

15   this is a --

16              MR. MARTINEZ:  -- Ms. O'Donnell, I --

17              MS. O'DONNELL:  -- corporate rep

18   deposition.

19              MR. MARTINEZ:  -- I appreciate your

20   objections, but the objection needs to go to form.

21              MS. O'DONNELL:  This is not state court.

22              MR. MARTINEZ:  And it doesn't matter.

23   Even in federal court, especially in front of Judge

24   Tagle.  She's going to go with the state -- the state

25   form.  So if you want to make your objection to form

1   without coaching your witness, I'd appreciate that.

2                   MS. O'DONNELL:  Well, I -- I -- I think

3   that you're asking a specific legal question.  And I

4   -- And I want to make sure that the record is clear

5   that he -- I will state for the record that he is not

6   here as a corporate representative for Bank of

7   America.

8                   MR. MARTINEZ:  Okay.  And -- Then we'll

9   take the corporate representative deposition later.

10      Q.   (BY MR. MARTINEZ)  But you understand that

11  you're an employee of Bank of America?

12      A.   Yes.

13      Q.   Okay.  You are currently employed by Bank of

14  America?

15      A.   Yes.

16      Q.   Okay.  By being employed for Bank of America,

17  you, in fact, speak for Bank of America?

18                  MS. O'DONNELL:  Objection.  Form.

19                  THE WITNESS:  I don't -- what do you

20  mean?

21      Q.   (BY MR. MARTINEZ)  Okay.  You're talking as a

22  Bank of America employee?

23      A.   Yes.

24      Q.   Okay.  Do you understand that everything you

25  say today with regards to actions that you took on

1   behalf of Bank of America, were for Bank of America?

2       A.   Yes.

3       Q.   Okay.  At the time that Mr. Reed was

4   recruited back in 2000, you were then an employee of

5   Bank of America?

6       A.   What do you mean by "recruited"?

7       Q.   Well, did Bank of America go and actively

8   recruit John Reed?

9       A.   I don't understand the question.

10      Q.   Did you-all call him up and say, "Are you

11  interested in a job with Bank of America?"

12      A.   Yes.

13      Q.   Okay.  Would you consider that recruiting?

14      A.   I don't know.

15      Q.   You don't know if that's recruiting?  What

16  other term would you use for it?

17      A.   Determine if he's interested in -- in working

18  at Bank of America.

19      Q.   Okay.  And that's a term that you would use?

20  You wouldn't use "recruiting"?

21      A.   I could.

22      Q.   Okay.  What terms do you use for it?

23      A.   Seeing if there's any interest on his part to

24  join Bank of America.

25      Q.   Okay.  So you've never used the term

1   "recruited" ever before?

2      A.   I'm sure I have.

3      Q.   Okay.  Especially in going back and seeing if

4   people are interested in joining Bank of America?

5      A.   I don't remember.

6      Q.   Back in 1999, tell me how Mr. Reed was first

7   contacted by Bank of America.

8      A.   Back when?  I'm sorry.

9      Q.   In 2000.  I'm sorry.

10     A.   Back in 2000?

11     Q.   Uh-huh.

12     A.   I'm sorry.  Say the question again.

13     Q.   When and how was Mr. Reed first contacted?

14     A.   When?  Then in 2000.

15     Q.   Okay.  How was he contacted?

16     A.   By whom?

17     Q.   That's my question.

18     A.   By Bank of America?

19     Q.   Right.

20     A.   From what I remember, it was a telephone

21  call.

22     Q.   Okay.  And did you make that telephone call?

23     A.   The initial telephone call, no.

24     Q.   Okay.  Do you know who made the initial

25  telephone call?

34

```
 1     A.    Yes.

 2     Q.    Okay.  Who was it?

 3     A.    From what I remember, it was Terry Edlund.

 4     Q.    Okay.  And what position does she have with

 5  Bank of America?

 6     A.    When?

 7     Q.    Back in 2000.

 8     A.    She assisted the commercial banking group.

 9     Q.    For what?

10     A.    In helping fill positions that might be

11  available.

12     Q.    Okay.  Would you call them recruiting

13  efforts?

14     A.    Sure.

15     Q.    Okay.  What is she now?

16     A.    I don't know.

17     Q.    Okay.  She's not assisting in seeing if

18  people are interested in joining Bank of America?

19     A.    I don't know.

20     Q.    Okay.  After she made the initial call, did

21  she contact you?

22     A.    Yes.

23     Q.    Okay.  And did you follow-up on that call

24  with Mr. Reed?

25     A.    Yes.
```

35

1     Q.   Okay.  And did you-all go out and see if --

2  actively see if Mr. Reed was interested in joining

3  Bank of America, between you and Ms. Edlund?

4     A.   Yes.

5     Q.   Okay.  And was he interested, based on the

6  conversations that he had with Ms. Edlund and you?

7     A.   Yes.

8     Q.   Okay.  And did you-all actively recruit him

9  from Chase Bank, where he was working at the time?

10    A.   What do you mean?

11    Q.   Did you-all actively go out and seek if he

12  was interested in joining Bank of America while he was

13  working with Chase at the time?

14    A.   Yes.

15    Q.   Okay.  And just for purposes of this

16  deposition, I can use the term "recruit," and it can

17  mean the same -- the same thing that you're saying, in

18  that "we wanted to see if he's interested in joining

19  Bank of America," okay?

20    A.   Okay.

21    Q.   And tell me if you agree or disagree with

22  these statements.  It's, obviously, very important

23  that when you go and recruit individuals, to be honest

24  with them?

25    A.   Yes.

1    Q.    Okay.  It's, obviously, very important that

2  when you go and recruit individuals, that you tell

3  them everything that they need to know?

4    A.    Yes.

5    Q.    Okay.  And that you're very specific with

6  them as far as what it is that Bank of America expects

7  of them if they join the team?

8    A.    State that again.  I'm sorry.

9    Q.    That you be very specific with them as far as

10  what Bank of America expects when they come and join

11  the Bank of America team.

12    A.    But what's the question?

13    Q.    That it's important that you be very specific

14  with them.

15    A.    Who's important?  For who?

16    Q.    It's important for you, when you go talk to

17  somebody that you're recruiting, to be very specific

18  with them as far as what Bank of America expects when

19  they join Bank of America.

20    A.    Well, what do you mean by "specific"?

21    Q.    Well, do you tell them what their objectives

22  are?

23    A.    What do you mean by "objectives"?

24    Q.    Okay.  What do you talk about when you go

25  actively recruit somebody?

37

1    A.    We talk -- We -- We talk to them about Bank

2   of America.

3    Q.    Okay.  And what do you tell them?

4    A.    We tell them about the bank, how we're

5   organized, things about the bank, that's -- among

6   other things.

7    Q.    Okay.  What else do you tell them?

8    A.    Tell them about the commercial banking group.

9    Q.    Okay.  Is that what you talked about with

10  Mr. Reed?

11   A.    When?

12   Q.    At the time that you talked to him.

13   A.    When did I talk -- I had --

14   Q.    Back in 2000.

15   A.    -- different conversations with him.

16   Q.    Okay.  Back -- In the initial conversation

17  you had back in 2000.

18   A.    At the initial -- Which initial conversation?

19   Q.    The term "initial" -- The first time that you

20  spoke with Mr. Reed over the phone or in person, you

21  spoke to him about what?

22   A.    The first time I spoke to -- to John was to

23  -- for us to get together --

24   Q.    Okay.

25   A.    -- in person.

1    Q.   And that was the extent of your conversation?

2    A.   From what I remember, yes.

3    Q.   Okay.  So you just asked him, "Hey, do you

4  want to get together so we can talk about this?"

5    A.   From what I remember, yes.

6    Q.   Okay.  When was it that you talked to

7  Mr. Reed about his 2000 goals?

8    A.   When?

9    Q.   Right.

10   A.   After -- you know, during -- during the

11  course of he and I's conversation before he was hired.

12   Q.   Okay.  And you gave him documentation to that

13  effect?

14   A.   Yes.

15   Q.   Okay.  Do you have a copy of that

16  documentation?

17   A.   With me?  No.

18   Q.   Anywhere.

19   A.   Do I have a copy of it?

20   Q.   Yeah.

21   A.   Yes.

22   Q.   You do have it, that you sent to Mr. Reed

23  during the interview process?

24   A.   Yes.

25   Q.   Okay.  Could you hand it over to

39

1   Ms. O'Donnell, because I haven't --

2              MS. O'DONNELL:  It's already been

3   produced.

4              MR. MARTINEZ:  Everything that I've --

5   Everything that I've seen has not been produced prior

6   to the employment process.

7              MS. O'DONNELL:  The -- The goals that

8   were given to Mr. Reed have been produced.

9              MR. MARTINEZ:  Okay.  And he's saying it

10  -- it was given to him -- Let me -- Let me make this

11  clear.

12      Q.   (BY MR. MARTINEZ)  You're saying that it was

13  given to him during the interview process?

14      A.   Gave what?

15      Q.   His 2000 goals.

16      A.   Yes.

17      Q.   Okay.  When did you talk to Mr. Reed about

18  specific information regarding each goal category?

19      A.   When?

20      Q.   Yeah.

21      A.   It would have been either in March or April.

22      Q.   This is before he was hired?

23      A.   Before he was hired.

24      Q.   Okay.  When was it you gave a detailed

25  explanation of the target commercial market?

40

1    A.   What do you mean "detailed"?

2    Q.   These are words that you used.  A detailed

3  explanation of the target commercial market.  When did

4  you talk to him about that?

5              MS. O'DONNELL:  Objection.  Form.

6              THE WITNESS:  Again, when did I say

7  "detailed"?

8    Q.   (BY MR. MARTINEZ)  During the interview

9  process.

10              MS. O'DONNELL:  Objection.  Form.

11              THE WITNESS:  I -- I don't understand

12  the question.

13    Q.   (BY MR. MARTINEZ)  Okay.  When was it that

14  you gave to Mr. Reed, who is sitting right here

15  (indicating), a detailed explanation of the target

16  commercial market?  What in that sentence do you not

17  understand?

18    A.   Well, I guess, "detailed."

19    Q.   Okay.  You explain to me how much detail you

20  gave him with regards to the target commercial market

21  at the time that you were interviewing him.

22    A.   Okay.  I -- I spoke to John about the types

23  of clients that we handle in the commercial banking

24  group.

25    Q.   Okay.

41

1    A.   And the types of services that we offer that

2    same market, among other things, from what I remember.

3    Q.   Okay.  And that's what you spoke to him

4    about?

5    A.   Yes.

6    Q.   Okay.  And did that coincide with the

7    specific goals that you talked to him about?

8    A.   What do you mean?

9    Q.   Did that -- Did that target commercial market

10   coincide with the goals that you spoke about with him?

11   Did that all go together?

12   A.   Sure.

13   Q.   Okay.  Did it also go together with the

14   specific information regarding each goal category?

15   A.   Say -- Repeat the question.

16   Q.   Did that also coincide with the information

17   that you gave him with regarding each goal category?

18   A.   What do you mean?  What coincide with the

19   specific goal?

20   Q.   The detailed explanation that you gave to

21   Mr. Reed regarding that target commercial market.

22          MS. O'DONNELL:  Objection.  Misstates

23   prior testimony.

24   Q.   (BY MR. MARTINEZ)  Okay.  Coincided with his

25   -- of his 2000 goals.

42

1    A.    I don't understand what your question is.

2    Q.    Okay.  Were those related?

3    A.    What?

4    Q.    When you talked to him about his target

5    commercial market, did you also talk about -- talk

6    about the goals with him?

7    A.    I spoke to John about the goal -- his goals

8    for 2000.

9    Q.    Okay.  Did you go into the specific

10   categories of each goal?

11   A.    Did I speak -- State the question again.  I'm

12   sorry.

13   Q.    Did you go into the specific categories of

14   each goal?

15   A.    Yes.

16   Q.    Okay.  Did you talk to him about the support

17   that he was going to get at the time that he was going

18   to get into B of A?

19   A.    What do you mean "support"?

20   Q.    The product managers, did you --

21   A.    What do you mean?

22   Q.    -- talk to him about the product managers?

23   A.    What do you mean "product managers"?

24   Q.    Let me -- Let me use the correct term.  The

25   product specialist.  I'm sorry.  Did you talk to him

43

1   about the product specialists --

2       A.   Did I talk to him --

3       Q.   -- that were going to support him?

4       A.   Again, what do you mean by "support"?

5       Q.   Okay.  Was there anybody that was going to

6   support John Reed while he was with B of A, while he

7   was trying to achieve the goals that you set out for

8   him?

9       A.   Again, I don't understand what you mean by

10  the word "support."

11      Q.   What's your definition of the word "support"?

12      A.   Administrative support?  Product support?  I

13  mean, there's just different things that you can use

14  the word "support" for.

15      Q.   Okay.  In any -- In any of those terms, how

16  was John Reed going to get support from B of A?

17      A.   He was -- He was going to have the assistance

18  of product specialists.

19      Q.   Okay.  That's the support that he was going

20  to get?

21      A.   Sure.

22      Q.   Okay.  And you explained this to him during

23  the interview process?

24      A.   I explained to him what?

25      Q.   The type of support he was going to get.

44

```
1      A.   I explained to him that he would have product
2  specialists that he would work with.
3      Q.   Okay.  And that was going to be his support
4  group?
5      A.   That was going to be some of the people that
6  he would work with.
7      Q.   Okay.  To support him?  Give me a term --
8      A.   To work with him.
9      Q.   -- you would use.  To work with him?
10     A.   Work with him.
11     Q.   Okay.  So they weren't going to support him;
12  they were going to work with him?
13     A.   Yes.
14     Q.   And these are all -- these different terms
15  that we're talking about, these are all specific
16  things that you talked about with Mr. Reed about
17  during the interview process?
18     A.   What -- What specific term?
19     Q.   Okay.  Product support or the people that he
20  was going to work with, with regards to product
21  specialists, right?
22     A.   In gen- -- From what I remember and generally
23  -- In general, I spoke to him about the products and
24  services that Bank of America can offer.
25     Q.   Okay.  And you talked about the product
```

1    specialists that he was going to work with?

2        A.    I spoke to him -- What -- What I remember is

3    that I mentioned to him that he was going to -- he was

4    going to be working with product specialists.

5        Q.    He specifically spoke about that?  I just

6    need to be very clear for the record.

7        A.    What?

8        Q.    That you spoke to him about product

9    specialists during the interview process.

10       A.    About product specialists, yes.

11       Q.    And him working with them?

12       A.    Working with the product specialists.

13       Q.    Okay.  And you spoke about Mr. Reed's 2000

14   goals -- In fact, you documented his 2000 goals during

15   the interview process, according to your testimony?

16       A.    Yes.

17       Q.    Okay.  And, in fact, you spoke about -- you

18   spoke about specific information regarding each goal

19   category?

20       A.    Yes.

21       Q.    Okay.  And you spoke -- And you gave a

22   detailed explanation of the target commercial market?

23       A.    What do you mean by "detailed"?

24       Q.    Okay.  More than just a vague statement.

25       A.    Yes.

1    Q.    Okay.  These are four different specific

2  things that you spoke about with Mr. Reed during the

3  interview process?

4    A.    However many there are.

5    Q.    Okay.  And -- So, you didn't just give him a

6  vague general statement as to what B of A was about

7  and what he was going to do?

8    A.    State the question again.

9    Q.    You didn't give him just a vague general

10  statement as to what Bank of America was about and

11  what Mr. Reed was going to do?

12    A.    I gave him a general statement about Bank of

13  America and the commercial banking --

14    Q.    Including all those four specific things that

15  we talked about?

16    A.    From what I remember, correct.

17    Q.    And would you agree with me or disagree with

18  me that it's important to give as much information as

19  you can to the specific people that you're recruiting?

20    A.    As much -- What do you mean by "as much

21  information as you can"?

22    Q.    Well, I mean, you're trying to recruit these

23  people, right, for Bank of America?

24    A.    Right.

25    Q.    Okay.  And you want to make sure that they

47

1  have enough information to make a decision --

2      A.  That's correct.

3      Q.  -- is that correct?  And when you're

4  recruiting somebody, obviously, you want to make Bank

5  of America look good and tell them all the good things

6  about Bank of America?

7      A.  What's your question?

8      Q.  When you're recruiting somebody, you want to

9  tell them all the good things about Bank of America?

10     A.  That's one of the -- That's many of the

11  things that we talk about.

12     Q.  Okay.  Including the different things that

13  you spoke about -- with Mr. Reed about, that we just

14  went over, that I won't rehash with you?

15     A.  Yes.

16     Q.  Okay.  And it's that information that

17  Mr. Reed is going to use in order to make a decision

18  as to whether or not to leave Chase Bank in order to

19  come to B of A?

20              MS. O'DONNELL:  Objection.  Calls for

21  speculation.

22              THE WITNESS:  I don't know.

23     Q.  (BY MR. MARTINEZ)  Okay.  Well, would you

24  expect that, based upon your experience of recruiting

25  people?

48

1     A.    What?

2     Q.    For people to use the information you give

3 them to make a decision.

4     A.    Yes.

5     Q.    Okay.  And, obviously, along with those other

6 specifics we talked about, you talked to him about the

7 money he was going to receive -- his salary?

8     A.    Yes.

9     Q.    Okay.  Did you ever talk with him about the

10 promise of a future presidency?

11    A.    Say the question again.

12    Q.    Did you ever talk with him about the promise

13 of a future presidency?

14    A.    No.

15    Q.    You understand that it's Mr. Reed's

16 contention that you did?

17    A.    Do I understand what?

18    Q.    Do you understand that it's his contention

19 that you did?

20    A.    Yes.

21    Q.    And you're saying that that's not -- that's

22 not true?

23    A.    That's correct.

24    Q.    Okay.  Have you ever talked with Eddie

25 Gutierrez about promising him a future presidency?

49

1     A.   No.

2     Q.   Okay.  You under- -- And, if so, if he says

3   -- he -- if he says otherwise, he's not telling the

4   truth, as well?

5     A.   State the question again.

6     Q.   If he says -- If Eddie Gutierrez says

7   otherwise, he's also not telling the truth then?

8     A.   I don't know what he's saying -- what he'd be

9   saying.

10     Q.   Well, it would be different than what you're

11   saying?

12     A.   Okay.

13     Q.   Is that right?

14     A.   I don't know.  State the question again.

15     Q.   If Eddie Gutierrez comes up and he says that

16   you promised him a future presidency, you're saying

17   that you didn't?

18     A.   I'm saying that I did not promise him.

19     Q.   Which is different than what he's saying?

20     A.   I don't know what he's saying.

21     Q.   Okay.  When you're going out and you're

22   recruiting people, you would expect people to rely on

23   what you say on behalf of Bank of America?

24          MS. O'DONNELL:  Objection.  Calls for

25   speculation.

50

```
 1              THE WITNESS:  State the question again.

 2      Q.   (BY MR. MARTINEZ)  When you're going out and

 3   recruiting people for Bank of America, you would

 4   expect them to rely on what you say?

 5      A.   I would expect them.

 6      Q.   To rely on --

 7      A.   Yes.

 8      Q.   -- what you -- Okay.

 9              You understand that when you go out and

10   you're talking on behalf of Bank of America, when

11   you're going out and doing recruiting -- Let me ask

12   you this:  How many people have you recruited for Bank

13   of America?

14      A.   When?

15      Q.   Since 1999.

16      A.   I don't remember.

17      Q.   Could it be over five?

18      A.   Could be.

19      Q.   Well, could it be over 10?

20      A.   It could be.

21      Q.   Twenty?

22      A.   I don't remember.

23      Q.   Okay.  Could it be less than 20?

24      A.   It could be less than 20.

25      Q.   Okay.  You don't know how many people you
```

1  spoke with since 1999 to try to get them over to Bank

2  of America?

3      A.   I don't remember.

4      Q.   You don't even have a ballpark figure?

5      A.   No.  I don't remember.

6      Q.   You understand that when you talk to

7  different people when you're recruiting them, that

8  your words actually bind Bank of America?

9             MS. O'DONNELL:  Objection.  Call for a

10  legal conclusion.

11             THE WITNESS:  State the question again.

12      Q.   (BY MR. MARTINEZ)  Okay.  You understand that

13  people who rely on your words -- we've already agreed

14  to that.

15             MS. O'DONNELL:  Objection.  Misstates

16  prior testimony.

17      Q.   (BY MR. MARTINEZ)  People rely on your words

18  when you're talking to them, as far as coming to Bank

19  of America?

20      A.   I don't know what they do.

21      Q.   Okay.  Well, you expect them to rely on your

22  words?

23      A.   Yes.

24      Q.   Okay.  And your words bind Bank of America.

25             MS. O'DONNELL:  Objection.  Calls for a

52

1   legal conclusion.

2       Q.   (BY MR. MARTINEZ)  I mean, you're acting on

3   -- on behalf of Bank of America when you're talking to

4   them?

5       A.   I'm -- I'm -- When I'm talking to them, I'm

6   talking to them as an employee of Bank of America.

7       Q.   Okay.  And you're acting on behalf of Bank of

8   America?

9       A.   I don't know.

10      Q.   Okay.  Well, I mean, if you -- if you tell

11  them a statement, it's basically coming from Bank of

12  America; wouldn't that be --

13      A.   I don't know.

14      Q.   -- true?  You don't know if it's coming from

15  Bank of America?

16      A.   Well, if -- if --

17      Q.   You don't -- Let me ask you this:  Do you

18  represent Bank of America when you're recruiting

19  people?

20      A.   Yes.

21      Q.   When you make statements to them, do you

22  expect Bank of Amer- -- Bank of America to back up

23  what you say?

24      A.   Yes.

25      Q.   Okay.  So, in fact, your words do bind Bank

1  of America?

2              MS. O'DONNELL:  Objection.  Calls for a

3  legal conclusion.

4              THE WITNESS:  I don't know.

5      Q.   (BY MR. MARTINEZ)  Well, you would understand

6  that if your word was different -- If you told

7  somebody something, okay, and then Bank of America

8  doesn't back up what you say, right, then somebody is

9  making a representation that's not true?

10             MS. O'DONNELL:  Objection.  Calls for a

11  legal conclusion.  Calls for speculation.

12             MR. MARTINEZ:  What's the legal

13  conclusion?

14             MS. O'DONNELL:  You're trying to ask him

15  to make a legal statement about -- about the impact of

16  statements that he made before, and I don't think he

17  can do that.

18             MR. MARTINEZ:  I'm asking him, if he

19  makes a statement and if Bank of America doesn't back

20  up that statement, then somebody is making a false

21  representation -- somebody is making a

22  misrepresentation.  That sounds to me like it's a

23  pretty factual thing.

24             MS. O'DONNELL:  Objection.  Calls for

25  speculation.

1           MR. MARTINEZ:  Okay.

2           THE WITNESS:  I don't know.

3    Q.   (BY MR. MARTINEZ)  Let's see if we can put it

4    in clear terms -- clear English terms.  If you make a

5    statement -- Do you understand that part of it?  You

6    make -- You make --

7    A.   What type of statement?

8    Q.   You make a statement to me and you say,

9    "Look, I'm going to -- I'm going to pay you a million

10   dollars a year."  You make that statement to me, okay?

11   And then Bank of America comes back and says, "I'm not

12   going to pay him a million dollars a year."  Somebody

13   is making a misrepresentation or a false statement.

14          MS. O'DONNELL:  Objection.  Calls for a

15   legal conclusion.

16   Q.   (BY MR. MARTINEZ)  Would that be right?

17   A.   I don't know.

18   Q.   You're telling me that you don't know, if you

19   make a statement to me and then somebody doesn't --

20   who -- who -- your employer doesn't back up that

21   statement, you don't know if that would be false or

22   true?

23          MS. O'DONNELL:  Objection.  Calls for

24   speculation.

25          THE WITNESS:  If I'm -- I'm just making

55

1  the statement for a million dollars?

2      Q.   (BY MR. MARTINEZ)  You just -- You just say

3  -- You -- You tell me.  "Hey, guess what.  I want you

4  to come over.  We're going to pay you a million

5  dollars a year," okay?  And I say, "Okay."  And then

6  Bank of America says, "I'm not going to pay you a

7  million dollars a year.  I'll pay you $500,000 a

8  year."  Somebody made a false statement.

9      A.   I don't know.  I don't -- From a legal

10 perspective, I don't know.

11     Q.   It's -- No, I'm just talking from -- from a

12 regular perspective.

13     A.   State the question again then.

14     Q.   If you make a statement to me saying that

15 you're going to pay me a certain amount of money --

16     A.   Okay.

17     Q.   -- okay, and then your employer says, "I'm

18 not going to pay you that amount of money," then

19 somebody -- somebody made a false representation

20 somewhere.

21              MS. O'DONNELL:  Objection.  Calls for

22 speculation.

23              THE WITNESS:  If I made a -- If I made a

24 statement for a million dollars --

25     Q.   (BY MR. MARTINEZ)  Right.

1    A.    Okay.

2    Q.    And your boss says, "We're not going to pay a

3    million dollars."  Then somebody made a falsity.

4    Somebody --

5    A.    If who is paying the million dollars?

6    Q.    You said, "Bank of America is going to pay

7    you a million dollars."

8    A.    Okay.

9    Q.    And then Bank of America says, "I'm not going

10    to pay you a million dollars."

11    A.    Okay.

12    Q.    Some statement is false in there somewhere.

13    A.    I don't know.

14    Q.    Okay.  Is that the -- If you get in front of

15    a jury, you're going to say that you don't know if

16    that's true or false?  Is that -- Is that -- Is that

17    what I'm understanding right now?

18    A.    From a legal perspective, I don't know.

19    Q.    Not from a legal perspective.  From a factual

20    perspective.  If I get you in front of a jury and I

21    ask you:  If somebody says, "I'm going to pay you a

22    million dollars," and then the employer says, "I'm not

23    going to pay a million dollars," you're going to go in

24    front of the jury and say, "I don't know if that's

25    true or false"?

1       A.    If who says "I'm not going to pay you a

2    million dollars"?  Me or Bank of --

3       Q.    Your employer.

4       A.    -- America?  If I state what?

5       Q.    If you state, on behalf of Bank of America,

6    that you're going to pay a certain amount of money,

7    and then Bank of America says, "I'm not going to pay

8    that amount of money," you can't tell me that there's

9    a false statement in there somewhere?

10              MS. O'DONNELL:  Objection.  Asked and

11   answered.

12              THE WITNESS:  What is the question?

13      Q.    (BY MR. MARTINEZ)  You said that you don't

14   know if there's a false statement; is that correct?

15      A.    Correct.

16      Q.    Okay.  And so, what I'm saying is, if I get

17   you in front of a jury and I gave you the same fact

18   scenario, you're going to go up there and tell 14

19   people that you don't know if that's a false

20   statement?

21              MS. O'DONNELL:  Objection.  Asked and

22   answered.

23      Q.    (BY MR. MARTINEZ)  That's what you're --

24   That's what you're going to go up there and tell them?

25   Because I'm going to read this deposition back to

1  them.

2      A.    State the question again.

3      Q.    If you go up there and you offer me a million

4  dollars on behalf of Bank of America --

5      A.    Okay.

6      Q.    -- okay, and then Bank of America says, "I'm

7  not going to pay you a million dollars" --

8      A.    Okay.

9      Q.    -- there's a false statement in there

10  somewhere.

11      A.    False statement?

12      Q.    Right.  Something that's not true.

13      A.    What do you mean by "not true"?  Something

14  that didn't happen?

15      Q.    Not that it didn't happen.  It's not going to

16  happen.  It's not true.  There was a representation

17  that was not going to come true.  Is that right?

18              MS. O'DONNELL:  Objection.  Calls for

19  speculation.  Asked and answered.

20              THE WITNESS:  I'm sorry.  State the

21  question again.

22      Q.    (BY MR. MARTINEZ)  I'll do it one more time.

23  This is -- This is what I'm going to read back to the

24  jury, is your answer and this question, and what I

25  want to know is what you're going to tell the ladies

59

1    and gentlemen of this jury with regards to this

2    statement --

3         A.    Okay.

4         Q.    -- okay?  We're clear on that?

5         A.    Uh-huh.

6         Q.    Okay.  If you go up here and you tell me, on

7    behalf of Bank of America, "I'm going to pay you a

8    million dollars a year," and then Bank of America

9    says, "I'm not going to pay you a million dollars a

10   year," then somebody made a representation that was

11   not true.

12        A.    That was not correct?

13        Q.    Not correct, not true, false, whatever

14   language you want to use.

15        A.    I don't know.

16        Q.    That's what you're going to tell this jury?

17        A.    Yes.

18        Q.    You're not going to change your testimony

19   when I read this statement back to them?

20              MS. O'DONNELL:  Objection.  Asked and

21   answered.

22              MR. MARTINEZ:  It's a different

23   question.

24              THE WITNESS:  What's the question?

25        Q.    (BY MR. MARTINEZ)  Same question that I've

60

1    asked before.  You're not going to change your --

2    You're not going to go up there and say, "By the way,

3    this is a false statement.  I just didn't know at the

4    time"?

5                    MS. O'DONNELL:  Objection.  Calls for

6    speculation.

7        Q.   (BY MR. MARTINEZ)  That's what -- This is

8    what you're going to say?

9        A.   Say what?

10       Q.   You're going to say "I don't know"?

11       A.   Yes.

12       Q.   So you don't know the difference between

13   false and true?

14                   MS. O'DONNELL:  Objection.  Misstates

15   prior testimony.

16                   THE WITNESS:  State the question again.

17       Q.   (BY MR. MARTINEZ)  You don't know the

18   difference between false statements and true

19   statements?

20       A.   Sure.

21       Q.   But you don't know the difference with

22   regards to that scenario?

23       A.   Right.

24       Q.   Do you understand that if you made a

25   statement on behalf of B of A, and B of A never

61

1   intended to back it up, then there would be a false

2   misrepresentation; you understand that?

3            MS. O'DONNELL:  Objection.  Calls for a

4   legal conclusion.

5            THE WITNESS:  Say the question again.

6   Q.   (BY MR. MARTINEZ)  That if you made a

7   statement on behalf of B of A, and B of A never

8   intended to back it up, then there would be a false

9   misrepresentation -- or there would be a

10  misrepresentation.  You understand that much?

11  A.   I'm sorry.  Say -- Say the --

12  Q.   That if you made a representation on behalf

13  of B of A, and B of A never intended to back it up,

14  then there would be a misrepresentation?

15  A.   I don't know.

16  Q.   You don't understand that?

17  A.   No.

18  Q.   You understand that that's Mr. Reed's

19  contentions here in his lawsuit?

20  A.   What?

21  Q.   That you made a statement and that either you

22  or Bank of America didn't back up that statement, so

23  there was a misrepresentation --

24  A.   Yes.

25  Q.   -- somewhere?  You understand that much?

62

```
1      A.   Yes.

2      Q.   Okay.  Now, whether you agree or disagree

3  with it, I mean, that's -- that's what he contends in

4  this case.

5      A.   Yes.

6      Q.   Okay.  And this is prior to his employment.

7      A.   Yes.

8      Q.   Okay.  We're understanding each other that

9  far; is that right?

10     A.   How far -- What far?

11     Q.   As far as what his contentions are.

12     A.   Yes.

13     Q.   Okay.

14              THE WITNESS:  How about a quick break to

15  go to the rest room?

16              MR. MARTINEZ:  Sure.

17              THE VIDEOGRAPHER:  We're off the record

18  at 10:06 -- 10:06.

19              (Break from 10:06 a.m. to 10:23 a.m.)

20              MS. O'DONNELL:  This one has been

21  previously marked Reed 00079, but it was produced

22  previously to Mr. Reed's counsel.

23              THE VIDEOGRAPHER:  We're back on the

24  record, 10:23.

25              (Exhibit No. 6 marked.)
```

63

1    Q.   (BY MR. MARTINEZ)  Mr. Anaya, just so we can

2    clarify, I've marked as Deposition Exhibit Number 6

3    what's been handed to me as "2000 Goals"; is that

4    correct?

5    A.   Yes.

6    Q.   Is that a document that you came up with?

7    A.   What do you mean "I came up with"?

8    Q.   Well, did you draw up that document?  Did you

9    type out that document?

10    A.   I don't remember if I produced this

11    document --

12    Q.   Okay.

13    A.   -- if I actually physically prepared it.

14    Q.   Well, did you have anything to do with that

15    document being prepared?

16    A.   What do you mean?

17    Q.   Did you have anything to do with it -- giving

18    the numbers, the format there, the groups or

19    categories, anything?

20    A.   These were the goals that were given to us

21    for the client managers.

22    Q.   Okay.  Those were the goals that were given

23    to you for the client managers --

24    A.   Right.

25    Q.   -- for the year 2000?

64

```
 1      A.    Right.

 2      Q.    Okay.  And you gave this specific document to

 3  John Reed during the interview process; is that your

 4  contention?

 5      A.    Yes.

 6      Q.    Okay.  How did you give it to him?

 7      A.    I don't remember.  I either Airborned it or

 8  just mailed it.

 9      Q.    Okay.  Can I see that back?

10      A.    Uh-huh.

11      Q.    Do you remember where you Airborned or mailed

12  it to?

13      A.    It would have been his house.

14      Q.    Okay.  And I'm -- I'm going to approach real

15  quick.  Do you mind if I, kind of, stand next to you?

16      A.    Uh-huh.

17      Q.    Could you explain to me exactly what these

18  numbers mean?  Let's say, under the term "Production"

19  on this document.

20      A.    Okay.

21      Q.    "New loan fundings"?

22      A.    New loan fundings is new, outstanding loans

23  booked.

24      Q.    Okay.  What does CM mean?  Right here

25  (indicating).
```

65

1      A.    CM, client manager.

2      Q.    Okay.  And that pertains to one client

3  manager?

4      A.    That's correct.

5      Q.    Okay.  And what do these numbers, 32 million,

6  24 million, and 12 million mean?

7      A.    Those are the -- Those are the goal levels

8  for the new loan fundings.

9      Q.    Okay.  And that's with respect to each one of

10  the client managers, depending on the years of

11  experience?

12      A.    That's correct.

13      Q.    Okay.  What did you consider Mr. Reed?

14      A.    Tier 1.

15      Q.    Tier 1 client manager with five-plus years of

16  experience?

17      A.    Yes.

18      Q.    Okay.  And so, how much, under the new loan

19  fundings, did you expect him to bring in in the year

20  2000?

21      A.    His goal was whatever it was in this

22  document.

23      Q.    Okay.  In this document, how much -- what do

24  you have to bring in?

25      A.    On this document right here --

66

1    Q.    Right.

2    A.    -- had he started at the beginning of the

3 year, would have been $32 million.

4    Q.    Okay.  And in addition to the 32 million for

5 new loan fundings, would he have to bring in new

6 deposits of 3.2 million?

7    A.    Yes.

8    Q.    And in addition to that, treasury management,

9 150 million?

10    A.    A hundred and fifty thousand.

11    Q.    Hundred and fifty thousand.  I'm sorry.

12    A.    Had he started at the beginning of the year,

13 that's correct.

14    Q.    Okay.  "Cross-Selling, Private Banking," what

15 does -- what does that mean?

16    A.    That means referrals -- closed referrals to

17 the private banking group.

18    Q.    Okay.  "Premier," what does that mean?

19    A.    Closed referrals to the premier banking

20 group.

21    Q.    And what does this mean where it says, "SA:

22 3" -- I'm assuming that's San Antonio 3 -- "and RGV:

23 2"?

24    A.    That's correct.

25    Q.    Is that San Antonio three clients and RGV two

67

1  clients -- Rio Grande Valley two clients?

2     A.   Three closed referrals from San Antonio to

3  the private banking and two closed referrals to the

4  private banking if you were in the Rio Grande Valley.

5     Q.   Okay.  And you didn't expect him to go by the

6  San Antonio group, you'd expect him to go by the RGV

7  group; is that correct?

8     A.   That's correct.

9     Q.   "Trade Finance," he was expected to bring in

10 $50,000; is that correct?

11    A.   Had he started at the beginning of the year.

12    Q.   Had he started at the beginning of the year.

13    A.   He would -- He would have been expected to

14 generate closed revenue -- trade finance revenue of

15 $50,000.

16    Q.   Okay.  "Derivatives," of 125,000?

17    A.   What's the question?

18    Q.   Is that what he would have been expected to

19 produce under "Derivatives"?

20    A.   A hundred and twenty-five thousand dollars

21 had -- if he would have started at the beginning of

22 the year.

23    Q.   Okay.  Could you explain to me what

24 derivatives is?

25    A.   Yes.

68

```
 1      Q.   Go ahead.

 2      A.   Derivative, in the way we use it in this

 3 connotation is where a -- we're, basically, swapping a

 4 floating rate to a fixed rate for a loan to one of our

 5 clients.

 6      Q.   Okay.  What is "FX"?  Is that foreign

 7 exchange?

 8      A.   Yes.

 9      Q.   And had to bring in $50,000 there, if he

10 started at the beginning of the year?

11      A.   Yes.

12      Q.   "Investment Services," 75,000?

13      A.   What -- What's the question?

14      Q.   What is investment services?  Let me start

15 out there.

16      A.   Investment services is, basically, revenue

17 generated from investments of our clients.

18      Q.   Okay.  And if he started at the beginning of

19 the year, he would have been expected to produce

20 $75,000?

21      A.   In revenue associated from investment

22 services, that's correct.

23      Q.   Okay.  In "Leasing," that was to be

24 determined?

25      A.   What?
```

69

1    Q.   In "Leasing," under this "Cross-Selling" --

2  Okay.  Explain to me what leasing is, first.

3    A.   Leasing is, basically, referring a leasing

4  opportunity to our leasing group.

5    Q.   Okay.  And that was to be determined; is that

6  right?

7    A.   What was to be determined?

8    Q.   The amount for leasing.  I'm assuming that

9  that's what "TBD" means.

10    A.   The 2000 goal for leasing was to be

11  determined, that's correct.

12    Q.   Okay.  Under "Calling.  Monthly In-Person

13  Calls," 25; is that correct?

14    A.   What's correct?

15    Q.   Was he supposed to make 25 monthly in-person

16  calls?

17    A.   Yes.

18    Q.   And then two calls per quarter for derivative

19  calls?

20    A.   What's the question?

21    Q.   Is that how many calls he's supposed to make,

22  two per quarter for derivative calls?

23    A.   Yes.

24    Q.   I'm sorry.  And this document, right here,

25  you said was produced to John Reed during the

1  interview process?

2      A.    Yes.

3      Q.    Do you understand that it's his contention

4  that he never received that during the interview

5  process?

6      A.    I don't know what his contention is.

7      Q.    Okay.  Is that what you understand his

8  contention is?  If his contention is that he did not

9  receive this during the interview process, that would,

10  obviously, be different than what your memory is?

11      A.    That's correct.  If that's his contention.

12      Q.    Well, I'll represent to you that it is.

13            Let me ask you this:  As far as when you

14  joined Bank of America or when you went up to your

15  specific steps, how much training time did you get?

16      A.    I don't remember.

17      Q.    Okay.  Well, was there specific training that

18  you had to go through with regards to each position

19  that you held?

20      A.    What do you mean by "each position"?

21      Q.    Well, we went over all your positions, right,

22  from 1989 all the way to 1999.  Are there any other

23  positions that you had that I don't know about?

24      A.    No.

25      Q.    Okay.  With regards to credit analyst,

71

1  banking associate, banking officer, assistant VP, vice

2  president, senior vice president, and senior vice

3  president in commercial banking group, did you have to

4  go through different trainings when you achieved each

5  one of those positions?

6      A.   I went through training during the course of

7  my career at the bank.

8      Q.   Okay.  And training in the course of each of

9  those positions?

10     A.   What do you mean by that, though?

11     Q.   Did you go through training for being a

12 credit analyst?

13     A.   I had training when I was a credit analyst,

14 that's correct.

15     Q.   Okay.  Did you go through a significant

16 amount of training?

17     A.   What do you mean by "significant"?

18     Q.   Well, did you go for weeks, months?

19     A.   Weeks.

20     Q.   Weeks?  Okay.  When you first got to B of A,

21 did you go -- I mean, did you have to get used to the

22 process and all this other stuff that B of A was going

23 to introduce you to, as an employee of B of A?

24     A.   What do you mean?

25     Q.   Did you have initial training when you joined

1  -- I guess it would be NCNB Texas?

2     A.   Did I have initial training?  Yes.

3     Q.   Okay.  How long did that last?

4     A.   From what I remember, it was 10 weeks.

5     Q.   It was 10 weeks?  Okay.

6     A.   When I first joined the bank.

7     Q.   Is that what people generally have when they

8  first start -- join B of A?

9     A.   When?

10     Q.   When they first get on.

11     A.   When they first join?

12     Q.   Bank of America.

13     A.   When?

14     Q.   Are they expected -- When they first join

15  Bank of America, they're expected to do initial

16  training?

17     A.   State the question again.

18     Q.   When people first join Bank of America, are

19  they expected to do initial training?

20     A.   No.

21     Q.   No, they're not?  Okay.  But you-all do have

22  training programs for people that join Bank of America

23  from other banks?

24     A.   I don't know.

25     Q.   Well, did you expect Mr. Reed to go through

1  training?

2      A.  Did I expect him to go through training?

3      Q.  Uh-huh.

4      A.  Training was made available for him.

5      Q.  Okay.  Did you want him to go through

6  training, as his manager?

7      A.  Yes.

8      Q.  Did you think that that would be beneficial

9  for him?

10      A.  Yes.

11      Q.  In fact, did you allow a number of months for

12  him to try and go train?

13      A.  What do you mean by that?

14      Q.  Did you say he needed to be trained in the

15  first six to nine months while he was there at B of A?

16      A.  Did I state that -- what?

17      Q.  Did you state that he needed to be trained in

18  the first six to nine months while he --

19      A.  No.

20      Q.  Never said that?

21      A.  Did not state that.

22      Q.  Okay.  If I have documentation showing that

23  he did -- that you did state that, would that be

24  incorrect?

25      A.  Say that question again.

74

```
 1      Q.    If I have documentation showing that he was
 2  to go through training for the first six to nine
 3  months, would that be incorrect?
 4      A.    I suggested training to him.
 5      Q.    Okay.  You didn't expect it?
 6      A.    It's up to him if he wanted to take it or
 7  not.
 8      Q.    Okay.  You don't select him to take the
 9  training?
10      A.    I suggest to him potential training that
11  might be available for him.
12      Q.    Okay.  But you don't select him to take it,
13  then?
14      A.    What do you mean by "select"?
15      Q.    You don't say, "John Reed, you're going to go
16  do training here in the next six to nine months"?
17      A.    I suggest that to him.
18      Q.    Okay.  So "select" is the wrong word then?
19      A.    I guess.
20      Q.    Okay.  Even if you used it in your
21  documentation?
22      A.    I don't know what you're talking about.
23               (Exhibit No. 5 marked.)
24      Q.    (BY MR. MARTINEZ)  Well, did you write John
25  Reed's "Performance Planning and Coaching, Commercial
```

75

1  Banking"?

2      A.   Yes.

3      Q.   Okay.  Is this your language that's put in

4  here?  Is it your typing?  Did you --

5           MS. O'DONNELL:  Can you show me the

6  document?

7      Q.   (BY MR. MARTINEZ)  Did you type it in?

8      A.   Can I see that?

9      Q.   Let me ask you:  Did you type this in?

10     A.   Type what in?

11     Q.   Anything that's in the Performance Planning

12  and Coaching.

13     A.   For John Reed?

14     Q.   Yeah.

15     A.   I typed it in.

16     Q.   And you stick by what it says?

17           MS. O'DONNELL:  For the record, he

18  hasn't seen the document that you're referring to.

19           MR. MARTINEZ:  I think the record

20  clearly reflects that.  That's okay.

21     Q.   (BY MR. MARTINEZ)  And you still stick by it

22  before you see it?

23     A.   Stick by what?

24     Q.   By what you wrote.

25     A.   By what I wrote where?

76

1     Q.    In his Performance Planning and Coaching;

2  that being John Reed.

3     A.    I wrote that in this.

4     Q.    And you stick by what you wrote?

5     A.    What do you mean by "stick by what I wrote"?

6     Q.    I mean you still stand by this.

7     A.    Stand by what?

8     Q.    The Performance Planning and Coaching of John

9  Reed.

10     A.    I don't understand the question.

11     Q.    You don't -- You don't back -- You don't

12  stand by your document that you wrote out for John

13  Reed?

14     A.    Who do you mean by "stand"?  Did I write that

15  document?  I wrote that document.

16     Q.    Okay.  And at the time that you wrote this,

17  you meant what you wrote?

18     A.    Yes.

19     Q.    Okay.  Since I don't have an extra copy, I'll

20  go ahead and show you.  Obviously, you wanted John

21  Reed to go through some training; is that correct?

22     A.    I suggested that he take some training.

23     Q.    Okay.  In here on page 8, under his

24  professional development goals, could you just read

25  that, what you wrote down there with regards to John?

1     A.    "John has been selected to take the following

2    training during the next six to nine months as the

3    training schedule is developed: (i) Client Advisor

4    Workshop, (ii) Management, Business and Industry

5    Evaluation, and (iii) Consultative Selling Skills."

6     Q.    And you understand that that's something that

7    you do for somebody who just got into B of A?

8     A.    State the question again.

9     Q.    Is that something that you'd normally do for

10   people who just got into B of A?

11    A.    Do what?

12    Q.    Suggest training or select training, or

13   something, for these guys, in the first months that

14   they're there.

15    A.    I do that for anybody that's on my team.

16    Q.    For everybody, right?

17    A.    Uh-huh.

18    Q.    And that would be fair?

19    A.    Yes.

20    Q.    And, in fact, when we go to the second

21   quarter, on page 9, you make a statement here that

22   John Reed joined the bank in May of 2000, so the

23   second quarter performance reflects two months of

24   activity; is that correct?

25    A.    Yes.

78

1     Q.   Okay.  So you make allowances for that

2  because he just joined two months prior to the report

3  of this?

4     A.   What's the question?

5     Q.   Basically, you put in here that this reflects

6  just two months of activity; is that right, because he

7  joined in May of 2000?

8     A.   That's correct.

9     Q.   Okay.  And you make different statements with

10  regards to John's ability and what he's been doing

11  since he joined in the first two months; is that

12  right?

13     A.   I make certain statements in there, that's

14  correct.

15     Q.   You still stand by those statements?

16     A.   What statements?

17     Q.   Statements that you wrote in here.

18     A.   In that document?

19     Q.   Yes.

20     A.   Yes.

21     Q.   Okay.  And, in fact -- I believe it's the

22  final page of the "Public Finance Expertise," in the

23  "Commercial Bank Incentive Plan."  In fact, you make a

24  statement with regards to John Reed, "For incentive

25  purposes" -- as of 12-31-00 to December 31st, 2000 --

1   "John Reed started in May of 2000"; is that correct?

2   Is that what you state in here?

3       A.   Let me read that.  Okay.  What's the

4   question?

5       Q.   That's just what you stated in here; is that

6   right?

7       A.   I made that statement.  I wrote that in

8   there, that's correct.

9       Q.   Okay -- "thus, the above results and goals

10  reflect only five months of performance"; is that

11  right?

12      A.   I made that statement.

13      Q.   Okay.  During the interview process with John

14  Reed, did you talk to him about your goals in the

15  Valley?

16      A.   Whose goals?

17      Q.   Your goals as a manager of the Rio Grande

18  Valley --

19      A.   I don't remember.

20      Q.   -- for commercial banking.

21      A.   I don't remember.

22      Q.   Can you tell me what your goals were in the

23  Rio Grande Valley?

24      A.   When?

25      Q.   Back when you became in charge of the Rio

80

1    Grande Valley in 1999.

2        A.    I don't remember them.

3        Q.    You don't remember what your goals were?

4        A.    No.

5        Q.    Were you trying to grow the Valley?

6        A.    Yes.

7        Q.    Okay.  Is that pretty much a general goal?

8        A.    Yes.

9        Q.    Okay.  Wanted to get more business down

10   there?

11       A.    Yes.

12       Q.    Okay.  Wanted to see everybody who was down

13   there succeed?

14       A.    Yes.

15       Q.    You wanted to see John Reed succeed?

16       A.    Yes.

17       Q.    And -- And because of that, you sent him to

18   different -- or you suggested different trainings to

19   him?

20       A.    That's correct.

21       Q.    In the first month that he was there?

22       A.    I don't know when.  I just...

23       Q.    Well, during the months that he was there,

24   based upon this report that we just read?

25       A.    During the time that he was there, I

81

1   suggested that he take some training.

2       Q.   Okay.  And as we said -- and we talked about

3   a number of people that you interviewed.  You say you

4   don't have a number; is that correct?

5       A.   I don't remember.

6       Q.   Okay.  Or you don't remember.  But at some

7   point in time, you interviewed Eddie Gutierrez?

8       A.   What do you mean by "interview"?

9       Q.   Did you talk to him about, basically, John

10  Reed's position at some point in time?

11      A.   What do you mean "John Reed's position"?

12      Q.   In becoming a commercial lender, did you talk

13  to Eddie Gutierrez about that before you spoke with

14  John Reed?

15      A.   Where and when?

16      Q.   Did you ever?

17      A.   Did I speak to Eddie Gutierrez?  Yes, I've

18  talked to Eddie Gutierrez.

19      Q.   Okay.  About that position?

20      A.   About what position?

21      Q.   About John Reed's position.

22      A.   What do you mean "John Reed's position"?

23      Q.   Okay.  About commercial banking -- about

24  being a commercial lender.

25      A.   About being a commercial lender with Bank of

82

1  America, yes.

2      Q.   Okay.  You did speak with him about that?

3      A.   Yes.

4      Q.   Okay.  Would you consider that an interview?

5      A.   No.

6      Q.   No?  Even though you spoke to him about that

7  position?  Okay.  Did you talk --

8      A.   I talked to him about many things.

9      Q.   Okay.  Did you talk with Margie Watson --

10     A.   Did I talk with --

11     Q.   -- about different positions down in the

12  Valley?

13     A.   Have I talked to Margie Watson?  I've talked

14  to Margie Watson.

15     Q.   About positions in the Valley?

16     A.   About what positions in the Valley?

17     Q.   Any positions in the Valley.

18     A.   When?

19     Q.   At any point in time.

20     A.   At any point in time, when?

21     Q.   After 1999.

22     A.   Have I -- Have I talked to Margie Watson?

23  Yes.

24     Q.   About a position in the Valley?

25     A.   I don't remember about a position in the

83

1   Valley.

2        Q.   Did you talk to her on behalf of B of A?

3        A.   I don't remember.

4        Q.   Okay.  Steve Mallet?

5        A.   What's the question?

6        Q.   Did you talk to Steve Mallet about a position

7   in the Valley?

8        A.   I don't remember.

9        Q.   You don't remember?  Could you have talked to

10  Steve Mallet about a position in the Valley?

11       A.   Yes.

12       Q.   Do you remember Steve Mallet?

13       A.   Yes.

14       Q.   Okay.  You don't remember talking to him

15  about a position down there in the Valley?

16       A.   I talked to him about a position.  I don't

17  remember where.

18       Q.   Okay.  Could it have been about a position in

19  the Valley?

20       A.   It could have been.

21       Q.   Okay.  And you talked to all these different

22  people, including John Reed, because, like you said,

23  you wanted to see the Valley grow?

24       A.   Is that a question?

25       Q.   Yes.

84

```
 1      A.    What's the question?

 2      Q.    Because you wanted to see the Valley grow; is

 3 that right?

 4      A.    Yes.

 5      Q.    Okay.  And you wanted -- If you were to hire

 6 these people, you wanted them to succeed?

 7      A.    Yes.

 8      Q.    Okay.  You, in fact -- you wanted John Reed

 9 to succeed?

10      A.    Yes.

11      Q.    Okay.  And you wanted B of A to grow with

12 respect to John Reed?

13      A.    What do you mean by that?

14      Q.    You wanted B of A to grow in the Valley

15 because of John Reed?

16      A.    I don't understand the question.

17      Q.    Did you want B of A to grow because of John

18 Reed's actions in the Valley?

19      A.    What do you mean by that?  "Actions"?

20      Q.    Okay.  Because of what he did for B of A, did

21 you want B of A to grow in the Valley?

22      A.    I don't understand the question.

23      Q.    Well, I don't know how else to put it, other

24 than:  Did he do work for B of A?

25      A.    He did work for B of A.
```

1     Q.    Did you provide him support or give him

2   people to work with, as far as product specialists?

3     A.    What do you mean by "support"?

4     Q.    People to work with.  We'll use your term.

5     A.    Okay.

6     Q.    Okay.  Did you provide that for him?

7     A.    Did I provide that for him?  What do you mean

8   by that?

9     Q.    Did -- Did B of A provide people to work with

10  John Reed?

11    A.    B of A had product specialists that were made

12  available to work with John Reed.

13    Q.    Okay.  And those product specialists were

14  supposed to help John Reed grow the Valley?

15    A.    What do you mean "help John Reed grow the

16  Valley"?

17    Q.    You know, I don't know how many different

18  ways I'm going to be able to -- to put this for you,

19  but I mean, the way that we're talking about now is

20  the way that I'm going to talk to you in front of a

21  jury, okay?

22    A.    Okay.

23    Q.    And what I want to know is if you're going to

24  tell me exactly the same thing that you're telling me

25  now in front of the jury, and the fact that you don't

1  understand the words that I'm saying.

2      A.    What's the question?

3      Q.    Did B of A allegedly help John Reed in the

4  Valley?

5      A.    I don't understand.  What do you mean by

6  "help"?

7      Q.    Did they give him product specialists to work

8  with?

9      A.    Were they made available to work with John

10 Reed?  Yes.

11     Q.    Okay.  Okay.  So they didn't give him help;

12 they were just made available?  Is that -- Is that --

13 Is that the difference that we're talking about here?

14 They didn't give him help, but they were just made

15 available?  I'm going to use your terms.

16     A.    Okay.

17     Q.    Okay.  Is that what you're saying?

18     A.    About what?  State the question.

19     Q.    The question is:  Based upon what you said,

20 they didn't give John Reed help, but they were made

21 available to him.  That's what you're stating.

22     A.    I didn't state that.  I didn't --

23     Q.    Tell me what you're stating, as far as the

24 product specialists.

25     A.    The statement that I made was that the

1  product specialists -- John had product specialists

2  that were available to assist him.

3     Q.   Okay.  But they didn't help him?

4     A.   What do you mean by "help him"?

5     Q.   Assist him, help him, whatever it is.

6     A.   They -- They worked with John Reed.

7     Q.   Okay.  But you won't use the term "help him"?

8     A.   It's pretty broad.

9     Q.   Well, I think every term can be pretty broad,

10 but you're not going to use that term, regardless?

11    A.   I don't know.

12    Q.   Well, you won't use it; is that right?

13    A.   What's the question?

14    Q.   That those people were there to help John

15 Reed, allegedly?

16    A.   They were made available.

17    Q.   Okay.  They were just made available to him?

18    A.   To help John.

19    Q.   Okay.  And like I say, because you wanted to

20 see the Valley grow?

21    A.   Yes.

22    Q.   Okay.  And that was something that was

23 important to you?

24    A.   What was important to me?

25    Q.   To see the Valley grow --

88

1    A.    Yes.

2    Q.    -- as far as B of A was concerned?

3    A.    Yes.

4    Q.    And, in fact, that was one of your goals that

5  was provided to you?

6    A.    What was?

7    Q.    To make sure that the Valley grew.

8    A.    That's correct.

9    Q.    I think we talked about it earlier.

10    A.    Yes.

11    Q.    And, in fact, the Valley didn't grow?

12    A.    What's your question?

13    Q.    The Valley did not grow?

14    A.    I don't remember.

15    Q.    Okay.  Well, we know that the Valley did not

16  grow.  Can you assume that with me, that the Valley

17  did not grow while you were managing that?

18    A.    Can I assume that the Valley did not grow?

19    Q.    Well, you would know better than anybody

20  else.

21    A.    I don't remember.

22    Q.    You don't remember?  Okay.  Well, B of A

23  didn't see the Valley grow; is that correct?

24    A.    What do you mean "B of A didn't see the

25  Valley grow"?

89

1     Q.   Bank of America has not expanded in the

2  Valley, right?

3     A.   What do you mean by "expanded"?

4     Q.   They haven't expanded since John Reed left;

5  is that right?

6     A.   I don't understand the question.

7     Q.   Since John Reed left, did they hire anybody

8  to replace him?

9     A.   No.

10    Q.   So B of A did not grow.

11    A.   What do you mean by --

12    Q.   B and A has not grown since John Reed has

13  left.

14    A.   I don't understand the question.

15    Q.   B of A has not replaced him?

16    A.   B of A has not replaced --

17    Q.   In fact --

18    A.   -- that position.

19    Q.   And, in fact, they got rid of another

20  secretary; is that correct?

21    A.   I'm sorry?

22    Q.   They got rid of another secretary in the

23  Harlingen office?

24    A.   What's the question?

25    Q.   B of A, they fired another secretary in the

1    Harlingen office?

2        A.    "Fire another secretary"?

3        Q.    Let go, fire.

4        A.    The position that was there is no longer

5    there, that's correct.

6        Q.    Okay.

7        A.    That's --

8        Q.    That's -- That's your term that we're going

9    to use.

10       A.    What's that?

11       Q.    That that position is no longer there.  They

12   didn't fire her; they just had a position that's no

13   longer there.

14       A.    I don't know what the proper term would be.

15       Q.    And you still agree with me that there was

16   nobody that replaced John Reed after his term there

17   with B of A?

18       A.    Where?  In the Valley?

19       Q.    In the Valley.

20       A.    John Reed's position has not been replaced.

21       Q.    Okay.  Let me ask you this:  What are the --

22   What are the down months in banking?

23       A.    The down months?  What do you mean by "down

24   months"?

25       Q.    What are slow months in banking?

1    A.    What do you mean by that?

2    Q.    What are the months where there's not as much

3    banking business going on?

4    A.    Where?

5    Q.    In the Valley.

6    A.    I don't know.

7    Q.    San Antonio.

8    A.    I don't -- I don't understand the question.

9    Q.    What are the months where the business is a

10    little bit slower than other months?

11    A.    What do you mean by "slower"?

12    Q.    Slower, where there's not as much business.

13    A.    I don't know.

14    Q.    You don't know?  Are there any down months in

15    the banking business?

16    A.    It just depends on the market.

17    Q.    Okay.  So it doesn't depend on the time of

18    year?

19    A.    I don't know.

20    Q.    You don't know?  You've been in the banking

21    business for almost 14 years, and you don't know any

22    down months?

23    A.    There are slower months, depending upon the

24    market.

25    Q.    Tell me the slower months.  That's what I

92

```
 1  want to know.

 2      A.    In which market?

 3      Q.    In commercial lending.

 4      A.    Where?

 5      Q.    In San -- Wherever you're at.

 6      A.    In Phoenix?

 7      Q.    In Phoenix.

 8      A.    It's generally slower in the summertime in

 9  Phoenix.

10      Q.    Okay.  When else?

11      A.    Where?

12      Q.    In Phoenix.

13      A.    In Phoenix?  Generally slower in the summer

14  months.

15      Q.    Just the summer months?

16      A.    In general.

17      Q.    Okay.  Not in December?

18      A.    In my opinion, sometimes there's slower

19  activity in December, other months it's maybe -- and

20  other Decembers may be busy.

21      Q.    Okay.  How about in San Antonio?

22      A.    What's the question?

23      Q.    Same question.

24      A.    What's the question?

25      Q.    What are the slower months?
```

1       A.    In San Antonio?

2       Q.    San Antonio.

3       A.    I don't know.

4       Q.    Okay.  You were in San Antonio for three

5  years and you don't know?

6       A.    It fluctuates month after month.

7       Q.    So I'm assuming that you don't know the

8  slower months in the Valley either?

9       A.    That's correct.

10       Q.    Okay.  Let me ask you this:  What was John

11  Reed's goal that was set for him after you adjusted

12  the regular numbers, as far as the amount of money

13  that he was supposed to book while he was there during

14  the year 2000?

15       A.    What do you mean "the amount of money he was

16  supposed to book"?

17       Q.    How much money was John Reed supposed to book

18  in the year 2000?

19       A.    I don't understand the word "the amount of

20  money."

21       Q.    What do you not understand about the word

22  "amount of money" -- or the term "amount of money"?

23       A.    I don't -- I don't know what you're talking

24  about when you say "amount of money booked."  Amount

25  -- Amount of loans?

94

1    Q.    Right.

2    A.    What was the question?

3    Q.    Is the term "booked" a common business term

4    in the banking industry?

5    A.    It's used, yes.

6    Q.    Okay.  Do you use that term daily?

7    A.    Daily?

8    Q.    Weekly?

9    A.    No.  I -- I use it.

10    Q.    Okay.  So you know the term?

11    A.    "Booked," yes.

12    Q.    Okay.  Tell me what "booked" means.

13    A.    In my opinion, "booked" means funding a loan,

14    booking deposits, funding deposits.

15    Q.    Okay.  Tell me how much money John Reed was

16    supposed to book in the year 2000, after making

17    adjustments.

18    A.    I don't understand the question "amount of

19    money."  What are you specifically talking about?

20    Q.    How much money was he supposed to bring in

21    for Bank of America?  What were his goals?

22    A.    His goals are stated in that document.

23    Q.    In which document?

24    A.    The document that we just reviewed.

25    Q.    In the Performance Planning and Coaching?

1    A.    In the Goal -- That's in there, as well.

2    Q.    Or in -- Or in the 2000 Goals?

3    A.    In the 2000 Goals --

4    Q.    Okay.  You --

5    A.    -- either one.

6    Q.    You tell me, in this document, how much money

7  John Reed was supposed to bring in.

8    A.    He was supposed to book, had he started at

9  the beginning of the year, $32 million in new loan

10  fundings.

11    Q.    Okay.  And you add that up with all those

12  other numbers that he's supposed to book; is that

13  correct?

14    A.    What's the question?

15    Q.    You have to add all those numbers up, as far

16  as what he's supposed to bring in.  I mean, you're

17  going to add all those categories up; am I right?

18    A.    He's supposed to bring in, as stated on the

19  document, the number of loans and the number of new

20  deposits.

21    Q.    Okay.  In regards to those numbers there,

22  that's how much he was supposed to bring in?

23    A.    In new loans and new deposits, that's

24  correct.

25    Q.    Okay.  And are those -- are those 2000 goals

96

1    for San Antonio, the Rio Grande Valley, Houston,

2    Phoenix, New York, or is that just for the Rio Grande

3    Valley?

4        A.    These goals right here are for the Rio Grande

5    Valley.

6        Q.    Those are for the Rio Grande Valley.  Never

7    handed out that document to anybody else other than

8    the people that worked in the Rio Grande Valley?

9        A.    I have sent -- I have distributed that to

10   other people.

11       Q.    Where?

12       A.    This (indicating)?

13       Q.    Yeah.

14       A.    To people in San Antonio.

15       Q.    San Antonio.  So San Antonio then?

16       A.    Yes.

17       Q.    And the Rio Grande Valley?

18       A.    Yes.

19       Q.    Those are the goals for both of those areas?

20       A.    These are the goals for the Rio Grande

21   Valley.

22       Q.    Okay.  That's not the goals for the San

23   Antonio area?

24       A.    I don't remember.

25       Q.    Never would have handed that document out to

97

1  anybody in San Antonio?

2      A.   I could have.

3            MS. O'DONNELL:  Could we take a quick

4  break?

5            MR. MARTINEZ:  Let me try and get

6  through this, because I need to leave.  I've got a

7  confirmation.  I'm a --

8            MS. O'DONNELL:  Okay.

9            MR. MARTINEZ:  -- sponsor for a

10 confirmation, but I need to be back by 5:00.

11            MS. O'DONNELL:  Okay.

12            MR. MARTINEZ:  So I'm going to try and

13 finish up by 1:00.

14            MS. O'DONNELL:  Okay.  I need -- I'm

15 going to have to take a break before 1:00, I can

16 promise you.

17            MR. MARTINEZ:  Let me just get through

18 this one little section --

19            MS. O'DONNELL:  Okay.

20            MR. MARTINEZ:  -- and we'll go ahead.

21 And I don't mean to be rude or anything, but --

22            MS. O'DONNELL:  Okay.  I'm just telling

23 you, I'm not going to make it to 1:00.

24            MR. MARTINEZ:  No.  No.  No.  No

25 problem.

98

1     Q.   (BY MR. MARTINEZ)  Can you tell me where in

2   here that you state the amount of money that John Reed

3   was supposed to book that had been adjusted based on

4   these numbers?

5     A.   I don't understand "the amount of money."

6     Q.   Okay.  We talked about the amount of money

7   that people are supposed to book while they're here;

8   is that right?  These are the 2000 goals for your

9   client managers with different years of experience; is

10   that right?

11     A.   These -- These are the different loan --

12   different categories --

13     Q.   And the amount of money that they're

14   supposed --

15     A.   -- for client managers.

16     Q.   And the amount of money they're supposed -- I

17   mean, you said "book," and we talked about this.

18     A.   Okay.

19     Q.   Okay.  That's the amount of money that

20   they're supposed to book -- or their goals?

21     A.   What is?

22     Q.   These numbers that are reflected right here

23   (indicating).

24     A.   New loan fundings is the amount of loans that

25   John Reed had to book, had he --

99

1    Q.   And then --

2    A.   -- stayed --

3    Q.   And then you have --

4    A.   -- in the beginning of the year.

5    Q.   Right.  And then you have to add that

6  category with this category, right?  You add all these

7  categories together -- the new loan fundings category

8  with the new deposits category, with the treasury

9  management category, with the trade finance, the

10  derivatives, the foreign exchange, the investment

11  services; is that correct?

12    A.   What?

13    Q.   You had to add all those together to figure

14  out how much Mr. Reed is supposed -- or anybody is

15  supposed to bring in, as far as goals?

16    A.   Each -- Each -- Each goal is stated there.

17    Q.   Okay.

18    A.   New loan fundings --

19    Q.   Right.  And you've got to add all those up to

20  determine a total amount that he's supposed to bring

21  in?

22    A.   The -- I don't understand what you mean

23  "total he's supposed to bring in."  These are each of

24  his individual goals.

25    Q.   Okay.  And you don't add those up to figure

1    out a total that he's supposed to bring in?

2        A.    I guess you can, if you want.

3        Q.    Okay.  I'm just trying to figure out here

4    what was the amount of money that John Reed was

5    supposed to book, or bring in, or whatever term you

6    want to use, from the time that he started to the end

7    of the year, in 2000.

8        A.    It's stated right there in each of the goals.

9        Q.    Okay.

10       A.    Each -- Each goal category is different.

11       Q.    Okay.  And your determination is that that's

12   the amount of money that he was supposed to bring in,

13   that's your testimony?

14       A.    My determination is that these are his goals

15   for each of those goal categories.

16       Q.    And those were his goals for the year 2000?

17       A.    Yes, had he been there at the beginning of

18   the year.

19       Q.    Okay.  Tell me what his actual goals were

20   after they were adjusted.

21       A.    His actual goals were, he had to generate

22   $21.3 million in new loans --

23       Q.    Okay.

24       A.    -- in 2000.  He had to generate new

25   non-interest bearing DDAs of $2.13 million, and so on

101

1   and so forth.

2        Q.   Let's -- Let's add all this stuff up.   21.3

3   in new loans -- Go ahead.   What was the next one?

4        A.   2.13 million in new non-interest bearing

5   demand deposits.

6        Q.   Okay.   The next one?

7        A.   New treasury management fees of $100,000.

8        Q.   Okay.   The next one?

9        A.   New trade finance fees of $30,000.

10       Q.   Next?

11       A.   New foreign exchange fees of $30,000.

12       Q.   Next?

13       A.   New derivative fees of $80,000.

14       Q.   Next?

15       A.   New investment services fees of $50,000.

16       Q.   Next?

17       A.   The rest of these goals are non-numerical.

18       Q.   Okay.

19       A.   Non-dollar.

20       Q.   Non-dollar goals?

21       A.   Right.

22       Q.   So it seems to me, if you add all this stuff

23  up, and you tell me -- you know, you're a banker and

24  I'm not.   If you add all this up, it comes out to

25  23,720,000 were his goals for the year 2000?

1     A.    If you add this up, whatever it is is what --

2   is -- is what it adds up to.

3     Q.    But that -- that seems close anyway, just

4   based upon any little addition there?

5     A.    What?

6     Q.    The 23,720,000 was the total amount of money

7   that he was supposed to book or bring in for the year

8   2000 -- those were adjusted?

9     A.    $23.7 million, if your math is correct --

10    Q.    Right.

11    A.    -- is what the aggregate amount of goals are,

12  if -- if you were to add them up.

13    Q.    Okay.  Do you know how many days that John

14  Reed was working for Bank of America?

15    A.    No.

16    Q.    I've added them up.  And tell me if you just,

17  kind of, agree or disagree.  And you may not have that

18  information, but it's 276 days, including weekends and

19  holidays.

20    A.    What's the question?

21    Q.    Does that seem about a reasonable period of

22  time?  He wasn't there a full year?

23    A.    Who?

24    Q.    John Reed.

25    A.    Where?

1      Q.   At Bank of America.

2      A.   That's correct.

3      Q.   And in between the time that he started, tell

4  me if you would agree that, besides the weekends,

5  these are the different holidays that are included

6  during the time that he was there, okay?  You have

7  Memorial Day in May -- These are banking holidays.

8  Memorial Day in May, July 4th --

9      A.   What's the question?

10      Q.   Tell me if you would agree that these are

11  banking holidays.

12      A.   That they're banking holidays?  Okay.

13      Q.   In which people in the banking industry do

14  not work.

15      A.   Okay.

16      Q.   Okay.  Memorial Day in May?

17      A.   That's correct.

18      Q.   July 4th?

19      A.   Correct.

20      Q.   Labor Day in September?

21      A.   That's correct.

22      Q.   Columbus Day in October?

23      A.   Correct.

24      Q.   Veterans Day in November?

25      A.   That's correct.

104

1      Q.    Thanksgiving?

2      A.    Yes.

3      Q.    Christmas?

4      A.    Yes.

5      Q.    And New Year?

6      A.    Yes, those are all holidays.

7      Q.    Okay.  And these were all holidays in which

8   John Reed was employed with B of A, if we go from May

9   all the way through January?

10     A.    I don't know.  I'd have to --

11     Q.    Okay.  Well, if he was working there from May

12  1st, which we all agree to that; is that correct?

13     A.    Yes.

14     Q.    And he was fired in February --

15     A.    I don't remember the date.

16     Q.    Okay.  Well, I can represent to you that it

17  was February.

18     A.    Okay.

19     Q.    Then these are the holidays that would be

20  included in those days while he was there.

21     A.    I guess they would be.

22     Q.    Okay.

23           MR. MARTINEZ:  Do you want to take a

24  break?

25           MS. O'DONNELL:   Thanks.

1             THE VIDEOGRAPHER:  We're off the record

2    at 11:00 o'clock.

3             (Break from 11:00 a.m. to 11:08 a.m.)

4             THE VIDEOGRAPHER:  We're back on the

5    record at 11:08.

6    Q.   (BY MR. MARTINEZ)  Mr. Anaya, there's --

7    there's just one point that -- that I wanted to go

8    over with you, and I'm just going to introduce these

9    now, for any other reason, but these are, basically,

10   statements that were -- that were made either by you

11   or through Bank of America.

12             You and I have already talked about the

13   -- the specific things that you talked about with

14   Mr. Reed when you -- during the interview process?

15   A.   Okay.

16   Q.   Is that -- Is that right?

17   A.   Yes.

18   Q.   We talked about all that?  Okay.

19   A.   Yes.

20   Q.   There wasn't -- There wasn't just a -- a

21   general comment made to Mr. Reed about, "Come join

22   Bank of America," before he came over?

23   A.   That's correct.

24   Q.   Okay.  You and I can agree to that?

25   A.   Yes.

1          (Exhibit Nos. 3 and 4 marked.)

2          MR. MARTINEZ:  Okay.  I'm going to

3    introduce Deposition Exhibits 3 and 4, which is one --

4    Deposition Exhibit 3 is the affidavit of Raul Anaya,

5    which was, I think, attached to a summary judgment;

6    and Deposition Exhibit 4, which is the letter that was

7    written to myself and Mr. Salinas by Kathleen Deibert.

8      Q.  (BY MR. MARTINEZ)  Mr. Anaya, I'm going to

9    get a piece of paper out here, and I've already --

10   I've already done these calculations, but I want to

11   make sure that -- that you and I do them together so

12   we -- we can check each other.

13     A.  Okay.

14     Q.  Okay.  We know that John Reed -- We've

15   already been over his goals, right?

16     A.  Yes.

17     Q.  Which, basically, we said were close to 23.7;

18   is that right?

19     A.  What is?  The -- What do you mean "the 23.7"?

20     Q.  His -- His goals came out to about 23.7 --

21   23,700,000?

22     A.  Well, he had the 21.3 in -- in loans, and

23   then the --

24     Q.  Right.  And then the aggregate.  Once you --

25   Once you add them all together, it came out to about

1  23 million?

2      A.    When you add them up together, that would be

3  the number.

4      Q.    Okay.  And his start date, we can all agree,

5  was May of 2000; is that right?

6      A.    Okay.

7      Q.    Okay.  And his end date -- Do you remember

8  when his end date was?

9      A.    No.  I don't remember the specific date.

10     Q.    Okay.  I'll represent to you that it was in

11 February of 2001.

12     A.    Okay.

13     Q.    Okay.  Does that sound fair?

14     A.    Yes.

15     Q.    Does that sound about right to you?

16     A.    Yes.

17     Q.    Okay.  So the months that we're looking at,

18 essentially, would be -- and you just tell me if I'm

19 right -- of 2000, May, June, July, August, September,

20 October, November, December.  And then in 2003, we're

21 looking at January before he was let go?

22     A.    2000-what?

23     Q.    2002, I'm sorry.  Or 2001, January, before he

24 was let go.

25     A.    Okay.  What do you mean?  Those are the

108

1   months that he was --

2       Q.   Those are the months that he was working.   So

3   we're -- we're looking at about nine months.

4       A.   Okay.

5       Q.   Am I -- Am I right about that?   Okay.   And

6   bear with me.   It's going to take me a little bit of

7   time.   I can tell you it's going somewhere.

8               Would you agree with me that May is, in

9   fact, 31 days?

10      A.   Yes.

11      Q.   June is 30 days?

12      A.   Yes.

13      Q.   July is 31 days?

14      A.   Yes.

15      Q.   August is 31 days?

16      A.   Yes.

17      Q.   September is 30 days?

18      A.   Yes.

19      Q.   October is 31 days?

20      A.   Yes.

21      Q.   November is 30 days?

22      A.   Yes.

23      Q.   December is 31 days?

24      A.   Yes.

25      Q.   And January is also 31 days?

109

```
 1     A.   Yes.

 2     Q.   Okay.  Now, I can do this or I can let you do

 3   this, just so -- just so you can check my numbers.

 4   Let me give you these numbers.  So if we're -- if

 5   we're looking at the amount of days that Mr. Reed was

 6   at Bank of America, he was there for 31 plus 30 --

 7     A.   Okay.

 8     Q.   -- plus 31 --

 9     A.   Okay.

10     Q.   -- plus 31 --

11     A.   Okay.

12     Q.   -- plus 30 --

13     A.   Okay.

14     Q.   -- plus 31 --

15     A.   Okay.

16     Q.   -- plus 30 --

17     A.   Okay.

18     Q.   -- plus 31, plus 31.

19     A.   Okay.

20     Q.   How many days is that?

21     A.   276.

22     Q.   Okay.  Okay.  And you'd agree with me, that's

23   276 days, including weekends and including holidays?

24     A.   Yes.

25     Q.   Okay.  And here, I'll just represent to you
```

1  that, obviously, banks don't work on weekends, right?

2     A.   Some do.

3     Q.   Which banks work on weekends?

4     A.   Saturdays.  They open on Saturdays.

5     Q.   Okay.  Saturdays from 8:00 to noon?

6     A.   Something like that.

7     Q.   Okay.  And which part of the bank works on

8  Saturday from 8:00 to noon?

9     A.   Generally, the retail bank.

10    Q.   Okay.  If you were to take out the weekends

11 -- and I'll just make a representation to you -- and I

12 did this -- from May to January of 2002, you basically

13 have about 77 days of weekend time.

14    A.   May through January of what?

15    Q.   May through January.

16    A.   Of what?

17    Q.   January of 2001.

18    A.   Okay.

19    Q.   Okay.  Does that sound about right?

20    A.   Sure.

21    Q.   Okay.  Let me ask you this:  If you take his

22 goal of 23 million -- and you may need to do this --

23 23,750,000, okay, and let's say he worked every single

24 day including weekends, including holidays, and you

25 divide that by 276 days, how much would John Reed need

1  to book every day?

2      A.   Based on my calculation, a little over

3  $86,000.  Let me -- Let me do that again.

4      Q.   Give me -- Give me a --

5      A.   Twenty -- Let's do that again.

6      Q.   23,750,000 --

7      A.   Okay.

8      Q.   -- divided by 276 days.

9      A.   That number is 86- -- a little over $86,000.

10     Q.   Give me -- Give me the number to the -- to

11  the penny now.

12     A.   Okay.  According to this, it's 86,050.72.

13     Q.   Okay.  And that's how much he would need to

14  book every single day, based upon his goal, if there's

15  no weekends or anything taken out, right?

16     A.   Well, I mean, if you're talking about the

17  number of -- If you just add the number of loans --

18     Q.   If you average the amount.

19     A.   -- and new deposits he's supposed to

20  generate, and divide by the number of days --

21     Q.   That's the average.

22     A.   -- that would be the number.

23     Q.   Okay.  Now, let's -- let's take out the

24  weekends.  Okay.  So if you take out 276 minus 77

25  days, then, basically, you're looking at --

112

1      A.    199 -- 199 days.

2      Q.    199 days.  Now, if you take 23,750,000, and

3  you divide it by 199 days, how much would he have to

4  book every single day?

5      A.    119,346.73 is the number, when you go through

6  that math.

7      Q.    Per day that he was there, if you don't

8  include the weekends, right?

9      A.    I guess.

10     Q.    Okay.  Now, let's say we take out the

11  holidays -- and we counted out eight holidays.  Okay.

12  And just make sure that my math is correct.  You've

13  got Memorial Day, right?

14     A.    Okay.

15     Q.    July 4th, Labor Day, Columbus Day, Veterans

16  Day, Thanksgiving, Christmas, and New Year; is that

17  right?

18     A.    Those are the 8 holidays that -- that were

19  covered under John being at the bank, that's correct.

20  It seems like that.

21     Q.    So, basically, that would be 191 days.  Okay.

22  And I'm just taking the total time.  We'll do for the

23  year 2000 in a minute.

24            Now, if you take 23,750,000 divided by

25  191 --

113

1    A.    Okay.

2    Q.    -- how much would he have to book every

3  single day?

4    A.    That number, just based on that math, was

5  124,345.54.

6    Q.    Per day that he was there?

7    A.    That's the number that came up with that

8  math.

9    Q.    Okay.  Now, let me do this:  I'm going to

10  just go for the year 2000, okay.  So you tell me if --

11  tell me if that's right -- if those numbers are right.

12    A.    What numbers?  What do you mean?

13    Q.    The numbers that we added up the days and

14  then, based upon the goal that he had, that that's the

15  amount that he had to book with regards to the total

16  number of days, then if you take away the weekends,

17  then if you take away the holidays.

18    A.    Based on this math, that's what the number

19  would be.

20    Q.    Okay.  And -- And you and I did those

21  together?

22    A.    That's correct.

23    Q.    Okay.  Okay.  Let's just do it for the year

24  2000, which means we're going to have to take away

25  January.

114

1     A.    Okay.

2     Q.    Okay.  And we'll have to take away the New

3  Year holiday.  So -- And let's add these -- if you go

4  through May, which is going to be 31 days; June, which

5  is going to be 30 days; July, 31; August, 31;

6  September, 30; October, 31; November, 30; and

7  December, 31.  Okay.  Now, if you add all those up

8  together, we can add them up or we can subtract from

9  276.  So if it's 276 minus 31, which would be January,

10 how many days would that give you?

11    A.    245 days.

12    Q.    Okay.  And if you take out the weekends in

13 January, you're looking at 77 minus -- one, two,

14 three, four, five, six, seven, eight -- minus eight,

15 so it would be, basically, 69 -- 69 weekend days?

16    A.    If that's what the number is.

17    Q.    Okay.  Let me represent to you that there's

18 77 days.  But if you take away those weekends, it

19 would be 69 for the weekends.

20    A.    Okay.

21    Q.    And if you do 245 minus 69, how much does

22 that leave you?

23    A.    176.

24    Q.    Okay.  And then, if you take away the

25 holidays, if you don't count New Year, you're talking

1   about seven days there; is that correct?

2       A.   Okay.

3       Q.   So you're looking at, actually, 169; is that

4   right?

5       A.   Yes.

6       Q.   Okay.  Let's do these calculations.  If you

7   take the total number of days for the year 2000, which

8   is -- and then divide it into the 23,750,000, what

9   would that leave you?

10      A.   What was -- What was the math again?

11      Q.   23,750,000 --

12      A.   Okay.

13      Q.   -- divided by 245.

14      A.   Divided by 245, that number, according to

15  this, is 96,938.78.

16      Q.   Okay.  That's how much he would need to book

17  if he was there every single day, including weekends,

18  from May to December?

19      A.   If you look at it the way you're looking at

20  it.

21      Q.   Okay.  And then, if you take 23,750,000 minus

22  the weekends, which would leave you 176, what is that

23  number?  It would be 23,750,000 divided by 176.

24      A.   That number is $134,943.18.

25      Q.   134,943?

1      A.    Yeah.   134,943.18.

2      Q.    Okay.   Now, if you take that number and you

3  take away the weekends and the holidays, it leaves you

4  23,750,000 divided by 169.   What does that number come

5  out to be?

6      A.    That number is 140,532.54.

7      Q.    That he would need to book every single day

8  that he was there?

9      A.    If you look at it the way you're looking at

10  it, that's correct.

11      Q.    And this doesn't include any slow days or any

12  -- any dead time in there, right?

13      A.    That would be correct.

14      Q.    Okay.   So can I write "does not include any

15  slow days" on here?   Would that -- Would that be

16  correct, like you said?   I'm going to write it in

17  there.   Would that be a fair assumption that this --

18  that this number that we're talking about does not

19  include any slow days?

20      A.    Does not include any slow days?

21      Q.    Right.

22      A.    I guess you can.

23              MR. MARTINEZ:  And I'll -- Let me go

24  ahead and mark these.   What number are we on?   I think

25  it -- What was -- What was the one -- That was the

1   last one over here.  Six, seven, eight.

2                  (Exhibit No. 7 marked.)

3       Q.   (BY MR. MARTINEZ)  I'm going to go ahead and

4   write the same thing on Exhibit 7, which is "Does not

5   include any slow days."  Is that -- Is that a fair

6   assumption?  The calculations that we made doesn't

7   include those days?

8       A.   I mean, I don't know what slow days it would

9   be, but --

10      Q.   We talked about slow months.

11      A.   Right.

12      Q.   Okay.

13                 (Exhibit No. 8 marked.)

14      Q.   (BY MR. MARTINEZ)  Okay.  Just real quickly,

15  these are the numbers that we calculated both for the

16  year 2000 as well as for the entire time while John

17  Reed was there; is that right?

18      A.   Okay.

19      Q.   Is that fair?  We both did those together,

20  those calculations?

21      A.   Yes.

22      Q.   And is your contention that you've told John

23  Reed about these numbers -- these specific goals that

24  he needed to meet before he was hired onto B of A?

25      A.   I gave -- We -- We reviewed each of his

118

1  different goal categories, that's correct.

2      Q.   Okay.  And did you give him those specific

3  numbers that -- that you've reviewed with me before?

4      A.   What specific numbers?

5      Q.   The ones that we talked about in his

6  coaching --

7      A.   On Exhibit 6?  Yes.

8      Q.   On Exhibit 5.

9      A.   Well, I reviewed Exhibit 6 with him and let

10  him know that I would prorate the goals for him --

11      Q.   Okay.

12      A.   -- based on him coming -- not starting at the

13  beginning of the year.

14      Q.   Okay.  And when did you review Exhibit 6 with

15  him?

16      A.   When?

17      Q.   Yeah.

18      A.   I mean, during the interview process.

19      Q.   Okay.  But when?

20      A.   Before he was hired.

21      Q.   Okay.  Do you know where?

22      A.   From what I remember, it was over the phone.

23      Q.   It was over the phone?

24      A.   Right.

25      Q.   That you interviewed -- During the interview

1  that you went over this document with him?

2      A.    During the interview process --

3      Q.    Okay.

4      A.    -- we -- we reviewed those goals over the

5  phone -- over the phone, after he had already received

6  them.

7      Q.    And it's your contention that he received

8  these via Fed-Ex/email, but you don't know where you

9  sent them to?

10     A.    I sent them to his home.

11     Q.    To his home.  Okay.  And you understand that

12  it's his contention that he never received these?

13     A.    That's what I understand.

14     Q.    Okay.  And you understand that it's his

15  contention that if he were to be notified of these

16  goals or any prorated goals amounting to that amount

17  of money that he would have had to bring in every day,

18  he never would have gone to B of A; do you understand

19  that's his contention?

20     A.    I don't know what his contention is, if it's

21  that.

22     Q.    Okay.  You understand that those are pretty

23  high goals?

24     A.    What do you mean by "high"?

25     Q.    To bring in, even at the lowest amount of

1   $86,000 a day, that's a pretty high goal?

2       A.   I don't understand what you mean by "high

3   goal."

4       Q.   Do you think it's fairly easy to bring in

5   $86,000 a day?

6       A.   I think it's reasonable.

7       Q.   You think that's reasonable?

8       A.   Yeah.  Yes.

9       Q.   Where?

10      A.   Where, what?

11      Q.   Where is that reasonable to bring in $86,000

12   a day?

13      A.   The Rio Grande Valley.

14      Q.   That's reasonable -- So if I brought in a

15   banker to tell you that that's not reasonable to bring

16   in, would you disagree with him?

17      A.   If you brought in another banker --

18      Q.   Uh-huh.

19      A.   -- would I disagree with him if he stated

20   otherwise?  Yes, I would.

21      Q.   And this is the amount of money that you

22   wanted John Reed to bring in, based on how many

23   clients did you give him originally?

24      A.   I'm sorry.  What's the question?

25      Q.   This is the amount of money you wanted John

1   Reed to bring in, based upon how many clients did you

2   give him originally?  How many clients did B of A

3   start him out with -- did B of A find?

4        A.    From what I remember, it was three --

5        Q.    Okay.

6        A.    -- maybe four.

7        Q.    And how many clients did you expect him to

8   generate on his own?

9        A.    How many clients?  I -- What I expected him

10  to generate is what's in those goals.

11       Q.    Okay.  So it didn't matter --

12       A.    Pro rata.

13       Q.    It didn't matter to you what clients were

14  there, as long as he met those goals, is that -- is

15  that what you're stating today?

16       A.    That's correct.

17       Q.    Okay.  Did it matter to you whether his

18  clients were looking for loans above a million dollars

19  or under a million dollars?

20       A.    Did it matter -- Say -- I'm sorry.  Clarify

21  the question.

22       Q.    Did it matter to you or B of A that these

23  clients were looking for either over a million dollars

24  or under a million dollars?

25       A.    His -- Which -- Are you talking about

122

1  companies, in general?

2      Q.   Uh-huh.

3      A.   That was the target market that we had.

4      Q.   What was your target market?

5      A.   Companies that had credit needs of at least a

6  million dollars is, generally, the profile that we

7  pursue in the commercial bank.

8      Q.   Okay.  But you didn't pursue any companies

9  that had credit needs under a million dollars?

10     A.   Did we not pursue?  At times, we would talk

11 to them.

12     Q.   Okay.  And how many did you approve of the

13 ones that John Reed brought in?

14     A.   I don't -- What do you mean?

15     Q.   Of the ones that were under a million

16 dollars, how many of those did you approve for

17 Mr. Reed?

18     A.   I don't remember.

19     Q.   Okay.  Did you approve any?

20     A.   What do you mean by "approve"?

21     Q.   Approved the loans that they requested.

22     A.   Well, under -- the way we make decisions at

23 the bank, it's not just one -- it's not my approval,

24 per se.  There's other individuals involved.

25     Q.   Okay.  Who is involved?

123

```
1      A.   A couple of other people.

2      Q.   Well, who?

3      A.   In the credit -- I mean, on the credit

4   products side and risk management side.

5      Q.   Well, could you tell me who is involved?

6      A.   I don't remember at that time.

7      Q.   Okay.  Well, give me their positions.

8      A.   Well, they would be in either risk manage- --

9   they would be in risk management and in credit

10   products, and in the underwriting team.

11                THE VIDEOGRAPHER:  Could we take a

12   moment to change the tape?

13                MR. MARTINEZ:  Sure.

14                THE VIDEOGRAPHER:  We're off the record

15   at 11:30.

16                (Break from 11:30 a.m. to 11:32 a.m.)

17                THE VIDEOGRAPHER:  We're back on the

18   record, beginning with tape 2, at 11:32.

19      Q.   (BY THE VIDEOGRAPHER)  Mr. Anaya, we were

20   talking about the process that you generally go

21   through in order to get your loans approved.  I assume

22   that Mr. Reed goes out, drums up business, and then it

23   goes on to a different department; is that correct?

24      A.   That's correct.

25      Q.   He opens up the door, and then it goes on to
```

1   a different department, such as the product

2   specialists -- different product specialists?

3        A.   Well -- State the question again.

4        Q.   Mr. Reed goes out and he gets business.  He

5   makes a cold call, he goes visits companies, or

6   whatever he does and he says, "Hey, look.  Do you need

7   a loan?  Do you want me to help you out with

8   something?"  And they say "yes."

9        A.   Okay.

10        Q.   Okay.  And then, does he refer them over to a

11   different product specialist after that?

12        A.   What he does is, he -- he calls the

13   particular person -- if it's foreign exchange, he'll

14   call the foreign exchange specialist; if it's leasing,

15   he'll call the leasing specialist.

16        Q.   You go to --

17        A.   And --

18        Q.   -- a specific special- --

19        A.   Yes.

20        Q.   I'm sorry.  I don't mean to interrupt you.

21   Go ahead.

22        A.   That's correct.

23        Q.   Okay.  You would go to a specific -- or he

24   would go to a specific specialist in order to continue

25   that business down the road of whether or not there's

125

1  going to be a loan delivered to that business?

2      A.   That's correct.

3      Q.   Okay.  And there's going to be different

4  product specialists for different businesses -- or

5  different types of businesses?

6      A.   Well, different product specialists for

7  different types of needs.

8      Q.   Okay.  And that's who he was supposed to work

9  -- I say "help," you say "work with" --

10     A.   Right.

11     Q.   -- that's who was supposed to help him or

12 work with him during this process?

13     A.   That's correct.

14     Q.   Okay.  And you understand that it's one of

15 his -- Mr. Reed's contentions that those product

16 specialists were not all made available to him to help

17 him out?

18     A.   Okay.

19     Q.   That's his contention.

20     A.   That's his contention.

21     Q.   Okay.  And that that was something that was

22 represented but it was not delivered.  That's his

23 contention --

24     A.   Okay.

25     Q.   -- you understand that?  You do understand

126

1  that?

2     A.   Yes.

3              MR. MARTINEZ:  Okay.  Why don't we take

4  a break.  I think I'm finished.

5              MS. O'DONNELL:  Okay.

6              MR. MARTINEZ:  Let me just --

7              THE VIDEOGRAPHER:  We're off the record

8  at 11:34.

9              (Break from 11:34 a.m. to 11:44 a.m.)

10             THE VIDEOGRAPHER:  We're back on the

11 record at 11:44.

12    Q.   (BY MR. MARTINEZ)  Mr. Anaya, I just have a

13 couple of questions with regards to your specific

14 goals.  Did they give you specific goals back in 1999?

15    A.   Yes.

16    Q.   Okay.  How about in 2000?

17    A.   Yes.

18    Q.   Okay.  Now, are we talking goals that were

19 similar to John Reed's?

20    A.   In term of the categories?

21    Q.   Numbers.

22    A.   Well, the numbers would be larger.

23    Q.   Numbers would be larger than John Reed's?  So

24 in year 2000, you had goals that were larger than --

25 obviously, larger than the 23 million, because that

1   was prorated, right?

2       A.   That's correct.

3       Q.   Okay.  And would they be coincidental with

4   the number that we have in Exhibit 6?  I'm sorry --

5   which is that sheet of paper that you contend you gave

6   John Reed during the interview process and he contends

7   that he did not receive.

8       A.   I'm sorry.  What was the question again?

9       Q.   Are those numbers, your numbers, too, as far

10  as your goals?

11      A.   They're -- They're -- My goals were greater

12  than these numbers.

13      Q.   Those were greater than your numbers?  Do you

14  have --

15      A.   At the market level.

16      Q.   Do you have a document that -- that supports

17  that?

18      A.   I don't know.

19              MR. MARTINEZ:  Do you have the amended

20  notice there?

21      Q.   (BY MR. MARTINEZ)  Let me just make sure that

22  -- And I realize there are objections to these.  Let

23  me just make sure that we have all these documents, or

24  -- or -- or there are no documents, okay?  Do you have

25  a file regarding this case?

128

```
 1      A.   Yes.

 2      Q.   Okay.  And have you produced that to

 3  Ms. O'Donnell so she can determine what's privileged

 4  and what's not privileged, and give them over to us?

 5      A.   Yes.

 6      Q.   Okay.  Any correspondence that you wrote

 7  either to Bank of America or any employee of Bank of

 8  America over the course of this process has been given

 9  over to Ms. O'Donnell?  Did you ever write any letters

10  to Bank of America regarding Mr. Reed and this

11  situation?

12      A.   I don't remember.  I'm sure I have.

13      Q.   Okay.  Have those been given over to

14  Ms. O'Donnell?

15      A.   If I have -- If I have -- If I have them,

16  yes.

17              MR. MARTINEZ:  Okay.  And,

18  Mrs. O'Donnell, obviously, you can take these

19  documents and decipher which is privileged and not

20  privileged information.  Those are the documents that

21  have been handed over, right?

22              MS. O'DONNELL:  We've produced

23  Mr. Anaya's file regarding John Reed, to you.

24      Q.   (BY MR. MARTINEZ)  Did you draw up any

25  reports pertaining to this case?
```

129

1      A.    Draw any reports?

2      Q.    Uh-huh.  Other than the memos that have been

3   provided and your file.

4      A.    I don't remember.

5      Q.    Okay.  Any emails sent as a result of this

6   case?

7      A.    I'm sure I have.

8      Q.    Okay.  The last thing, was there any

9   repercussions for you as a result of what happened in

10   the Rio Grande Valley and John Reed?

11      A.    What do you mean by "repercussions"?

12      Q.    Well, I know that you were transferred, okay?

13      A.    Okay.

14      Q.    Was that a -- Was that a punishment for you,

15   or was that something that was just a side transfer,

16   or did some- -- was there a meeting had with regards

17   to you and to this situation down in the Valley?

18      A.    No.

19      Q.    Okay.  That's just a situation where they

20   transferred you because they needed somebody over

21   there?

22      A.    Yeah.  There was an opportunity in Phoenix.

23      Q.    It wasn't -- It wasn't a punishment?

24      A.    No.

25      Q.    Do you know of any meetings that were had as

1   a result of this situation?

2       A.   What do you mean?

3       Q.   Do you know if there were any meetings as a

4   result of John Reed's employment, as well as any

5   pre-employment interviews and the fact that he was let

6   go nine months into the job?

7       A.   I don't -- I don't know.

8       Q.   Do you know of any meetings that were had --

9       A.   By whom?

10      Q.   Did you have any meetings?

11      A.   Did I have any meetings?

12      Q.   Yeah.

13      A.   About John Reed?

14      Q.   Yeah.

15      A.   Yes.

16      Q.   Okay.  Tell me about the meetings that you

17  had.

18               MS. O'DONNELL:  Other than meetings with

19  counsel, right?

20               MR. MARTINEZ:  Right.

21               MS. O'DONNELL:  Okay.

22      Q.   (BY MR. MARTINEZ)  No.  Meetings in Bank of

23  America.

24      A.   Related to the --

25      Q.   Related to John Reed and his -- his interview

1   process, his employment there --

2       A.   Okay.

3       Q.   -- and the reason he was let go.

4       A.   From what I remember, there were various ones

5   with Terry Edlund on the phone and in person.  I'm

6   sure there were meetings with other folks within the

7   commercial bank about that, as well.  I don't

8   remember --

9       Q.   Was this in regards --

10      A.   -- the specifics.

11      Q.   -- to the interview process or --

12      A.   It was in regards to just hiring John and

13  just normal meetings that I have with my managers

14  about a market.

15      Q.   Okay.  Were there any notes taken in these

16  meetings?

17      A.   I don't know.

18      Q.   Did you take any notes?

19      A.   Did I -- No.

20      Q.   Okay.  Other than the meetings that we just

21  discussed, can you think of any other ones?

22      A.   I don't remember any others.

23      Q.   There may have been some, but you don't

24  remember?

25      A.   Right.

132

1    Q.   Okay.  You don't remember either the general

2   or specific dates of those meetings or the -- or the

3   specific discussions in those meetings?

4    A.   The specific discussions, I don't remember

5   them.  I mean, they're generally about what was going

6   on in the marketplace in -- in --

7    Q.   In the Valley, you mean?

8    A.   In South Texas, San Antonio, the Valley --

9    Q.   Okay.

10   A.   -- Corpus.

11   Q.   Can you generalize or just give a notion as

12   to what the feeling was for the value -- for the

13   Valley?  I'm sorry.

14   A.   I mean, I just don't remember.  I mean, just

15   very general discussions about opportunities and...

16   Q.   Okay.  Was there ever any feeling that the

17   Valley was just -- was not working for B of A and the

18   model that was supposed to be inputted into the

19   Valley?

20   A.   From our perspective, I don't remember of

21   any.

22   Q.   Okay.  You don't remember any meetings where

23   they said, "Look, this is just not working"?

24   A.   That's correct.

25   Q.   That is correct, there were meetings where

133

1  they said that?

2      A.   No.  I don't remember any of these type of

3  the meetings.

4      Q.   Could they have -- Could they have said that

5  in some meetings?

6      A.   Could they have said that?  I don't know.

7      Q.   If somebody came up and testified that B of A

8  is not expanding into the Valley or -- or the results

9  were not what B of A wanted, would you have any

10 dispute with that?

11     A.   If -- I'm sorry.  If who would testify?

12     Q.   That B of A was not doing what people thought

13 it was going to do in the Valley, would you have any

14 dispute with that general notion?

15     A.   I mean, it would depend on who it was.

16     Q.   Well, if somebody said that, would you have

17 any dispute with that?

18     A.   If somebody said that, sure.

19     Q.   You would have a dispute with it?

20     A.   Yes.

21     Q.   And -- And you and I both agree that B of A

22 is not expanding into the Valley now, right?

23     A.   Right now?  There's talk about expanding in

24 the Valley.

25     Q.   But after John Reed left, there was no

1  expanding into the Valley after that point?

2      A.   What do you mean by "expanding"?

3      Q.   I mean, there was nobody hired.

4      A.   For the commercial banking group?

5      Q.   Sure.

6      A.   That's correct.

7      Q.   Even up to this point?

8      A.   That's correct.

9      Q.   Let me ask you one question.  And I'm sorry

10 to bring this up, but -- I'm going to show you what's

11 been marked as Deposition Exhibit Number 4.  Did you

12 have conversations with Kathleen Deibert regarding

13 this case?

14             MS. O'DONNELL:  I --

15             MR. MARTINEZ:  I'm not going to ask him

16 the specifics.

17             THE WITNESS:  Did I have conversations

18 with Kathleen Deibert on this specific case?  Yes.

19     Q.   (BY MR. MARTINEZ)  Okay.  Not to get into

20 those specific conversations, but those are reflected

21 in the letter that -- that she wrote to me.

22             MS. O'DONNELL:  I'm going to object and

23 instruct him not to answer that question.  I think

24 that would require him to reveal the --

25             MR. MARTINEZ:  I think whatever is in

1  there --

2              MS. O'DONNELL:  -- contents.

3              MR. MARTINEZ:  I think whatever is in

4  there, in the letter, is not privileged anymore.

5              MS. O'DONNELL:  I think you can ask him

6  about the letter, but I don't think you can ask him if

7  the letter was the result of conversations between him

8  and Kathy Deibert.  Or I think, the way you worded it

9  -- the way you worded it was, is this --

10             MR. MARTINEZ:  Have you seen -- Let me

11 -- Let me do this.

12             MS. O'DONNELL:  Okay.

13             MR. MARTINEZ:  Let me lay a predicate.

14     Q.   (BY MR. MARTINEZ)  Have you seen that letter?

15     A.   Yes.

16     Q.   Okay.  Have you seen that letter recently?

17     A.    In the last week, yes.

18     Q.   Okay.  What other documents have you reviewed

19 in the last week?

20     A.    Just documents related to this case that are

21 in my file.

22     Q.   Okay.  Have you read the deposition of John

23 Reed?

24     A.    Have I read it?  Yes.

25     Q.   Okay.  Recently?

136

1      A.   I've skimmed through it --

2      Q.   Okay.

3      A.   -- in the last couple of weeks.

4      Q.   What other documents have you read?

5      A.   Just other things that are in the file.

6      Q.   Such as?

7      A.   Things that are in -- I mean, I -- I don't

8   remember.  I mean, they're all -- The Performance

9   Planning and Coaching document is another thing that I

10  remember.

11     Q.   Okay.  Just a number of documents that you've

12  seen here today?

13     A.   Yeah.  Yes.

14     Q.   Okay.  In that letter that Kathleen Deibert

15  wrote, there is something on page 2 that just kind of

16  caught my attention, and if you turn to page 2, in the

17  second full paragraph.

18     A.   Okay.  Can I read the letter first?

19     Q.   Sure.  Sure.  Go ahead.  Take your time.

20     A.   Let me read it real quick.

21               MR. MARTINEZ:  We can go off the record

22  for this.

23               THE VIDEOGRAPHER:  We're off the record

24  at 11:57.

25               (Off the record from 11:57 to 11:59.)

1          THE VIDEOGRAPHER:  We're back on the

2   record at 11:59.

3      Q.   (BY MR. MARTINEZ)  You notice that I've

4   marked "justify his staffing" there on Exhibit 4.  I'm

5   sorry.

6      A.   Okay.

7      Q.   Explain to me who it is that you had to

8   justify your staffing to.

9      A.   My managers.

10     Q.   Okay.  And that would be Deborah Cannon?

11     A.   Whoever my managers were during the course of

12  the year.

13     Q.   Okay.  Well, would it include Guy Bodine?

14     A.   Yes.

15     Q.   Deborah Cannon?

16     A.   Likely.  I mean, she was a manager and she's

17  got other responsibilities now, so I just don't

18  remember the specific timeframe that she and I worked

19  together.

20     Q.   Okay.  But Guy Bodine, most definitely?

21     A.   Yes.

22     Q.   Okay.  And why did you have to justify your

23  staffing?

24     A.   We justify the staffing based on performance

25  of that individual.

138

1    Q.    And this was late in the year 2000?

2    A.    It's during -- during -- I mean, during --

3    during the year.  On a monthly basis, we have meetings

4    and we talk about things.

5    Q.    Well, based upon that letter, it was late in

6    the year that you had to justify your staffing; is

7    that correct?

8    A.    Well, based on this letter, it says,

9    "Mr. Anaya warned Mr. Reed that he would be required

10   to assess and justify his staffing."

11   Q.    Okay.  Is that what you had to do late in the

12   year?

13   A.    I warned Mr. Reed that that was some of the

14   things that I was doing.

15   Q.    Okay.  Did you actually have to go and

16   justify your staffing and assess your staffing?

17   A.    Throughout the year, yes.

18   Q.    Okay.  So you did that every month then?

19   A.    Generally, every month, from what I remember.

20   Q.    Now, I just want to -- I just wanted to make

21   sure that that's what was being said.  Mr. Anaya, I

22   think that's all the questions I have.  Thank you very

23   much.

24        MR. MARTINEZ:  I'll pass the Witness at

25   this time and reserve our questions for the time of

139

1  trial -- remainder of our questions for the time of

2  trial.

3              MS. O'DONNELL:  We will reserve our

4  questions until the time of trial.

5              THE VIDEOGRAPHER:  We're off the record

6  at 12:01.

7              (Deposition concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

140

```
 1              CHANGES AND SIGNATURE

 2  RE:  JOHN REED VS. BANK OF AMERICA, N.A.

 3  PAGE    LINE      CHANGE              REASON
    _____
 4  _____
    _____
 5  _____
    _____
 6  _____
    _____
 7  _____
    _____
 8  _____
    _____
 9  _____
    _____
10  _____

11
        I, RAUL ANAYA, have read the foregoing deposition
12  and hereby affix my signature that same is true and
    correct, except as noted above.
13

14              _____
                RAUL ANAYA, Witness
15

16  THE STATE OF _____ )
    COUNTY OF _____ )
17
        Before me, _____, on this day
18  personally appeared RAUL ANAYA, known to me (or proved
    to me under oath or through _____)
19  (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
20  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
21  expressed.

22      Given under my hand and seal of office this
    _____ day of _____, _____.
23

24              _____
                Notary Public in and for
25              the State of _____.
```

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                  BROWNSVILLE DIVISION

 4
   JOHN REED,                    )
 5                               )
        Plaintiff,               )
 6                               )
   VS.                           )  CIVIL NO. B-02-104
 7                               )
   BANK OF AMERICA, N.A.,        )
 8                               )
        Defendant.               )
 9

10
                  CERTIFICATE FROM THE
11
        ORAL AND VIDEOTAPED DEPOSITION OF RAUL ANAYA
12
                    MAY 6, 2003
13

14      I, NAOMI R. PELTIER, a Certified Shorthand

15  Reporter in and for the State of Texas, do hereby

16  certify that the foregoing deposition is a full, true

17  and correct transcript;

18      That the foregoing deposition of RAUL ANAYA, the

19  Witness, hereinbefore named was at the time named,

20  taken by me in stenograph, on May 6, 2003, the said

21  Witness having been by me first duly cautioned and

22  sworn to tell the truth, the whole truth, and nothing

23  but the truth, and the same were thereafter reduced to

24  typewriting by me or under my direction.  The charge

25  for the completed deposition is $_____ due from
```

142

1  Plaintiff;

2      ( ) That pursuant to the Federal Rules of Civil

3  Procedure, the Witness shall have 30 days after being

4  notified by certified mail, return receipt requested,

5  by the deposition officer that the original deposition

6  transcript is available in her office for review and

7  signature by the Witness and if any corrections made

8  are attached hereto;

9      ( ) That by agreement of counsel, a reading

10  condensed copy of the deposition transcript along with

11  the full-sized original Changes and Signature Sheet

12  has been sent to _____ on _____

13  for review and signature within 30 days and if any

14  corrections returned are attached hereto;

15     (X) That by agreement of counsel, the deposition

16  officer is instructed to release the original

17  deposition transcript, and the deposition officer is

18  thereafter released of any further responsibility with

19  regard to the original.

20     ( ) That the signed transcript ( ) was ( ) was not

21  received from the Witness within 30 days.

22     ( ) That the examination and signature of the

23  Witness is waived by the Witness and the parties;

24     That the amount of time used by each party at the

25  deposition is as follows:

143

1      Benigno (Trey) Martinez - 2 hours 13 minutes

2      I further certify that I am neither counsel for,

3   related to, nor employed by any of the parties in the

4   action in which this proceeding was taken, and further

5   that I am not financially or otherwise interested in

6   the outcome of the action.

7      WITNESS MY HAND, this the  _____  day of

8   _____, 2003.

9

10                     _____
                       NAOMI R. PELTIER
11                     Texas CSR 3672
                       Expiration Date:  12/31/04
12                     7800 IH-10 West, Suite 100
                       San Antonio, Texas  78230
13                     (210) 377-3027

14

15

16

17

18

19

20

21

22

23

24

25